BEN ROSENFELD (SBN 203845)
PIER 5 LAW OFFICES
3330 Geary Blvd., 3rd Floor East
San Francisco, CA 94118
Tel: (415) 285-8091
Fax: (415) 285-8092
ben.rosenfeld@comcast.net

TESFAYE W. TSADIK (SBN 108103)
LAW OFFICES OF TESFAYE TSADIK
528 Grand Avenue
Oakland, CA 94610
Tel. (510) 839-3922
Fax: (510) 444-1704
ttsadik@pacbell.net

Attorneys for Plaintiff Agonafer Shiferaw,
dba Fillmore Entertainment Complex/Republic of Fillmore, LLC

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

AGONAFER SHIFERAW, dba FILLMORE ENTERTAINMENT COMPLEX /REPUBLIC OF FILLMORE, LLC,

Plaintiffs,

v.

CITY AND COUNTY OF SAN FRANCISCO; Mayor LONDON BREED, an individual, in both her personal and official capacities; Reverend AMOS BROWN, an individual, in both his personal and capacities; Director of the Mayor's Office of Economic and Workforce Development JOAQUIN TORRES, an individual, in both his personal and official capacities; City Administrator NAOMI KELLY, an individual, in both her personal and official capacities; Former District 5 Supervisor VALLIE BROWN, an individual, in both her personal and official capacities; and DOEs 1-100,

Defendants.

Case No. 4:18-cv-06830-SBA

THIRD AMENDED COMPLAINT*

1. Waste of Taxpayer Resources (Cal. Code Civ. Proc. § 526a);
2. Fraud, Misrepresentation and Deceit (Cal. Civ. Code. §§ 1572, 1709, 1710
3. Conspiracy to Commit Fraud, Misrepresentation and Deceit (Civ. Code. §§ 1572, 1709, 1710);
4. Violation of 42 U.S.C. §1983 (Denial of Equal Protection based on Race, Ethnicity, and National Origin);
5. Violation of 42 U.S.C. §1983 (Retaliation for Exercise of Free Speech and Petition);
6. Violation of 42 U.S.C. §§ 1983 & 1985 (Conspiracy To Violate Civil Rights);
7. Violation of Cal. B&P Code §§ 17200, et. seq. (Unlawful Business Practices);
8. Intentional Interference with Prospective Business Advantage;

9. Violation of the California Political Reform Act, Gov. Code §§ 81000 *et. seq*;

10. Violation of the San Francisco Ethics Ordinance, as incorporated under Cal. Gov. Code § 87300

INJUNCTIVE RELIEF AND PUNITIVE DAMAGES SOUGHT

JURY TRIAL DEMANDED

*Plaintiff's Third Amended Complaint herein makes substantive changes only to his First Cause of Action, as instructed by the Court in its August 28, 2020 Order (Dkt. #91, p. 21). Plaintiff acknowledges that the Court's 8/28/20 Order nevertheless controls other portions of plaintiff's pleading.

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

**OVERVIEW AND FACTS COMMON TO ALL CAUSES OF ACTION**

1. Plaintiff Agonafer Shiferaw, a successful San Francisco businessman of Ethiopian heritage, on his own behalf and on behalf of San Francisco residents (and particularly residents of the Fillmore District), seeks injunctive relief and monetary damages against Defendant Mayor London Breed and her fellow officials, to halt and redress their plan to steer control of the City's historic Fillmore Heritage Center ("the Center" or "FHC") to allies, in stark violation of local, state, and federal law, and in an unconstitutionally discriminatory manner.

2. Built with public funds, the Fillmore Heritage Center once stood as the flagship of economic and cultural renewal of San Francisco's Fillmore District. Known as the "Harlem of the West," the Fillmore is a historically African-American neighborhood and former center of Bay Area black culture, and home to a vibrant jazz scene, nightlife, and thriving local businesses. Today, the Fillmore epitomizes the struggles facing urban black residents amid the gentrification and destruction of lower income housing for "urban renewal" projects.

3. Defendants' historical mismanagement of the Jazz Preservation District and renaissance, and its crown jewel, the Fillmore Heritage Center, stand as an egregious example of defendants' abuse of power and waste of public funds, representing roughly a hundred million dollars in public and private failed investment. For years, the Center has lain mostly dormant as a result of defendants' sustained mismanagement and repeated efforts to gift it to various friends for their political loyalty, regardless of their qualifications. In the process, defendants have robbed the Fillmore community of a vital cultural resource, and they have both misspent and failed to generate millions of taxpayer dollars. Rather than sell or manage the Center for the benefit of San Francisco residents and taxpayers, defendant city officials are literally expending City funds to pay the Center's no bid users to operate it.

4. On top of this, the City does not even legally own the Center. Rather, its legal owner, the San Francisco Office of Community Investment and Infrastructure ("OCII"), a quasi-state agency which is the successor to the San Francisco Redevelopment Agency, has failed, despite a California State mandate to transfer ownership of the Center to the City—although the OCII and the City agree that the City controls the Center. California's redevelopment agency

dissolution law, H&S Code §§ 34179 *et seq*., called upon the successors to the redevelopment agencies like OCII to transfer assets to local control. In 2015, the California Department of Finance approved OCII's Long Term Plan for the transfer of the Center to, and only to, the City and County of San Francisco. It is unknown who presently is paying the substantial maintenance, upkeep, insurance, and association fees for the Center. But regardless whether it is the City, the OCII, or a combination of both, it is clear that more than four years after the state mandated transfer, defendants continue to mismanage the Center in such a way as to squander rather than generate revenue.

5. In 2014, in a dramatic example of their insider dealings, defendant officials defrauded San Francisco City taxpayers by simply erasing a $4.8 million loan to the former proprietor of Yoshi's SF (anchor tenant of the Fillmore Heritage Center), hidden from public scrutiny, in order to re-secure control of the property in preparation for re-offering it as a prize to political supporters.

6. In May 2015, when then-owner Michael Johnson became unable to continue operation of the Center, Plaintiff Shiferaw reached an agreement with Mr. Johnson to purchase and operate the Center for $6.4 million. Defendants did not even respond to plaintiff's and Mr. Johnson's offer. Instead, defendants simply took back control of the Center from Mr. Johnson in June 2015, receiving nothing in return. The City then justified the millions lost in this arrangement by falsely claiming that Mr. Johnson had been unable to find a buyer for the Center. Today, outlandishly, the City is suing Mr. Johnson to recover unpaid loans despite allowing Mr. Johnson to walk away at the time, and despite the fact that the defendants easily could have generated substantial revenue by approving his purchase agreement with plaintiff.

7. In 2016, defendant officials embarked on a new scheme to steer control of the Center into the hands of preferred associates under the guise of a sham Request for Proposals ("RFP") bidding process. The RFP was a fraud and a charade from start to finish, designed as a pretext and a smokescreen to sidestep state and local government contracting and bidding laws, and to steer the project into the hands of defendants' chosen cronies.

8. Plaintiff Shiferaw sought to bring transparency and equity to the process in appeals to the San Francisco District Attorney, the City Attorney, and the Ethics Commission, but these agencies took no corrective action. When plaintiff exposed defendants' corrupt scheme, defendants abandoned any pretense of a legal, competitive bidding process, abruptly canceled the RFP, pretending that they had not received any qualifying bids, and embarked on private negotiations outside of the RFP process, including with several bidders whom defendants previously deemed unqualified, in furtherance of defendants' plan to award the project to political loyalists—as defendants have now done, at least on a temporary basis.

9. Defendants have shown illegal animus against Plaintiff Shiferaw, based on his status as an Ethiopian immigrant, and in retaliation for his exposing the RFP process as a sham. Defendants' discrimination against plaintiff has taken many forms, including defendants' disparate handling of the terms of plaintiff's repayment of loans with the City, which plaintiff has timely repaid – in stark contrast with the favorable terms defendants have given to similarly or worse situated borrowers.

10. Defendants are so determined to steer control of the Center away from plaintiff that they privately leased control of it to unfit political cronies *and paid them to use it*, rather than accept either plaintiff's qualifying RFP bid or his agreement with Michael Johnson to purchase the Center for $6.5 million, the City's asking price, and operate it as a community resource and job maker. Defendants' thus privately leased the Center to the private, non-profit groups San Francisco Housing Development Corporation ("SFHDC") and New Community Leadership Foundation ("NCLF"), who utterly lacked the experience and financial wherewithal to operate it, and reportedly paid them at least $50,000 to "run" the Center, which really only entailed their hosting of small, non-revenue generating events with narrow appeal.

11. Defendants did not engage the public in any process in awarding operation of the Center to their cronies, nor exercise any meaningful oversight of the organizations' activities. Astonishingly, defendants ushered SFHDC into control of the Center despite having rejecting its RFP bid. This corrupt and bad planning led, tragically, to a shootout on March 25, 2019 during the NCLF's hosting of a funeral for a reputed former drug kingpin and local pimp, without

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

providing adequate security. The shooting, which left one person dead and five injured, at least one of whom is paralyzed, has spawned other litigation against some of the defendants.

12. At a town hall meeting at the Center following the shooting, Defendant Vallie Brown stood in front of anxious members of the public, including residents of the condominium complex above the Center, and falsely told them that the City had been unable to attract any qualified buyers of the Center.

13. Now, in the face of the criticism and spotlight cast by this lawsuit, defendants have taken the cavalier position that they have unbridled discretion to modify the intended uses of the Center, thereby allowing the City to lease or sell it to anyone for any purpose, including purely private ventures divorced from the Center's historical and cultural purposes. For example, defendants have solicited an ally of Mayor Breed's, Dr. Ernest Bates, to establish a dialysis unit in the Center. And plaintiff is informed and believes that Amos Brown, acting on the Mayor's unofficial/official behalf, has been working private to shop and arrange other such private deals, outside of any public process or scrutiny.

14. Today, the Center essentially remains dormant as an entertainment venue. What was promoted as the flagship of the City's renewal of the Fillmore community has instead become a glaring symbol of urban neglect, and defendant's corruption and mismanagement.

**PARTIES**

15. Plaintiff AGONAFER SHIFERAW, dba FILLMORE ENTERTAINMENT COMPLEX/REPUBLIC OF FILLMORE, LLC ("Plaintiff" or "Mr. Shiferaw") is now, and at all times relevant hereto was, a California Limited Licensed Corporation, qualified to do business in California, located in San Francisco, California. Mr. Shiferaw is a San Francisco resident and United States citizen who owns real property within San Francisco and has, within one year of the filing of this Complaint, (1) been assessed for and liable to pay taxes, and (2) has paid taxes, including but not limited to property taxes, to and for the benefit and support of the City and County of San Francisco, within which Mr. Shiferaw resides.

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

**Entity Defendant:**[1]

16. Defendant CITY AND COUNTY OF SAN FRANCISCO ("the City" or "CCSF") is a municipality incorporated under the laws of the State of California, and is both a Charter City and a County under the California State Constitution, Article XI, § 6.

**Individual Defendants:**

17. Defendant London Breed ("Breed"), an individual, worked and or resided in San Francisco at all times relevant to this Complaint. Defendant Breed is San Francisco's current serving Mayor. In 2004, Breed was named to the SFRA Commission. In 2012, Breed was elected Supervisor of District 5. Following the death of former mayor Ed Lee, Breed served as acting mayor between December 12, 2017 and January 23, 2018 (while continuing to serve on the Board of Supervisors). On June 5, 2018, Breed was elected mayor of San Francisco. Defendant Breed is sued here, and has been served, in both her personal and official capacities.[2]

18. Defendant Amos Brown, an individual, worked and or resided in San Francisco at all times relevant to this Complaint. Defendant Amos Brown is Pastor of the Third Baptist Church of San Francisco, and Chair of the Third Baptist Foundation, Inc. During time periods relevant to this action, Defendant Amos Brown was Chair of the Fillmore Heritage Center RFP Selection Committee (also known as the "Review Panel"). Defendant Amos Brown is sued here in both his personal and official capacities.

19. Defendant Joaquin Torres ("Torres"), an individual, worked and or resided in San Francisco at all times relevant to this Complaint. Beginning in 2013, Torres served as Deputy

---

[1] In keeping with the rule within the Ninth Circuit, as announced in *Lacey v. Maricopa County*, 693 F.3d 896, 927-928 (9th Cir. 2012), plaintiff, without forfeiting any right to appeal the Court's dismissal, with prejudice, of several parties and claims in its Order partially granting defendant's motion to dismiss (Dkt. No. 64), including the San Francisco Office of Community and Infrastructure, omits without re-pleading in this SAC such claims and naming such parties.

[2] To avoid confusion over different applications of the word "individual," plaintiff uses the term "personal capacity" to refer to his state law claims and allegations against the individual defendants sued for their acts and omissions as private citizens, and "individual, personal capacity" to refer (below) to his federal civil rights claims against the individual defendants sued as state actors, against whom plaintiff seeks "to impose personal liability [for their] actions [undertaken] under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).



LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

Director of the Mayor's Office of Economic and Workforce Development ("OE&WD"). In August 2013, Breed named Torres Director of OE&WD. Defendant Torres is sued here, and has been served, in both his personal and official capacities.

20. Defendant Naomi Kelly ("Kelly"), an individual, worked and/or lived in San Francisco at all times relevant to this Complaint. Defendant Kelly is and was, at all relevant times hereto, the San Francisco City Administrator. Defendant Kelly is sued here, and has been served, in both her personal and official capacities.

21. Defendant Vallie Brown, an individual, worked and or resided in San Francisco at all times relevant to this Complaint. Defendant Vallie Brown is Breed's former senior legislative assistant, and the former District 5 Supervisor, having been appointed by Breed in 2018 to Breed's seat when Breed became Mayor. Defendant Vallie Brown is sued here in both her personal and official capacities.

22. Defendants Amos Brown and Vallie Brown have each been served in their official capacity. Efforts by plaintiff to serve these defendants in their personal capacity are underway at the time of filing this SAC. Defense Counsel, Deputy City Attorney Thomas Lakritz, has informed plaintiff's undersigned counsel that he will accept mail waiver of service on behalf of these defendants under F.R.Civ.P. 4(d), but plaintiff's counsel has not yet received such acknowledgment of waiver forms as of the time of filing this SAC.

23. DOES 1 through 100, inclusive, are employees, officers, and/or agents of the City and County of San Francisco, and/or other agencies, instrumentalities, public entities, or municipal corporations acting as agents for, and under the direction and control of, the City. Presently, plaintiff is unaware of their true names, identities, and capacities and therefore sues them by these fictitious names. Plaintiff will seek to substitute their true names and identities if and when they become known through discovery or other sources. Plaintiff is informed and believes, and on that basis alleges, that each of these fictitiously named defendants acted willfully and in conscious disregard of plaintiff's rights and/or was negligent, careless, liable, or otherwise legally responsible in some manner for the wrongs alleged herein, thereby proximately causing the damages suffered by Plaintiff.

24. In engaging in the conduct described herein, the individual defendants, and each of them, acted under color of California state law and in the course and scope of their employment and duties with the City and County of San Francisco.

25. In engaging in the conduct described herein, defendants, and each of them, conspired and acted in concert with one another, and they are jointly and severally liable for the wrongs and damages alleged.

**JURISDICTION**

26. The Court has subject-matter jurisdiction of this lawsuit and the causes of action pleaded herein under the Federal Civil Rights Act, 42 U.S.C. §§ 1983, 1985, 1986, and 1988, for violations of the Fifth and Fourteenth Amendments to the United States Constitution; and under the Judicial Code, 28 U.S.C. §§ 1331, 1343(a)(1-4), and 1367(a) (supplemental jurisdiction of state law claims).

27. The Court has inherent authority to grant injunctive relief, and under Rule 65 of the Federal Rules of Civil Procedure, and California Code of Civil Procedure ("CCP") §§ 525, 526 and 526a.

28. The Court has inherent authority to grant declaratory relief, and under Rule 57 of the Federal Rules of Civil Procedure, 28 U.S.C § 2201, and CCP § 1090.

**VENUE**

29. Venue in this Court is proper under 28 U.S.C. § 1391(b)(1) and (2) because the defendants are all located, reside, and/or work within the territory of the Northern District of California federal court district (i.e. the City and County of San Francisco); because the events, acts, and omissions giving rise to this lawsuits and plaintiff's claim stated herein occurred within the Northern District of California; and because the property which is the subject of this action, the FHC, is situated within the Northern District of California.

**COMPLIANCE WITH THE CALIFORNIA TORT CLAIMS ACT**

30. In compliance with the California Government Tort Claims Act, Gov't Code §§ 905, *et seq*., plaintiff submitted a timely claim against the City and County of San Francisco on April 30, 2018 covering the subject matter of this lawsuit, which the CCSF denied on June 15,

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

2018. Plaintiff then commenced this action within the required six months of the CCSF's denial, i.e. on November 9, 2018, thus entitling plaintiff to make the claims and seek the monetary damages and relief he seeks against defendants.

**PREFERENCE**

31. This is a matter affecting the public interest. Accordingly, plaintiff is entitled to and hereby requests that the Court grant this matter trial preference over all other civil matters, except for those granted equal preference. *See Anderson-Fribury Inc. v. Justin R. Clark & Son*, 98 F.Supp. 75 (D. C.N. Y. 1951) (matters strongly impacting the public interest afforded trial preference); *Weiss v. Doyle*, 178 F. Supp. 566 (D. C. N. Y. 1955) (same); *Ivey v. David*, 17 F. R. D. 319 (D.C. N. Y. 1955) (same).

32. This is also taxpayer action entitled to mandatory trial preference under California law, pursuant to Cal. Civil Code § 526a, which provides in pertinent part: "An action brought pursuant to this section to enjoin a public improvement project shall take special precedence over all civil matters on the calendar of the court except those matters to which equal precedence on the calendar is granted by law." See *Miller v. Superior Court*, 221 Cal.App.3d 1200 (1990).

**FURTHER STATEMENT OF FACTS COMMON TO ALL CAUSES OF ACTION**

**The Fillmore Heritage Center and Yoshi's Jazz Club in San Francisco**

33. In November 28, 2007, the owners of Oakland's Yoshi's Jazz Club opened a second, 28,000-square-foot location in San Francisco's Fillmore District, Yoshi's San Francisco ("Yoshi's), located within the Fillmore Heritage Center, a 50,000-square-foot complex in the 1300 block of Fillmore Street. Yoshi's also served as a flagship of the City's attempt to restore the formerly African American neighborhood (uprooted in the 1970s by urban renewal) as a center of black culture and jazz.

34. In the summer of 2014, Kaz Kajimura, the two-thirds majority owner of Yoshi's San Francisco, sold the club to developer Michael Johnson, dba Fillmore Development Associates, LLC ("FDA"), and EM Johnson Interest, Inc ("EMJ"), who declared their intent to close and rename the club. In the process, the City forgave Mr. Kajimura's $4.8 million share of the club's then $7.2 million tenant improvement loan debt to the OCII (successor to the

redevelopment agency). This loan debt was owed to the State and federal government, whose funds financed the Center's development, including payments due pursuant to the City's $5.5 million loan of federal Community Development Block Grant funds that.

35. Defendants concealed from the public their decision to forgive Kajimura's loan, at a loss to taxpayers of $4.8 million. In seeking approval to transfer the Center to Michael Johnson, defendants, by and through OCII Director Tiffany Bohee and Mayor's Office of Housing and Community Development Director Olson Lee, misrepresented to the OCII Commission and the Mayor's Office that the $4.8 million loan to Kajimura/Yoshi's was "lost in the bankruptcy." As they knew, however, there was never a consummated bankruptcy. Rather, defendants engineered this covert form of "loan forgiveness," hiding it from public view and bamboozling other officials, in furtherance of their insider scheme. (Exhibit C, SFRA's 3/3/14 "Term Sheet For the Restructuring of Certain Debts and Obligations.")

36. As part of the deal, Johnson formed a new company, Fillmore Live Entertainment, which also assumed Johnson's prior one-third of Yoshi's debt ($2.4 million) to the redevelopment agency.

37. In November 2014, Johnson renamed Yoshi's "the Addition." Two months, later in January 2015, Johnson closed the business. More than three years after that short-lived venue's closure, signage for "the Addition" remained the prominent—indeed, the only—indicia that a business of any kind every existed where Yoshi's used to stand:

38. When FDC (Johnson) fell into arrears, the OCII proposed to the California Department of Finance that the OCII's ownership of the commercial parcel either be (1) transferred to the City to continue enforcement of the ground lease with FDC or (2) sold at fair market value with the proceeds first distributed to the City to repay its loan and second to OCII for purposes consistent redevelopment dissolution law.

39. In May 2015, plaintiff reached an agreement with Johnson to purchase and operate the Center for $6.4 million. Plaintiff and Johnson presented this agreement—which provided for the repayment of HUD and City loans, viable entertainment, restaurateurs, and other tenants, along with a community benefit plan to ensure community participation, to the OCII and



LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

the City. Instead of approving this plan, the OCII, through its then Executive Director, Tiffany Bohee, *falsely* asserted that Johnson (FDC) had failed to reach an agreement with an investor capable of curing FDC's defaults and recapitalizing the Center, reopening it as an entertainment venue, and taking over its day-to-day operations—even though Plaintiff Shiferaw had reached an agreement with FDC to do just that and was fully capable of meeting those objectives.

40. Instead, after ignoring and concealing Shiferaw's agreement with Johnson (FDC), defendants simply took possession of the commercial parcel from FDC in June 2015, receiving nothing in return.

41. The OCII interfered with and obstructed plaintiff's purchase of the Center from Michael Johnson (FDC) by falsely and publicly representing that Johnson (FDC) had failed to reach an agreement with a qualified investor to purchase and operate the Center, where OCII knew and or should have known that plaintiff was equipped and prepared to do so.

42. The Center has essentially remained dormant as an entertainment venue since that time. What was promoted as the flagship of the City's renewal of the Fillmore community has instead become a glaring symbol of urban neglect, and defendant's corruption and mismanagement.

43. In August 2018, the City sued Johnson to recover $5.5 million in claimed debt. In October 2018, Johnson counterclaimed against the City, Mayor Breed, and City Administrator Naomi Kelly alleging, among other cross-claims, that the City demonstrated bad faith in failing to approve plaintiff's agreement with Johnson to purchase the property, and that the City is violating its agreement to let Johnson walk away.

44. Other than Yoshi's, the Center's biggest tenant was a restaurant named "1300 on Fillmore" (now closed), co-owned by Monetta White and David Lawrence. In 2005, before it opened, the redevelopment agency lent $1.7 million to 1300 on Fillmore. The restaurant then opened in 2007. In that year, the agency lent 1300 on Fillmore an additional $350,000. In May 2008, the agency lent the restaurant an additional $852,000. Later, the City diverted an additional $640,000 to the restaurant. In October 2008, after the restaurant's owners said they needed another $1 million to stay in business, the agency lent them $100,000.

45. On information and belief, 1300 on Fillmore has repaid the City only $500.00 of its millions in debt, and has never paid a dime in rent, property taxes, or homeowner's association fees. The City could have, and presumably would have, assigned the lease to a qualified operator if not for the favorable relationship between the restaurant's owners and Breed. Rather than make any effort to retake the property, the City also allowed the defaulted tenants to hold onto the property as if it was their private property. On information and belief, the tenants are trying to sell the liquor license, valued at over $300,000, without any effort by the City to collateralize or secure a lien against monies obtained through sale of the license. Notably, during the period that defendants were permitting 1300 on Fillmore and other individuals and entities connected to avoid their rent obligations entirely, defendants blocked all efforts by Plaintiff Shiferaw to renegotiate the repayment terms of his loans with the City—even though Shiferaw, unlike defendants' allies, has made timely loan payments and is in good loan standing.

46. At this stage, on information and belief, the City's mismanagement of the Center and the favoritism shown to its tenant cronies has cost the City approximately $25 million in nonperforming development loans.

**Dissolution of California Redevelopment Agencies Under the Dissolution Law**

47. In 1945, the California Legislature enacted the Community Redevelopment Law authorizing cities and counties to establish redevelopment agencies in order to remediate urban decay. Health & Safety ("H&S") Code § 33000 et seq.; *see also*, *California Redevelopment Association v. Matosantos*, 53 Cal.4th 231, 245-46 (2011).

48. The SFRA originally acquired the land on which the Fillmore Heritage Center now sits with urban renewal funds provided through a federal Loan and Grant Contract dated December 27, 1956 (Contract No. Calif. 2-2 (LG)), which was approved by the U.S. Department of Housing and Urban Renewal (the "HUD Contract"). Under the HUD Contract, the SFRA was required to use the federal funds to carry out redevelopment activities in accordance with the local redevelopment plan and the federal urban renewal standards.

49. In 1982, the City and the SFRA executed, with HUD concurrence, a Closeout Agreement for the Western Addition Area Two Redevelopment Project (Calif. R-54) in which



LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

the land that was developed for the Property is identified as Parcel 732-A. The Closeout Agreement states:

> All remaining undisposed properties acquired by the Agency in the redevelopment area are shown in Exhibit A hereto. All the proceeds from the sale or lease of such property after financial settlement of the Program shall be treated as program income to the Community Development Block Grant Program under the provisions of 24 C.F.R. 570.506.

50. In 2015, HUD determined that a portion of any proceeds from a sale of the Garage Parcel (which includes the land) would be restricted as CDBG program income because the land was purchased with federal urban renewal grant funds and is subject to the Closeout Agreement described above. Any proceeds from the sale of the Commercial Air Rights Parcel must first go to the City to pay off the City's $5.5 million HUD Loan.

51. On June 28, 2011, the Legislature enacted AB 1X 26 ("AB 26"), which froze the activities of redevelopment agencies and provided procedures for their ultimate dissolution on October 1, 2011. See, generally, H&S §§ 34161, 34177. Effective immediately, redevelopment agencies were not permitted to incur new, or expand existing, monetary or legal obligations, and were specifically prohibited from making loans or entering into loan agreements. H&S §§ 34161, 34162, 34163.

52. In June 2012 the Legislature adopted AB 1484, modifying the provisions of AB 26 in response to litigation over the legality of AB 26. (AB 26 and AB 1484 are referred to hereafter collectively as the "Dissolution Law.") One of the primary goals of the Dissolution Law was to increase the share of property taxes going to cities, counties, schools and other local entities by reallocating to them the tax increment formerly allocated to redevelopment agencies. *See, e.g., Matosantos,* 53 Cal.4th at 241, 250, 263; 2011 Stats., 1st Ex. Sess., ch. 5, § 1.

53. To implement the Dissolution Law, the Legislature established successor agencies to wind down the affairs of the former redevelopment agencies. Cal. H&S §§ 34173, 34177. Under the Dissolution Law, successor agencies were legally required to dispose of the redevelopment agencies' assets, which disposal "[was] to be done expeditiously and in a manner aimed at maximizing value." H&S § 34181 In San Francisco, the Office of Community



LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

Investment and Infrastructure ("OCII"), is the successor agency to the former San Francisco Redevelopment Agency.

54. The Fillmore Heritage Center is owned by the OCII.

55. The Dissolution law required the successor agency to prepare a long-range property management plan that addresses the disposition and use of the real properties of the former redevelopment agency.

56. In the years since its formation, however, the OCII has not disposed of the Center "expeditiously," or "maximized its value" to the City or the Fillmore District. Instead, the OCII has allowed the Center to remain shuttered, while issuing annual statements about plans for the Center's use that have never materialized.

57. In June 2013, the OCII published a "Proposed Fiscal Year 2013-2014 Budget" that purported to describe OCII's plans for the winding down of former SFRA assets pursuant to the Dissolution Law, including the Center. In it, the OCII stated:

> Fillmore Heritage Center Commercial Parcel: The Successor Agency also owns the commercial space within the Fillmore Heritage Center. The commercial space is leased to a master tenant, who subleases it to a jazz club/restaurant and another restaurant. Work includes managing the master tenant and subtenants, resolving problems with the homeowners' association, dealing with property management issues of the common areas, analyses associated with a tenant's bankruptcy, and other asset management duties. Work also will include developing and implementing a disposition plan for this asset. Staff time is paid from the Successor Agency's administrative cost allowance.

(2013-2014 Budget at Sec.8(C) 2, pp. 32-33.)

58. In November 2015, the OCII approved a revised Long-Range Property Management Plan that provided, in relevant part, for the transfer of the Center to the City. (Exhibits Q (Long Range Property Management Plan) and S (November 23, 2015 Revisions).) On December 7, 2015, the California Department of Finance approved the revised Long-Range Property Management Plan. That approval expressly noted that under the Plan, transfer of the Center to the City was subject to the requirement that the City execute a compensation agreement with the taxing entities affected (including HUD, whose federal loans funded the Center), stating:

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

> In accordance with HSC section 34180(f), the LRPMO acknowledges the City and County of San Francisco's (City and County) requirement to execute a compensation agreement with the affecting taxing entities for those properties with the affected taxing entities in which the City and County will retain for future development.

59. However, no compensation agreement has been executed, so the OCII retains ownership of the Center.

60. Far from serving as a catalyst for the revitalization of the lower Fillmore, the Center has remained vacant in the years since the Long Term Plan was published.

**The Fillmore Heritage Center Request for Proposals**

61. On February 10, 2017, three years after Yoshi's closed, the City issued a "Request for Proposals" to purchase and manage the Center, titled "Request for Proposals: Fillmore Heritage Center" (hereinafter, "the Fillmore Heritage Center RFP" or "the RFP"). (Exhibit A, RFP first page.)[3]

62. In the "Overview" to the RFP, the City acknowledged the Center's historical and cultural significance, and affirmed its commitment to ensuring the Center's future as a community resource, stating:

> The Fillmore Heritage Center, one of the last projects from the Western Addition redevelopment program, was developed as a multi-use facility whose goal was both to revitalize the commercial corridor and to honor the cultural heritage of the neighborhood, which prior to "Urban Renewal" was considered the "Harlem of the West" for its sizable community of African American residents and African American-owned businesses, many of them music venues.
>
> The City is committed to ensuring that, through its sale, the Property emerges as a vibrant and financially viable commercial establishment, such as an entertainment venue, that also provides substantial and sustained community benefits to the Fillmore corridor and the Western Addition community. The City encourages proposals that creatively incorporate one or more of the following uses: performing arts, visual/media arts, food, and recreation/leisure activities. [Exhibit A, RFP.]

63. The Fillmore Heritage Center RFP set forth "Goals and Objectives" listing specific objectives every proposal was require to address, namely: (1) meeting or exceeding the

[3] The whole RFP can be viewed or downloaded at https://OE&WD.org/sites/default/files/Documents/Bid%20Opportunities/Fillmore%20Heritage%20 Center%20RFP%20-%20Complete%20Package.pdf.



LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

"Minimum Bid Price;" (2) demonstrating the capacity to be a financially viable and sustainable commercial establishment; (3) fulfilling objectives of a "Long Range Property Management Plan" under state law requiring that the Property serve as a catalyst for the revitalization of the Fillmore Street commercial corridor and the creation of employment opportunities for the community; (4) Complementing the streetscape and the corridor's mix of uses, and applying design principles and leasing strategies that help activate the fronting sidewalk and the corridor; and, notably, (5) providing "Community Benefits," which the RFP defined as including:

(a) nonprofit or small business partnerships;

(b) affordable community activation (i.e. space rental) opportunities;

(c) job creation;

(d) minority and women-owned enterprise opportunities; and

(e) providing additional economic return to the public, including generation of revenue above the minimum bid price from the sale of the Property.

64. The OCII regularly issues requests for proposals approved by Commission resolution. These RFPs cover a variety of contracts put out for bid, from housing and building contracts to management and employment contracts. Ordinarily, the RFP process is conducted by the OCII staff; indeed, this is the purpose for which the OCII was created, and for which OCII staff were hired. H&S Code §§ 34173.

65. However, the City took a different approach with respect to the Fillmore Heritage Center: It provided for a "Review Panel," purportedly to be comprised of "community members and City staff" ("RFP Review Panel", or "the Panel"). The Panel's stated purpose was to review qualifying RFP applicants based upon criteria specified in the RFP, and ultimately to select a winning applicant.

66. The RFP attracted multiple respondents, including Agonafer Shiferaw, whose 2015 agreement with Johnson had substantially satisfied all of the RFP's criteria two years earlier.

**Agonafer Shiferaw**

67. Agonafer Shiferaw is a San Francisco resident who has owned and operated businesses in the City and County of San Francisco since 1981. He opened his first business, Super Hardware Home Improvement Center, at 2028 California Street, in 1981. After nine successful years, Super Hardware Home Improvement Center was sold in 1990. In 1986, Shiferaw opened the Rasselas Jazz Club and Restaurant at the corner of Divisadero and California Streets. Rasselas rose to fame as one of the most recognized jazz clubs in San Francisco until its closure in 2013.

68. In 1997, Mr. Shiferaw leased 1534 Fillmore with an option to purchase the building in five years. During this time, Mr. Shiferaw treated 1534 Fillmore as a shell building and supervised the development of the property. In 1999, Shiferaw opened Rasselas at 1534 Fillmore while continuing to own and manage the Rasselas on California Street.

69. The two Rasselas' were the only jazz clubs in the Western Addition until Yoshi's opened in 2007. In 2004, Shiferaw purchased the building located at 1534 Fillmore which housed Rasselas. As an active owner manager, Shiferaw managed staff, booked entertainment, ordered food and beverages, and organized special events, while ensuring compliance with all regulatory requirements, among his many responsibilities.

70. Since the 1980s, Mr. Shiferaw has owned mixed use commercial and residential buildings, including a 20-unit mixed-use (four commercial/retail and 16 residential space) building in Pacific Heights, as well as rental property in Oakland, California. Tenants include restaurants, bakeries and night clubs. As an active owner manager of these properties, Shiferaw negotiates rents and oversees the planning and completion of construction and repairs, while ensuring compliance with all regulatory requirements, among his many responsibilities.

71. Mr. Shiferaw expressed interest in developing the Fillmore Heritage Center as a community resource even before the RFP was issued. In May 2015, he negotiated with and signed a letter of intent with Mr. Johnson, principal of Fillmore Development Commercial, LLC, to purchase Yoshi's for $6.4 million, and to assume operation and management of the space immediately. Shiferaw delivered their letter of intent to Supervisor London Breed and Theo

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

Miller (Mayor Ed Lee's City Hall liaison for the FHC project), and Mr. Johnson delivered it separately to Mr. Miller. (Exhibit D, 5/22/15 Shiferaw/Johnson Letter of Intent.)

72. Instead of approving this plan, the City immediately took possession of the commercial parcel. As a result, the property has been closed and dormant now for over three and a half years, from February 2015 to the present.

73. During this period of closure, Plaintiff Shiferaw proposed in writing a Management plan to operate and manage the space. Although his proposal was delivered to then Supervisor Breed and Joaquin Torres (then Deputy Director of the Mayor's Office of Workforce and Economic Development), plaintiff has never received any response, written or verbal. Breed and her cronies were already beginning to evince their determination to keep the project away from Mr. Shiferaw and steer it toward their cronies. (Exhibit E, Plaintiff's 8/28/15 Interim Facilities Management Proposal.)

74. Mr. Shiferaw continued to communicate his interest to the City, meeting with Breed, Torres, and Brown to discuss the future of the Center. Mr. Shiferaw also joined with a community group to preserve the Center consistent with its original mission—as an entertainment destination and catalyst for the redevelopment of the commercial corridor in a manner that would make it culturally relevant to the Black community in the Fillmore.

**The Republic of Fillmore's Response to the RFP**

75. On April 24, 2017, Plaintiff Shiferaw timely submitted a response to the RFP, on behalf of Fillmore Entertainment Complex, LLC/The Republic of Fillmore ("Republic of Fillmore"). (Exhibit B, Plaintiff's 4/24/17 RFP Proposal). The Republic of Fillmore's bid and proposal met and exceeded each of the above-listed RFP requirements, as follows:

76. The RFP required a bid of $6.5 million (criterion 1). Mr. Shiferaw's bid was $6.5 million.

77. Mr. Shiferaw demonstrated his capacity to operate a financially viable and sustainable commercial establishment (criterion 2). In addition to his experience and expertise described above, Mr. Shiferaw's current real estate assets in San Francisco and Oakland are valued at $22 million, with a net equity value of $15 million and 2017 income of over $1 million,

also projected to exceed $1 million in 2018. Mr. Shiferaw is informed and believes, and on that basis alleges, that among 1997 Fillmore business development loan recipients, that he is the only recipient to have continued to make loan payments to the redevelopment agency for prior projects in accordance with his loan agreement.

78. The Republic of Fillmore's bid and proposal fulfilled the "Long Range Property Management Plan" objectives, complemented the streetscape and the corridor's mix of uses, and applied design principles and leasing strategies that would activate the fronting sidewalk and the corridor (criteria 3 and 4).

79. The Republic of Fillmore's bid and proposal provided for thorough, well-planned and diverse benefits to the Fillmore community, backed by extensive documentation (criterion 5). It included $300,000 budgeted to support culturally relevant community activities. Specifically, the proposal provided for:

- Kiosks/popups;
- Scholarship fund and on-the-job culinary art training;
- Management and entrepreneurial training in garage parking;
- Sponsorship of, and a seasonal home for, the San Francisco Black Film Festival, St. John Coltrane; Church, Lorraine Hansberry Theater, Afro Solo, Cultural Odyssey and other art organizations;
- Retail space for Marcus Bookstore and bookstore café;
- Office and meeting space for the San Francisco Black Chamber of Commerce; and
- Establishment of a business improvement district for the lower Fillmore.

80. Based on the foregoing, Mr. Shiferaw/The Republic of Fillmore was an ideal candidate, possessing the financial wherewithal, documented experience, and local ties sought by the RFP.

81. In spite of the above qualifications, including 30 years experience in the entertainment industry, and his submission of a timely, complete, and fully qualifying RFP response, defendants treated plaintiff and his RFP response as non-existent. At the same time, defendants went out of their way to prop up non-conforming and untimely responses by other bidders, including by allowing bidders the opportunity to provide additional documents to



LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

support incomplete or insufficient proposals; meeting with them ex parte; and giving them opportunities to correct shortcomings in their proposals, including after the deadline.

82. Unbeknownst to plaintiff, defendants issued a negative "evaluation" of plaintiff's RFP response that was riddled with demonstrably false findings and assertions. That evaluation was not disclosed to plaintiff until he demanded it in a public records request.

83. Defendants' evaluation of plaintiff's RFP response contained false and prejudicial information about plaintiff, including that he showed "questionable financial projections and commitment of debt," "with slim applicable development experience;" that his "[f]inancing is questionable;" that he could not "[d]emonstrate[] ability to access capital by September 2017," and that he had "$1,256,000 owed to the City with a spotty payment history." (FHC RFP Response assessment.) These characterizations are demonstrably false. In fact, as of September 8, 2017, Mr. Shiferaw had secured financing, and he has always made timely loan repayments in accordance with his agreement with the City.

84. The obvious falsity of defendants' foregoing characterizations of plaintiff's financial wherewithal to support his proposal raises a strong inference, and plaintiff thereon alleges, that defendants knowingly disparaged plaintiff's proposal to the RFP Review Panel in a deliberate effort to undermine plaintiff.

85. Contrary to defendants' false assertion, plaintiff has always been current in his loan repayments to the City. In early 1997, the City, as part of its effort to revitalize the lower Fillmore into an entertainment destination district, offered tenant improvement loans to various individuals. Mr. Shiferaw was one of those selected to participate in this program. Of those selected, Shiferaw is the only recipient to have made payments in accordance with his agreement with the City, which he continues to do.

86. On information and belief, the restaurant 1300 on Fillmore, which opened in 2007, is in major default on its $4,000,000.00 tenant improvement loan and has not paid rent, secured and unsecured taxes, or Home Owners Association fees to the City of San Francisco in the past ten years. City contractual practices requires that vendors, contractors and service providers are not allowed to participate in new contracts and loans unless they are current on

their existing loan obligations.

87. RFP language required applicants to negotiate a participation package, including lease and community benefit, with the owners of 1300 on Fillmore. This created several significant problems: For example, several respondents simply offered the restaurant's co-owner, Monetta White, cash payments of $300,000.00 to $500,000.00 in exchange for her support of their proposals. Essentially, therefore, the RFP encouraged bribery. For instance, respondent FHC2017 struck an agreement with White to pay her $300,000.00 to $500,000.00 if FHC2017 were selected, plus give White the opportunity to purchase her portion of the building for a million dollars under its market value. (Exhibit F, 4/24/17 MOU between FHC2017 and Monetta White.)

88. Meanwhile, the City steadfastly refused Plaintiff Shiferaw's requests for renegotiation of his prior loan.

89. It is clear in retrospect that the fix was in, and that defendants never intended to give plaintiff's RFP proposal good faith consideration. Not only were defendants intent on awarding the project to one of their cronies, they were intent on keeping it away from plaintiff.

90. First, plaintiff, who opposed Breed's District 5 candidacy and supported her opponent, former District 5 Supervisor and rival Christina Olague, was never seen as a Friend of London Breed ("FOL").

91. Second, as discussed further below, plaintiff refused to participate in defendants' pay to play scheme, instead blowing the whistle on defendants' malfeasant operation of the RFP process.

92. Third, throughout his efforts to purchase and develop the Center, plaintiff, an immigrant of Ethiopian descent, was made aware of anti-immigrant and anti-African bias and comments by City officials, indicating that because of his ethnicity and origin, he was not the preferred candidate to purchase the Center, and that Defendant Breed, at a luncheon at the Marriott Hotel, indicated to Fred Jordan, President of the San Francisco African American Chamber of Commerce, that she would make the final decision. As a San Francisco Supervisor, Breed did not have the legal authority to make this type of executive decision. Nevertheless,

then-Mayor Edwin Lee, then-City Manager Naomi Kelly, OCII, and the OE&WD each knowingly and deliberately extended to Breed de facto control over the administration and sale or distribution of the Center. Defendants' bias against plaintiff was confirmed in disparaging remarks defendants made about plaintiff's ethnicity, as relayed to plaintiff by witnesses, when the witnesses questioned why the City seemed so hostile to plaintiff's efforts to purchase the Center. Then-Supervisor Breed, for instance, stated: "I'm not going to give it to that African," meaning plaintiff.

93. Defendant Rev. Amos Brown, the chair of the RFP selection committee, repeatedly referred to the plaintiff's background as underserving of economic opportunity. During a negotiation between the Fillmore Center and Powell's Place's nonimmigrant owner Emmitt Powell, Rev. Brown indicated his support for black businesses on Fillmore, but explicitly stated that "I am not talking about those Ethiopians."

94. At a protest staged by the NCLF to disrupt a political mayoral forum at plaintiff's former restaurant on Fillmore Street, supporters of Supervisor London Breed yelled "Go home, this is London Breed's 'house," disparaging plaintiff's nationality. Present were friends, allies and supporters of Mayor Breed Rev. Amos Brown, Rev. Arnold Townsend, Cheryl Davis (Director of the Office of Human Rights). At no time did anyone present, nor Mayor Breed or any of the other defendants afterward, criticize or disavow the disruptors for making such disparaging remarks. On the contrary, the Mayor and her fellow defendants later maneuvered to reward control of the Center to the NCLF, outside of public process or scrutiny, knowing of the NCLF's staged disruption.

**Improprieties in the Formation and Handling of the RFP**

95. The RFP process was a ruse from the start—a cover for an elaborate scheme by Breed and other officials to continue awarding development contracts to allies who lacked the experience, finances, or commitment to the community the RFP purported to require.

**The Shady Formation of the RFP Review Panel**

96. As it turned out, the so-called "Review Panel" served as a vehicle to side-step state and local procedural safeguards and generally shrouds the process in obscurity.



LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

97. Defendants refused to disclose the process, criteria, or persons responsible for selecting the Review Panel. Defendants also refused to disclose the names of those who applied to serve on the Panel. (Shiferaw Decl., ¶ 19-20.) Persons who applied for the panel, but were not selected, never received any notification that they were not selected, or any response whatsoever. (Shiferaw Decl., ¶ 19.) Other panel members were appointed before the selection process was even announced and the applications were sent out. (Shiferaw Decl., ¶ 20.)

98. One of the few criteria for Review Panel selection that defendants did disclose pertained to community representation. The Panel was to include 5 community representatives and 4 City representatives. However, the five “community members” selected included at least two people (Rick Swig and Audrey Joseph) who neither lived nor worked in the Fillmore District or the Western Addition, and had no discernable connection to the community, nor any qualifications other than that they were friends and supporters of London Breed, the then-Supervisor for the district where the Center is located. Breed had appointed Mr. Swig to the San Francisco Board of Appeals, on which he continues to serve.

99. Joaquin Torres and the redevelopment agency cloaked the selection process in secrecy, refusing to disclose (1) the identities of the persons responsible for choosing the panel, or (2) the methods by which the panel would be chosen. Defendants also refused to disclose the names of those who applied to serve on the Panel. While several people who applied received no response from the City, Plaintiff is informed and believes, and on that basis alleges, that a number of people ultimately selected for the Panel never applied at all, but were simply tapped to serve by officials.

100. Among the people who applied, but received no response, were: Attorney Carl L. Williams, who is the former Director of the San Francisco Housing Authority, a former City Commissioner, and the original member of the Mayor`s Fillmore Jazz Preservation Committee, responsible for the development of the Fillmore Heritage Center.

101. The Panel’s prospective members were required to submit an application for selection, due by March 11, 2016. However, at least two panelists were notified of their selection even before the selection process was announced and the applications were sent out, namely:

(1) Defendant Amos Brown, a friend and supporter of London Breed, who was selected to chair the Review Panel, and (2) Latonia Grice-Harold, a friend of London Breed. Defendants City continues to refuse to disclose how, or by whom, Brown was selected as chair, or any other information concerning his selection.

**Irregular and Unlawful RFP Deadline Changes**

102. The original RFP, issued on February 10, 2017, set a response deadline of 4:00 pm. on April 3, 2017 for responsive proposals. The RFP permits the City to "modify the RFP, prior to the proposal due date, by issuing Change Notices, which will be posted on the website http://sfgov.org/realestate/documents." On or about March 15, 2017, the deadline was extended to April 24, 2017, by published notice. (Exhibit G, 3/15/17 Notice of Extension.) The RPF expressly states that "[l]ate submissions will not be considered unless the RFP submission deadline is formally extended to all applicants." But on April 25, 2017, after the deadline had passed, the following unsigned email was sent, apparently from an authorized City account:

> From: Fillmore-Heritage-RFP (MYR) <Fillmore-Heritage-RFP@sfgov.org> To: Fillmore-Heritage-RFP (MYR) <Fillmore-Heritage-RFP@sfgov.org> Sent: Tuesday, April 25, 2017 9:41 AM
>
> Subject: RFP Materials Extension - 4pm Today
>
> Good morning registrants,
> The City is extending the deadline for already registered respondents to supplement or supply material for the Fillmore Heritage Center RFP until Tuesday April 25th at 4:00pm, to be submitted at the location listed in the RFP.
> Thank you.

103. This email did not identify its author, either by username or in the text. (It bore no closing signature). Neither did the email provide any explanation for the extension. The recipients of the email included Mr. Shiferaw, who had submitted a proposal on time.

104. Clearly, the email announcing the one day extension would not have given any applicant sufficient time to modify and resubmit an application unless the applicant had already submitted a late application, or was given greater advanced (i.e. private) notice of the extension. Notably, no mention of the extension appeared on the City's website where Change Notices were supposed to be posted, and where the prior (formal) extension had been posted. The extension of



LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

the deadline by a post-deadline, unpublished, unsigned email plainly violated multiple provisions of the RFP.

105. On information and belief, this post-deadline extension was made to accommodate several applicants, but one in particular, namely Fillmore Heritage Partners/Planted Concepts/Jay Haggland. Several factors support this inference—reinforced by the City's inadequate response to inquiries regarding these events. After the City announced that this respondent was the leading candidate, Fillmore Heritage Partners indicated in a letter to the City that they had misrepresented their primary funding source to be rapper Sean "Puff Daddy" Combs. Plaintiff believes and thereon alleges that this is what had enabled this group to be ranked first among respondents. After defendants provided the post-deadline extension, the group modified its proposal to reflect that Combs was not in fact attached as an investor.

106. Another respondent, FHC2017, was also permitted to materially revise its submission long after the deadline elapsed, because several of its original community benefit partners dropped out, including the African American Chamber of Commerce and its president, Fred Jordan.

107. The RFP prohibited post-deadline application revisions. Defendants' post hoc deadline extension constituted a violation of the RFP process as well as basic fairness. Defendants withheld notice of the revised submissions from other bidders, and indeed defendants still have not acknowledged this irregularity.

**Further Favoritism Shown by Defendants to Respondent FHC2017**

108. The RFP does permit the City or the Panel to request "clarification" from a proposer. But plaintiff is informed and believes that the revised late submission which the City allowed from FHC2017 was not a mere "clarification" but a substantive revision that materially altered FHC2017's proposal and included changes to its constituent partners, specifically, the departure of numerous Western Addition community members originally included in FHC2017's proposal who withdrew their participation in, and association with, FHC2017. Thus, not only did the City improperly receive the revision, the revision watered down FHC2017's satisfaction of the key "Community Benefit" principle of the RFP.

109. On Friday, August 11, 2017, FHC2017 principals Tim and Vicky Shelton met with Defendant Torres to discuss their proposal. This despite the fact that Benjamin McCloskey (Deputy Director of Finance and Administration in the Mayor's Office of Housing and Community Development) had indicated in a prior email to RFP respondents that the Mayor's Office was not taking any meetings with RFP respondents. This is a further example of favoritism shown to one applicant, along with the City's lack of consistency and transparency.

**The Amos Brown/Third Baptist Church Solicitation for Event Sponsorship**

110. In 2017, Defendant Amos Brown, Pastor of Third Baptist Church and Chair of the RFP Selection Committee, and his wife Jane Brown, were getting ready to celebrate their 40th anniversary with the Church. In August 2017, Plaintiff Shiferaw received two calls from Jane Brown soliciting contributions for the anniversary event. In light of the fact that Pastor Brown was chair of the RFP selection committee and plaintiff's proposal was pending, plaintiff declined. In contrast, on or about September 8, 2017, the Sheltons, principals of RFP respondent FHC2017, made a significant financial contribution in sponsorship of the Browns' anniversary event. (See Exhibit H, 10/6/17 Letters to City Attorney, attaching list of anniversary event sponsors.)

111. Def. Amos Brown's acceptance of the Shelton's contribution violated the Political Reform Act of 1974 which prohibits public officials from acting in matters when their private interests might conflict with their public duties. Section 81000 of the Reform Act, provides, in pertinent part: "No public official at any level of…..local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest."

112. Section 87103 of the Reform Act provides, in pertinent part: "A public official has a financial interest in a decision within the meaning of Section 87100 if it is reasonably foreseeable that the decision will have a material financial effect, distinguishable from its effect on the public generally, on … (c) Any source of income … aggregating five hundred dollars ($500.00) or more in value … received by []the public official within 12 months prior to the time when the decision is made…"



LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

113. For purposes of disqualification under Sections 87100 and 87103, "a public official has an economic interest in any donor of, or any intermediary or agent for a donor of, a gift or gifts aggregating $500.00 or more in value provided to, received by, or promised to the public official within 12 months prior to the time when the decision is made."

**The City's Abrupt and Arbitrary Cancelation of the RFP in the Wake of Plaintiff's Whistleblowing**

114. On May 3, 2018, plaintiff raised the foregoing irregularities and illegalities in a letter to the San Francisco City Attorney's Office. (Exhibit H, 10/6/17 Letters to City Attorney's Office.) Plaintiff's exposure of the Browns' solicitation, and the Shelton's' (FH2017's) actual contribution to the Third Baptist Church anniversary event, disqualified Brown from serving as Chair of the Selection Committee and the Sheltons as bidders. This cornered defendants and disrupted their ability to use the RFP as a cover to award control of the Center to the Sheltons. Rather than investigate, however, defendants abruptly, arbitrarily, and unceremoniously terminated the RFP in email to applicants on November 2, 2017. (Exhibit I (November 2, 2017 email).)

**Defendants' Abrupt and Arbitrary Cancelation of the RFP**

115. On or about November 2, 2017, the City arbitrarily announced, by email, that it was canceling the RFP, stating:

> Dear Respondent,
>
> Thank you for your participation in the Request for Proposals process for the Fillmore Heritage Center. The process has now concluded.
>
> After the Review Panel and City review, it was determined that no proposal emerged that could appropriately meet the expectations outlined in the RFP. The criteria included immediately available capital, a viable business plan, and a diverse set of community benefits.
>
> Based on this process, the City will not be moving forward under the RFP with the negotiation of an Exclusive Negotiating Agreement for the purchase and repurposing of the commercial portions and the parking garage of the Fillmore Heritage Center. Accordingly, consistent with RFP Section L, the City is rejecting all proposals and no project will be pursued based on this RFP process. All respondents will be refunded their Earnest Money Deposits. Please email fillmore-heritage-rfp@sfgov.org to confirm the payee and mailing address for the return of your Deposit. Please allow 2-3 weeks for your Deposit to be returned.



LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

> The City will determine its options for the building and provide a public update before the end of the calendar year.
>
> Thank you again for your interest in the property and for your participation in the process.
>
> Fillmore Heritage RFP Team

(Exhibit I, November 2, 2017 email cancelling RFP.)

116. Defendants' assertion, that "that no proposal emerged that could appropriately meet the expectations outlined in the RFP" was false and pretextual. Plaintiff's proposal met and exceeded the RFP criteria. Plaintiff had available capital, including a bank commitment to purchase the property. His business plan was unquestionably viable. His vision, including his community benefit package have since been recognized by some community groups as being the most complete compared to those of competitors.

117. Contrary to established law, plaintiff received no explanation as to why defendants found his RFP proposal lacking. A bidder "is entitled to notice of that fact and is entitled to submit materials … concerning the issue of responsiveness," *Taylor Bus Service, Inc. v. San Diego Bd. of Education*, 195 Cal.App.3d 1331, 1342 (1987). Instead, defendants simply sent a mass email announcing that they were terminating the RFP process and rejecting all proposals upon concluding that no respondent had met all of the requirements. (Exhibit A, Plaintiff's RFP Proposal.)

**Defendants' Pattern of "Blacklining" Discrimination Against Plaintiff**

118. Defendants' negative and disparate treatment of Plaintiff Shiferaw is substantially motivated by defendants' animus, prejudice, and bias against plaintiff based on his ethnicity, national origin, and status as an Ethiopian immigrant.

119. As recounted above, when questioned about the City's unequal and unfair treatment of plaintiff in his effort to acquire the Fillmore Heritage Center, Defendant Breed stated: "I'm not going to give it to that African," meaning plaintiff.

120. Racial discrimination in the form of "redlining" – race-based banking discrimination – has been documented since the 1930s. As a result of persistent Black struggle in

the 1960s, the banking industry was forced to revise their practices that institutionally and disproportionately affected members of the Black community. In this case defendants have subjected plaintiff to a variant of redlining ("blacklining"), wherein defendants, some of whom are US-born African Americans, have systematically discriminated against African and other immigrants.

121. Defendants' anti-immigrant and anti-African immigrant bias is also reflected in the disparate treatment of recipients of business loans in the Fillmore District and associated with the Fillmore Heritage Center. In connection with redevelopment efforts, both U.S.-born and immigrant black Americans received loans from the City. But while defendants have required the immigrant black recipients, including plaintiff, to repay their loans, and they have done so, defendants have allowed the U.S. born black Americans to not repay their loans, and to retain their leases while not paying the amounts owed under their leases.

**London Breed Gifts the Project to Friends and Political Loyalist**

122. Questions and complaints concerning London Breed's and Amos Brown's ethics have swirled for years. In 2015, a "pay-to-play" investigation by the FBI reportedly yielded evidence of corruption by Breed and Brown. Two of their close associates, Keith Jackson and Derf Butler, who were instrumental in the award of the Fillmore Heritage Center development contract, were convicted in the wake of the investigation.[4]

123. In December 2017, Defendant Breed became acting mayor of San Francisco following the death of former Mayor Ed Lee. On information and belief, Breed then asked her closest advisors and aides, Vallie Brown and Joaquin Torres, to offer the Heritage Center to Dr. Ernest Bates to convert a sizeable portion of the space into a chemotherapy/radiation center in

[4] Per the San Francisco Examiner: "In Breed's case, according to the filing, Derf Butler, a politically connected businessman who worked for [former State Senator Leland] Yee with [former SF Board of Education member Keith] Jackson, told an FBI source that he 'pays Supervisor Breed with untraceable debit cards for clothing and trips in exchange for advantages on contracts in San Francisco.'" Similarly, the article reports on an allegation that "Rev. Amos Brown's house [was] fixed in exchange for some unsaid favor from [the] former Housing Authority head." *Public officials named in new findings from FBI probe of 'Shrimp Boy' Chow*, San Francisco Examiner, August 4, 2015. (http://www.sfexaminer.com/mayor-city-officials-others-accused-of-wrongdoing-according-to-new-details-from-fbi-probe-into-shrimp-boy/).

partnership with a community group known as the New Community Leadership Foundation ("NCLF"), with the San Francisco Housing Development Corporation ("SFHDC") acting as their fiscal agent.[5]

124. Neither the SFHDC nor NCLF has any experience operating or managing a night club or other entertainment venue. Their only "qualification" to run the Center was their association with and support for London Breed.

125. Nevertheless, defendants embarked on private negotiations, outside of the RFP process, with Majeid Crawford, head of NCLF. These negotiations led to a letter of intent between the City and the SFHDC to give interim control of the Center to the SFHDC, in partnership with NCLF. (Exhibit J, 2/2/3/18 Letter of Intent, signed by City Administrator Naomi Kelly.)

126. Review of the OCII agenda and minutes from 2015 to the present confirms that no public hearing was noticed or held authorizing the transfer to New Leadership Community Foundation, and the San Francisco Housing Development Corporation.

127. NCLF is a shell organization which styles itself a community group, headed by Majeid Crawford, a friend of London Breed, who strongly supported her mayoral campaign, and showed it by organizing a protest which resulted in the violent disruption of a political forum hosted by plaintiff in May 2018.

128. Specifically, on May 12, 2018, plaintiff hosted a forum to discuss the future of the Fillmore District, featuring Breed's mayoral opponents, candidates Jane Kim and Mark Leno. (Exhibit K, "Meet the Progressives" flyer.) The day before, on May 11, 2018, the NCLF issued a press release riling people up to protest the forum. (Exhibit L, 5/11/18 NCLF Press Release.)

129. A surly group of protesters heeded the NCLF's call for a rally. These protesters disrupted the forum by shouting "go home" (plaintiff is an immigrant of Ethiopian decent) and ethnic slurs at candidate Jane Kim. Their physically intimidating disruption was covered, in part,

[5] Plaintiff submitted California Public Records Act / San Francisco Sunshine Requests to several City agencies for documents related to the RFP. Plaintiff has received two partial responses. However, neither response addresses plaintiff's request for information concerning Mayor Breed's or City Administrator Naomi Kelly's suspect dealings with Dr. Bates.



LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

on local news.[6]

130. In attendance at the May 12, 2018, political forum hosted by plaintiff were Defendant Amos Brown, and Defendant Breed advisors Rev Arnold Townsend, and Sheryl Davis. None of these individuals expressed any disagreement with, let alone condemnation of, the offensive statements made by the NCLF-fielded protesters, either during or after the forum.

131. On information and belief, as of November 2018, defendants in fact gave the SFHDC/NCLF partnership keys to the Center—*even though defendants had rejected the SFHDC's proposal during the RFP process, and, unlike plaintiff, these individuals have no experience whatsoever operating a night club, restaurant, or any kind of entertainment venue*. (Exhibit M, 11/5/18 Press Release.) On information and belief, defendants are calling this transfer a temporary reactivation of the Center as a means of avoiding standard CCSF procurement policy and procedure.

132. On information and belief, under their agreement with defendants, neither NCLF nor SFHDC paid any rent to the City or OCII. Instead, unbelievably – *the City paid NCLF and SFHDC to "operate" the Center***.**

133. Rather than permit Plaintiff Shiferaw, who has the experience and financial wherewithal, to operate the Center successfully and for the benefit of the public, defendants have effectively gifted the Center to allies who not only lack sufficient experience or capitalization to operate the Center, they cannot even pay rent. Notably, NCLF is not even a signatory to defendants' sublease agreement with SFHDC, although both NCLF and defendant officials talk as if NCLF is in charge of the Center. (Exhibits L and M.) <u>While the City purports that its sublease agreement with this group is only temporary, the City has declined to provide plaintiff or the public any assurance that it will not simply continue renewing this sweetheart deal,</u>

[6] See news ABC7 and KPIX (CBS) news coverage at https://abc7news.com/politics/racial-insult-yelled-at-sf-mayoral-candidate-during-election-event/3470631/ and https://youtu.be/Cry_ZhJkWpw (respectively). Other racist, xenophobic, and homophobic comments lobbed were not captured on video. These included: "This skinny rice eating Chinese" (of Jane Kim); "This is London Breed's house;" "This is London Breed's playground;" And, "Fa _ _ ot" (in reference to a young Mark Leno supporters' perceived sexual orientation).

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

bypassing all City bidding and contracting laws.

134. Moreover, because NCLF and SFHDC were neither qualified to administer and oversee the operation of the Center, nor capable of running it as a financially viable operation, defendants arranged for the City to pay these entities to lease and "run" the Center. Specifically, plaintiff is informed and believes that defendants paid SFHDC and NCLF at least $50,000 to "run" the Center.

135. Defendants' turnover of the Center to allies whom the City had to pay to operate it puts the falsity to defendants' claim that defendants rejected Plaintiff Shiferaw's RFP proposal based on any deficiency in his financial showing.

136. On information and belief, the terms of the City's interim reactivation agreement with the SFHDC and NCLF are, in substance, the same terms that plaintiff had twice proposed to the City, including the second time, in conjunction with the San Francisco African American Chamber of Commerce as community partner through City consultant Andrea Baker. On information and belief, Ms. Baker is now acting as a consultant to the SFHDC and NCLF partnership.

137. On information and belief, in or about February 2019, Defendant Amos Brown, purporting to speak for the City, offered the Center to Dr. Ernest Bates, for the purposes of opening a for-profit medical services operation.

138. While the City may have broad discretion to reject all bids and cancel an RFP in the "best interests" of the city, this case presents a different and corrupt scenario which falls outside of the City's discretion. Defendants never sincerely intended in the first place to conduct a fair RFP process based on competitive bidding, nor to genuinely consider plaintiffs' or other bidders' proposals within the RFP framework. Rather, the RFP was a charade and a pretext from the start, designed as a smoke screen for defendants' plan to steer the Center into the hands of defendants' cronies.

139. In fact, defendants did not reject all bids. Rather, they awarded the project to a bidder whom they only pretended to reject, namely the SFHDC, in partnership with the NCLF. Defendants' actions are corrupt to the nth degree, unbecoming of public servants, and forbidden

by law.

140. On or about March 25, 2020, five people were shot, and one person, Dee Carnell Simmons was killed, when the NCLF hosted a funeral for Ron Newt, a reputed drug kingpin and pimp. Since the shooting, the Center has remained effectively closed.

141. As a result of the defendants' corrupt conduct, plaintiff has incurred major losses, in the past (in preparing his RFP proposal), prospectively, as the only qualifying bidder and therefore rightful awardee, and as a result of defendants' defamation of his character and professional reputation.

**The City's Lawsuit Against Michael Johnson**

142. On August 16, 2018, the City filed suit against Michael Johnson and his group, seeking to recover $5.5 million of its purported un-repaid loans to him. (*CCSF v. Johnson, et al.*, San Francisco Superior Court Case No. CGC-18-568954).

143. In October 2018, Mr. Johnson cross-complained, alleging, *inter alia*, that

> the City refused to allow FDC to attract investors willing to use the property for a different commercial purpose that would generate enough revenue to ensure the Project's economic success. As a result, the City breached its obligation under a lease with FDC to permit a different use. … [R]ather than focus limited public resources to successfully revitalize the Fillmore District and assist the economic and cultural well-being of District residents, the City has engaged in bad-faith tactics while the Project has remained vacant for years.

(*CCSF v. Johnson, et al.*, San Francisco Superior Court Case No. CGC-18- 568954, Cross-complaint at ¶ 6.)

144. In his cross-complaint, Mr. Johnson also points that the City failed even to respond to, much less consider or approve, the letter of intent he and plaintiff signed. (Id. at ¶¶ 20, 21.) Had the City considered and approved Plaintiffs' agreement with Johnson, the City's action against him would have been unnecessary.

145. On information and belief, the team reached this determination only because plaintiffs had exposed its corrupt, pay to play scheme, not because a qualified bidder had not emerged. Rather, plaintiffs handily met all of the RFP criteria. Plaintiffs' Public Records Act/Sunshine requests for documents, including the individual panelists' ratings and the ranking of the bidders, have been ignored.

## CAUSES OF ACTION

### ONE: Waste of Taxpayer Resources
### California Code of Civil Procedure § 526a
### Against All Defendants, Including Each Individual Defendant in his/her Personal Capacity

146. Plaintiff hereby re-alleges and incorporates by reference the foregoing paragraphs, as if set forth in full herein.

147. Plaintiff is a taxpayer and has paid state and local taxes in the past year.

148. Plaintiff brings this cause of action as a citizen-taxpayer action under California Code of Civil Procedure ("CCP") § 526a.

149. CCP § 526a authorizes taxpayer actions "restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county . . . against any officer thereof." The primary purpose of the statute is "to enable a large body of the citizenry to challenge governmental action which would otherwise go unchallenged in the courts because of the standing requirement." *Los Altos Property Owners Assn. v. Hutcheon*, 69 Cal.App.3d 22, 27 (1977).

150. The City of San Francisco is the beneficial owner of the FHC. Although the OCII has not formally transferred title of the FHC to the City (as called for in the 2015 Long-Range Property Plan), the City has controlled, dominated and operated the FHC as a City asset since before 2015, and continues to do so. Despite the OCII's retention of notional title, the City has solely determined the use—and disuse—of the FHC throughout this period. In exercise of its authority and control over the FHC, the City drove the OCII's predecessor agency's decisions (a) to allow the City unfettered control and decision-making over the FHC; (b) to lease the FHC on any terms the City decided; (c) to conduct RFPs, sell the FHC, with any profits from sale to go to the City

151. The lease of real property owned by the City is governed by San Francisco Administrative Code Chapter 23 ("Real Property Transactions"). Section 23.30 of this Chapter ("Lease of Real Property") provides that, subject to exceptions not applicable here, the "Director of Property shall collect rents due under [leases of City property]." SFAC § 23.30 states, in pertinent part:

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

> Except as provided by Sections 4.112, 4.113, 4.114, 4.115, and B3.581 of the Charter and by Sections 2A.173 and 23.36 of this Code, or as otherwise provided by the Charter or this Code, the Director of Property shall have the charge of the Lease of Real Property owned by the City. When the head of any department in charge of Real Property reports to the Director of Property that certain land is not required for the purposes of the department, the Board of Supervisors, by resolution, may authorize the Lease of such Real Property. The Director of Property shall determine the Market Rent of such Lease based on a review of available and relevant data. If the Market Rent of the Lease is more than $45 per square foot per year as base rent, the Director of Property shall obtain an Appraisal for such Lease. If an Appraisal determines the Market Rent of the Lease exceeds $60 per square foot per year as base rent, the Director of Property shall obtain an Appraisal Review for such Appraisal. Any Appraisal or Appraisal Review shall have an effective date of value that is not earlier than nine months before the date legislation for the proposed Lease is submitted to the Board of Supervisors. The Director of Property shall arrange for such Lease to the highest responsible bidder in accordance with Competitive Bidding Procedures and for no less than the Director of Property's opinion of Market Rent if there is no Appraisal, or for no less than the Market Rent stated in the Appraisal if there is an Appraisal, unless the Board of Supervisors has by resolution found that (a) such Competitive Bidding Procedures are impractical or impossible or has authorized other means of award in furtherance of a proper public purpose, or (b) a lesser sum with further a proper public purpose. The Director of Property shall collect rents due under such Lease.

152. Pursuant to section 526a and SFAC § 23.30, the City has a duty to collect funds due to the City. However, defendants have failed to collect millions of dollars in still outstanding rents and loan payments owed to the City by FHC operators, including particularly Kaz Kajimura, Monetta White/David Lawrence/1300 on Fillmore (see ¶¶ 44-45),[7] and Michael Johnson—all conditions triggering the City's duty under SFAC § 23.30 having been satisfied.

153. In Michael Johnson's case, the City entered into a purchase loan agreement with him which functioned as a rental/lease agreement, under which the City arrogated to itself the power to evict Johnson from the FHC for defaulting on his loan repayments, as it eventually did, without recognizing any ownership equity he acquired based on his two million in "loan" payments to that point. On February 20, 2015, the City (Mayor's Office of Housing and

[7] On information and belief, 1300 on Fillmore repaid the City only $500.00 of its millions in debt, and never paid a dime in rent, property taxes, or homeowners' association fees owed under its lease.

Community Redevelopment) sent a letter to Mr. Johnson summarizing Johnson's missed loan payments (i.e. the City's uncollected rents) going back as far as August 2010, i.e. 4.5 years prior, which totaled at the time over two million dollars (in combined missed payments, interest, and fees). The City closed the letter by stating that it planned to "foreclosure on the leasehold deed of trust," i.e. to take back the FHC for itself, if Johnson did not cure—as the City in fact did about four months later, in June 2015.

154. In other words, the City (a) failed to collect over two million dollars in rent from Johnson over a 4.5 year period; and (b) constructively acknowledged throughout its dealings with him that it was the beneficial owner of the FHC.

155. Because the amounts owed under these leases is established and liquidated, the public has suffered a direct "dollars and cents" injury as a result of the City's failure and refusal to collect rents owed under at least the afore-listed three leases. Further, defendants inexplicably entered into a bizarre lease agreement with SFHDC and NCLF to act as "paid tenants" of the FHC, whereby instead of collecting rent from these tenants, the City used the public's money to *pay them* over $50,000 to operate the FHC. This is a direct waste of taxpayer resources.

156. Defendants' actions have thus caused the waste, loss of established rent and unlawful disbursement of millions of taxpayer dollars.

157. Unabated, this pattern of behavior by defendants will continue to cost the taxpayers of San Francisco millions of dollars in unpaid rent, the wasteful loss of the FHC as a community resource, and the loss of thousands of dollars of taxpayer funds improperly diverted to Defendants and their cohorts as part of their kickback/corruption scheme.

158. Pursuant to CCP § 526a, the Court may issue an order requiring officials to repay wasted funds to the taxpayers. The Court may also issue an order restraining defendants from selling the FHC to defendants' cronies, or, alternatively, requiring defendants to accept the most qualified RFP proposal and grant control of the FHC to the most qualified RFP respondent, namely plaintiff.

159. Plaintiff has suffered a direct injury as a consequence of defendants' actions, to wit, the costs associated with preparing his (then-unknowingly futile) RFP proposal in reliance

on the RFP process and terms created by defendants, and his loss of prospective income and economic benefits associated with operating the FHC.

160. Plaintiff is further entitled to recover from defendants his reasonable costs and attorney fees incurred in bringing this action pursuant to CCP § 1021.5.

**TWO: Fraud, Misrepresentation, And Deceit**
**(Cal. Civ. Code §§ 1572, 1709, 1710)**
**Against All Defendants, Including Each Individual Defendant in his/her Personal Capacity**

161. Plaintiff hereby re-alleges and incorporates by reference the foregoing paragraphs, as if set forth in full herein.

162. Defendants falsely represented that the RFP for the Fillmore Heritage Center was a legitimate bidding process under California law, pursuant to which responsive bidders would be evaluated based on the criteria set forth in the RFP and required under California law.

163. Defendants' foregoing representations were false and misleading, and defendants made them knowing them to be false and misleading.

164. Rather, the RFP was a sham from the start. Defendants never sincerely intended to conduct a fair RFP process based on competitive bidding, nor to genuinely consider plaintiffs' and other bidders' proposals within the RFP framework. Rather, defendants designed the RFP as a smoke screen for their plan to steer the Center into the hands of their cronies.

165. Defendants' acts of deceit and misrepresentation include: the establishment and administration of the sham RFP, and creation of the RFP Review Panel ("the Panel"), chaired by Amos Brown, a London Breed loyalist and supporter selected to do Mayor Breed's bidding on the Panel, not the public's, and comprised in part of panelists clandestinely solicited by defendants for their support and loyalty to London Breed. Before the Panel was announced, defendants secretly determined the Panel's composition, by selecting Panel members who never applied for the position, in derogation of the City's published RFP guidelines. Defendants then presented to the public a sham RFP and Review Panel application process, designed to give the public the false impression that a fair and equitable Review Panel member selection and proposal judging process was taking place. These acts defrauded the public, legitimate Panel applicants, and RFP bidders including Plaintiff Shiferaw, whom defendants induced to waste substantial

time and resources preparing their proposals and bids.

166. "[A] public entity should not be permitted to call for bids if, in fact, at that time it does not intend to consider the bids. A businessman is entitled to rely on the good faith of the entity in soliciting the bids." *Universal By-Products, Inc. v. City of Modesto*, 43 Cal.App.3d 145 (1974) (city's implied representation to consider the bids was false in that at the very time it issued the notice to bidders it did not intend to consider the bids in determining if the license should be awarded).

167. Here, defendants did not cancel the RFP "in the best interests" of the City (Cal. Public Contract Code § 20166; *cf. Judson Pacific-Murphy Corp. v. Durkee*, 144 Cal.App. 2d 377, 382 (1956)), but because plaintiff cornered defendants by exposing their corrupt plan and practices. Defendants therefore canceled the RFP as a pretext so they could follow through on their original corrupt plan to award the Center to cronies, as they have now done. Nor did defendants even reject all bids (*cf. id.*); rather, they have handed at least temporary management of the Center in part to one of the bidder, namely the private nonprofit San Francisco Housing Development Corporation.

168. Plaintiff reasonably relied to his detriment on defendants' misrepresentations, and devoting substantial time, resources, and funds to preparing a response to the RFP and to participating in the RFP process, and forgoing other economic opportunities as a result.

169. Defendant CCSF is vicariously liable in r*espondeat superior* for the unlawful conduct of its defendant employees as alleged herein, which were committed in the course and scope of their employment with the CCSF. Gov. Code § 815.2.

170. As a proximate and foreseeable consequence of defendants' fraudulent conduct, plaintiff has been substantially harmed, entitling plaintiff to (1) injunctive relief against all CCSF Defendants, and (2) compensatory and exemplary monetary damages against Defendant Amos Brown.

///

///



LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

**THREE: Conspiracy to Commit Fraud, Misrepresentation, And Deceit**
**California Common Law**
**Against All Defendants, Including Each Individual Defendant in his/her Personal Capacity**

171. Plaintiff hereby re-alleges and incorporates by reference the foregoing paragraphs, as if set forth in full herein.

172. Defendants, and each of them, were aware of each others' intent to commit the fraud, misrepresentations and deceit described above, including particularly to falsely represent that the FHC RFP was a legitimate bidding process, pursuant to which responsive bidders would be evaluated based on the criteria set forth in the RFP and required under California law.

173. Defendants' acts of deceit and misrepresentation included the establishment and administration of the RFP Review Panel. Before the Panel was announced, defendants secretly determined the Panel's composition, by selecting Panel members who never applied for the position. Defendants then presented to the public a sham RFP and Review Panel application process, designed to give the public the false impression that a fair and equitable RFP and Review Panel member selection and proposal judging process was taking place. These acts defrauded the public, legitimate Panel applicants, and RFP bidders including Plaintiff Shiferaw, whom defendants induced to waste substantial time and resources preparing their proposals and bids.

174. Defendants, and each of them, intended and agreed, whether explicitly or tacitly, to commit the fraud, misrepresentation, and deceit described above.

175. As a proximate and foreseeable consequence of defendants' fraudulent conduct, plaintiff has been substantially harmed, entitling plaintiff to (1) injunctive relief against all CCSF Defendants, and (2) compensatory and exemplary monetary damages against Defendant Amos Brown.

///

///



LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

**FOUR: Denial of Equal Protection Based on Race, Ethnicity, and National Origin**
**42 U.S.C. § 1983 (14th Amendment)**
**Against All Defendants, Including Each Individual Defendant**
**in his/her Individual, Personal Capacity**

176. Plaintiff hereby re-alleges and incorporates by reference the foregoing paragraphs, as if set forth in full herein.

177. The Fourteenth Amendment to the U.S. Constitution guarantees plaintiff the right to be free from invidious discrimination based on race, ethnicity, national origin, and immigrant status.

178. Defendants, and each of them, acting under color of state law, denied plaintiff equal protection of the law when defendants denied gave preferential treatment to plaintiff's competitors and denied plaintiff's RFP proposal, motivated out of animus and bias against plaintiff based on plaintiff's race, ethnicity, Ethiopian origin, and/or immigrant status.

179. Defendants' acts and omissions had the discriminatory effect of causing plaintiff to be denied selection as the winning bidder for no reason but plaintiff's race, ethnicity, national origin, and/or immigrant status.

180. Defendant City and County of San Francisco is directly liable to plaintiff under *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658 (1978) for engaging in a pattern and practice of depriving plaintiff of his right to equal protection, in the manners alleged above. Defendant CCSF is also directly liable to plaintiff because CCSF policymakers with "final policymaking authority," including Defendant Breed, as San Francisco's President of the Board of Supervisors and its current Mayor, and Defendant Vallie Brown, as San Francisco's current District 5 Supervisor, have failed to correct and redress, and have thereby ratified, the City's ongoing deprivations of Plaintiff's rights to procedural and substantive due process, along with the continuing corrupt mismanagement of the Center and concomitant waste of taxpayer resources.

181. The City's wrongful acts and omissions herein about which plaintiff complains are the product of the City's custom and practice of treating immigrant and non-U.S.-born African Americans disparately, discriminatorily, and unfavorably—a practice which is widespread and widely-known within the local business community and City government. The



LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

City's wrongful acts and omissions are also the product of the defendants', including the City's and Mayor Breed's, custom and practice of engaging in "pay to play" schemes in which businesses and individuals who provide money or services to government officials or employees, like Mayor Breed and Amos Brown in this case, are rewarded with benefits, privileges, and City contracts in exchange.

182. Defendants' unlawful acts and omissions, as alleged above, were also ratified by City policymakers, including Vallie Brown, a City Supervisor, and London Breed, a City Supervisor and Mayor, who had direct and constructive knowledge of the City's custom practice of discriminating against African Americans of immigrant origin, including plaintiff. In Mayor Breed's case, she personally and directly evinced, encouraged, and ratified discrimination against Plaintiff, stating, about the Center: "I'm not going to give it to that African," meaning plaintiff. As Mayor and final policymaker for the City, Defendant Breed has the power to end the City's practice and custom of discriminating against non-U.S. born African American business people, including plaintiff, but instead has chosen to maintain it, including by continuing to deny fair consideration to plaintiff of both his RFP proposal and his purchase agreement with Michael Johnson to acquire the FHC.

183. As an actual and proximate result of defendants' above-described conduct, plaintiff has suffered damages in amounts to be proven at trial.

**FIVE: Retaliation for Exercise of Free Expression and Petition**
**42 U.S.C. § 1983 (First, Fifth, and Fourteenth Amendments)**
**Against All Defendants, Including Each Individual Defendant in his/her Individual, Personal Capacity**

184. Plaintiff hereby re-alleges and incorporates by reference the foregoing paragraphs, as if set forth in full herein.

185. Plaintiff has rights under the First, Fifth, and Fourteenth Amendments to the U.S. Constitution to be free from interference by government officials with his rights to free expression and petition for redress of grievances, and to be free from retaliation for exercising those rights. Defendants, and each of them, acting under color of state law, abridged plaintiff's afore-described rights.

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

186. In giving preferential treatment to plaintiffs' competitors and rejecting plaintiff's RFP bid, defendants, and each of them, were substantially motivated by plaintiff's exercise of his protected rights to free expression and to petition the government for redress of grievances.

187. The City's wrongful acts and omissions herein about which plaintiff complains are the product of the City's custom and practice of treating immigrant and non-U.S.-born African Americans disparately, discriminatorily, and unfavorably—a practice which is widespread and widely-known within the local business community and City government. The City's wrongful acts and omissions are also the product of defendants', including the City's and Mayor Breed's, custom and practice of engaging in "pay to play" schemes in which businesses and individuals who provide money or services to government officials or employees, like Mayor Breed and Amos Brown in this case, are rewarded with benefits, privileges, and City contracts in exchange, and those, like plaintiff, who challenge and buck these practices are treated as *persona non grata* and denied City contracts and access to City officials and resources.

188. Defendants' unlawful acts and omissions, as alleged above, were also ratified by City policymakers, including Vallie Brown, a City Supervisor, and London Breed, a City Supervisor and Mayor, who had direct and constructive knowledge of the City's custom practice of discriminating against African Americans of immigrant origin, including plaintiff, and of "pay to play" schemes such as defendants' use of the FHC and manipulation of the RFP process, as described above. In Mayor Breed's case, she personally and directly evinced, encouraged, and ratified discrimination against Plaintiff, stating, about the Center: "I'm not going to give it to that African," meaning plaintiff. And she substantially oversaw and directed the "pay to play" scheme involving the FHC. As Mayor and final policymaker for the City, Defendant Breed has the power to end the City's practice and custom of discriminating against non-U.S. born African American business people, including plaintiff, and engaging in and tolerating pay-to-play schemes. Instead, however, she has chosen to maintain these practices, including by continuing to deny fair consideration to plaintiff of both his RFP proposal and his purchase agreement with Michael Johnson to acquire the FHC.

189. As an actual and proximate result of defendants' above-described conduct, plaintiff has suffered damages in amounts to be proven at trial.

**SIX: Conspiracy To Violate Civil Rights**
**42 U.S.C. §§ 1983 and 1985 and Federal Common Law**
**Against All Individual Defendants in their Individual, Personal Capacities**

190. Plaintiff hereby re-alleges and incorporates by reference the foregoing paragraphs, as if set forth in full herein.

191. Defendants, and each of them, acting under color of state law, conspired with one another to violate plaintiff's civil rights, including his constitutional rights to due process and to contract freely; to equal protection of the laws; to engage in free expression; and to petition government officials for redress of grievances.

192. Defendants agreed, whether explicitly or through a tacit meeting of the minds, to deprive plaintiff of fair and unbiased consideration of his RFP proposal, each defendant playing his/her part and acting intentionally in furtherance of this conspiracy, by engaging in the acts and omissions afore-described.

193. As an actual and proximate result of defendants' above-described conduct, plaintiff has suffered damages in amounts to be proven at trial.

**SEVEN: Unlawful Business Practices**
**California Business & Professions Code §§ 17200 *et seq*.**
**Against Amos Brown in his Personal Capacity**

194. Plaintiff hereby re-alleges and incorporates by reference the foregoing paragraphs, as if set forth in full herein.

195. Business and Professions Code §§ 17200 *et seq*. (the Unfair Competition Law or UCL) prohibits any person from engaging in unlawful, unfair, or fraudulent business act or practice; any unfair, deceptive, untrue, or misleading advertising; or any violation of Business and Professions Code §§ 17500 et seq.

196. Mr. Brown sought and obtained the RFP Chairpersonship by means of deceiving and misleading the RFP selection committee regarding his true goal and purpose for doing so, which was to assist his fellow defendants in running a sham RFP, designed as a smokescreen to be used to steer control of the Center to Defendant Breed's political allies and friends. Mr.

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

Brown's fraudulent conduct in seeking and obtaining the RFP Chairpersonship can be inferred, in part, from the misconduct he demonstrated in that position, including showing favoritism to plaintiff's RFP competitors FHC2017 (principals Tim and Vicky Shelton) and solicitating and receiving bribes from the Sheltons in the form of sponsorship of his Third Baptist Church anniversary event.

197. As a direct, proximate, and foreseeable consequence of Defendant Amos Brown's unfair business practices, plaintiff has suffered damages in amounts to be proven at trial.

**EIGHT: Intentional Interference With Prospective Economic Advantage**
**California Common Law**
**Against All Individual Defendants in Their Personal Capacities**

198. Plaintiff hereby re-alleges and incorporates by reference the foregoing paragraphs, as if set forth in full herein.

199. Plaintiff and Michael Johnson had an economic relationship involving plaintiff's purchase of the Center that would have resulted in an economic benefit to plaintiff. Defendants knew of this relationship. In refusing to accept and approve plaintiff's and Johnson's agreement and thwarting plaintiff's purchase of the Center, defendant's intentionally disrupted this relationship, thereby harming plaintiff.

200. Defendants' conduct was a substantial factor in causing plaintiff's harm.

201. Additionally, in the favoritism defendants showed to plaintiff's competitors, in failing to conduct a fair and unbiased RFP process, and through their many improprieties described above, defendants intentionally interfered with, and deprived plaintiff of, a prospective economic advantage, namely operation of the Fillmore Heritage Center, and the benefits plaintiff would have derived thereunder.

202. As a proximate and foreseeable consequence of defendants' interference with plaintiff's prospective economic advantage, plaintiff has been substantially harmed, entitling plaintiff to (1) injunctive relief against all CCSF Defendants, and (2) compensatory and exemplary monetary damages against Defendant Amos Brown.

**NINE: California Political Reform Act**
**California Government Code §§ 81000 *et. seq.***
**Against Amos Brown in his Personal Capacity**

203. Plaintiff hereby re-alleges and incorporates by reference the foregoing paragraphs, as if set forth in full herein.

204. The Political Reform Act of 1974 (Cal. Gov. Code §§ 81000 *et seq*.) (the "Reform Act") prohibits public officials from acting in matters where their private interests might conflict with their public duties. The purpose of the Reform Act is to prevent public officials from acting in the face of a conflict of interest unless such action is absolutely necessary.

205. Section 81000 of the Reform Act, provides, in pertinent part: "No public official at any level of . . . local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest."

206. Section 87103 of the Reform Act provides, in pertinent part: "An official has a financial interest in a decision within the meaning of Section 87100 if it is reasonably foreseeable that the decision will have a material financial effect, distinguishable from its effect on the public generally, on … (c) Any source of income . . . aggregating five hundred dollars ($500) or more in value … received by [] the public official within 12 months prior to the time when the decision is made.."

207. For the purposes of disqualification under Section 87100 and 87103, "a public official has an economic interest in any donor of, or any intermediary or agent for a donor of, a gift or gifts aggregating $500 or more in value provided to, received by, or promised to the public official within 12 months prior to the time when the decision is made."

208. An officer of a city or his agent is not entitled to represent secretly a party adverse to the city and to accept a fee for such service. A public officer may not make an unauthorized profit out of the particular public business which has been entrusted to his care. An agent stands in a fiduciary relationship to his principal, and if he makes a secret profit from the subject matter of his agency, the principal may recover such profit.

209. Local government officials and employees are in violation of the rules and statutes forbidding conflict of interests when they vote, or in any other way approve or disapprove of requests for local action, if they have a disqualifying interest in the matter.

210. Defendant individuals are public officials subject to the Political Reform Act under California Government Code § 82048, which defines public officials to include every officer or employee of a local governmental agency.

211. By soliciting and accepting financial contributions from RFP bidders to his Third Baptist Church anniversary event while serving as the RFP Review Panel Chairperson, and by then failing to withdraw from this position, Def. Amos Brown violated the Reform Act By enabling, encouraging, approving, and/or allowing Defendant Brown to do so, and by failing to require him to withdraw from his position after doing so, the other individual defendants also violated the Reform Act.

212. Defendant CCSF is vicariously liable in r*espondeat superior* for the unlawful conduct of its defendant employees as alleged herein, which were committed in the course and scope of their employment with the CCSF. Gov. Code § 815.2.

213. As a direct, proximate, and foreseeable consequence of defendants' violations of the Reform Act, plaintiff has suffered damages in amounts to be proven at trial.

**TEN: Violation of the San Francisco Ethics Ordinance**
**California Government Code § 87300**
**Against Amos Brown in his Personal Capacity**

214. Plaintiff hereby re-alleges and incorporates by reference the foregoing paragraphs, as if set forth in full herein.

215. California Government Code ("Gov. Code") § 87300 requires every agency in the state to adopt and promulgate a Conflict of Interest Code pursuant to the provisions of the Reform Act. Defendants City and County of San Francisco and The Mayor's Office Of Economic and Workforce Development are "agencies" within the meaning of Section 87300.

216. Pursuant to § 87300, San Francisco enacted the San Francisco Government Ethics Ordinance (the "Ethics Ordinance"), which is codified in San Francisco Campaign and Government Code ("SFC&G Code") § 3.200 et seq.

217. SFC&G Code" § 3.214(a) requires City officers and employees to "disclose on the public record any personal, professional or business relationship with any individual who is the subject of or has an ownership or financial interest in the subject of a governmental decision being made by the officer or employee where as a result of the relationship, the ability of the officer or employee to act for the benefit of the public could reasonably be questioned."

218. By failing to disclose Amos Brown's solicitation and receipt of funds from FHC2017 principals Timothy and Cindy Shelton, defendants, and each of them, have violated the Ethics Ordinance.

219. Defendant CCSF is vicariously liable in r*espondeat superior* for the unlawful conduct of its defendant employees as alleged herein, which were committed in the course and scope of their employment with the CCSF. Gov. Code § 815.2.

220. As a direct, proximate, and foreseeable consequence of defendants' violations of the Ethics Ordinance as alleged herein, plaintiff has suffered damages in amounts to be proven at trial.

221. Pursuant to SFC&G Code § 3.214(b), a court may void any governmental decision made by a city officer or employee who willfully fails to disclose a relationship as required by § 3.214(a) Plaintiff is therefore entitled to an injunction rescinding defendants' decisions rejecting plaintiff's RFP proposal and terminating the RFP.

**RELIEF SOUGHT**

222. Wherefore, plaintiffs pray for relief and judgment against defendants, jointly and severally, as follows:

223. Injunctive and declaratory relief in favor of San Francisco taxpayers, including:

(a) enjoining defendants from leasing, selling, gifting, or otherwise transferring control of the Fillmore Heritage Center to the San Francisco Housing Development Corporation and the New Community Leadership Foundation;

(b) enjoining defendants from leasing, selling, gifting or otherwise transferring control of the FHC to anyone, especially defendants' friends and political allies, in derogation of applicable public contracts and bidding laws;

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

(c) ordering defendants to collect, on behalf of the citizens of San Francisco, all outstanding rents and loan payments owed by Fillmore Heritage Center tenants;

(d) ordering defendants to cease paying SFHDC/NCLF to occupy the Fillmore Heritage Center;

(e) declaring plaintiff to be the sole qualifying applicant under the Fillmore Heritage Center RFP and/or ordering defendants to select plaintiffs' RFP proposal as the winning bid for the purchase, management, and control of the Fillmore Heritage Center in accordance with the terms of the RFP; or, alternatively ordering defendants initiate a new RFP process while appointing a special court master to oversee it and ensure that the process is lawful and transparent;

(f) ordering defendants to approve the May 22, 2015 purchase agreement between plaintiff and Michael Johnson;

(g) ordering defendants to repay the City for the costs and expenses incurred as a result of their acts in violation of California Civil Code Section 526a and California Health and Safety Code §§ 33430-33431, 33433, and 34181;

(h) ordering defendants (d) to conduct the RFP process fairly; (e) to select plaintiffs' RFP proposal as the winning bid for purchase, management, and control of the Fillmore Heritage Center project; (f) to extend plaintiff equal loan terms, discounts, and opportunities with respect to plaintiff's existing loans with the defendants, compared to similarly or worse situated other borrowers; and

(i) voiding any action by defendants inconsistent with the foregoing relief.

224. Civil penalties of $5,000 for each violation of the San Francisco Ethics Ordinance proven, pursuant to SFC&G Code § 3.242;

225. Any and all other statutory penalties provided under applicable laws;

226. Compensatory damages;

227. Special damages;

228. Punitive (exemplary) damages, against the individual defendants in their individual, personal capacities;

229. Attorneys' fees, including under 42 U.S.C. § 1988 and California Code of Civil Procedure § 1021.5;

230. Expert witness fees;

231. Costs of litigation;

232. Pre- and post-judgment interest in the maximum amounts allowable; and

233. Such other relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

234. Plaintiff demands trial by jury as to each and every claim/causes of action recited above for which a jury trial is available.

Respectfully Submitted,

Ben Rosenfeld
Tesfaye W. Tsadik

September 4, 2020 By: *s/ - Ben Rosenfeld*_____
Ben Rosenfeld
Attorneys for Plaintiff