BEN ROSENFELD (SBN 203845)
PIER 5 LAW OFFICES
3330 Geary Blvd., 3rd Floor East
San Francisco, CA 94118
Tel: (415) 285-8091
Fax: (415) 285-8092
ben.rosenfeld@comcast.net

TESFAYE W. TSADIK (SBN 108103)
LAW OFFICES OF TESFAYE TSADIK
1736 Franklin Street, 9th Floor
Oakland, CA 94612
Tel. (510) 839-3922
Fax: (510) 444-1704
ttsadik@pacbell.net

Attorneys for Plaintiff Agonafer Shiferaw,
dba Fillmore Entertainment Complex / Republic of Fillmore, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AGONAFER SHIFERAW, | Case No. 4:18-cv-06830-SBA (JSC) |
| Plaintiff, | |
| v. | PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT |
| CITY AND COUNTY OF SAN FRANCISCO, et al., | |
| Defendants. | Date:       April 28, 2021 |
| | Time:       2:00 pm. |
| | Place:      Video Conference |
| | (Honorable Saundra Brown Armstrong) |

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

ARGUMENT ........................................................................................................1

   I.   PLAINTIFF'S RECORD FACTS PRECLUDING SUMMARY
       JUDGMENT ...............................................................................................1

     A.  The Fillmore Jazz District and the Fillmore Heritage Center ....................1

     B.  Plaintiff Agonafer Shiferaw, his Qualifications, and Interest in the
        Center .................................................................................................1

     C.  The Sham Request for Proposals and Mayor Breed's Cherry Picking of
        Friends and Allies to Serve on the RFP Review Panel ...............................1

     D.  Plaintiff's RFP Proposal Exceeded All of the Criteria .............................3

     E.  Favoritism and Solicitude Shown by Defendants to Respondent
        FHC2017 ..............................................................................................3

     F.  The City's Abrupt and Arbitrary Cancelation of the RFP in the Wake of
        Mr. Shiferaw's Whistleblowing ...............................................................4

     G.  Mayor Breed's and Her Fellow Defendants' Improper Recruitment of
        and Negotiations with Dr. Bates, and Evidence that they Canceled the
        RFP to Facilitate Dr. Bates' Purchase of the Center ...............................5

     H.  Defendants Settle for Gifting the Center to Mayor Breed's Ally Majeid
        Crawford of the NCLF in an Effective No Bid, Single Source,
        Sweetheart Deal ...................................................................................8

        1.  The NCLF's Main "Qualification" Was Its Head, Majeid
           Crawford's, Loyalty to London Breed ...............................................9

        2.  The NCLF Exhortation to Supporters to Disrupt a Political Forum
           for Breed's Mayoral Campaign Rivals ...........................................11

        3.  Fatal Shooting During NCLF's Funeral for Drug Kingpin Re-
           Shutters the Center .........................................................................12

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

II. PLAINTIFF'S FIRST CAUSE FOR WASTE OF TAXPAYER RESOURCES UNDER CALIFORNIA CODE CIVIL PROC. § 526a IS VIABLE .................................................................................................12

    A. The City and County of San Francisco is the Beneficial Owner of the FHC .......................................................................................................12

    B. The City Cannot Refuse to Collect Rents on City-Owned Property Merely Because It Obtained Right to Collect Rent With Acquisition of Ownership .........................................................................................14

III. PLAINTIFF'S SECOND CAUSE FOR FRAUD, MISREPRESENTATION, AND DECEIT IN THE RFP PROCESS IS VIABLE .................................................................................................16

    A. The Individual Defendant are Not Immune From Actual Fraud, Corruption, or Malice ...............................................................................16

    B. Defendants Committed Fraud, Misrepresentation, and Deceit .................17

    C. Plaintiff's Related Third Cause of Action for Civil Conspiracy is Viable ..............19

IV. PLAINTIFF'S FOURTH CAUSE OF ACTION FOR DENIAL OF EQUAL PROTECTION BASED ON RACE, ETHNICITY, AND NATIONAL ORIGIN UNDER THE FOURTEENTH AMENDMENT / 42 U.S.C. § 1983 IS VIABLE ...............................................................................................19

V. PLAINTIFF'S FIFTH CAUSE OF ACTION FOR RETALIATION FOR EXERCISE OF FREE SPEECH AND PETITION UNDER THE FIRST AMENDMENT / 42 U.S.C. § 1983 IS VIABLE ..........................................22

    A. Defendants Cancelled the RFP Rather Than Selecting a Winning Bid Because Plaintiff Blew the Whistle on Defendants' Fraudulent RFP ....................22

    B. Defendants Are Not Entitled to Qualified Immunity ...............................23

VI. DEFENDANTS CONSPIRED TO VIOLATE PLAINTIFF'S CIVIL RIGHTS PURSUANT TO 42 U.S.C. § 1983 (SIXTH CAUSE OF ACTION) ...............................................................................................25

VII. PLAINTIFF HAS STATED VIABLE *MONELL* CLAIMS AGAINST CCSF ......................................................................................................25

CONCLUSION.................................................................................................25

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

ii

1

**TABLE OF AUTHORITIES**

2

**Federal Cases**

3

*Anderson v. Creighton*, 483 U.S. 635 (1987) ...................................................................24

4

*Auluck v. Cty. of* Alameda, 2014 U.S. Dist. LEXIS 20018 (N.D. Cal. 2014) ...........................18

5

*Bari v. Held*, 1992 U.S. Dist. LEXIS 13634, *53 (N.D. Cal. 2013)................................................22

6

*Board of County Commissioners v. Umbehr*, 518 U.S. 668 (1996).............................................24

7

*Bracken v. Okura*, 869 F.3d 771, 778 (9th Cir. 2017) ........................................................23

8

*Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115 (9th Cir. 2000)........................................17

9

*Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008) ........................................................20

10

*Esmail v. Macrane*, 53 F.3d 176 (7th Cir. 1995) ...............................................................19

11

*Fisher Sand & Gravel Co. v. Clark County*, 2010 U.S. Dist. LEXIS 4888 (D. Nev. 2010).........................................................................................................................18

12

13

*Foster v. Runnels*, 554 F.3d 807 (9th Cir. 2009) .................................................................24

14

Fuller v. City of Oakland, 47 F.3d 1522 (9th Cir.1995) ........................................................25

15

*Geinosky v. City of Chicago*, 675 F.3d 743 (2012)..............................................................20

16

*Gerhart v. Lake County, Montana*, 637 F.3d 1013 (9th Cir. 2011)..................................19, 20, 21

17

*Guillemard-Ginorio v. Contreras-Gomez*, 490 F.3d 31 (1st Cir. 2007)...................................23

18

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .......................................................................23

19

*Healthcare Emples. Union, Local 399 v. NLRB,* 463 F.3d 909 (9th Cir. 2006)..........................22

20

*Inouye v. Kemna*, 504 F.3d 705 (9th Cir. 2007) .................................................................24

21

*Kunik v. Racine County*, 946 F.2d 1574 (7th Cir. 1991) ....................................................25

22

*Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991) ...............................................25

23

*Lucas v. Monroe County*, 203 F.3d 964 (6th Cir. 2000)......................................................24

24

*Malley v. Briggs*, 475 U.S. 335 (1986) .............................................................................23

25

*Mathers v. Wright,* 636 F.3d 396 (8th Cir. 2011) ..............................................................24

26

*McCardle v. Haddad*, 131 F.3d 43 (2d Cir. 1997)..............................................................23

27

28

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

*Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283 (9th Cir. 1999) ...............................25

*Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836 (10th Cir. 2005)................................................20

*Morgan v. Morgensen*, 465 F.3d 1041 (9th Cir. 2006)................................................................24

*Nat'l Union Fire Ins. Co. v. Garber*, 45 F.App'x 564 (9th Cir. 2002) ..........................................17

*Nev. Partners, Inc. v. Workforce Connections*, 2019 U.S. Dist. LEXIS 142597 (D.
     Nev. 2019) ............................................................................................................................19

*Oscar Renda Contracting, Inc. v. Lubbock,* 463 F.3d 378 (5th Cir. 2006) ..................................24

*Putman v. Gerloff*, 701 F.2d 63 (8th Cir. 1983)..........................................................................25

*Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678 (9th Cir. 2017) ............................................23

*Rutkin v. Reinfeld*, 229 F.2d 248 (2d Cir. 1956) ........................................................................25

*Scott v. Harris*, 550 U.S. 372 (2007) ..........................................................................................7

*Seariver Mar. Fin. Holdings v. Mineta*, 309 F.3d 662 (9th Cir. 2002)........................................19

*Sloan v. GM LLC,* 2020 U.S. Dist. LEXIS 71982 (N.D. Cal. 2020) ..........................................17

*Vaughn v. Ruoff*, 253 F.3d 1124 (8th Cir. 2001)..........................................................................24

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) ........................................................19, 20

*Warren v. City of Carlsbad*, 58 F.3d 439 (9th Cir. 1995) ..........................................................17

*Wilson v. Lawrence County*, 260 F.3d 946 (8th Cir. 2001) ........................................................24

*Wyatt v. Cole*, 504 U.S. 158 (1992) ............................................................................................23

*Yagman v. Gali*po, 2013 U.S. Dist. LEXIS 6978 (C.D. Cal. 2013)..............................................18

**State Cases**

*City of Anaheim v. Cty. of San Diego*, 190 Cal.App.3d 695 (1987) ............................................13

*Curcini v. Cnty. of Alameda*, 164 Cal.App.4th 629 (2008) ........................................................17

*Eisley v. Mohan*, 31 Cal.2d 637 (1948) ......................................................................................13

*Elliott v. McCombs*, 17 Cal.2d 23 (1941) ..................................................................................13

*Fireside Bank Cases*, 187 Cal.App.4th 1120 (2010) ..................................................................15

*General Dynamics Corp. v. County of L.A.*, 51 Cal.2d 59 (1958)................................................12

*Shipyard Workers Educ. Asso. v. Lynch*, 250 Cal.App. 2d 238 (1967) ...........................................12

*Slater v. Bielsky*, 183 Cal.App.2d 523 (1960)................................................................................17

*Taylor Bus Service, Inc. v. San Diego Bd. of Education*, 195 Cal.App.3d 1331 (1987) ..............17

*Taus v. Loftus*, 40 Cal.4th 683 (2007)............................................................................................17

*Timm Aircraft Corp. v. Byram*, 34 Cal.2d 632 (1950) ...................................................................13

**State Statutes**

California Gov. Code § 822.2 .............................................................................................16, 17, 18

California Health and Safety Code § 34191.5 ..................................................................................14

**Local Ordinances**

San Francisco Admin. Code § 23.30 .................................................................................................14

San Francisco Admin. Code § 23.35 .................................................................................................15

**Other Authorities**

*Donahue v. Board of Levee Comm'rs,* 413 So.2d. 488, 492 (La. 1982) ..........................................18

*Gurtler, Herbert & Co. v. Orleans Parish Sch. Bd.,* 251 So.2d 51, 62 (La. Ct. App. 1971)...........................................................................................................................................18

**Treatises**

10 McQuillian, Municipal Corporations § 29.77, at 438-39..........................................................18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

**ARGUMENT**

## I.    PLAINTIFF'S RECORD FACTS PRECLUDING SUMMARY JUDGMENT

### A.    The Fillmore Jazz District and the Fillmore Heritage Center

Known as the "Harlem of the West," the Fillmore is a historically African-American neighborhood and former center of Bay Area Black culture, and home to a vibrant jazz scene, nightlife, and thriving local businesses. The Fillmore Heritage Center ("the Center") was built with public funds and conceived as the flagship of economic and cultural renewal of the Fillmore Jazz Preservation District. (Exhibits 2 - 7/7/15 Memo by OCII at 1; 5 – 11/23/15 Resolution of the Successor Agency to the Redevelopment Agency; 6 - Cal. Dept. of Finance Long-Range Property Management Plan ("LRPMP"); 7 – 1/28/16 RFI; 8 - 2/10/17 RFP at 1-2 and 29 – 2/18/18 emails to/from Joaquin Torres.)

### B.    Plaintiff Agonafer Shiferaw, his Qualifications, and Interest in the Center

Plaintiff Agonafer Shiferaw is a successful San Francisco businessman of Ethiopian heritage, who has owned and operated businesses in the City and County of San Francisco since 1981, including two locations of the former Rasselas jazz club, on Fillmore and California Streets. (Decl. Shiferaw, ¶¶ 1-6.) In early 1997, Mr. Shiferaw obtained a tenant improvement loan from the City, in part to develop the second Rasselas location on Fillmore Street. Of those developers selected to receive one of these loans, Mr. Shiferaw alone made payments in accordance with the terms and remains current today. (Decl. Shiferaw, ¶ 30.)

Mr. Shiferaw expressed interest in developing the Fillmore Heritage Center since before the City issued its RFP in February 2017, and has made four separate bona fide offers to purchase and/or reactivate it, each of which defendant officials rebuffed or actively thwarted, out of animus toward him and favoritism toward others. (Decl. Shiferaw, ¶¶ 7-13, 36.)

### C.    The Sham Request for Proposals and Mayor Breed's Cherry Picking of Friends and Allies to Serve on the RFP Review Panel

On February 10, 2017, three years after anchor tenant Yoshi's closed, the City issued its Request for Proposals ("RFP") for the purchase and operation of the Center, with the goal of creating a "vibrant and financially viable commercial establishment, such as an entertainment venue [in order to] revitalize the [Fillmore] commercial corridor and to honor the cultural

heritage of the neighborhood … the "'he Harlem of the West,' … [with emphasis on] performing arts, visual/media arts, food, and recreation/leisure activities." (Ex. 8 at 1-2 (setting forth detailed Project Goals and Objectives" at 5-6). However, the evidence shows that the RFP was a fraud and a charade from start to finish, designed as a pretext and a smokescreen to sidestep state and local government contracting and bidding laws, and to steer the project into the hands of then-Supervisor, soon to be Mayor London Breed's and her fellow defendant' officials friends and political supporters, who lacked the experience, finances, and commitment to the community's interests which the RFP purported to require.

Though Mayor Breed, as the then District 5 Supervisor (the District in which the Center sits) had no official role to play in the RFP process once it was underway, she acknowledged between the lines of her deposition testimony that she played an active role in the process from beginning to end, making sure that the RFP reflected the Fillmore community's values and goals (Ex. 51 – Breed Depo at 79:24-84:7, 85:24-86:7; Ex. 7 –1/28/16 RFI); recruiting Reverend Amos Brown to serve on the Review Panel (Breed depo at 86:18-21, 91:9-92:9); receiving briefing on the proposals; and receiving advanced notice of the City's cancellation of the RFP before the bidders and the public were notified. (Breed depo at 92:22-94:25, 96:9-99:13.)

The RFP provided for a Review Panel to be comprised of five community members and four representatives of City departments, whose job it was to review qualifying RFP applicants based upon criteria specified in the RFP, and ultimately to select a winning proposal. (Ex. 8 at 12-13.) The evidence shows, however, that defendant officials, including London Breed and Joaquin Torres, cherry picked the Review Panel chairperson and members without receiving or reviewing any applications.  (No application materials have ever been produced by defendants.) (Decl. of Ben Rosenfeld, ¶ 16; Decl. of Shiferaw, ¶ 18.)

The Review Panel was comprised of "community panelists" Rev. Amos Brown, Chair, and members LaTonia Grice, Darryl Dieter, Rick Swig, and Audrey Joseph. (Ex. 9.) Two of them, however (Rick Swig and Audrey Joseph) neither lived nor worked in the Fillmore District nor the Western Addition, and had no discernable connections to the Fillmore community. (Decl. Shiferaw, ¶ 18.) Three of these five chosen—Rev. Brown, Grice, and Swig—were personal friends and political allies of London Breed. (Ex. 51 – Breed Depo at 88:16-18, 88:21-89:19,

91:9-92:9); Decl. Shiferaw, ¶ 18.) Mayor Breed testified that she personally recruited Rev. Amos

Brown (Ex. 51 – Breed Depo at 86:18-21, 91:9-92:9), and acknowledged that her office may

have made other suggestions. (Id. at 86: 18-19.) Mayor Breed testified that she chose Rev.

Brown based on his vociferous opinions regarding the fate of the Center. (Ex. 51 – Breed Depo

at 91:9-92:9.) Rev. Brown and Latonia Grice were notified of their selection even before the

selection process was announced. (Decl. Shiferaw, ¶ 18.)  At least one person—Attorney Carl

Williams, former Director of the San Francisco Housing Authority, the only living original

member of the Fillmore Jazz Preservation District Committee—applied to serve on the Review

Panel but never even heard back from the City. (Decl. Shiferaw, ¶ 18.)

Based on these facts, a reasonable jury could conclude they were selected specifically and

only because Mayor Breed picked them and saw to it that they were simply installed.

### D.    Plaintiff's RFP Proposal Exceeded All of the Criteria

On April 24, 2017, Plaintiff Shiferaw submitted his timely RFP response.  (Ex. 8.)  His

was one of five, financially *pre-qualified* proposals for the purchase and development of the

Center. (Decl. Shiferaw, ¶ 14; Ex. 11 – earnest money deposit.) Defendants accepted Shiferaw's

proposal for consideration, thereby representing that he had met the requirements for

consideration. Shiferaw's proposal met and exceeded each of the RFP requirements, as detailed

in his proposal (Ex. 8) and recounted in his Declaration hereto.  (Decl. Shiferaw, ¶¶ 29-30.)

Relying to his detriment on defendants' representation that the RFP process was genuine, and

that his proposal would be given fair and equal consideration, Mr. Shiferaw spent roughly

$25,000 on the preparation and submission of his proposal. (Decl. Shiferaw at ¶ 17; Ex. 15 –

itemization of costs, cancelled checks, and consultant contract.). However, the RFP was a

charade and a pretext from the start, designed as a smoke screen for defendants' plan to

circumvent the bidding process, and to steer the Center into the hands of defendant officials'

friends and political cronies.

### E.    Favoritism and Solicitude Shown by Defendants to Respondent FHC2017

In August 2017, Defendant Rev. Amos Brown solicited financial sponsorships from RFP

bidders for a 40th anniversary event he and his wife, Jane Brown, were set to host at the Third

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

Baptist Church. with the Church on September 8, 2017—*while Rev. Brown was serving as the Review Panel Chair of the pending RFP*. Plaintiff Shiferaw received two calls from Jane Brown soliciting contributions to the anniversary event. In adherence to law and principle, Shiferaw declined. However, Tim Shelton, principal of Shiferaw's competitor FHC2017, did sponsor the event, as reflected in the event program and testified to by Mr. Shelton. (Ex. 18 – Event Program.) This improper conduct by Rev. Brown, in violation of the California Political Reform Act of 1974, gave FHC2017 an unfair advantage over Mr. Shiferaw with Rev. Brown. (Decl. Shiferaw, ¶ 24; Exhibit 19 – 10/6/17 letters by Shiferaw's counsel to City Attorney.) Notably, Shelton testified that he also sponsored a 2017 Juneteenth event in part so Amos Brown would notice him. (Ex. 50 – Shelton Depo at 28:2-30:24, 48:16-19, 51:7-13.)[1]

### F. The City's Abrupt and Arbitrary Cancelation of the RFP in the Wake of Mr. Shiferaw's Whistleblowing

On May 3, 2018, Mr. Shiferaw raised a number of the foregoing irregularities and illegalities in a letter, through his counsel, to the San Francisco City Attorney's Office. (Ex. 19; (Decl. Shiferaw, ¶ 35.) Shiferaw's exposure of the Browns' solicitation, and the Shelton's' (FH2017's) actual contribution to the Third Baptist Church anniversary event, disqualified Brown from serving as Chair of the Selection Committee and the Sheltons as bidders. This cornered defendants and disrupted their ability to continue trying to use the RFP as a vehicle for awarding control of the Center to friends and allies.

On November 2, 2017, the RFP administrators abruptly and arbitrarily announced, in a vague and threadbare email, that the City was terminating the RFP without selecting a winning bid, stating, *inter alia*: "After the Review Panel and City review, it was determined that no proposal emerged that could appropriately meet the expectations outlined in the RFP. The criteria included immediately available capital, a viable business plan, and a diverse set of community benefits. … Accordingly, consistent with RFP Section L, the City is rejecting all

---

[1] In addition, on August 11, 2017, Defendant Torres met privately with FHC2017 principals Tim and Vicky Shelton to discuss their proposal—despite the fact that an RFP administrator, Benjamin McCloskey, had indicated in a prior email to RFP respondents that the Mayor's Office would not take meetings with RFP respondents. (Decl. Shiferaw, ¶ 19; Ex. 50 – Shelton Depo at 34:6-14.)

proposals and no project will be pursued based on this RFP process." (Exhibit 22 – 11/2/17 email cancelling RFP; Decl. Shiferaw, ¶ 26.) This was false on its face. Not only were the bidders, including Mr. Shiferaw, allowed to compete only on the basis of their financial pre-qualification (Decl. Shiferaw, ¶ 14, 28-31; Ex. 13 – RFP Proposal at 28, 34), the Review Panel's assessments of the proposals belie the cursory reasons cited for the cancellation. (Ex. 21.) Notably, Mayor Breed herself glowingly praised Mr. Shiferaw's experience in operating successful businesses, i.e. restaurants and night clubs, in San Francisco, which they Mayor testified she liked to patronize.  (Ex. 51 – Breed Depo at 105:5-105:5.)

At his deposition, experienced developer Tim Shelton, principal of the bidding team FHC2017, expressed surprise and irritation over the cancellation, and the fact that the Review Panel never approached him about shoring up any supposed deficiencies in his proposal. (Ex. 50 – Shelton Depo at 21:2-18, 39:15-40:24.) Shelton could not recall another RFP he participated in which was terminated without the selection of a winner. (Ex. 50 – Shelton Depo at 20:8-11, 21:8-18, 89:12-18; Shiferaw Decl., ¶ 26.)

### G.   Mayor Breed's and Her Fellow Defendants' Improper Recruitment of and Negotiations with Dr. Bates, and Evidence that they Canceled the RFP to Facilitate Dr. Bates' Purchase of the Center

Dr. Ernest Bates is a distinguished physician, businessman, altruist, and personal friend of Mayor London Breed's and Rev. Amos Brown's, whose church Bates attends. (Ex. 49 – Bates Depo. at 24:17-25:2, 37:20-39.) Dr. Bates did not submit a proposal in response to the RFP.  (Id. at 31:23-33:9.) But that did not stop then Supervisor and later Mayor Breed, Vallie Brown and others from pulling out all the stops to try to award control of the Center to him in a no bid, single source, shady deal, brokered in part by Mayor Breed over her personal email account, involving records which the City has never produced, and which Mayor Breed admits deleting. Ex. 51 – Breed Depo at 17:7-13, 54:1-57:12, 109:9-111:19.)[2]

---

[2] Plaintiff intends to file separately, in conjunction herewith, a motion for relief under F.R.Civ.P. 56(d) related to defendants' prejudice spoliation and evident continued withholding of material documents in this case, along with their extremely tardy production of other documents (a number coming on April 16, 2021, two and a half weeks after defendants filed their MSJ. (See Decl. Ben Rosenfeld, ¶ 12; Ex. 26, reflecting Mayor Breed's communications with Dr. Breed over her personal gmail address.)

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

According to Dr. Bates, Review Panel Chair Rev. Brown first encouraged him to vie for use of the Center, to open a medical business, involving installing a giant proton beam machine there. (Ex. 49 – Bates' Depo at 18:3-11, 23:10-16, 31:9-16.) Records withheld and/or spoiled by defendants, but produced late in the case by third party witness Dr. Ernest Bates—a close personal friend of Mayor Breed's—show that on n May 30, 2017, more than a month after the RFP response deadline, Amy Cohen, of the Mayor's Office of Economic and Workforce Development ("OEWD"), notified Joaquin Torres (who was supposed to be responsible for the already-closed RFP process) of a site tour she was arranging for Dr. Bates and his business partner, Craig Fruin. (Ex. 23.) A couple months later, at the suggestion of his friend London Breed, Bates spoke with Vallie Brown (also with OEWD) who arranged another site tour in July 2017, also outside of the already closed, but still pending, RFP process. Vallie Brown expressly notified Joaquin Torres of Bates pending tour. (Ex. 24.)

On November 7, 2017, just five days after the City canceled the RFP, Mayor Breed began earnestly trying to broker Dr. Bates' purchase or lease of the Center for his medical business, despite the fact that such a use was far afield of the community uses of the space which Mayor Breed has piously pretended to champion. In so doing, Mayor Breed arranged a private dinner meeting between herself, Dr. Bates, then Mayor Ed Lee, then City Administrator Naomi Kelly, and others, to promote Dr. Bates' interest in the Center. (Ex. 51 – Breed Depo at 15:7-25:21; Exhibits 26 – Breed's personal email exchanges with Bates; 27 – staff planning of 11/27/17 dinner meeting (incl. 11/7/17 email from Lynn Khaw to Myisha Hervey).)

At her deposition, Mayor Breed seemed reluctant to admit that she arranged the November 27, 2017, testifying that she only acceded to a request by Dr. Bates. But in her 11/14/17 1:49:57 PM email to Dr. Bates, Mayor Breed plainly initiated the invitation, writing: "Can Dr. Bates have dinner with me and the Mayor on 11/27?" (Ex. 26.) Mayor Breed then testified demonstrably inaccurately) that she only arranged this dinner meeting out of respect for Dr. Bates, based on his interest in the Center, same as she would do and did do in response to other inquiries from other esteemed members of the community. She further claims to have dumped cold water on Dr. Bates' plans at their dinner with Mayor Lee, telling him that his

proposal was not in league with the community values sought to be enshrined by the Center, and that Dr. Bates therefore withdrew his interest, saying: "I think things kind of ended at that point … It seemed like he just kind of quietly walked away." (Ex. 51 – Breed Depo at 18:16-20:3, 25:22-26:24, 28:16-29:20, 41:20-42:2, 48:9-123:9-11.)

However, Dr. Bates did not withdraw his interest—at least not until he concluded himself, months later, that the Center was not suitable because it would not accommodate his huge proton beam machine. (Ex. 49 – Bates' Depo at 113:11-12.) There is not one document corroborating Mayor Breed's testimony that she discouraged Dr. Bates' from pursuing use of the Center. Rather, documents produced by Dr. Bates pursuant to subpoena in January 2021, followed by further documents finally dislodged from defendants on April 16, 2021—*after filing their instant MSJ*—overwhelmingly show the opposite.[3] That is, both preceding and following Mayor Breed's high level dinner meeting with Dr. Bates, the other defendants all actively nurtured Bates' interest, including for months after the November 27, 2017 dinner meeting (after Breed's appointment as Mayor in December 2017 following the tragic death of Ed Lee)—by hosting and facilitating meetings with him, site inspections, providing him schematics of the Center, receiving his renderings, and communicating enthusiastically among one another about the prospect of his taking over the Center. (Exhibits 23-28, 34-35; 51 – Breed Depo at 48:25-51:21; Decl. Ben Rosenfeld, ¶¶ 9-14, 19.) In light of this, it is inconceivable that Mayor Breed actually discouraged Dr. Bates by telling him at their dinner meeting with Ed Lee, in front of Naomi Kelly, that his use of the Center was incompatible with the community's interests. Else, why would Naomi Kelly, let alone Dr. Bates, have persisted for so long afterward in pursuing his use of the Center? Presented with this contradiction, Mayor Breed could not furnish an explanation. (Ex. 51 – Breed Depo at 48:9-21, 60:10-19.)

At her deposition, Mayor Breed was grudgingly forced to concede that Mr. Shiferaw's RFP proposal, which in contrast to Dr. Bates' proposal *did* satisfy the community benefits

---

[3] "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" in ruling on the motion. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

criteria of the RFP, was therefore more qualified than Dr. Bates' proposal. (Ex. 51 – Breed Depo

at 37:22-42:3.) Yet the moment the RFP was cancelled, Mayor Breed began trying to broker

Dr. Bates' take over of the Center, not Mr. Shiferaw's, despite Mr. Shiferaw's repeated and

ongoing interest and proposals. The foregoing facts strongly suggest, and a reasonable jury could

conclude, that Mayor Breed, in cahoots with her fellow defendants, arranged for the surprise and

baseless cancellation of the RFP to clear the way for Dr. Bates to occupy it.

Similarly, at her deposition, Mayor Breed could not point to a single other person or

group whose interest in the Center she and her fellow defendant officials made such a

significant—*or any*—interest to foster. Mayor Breed tried to draw an equivalency between her

efforts on behalf of Dr. Bates and her attendance at a meeting she claims was organized by

Reverend Brown at Third Baptist Church to showcase Mr. Shiferaw's proposal for the Center.

(Ex. 51 – Breed Depo at 20:9-21:21, 23:19-24:18, 25:11-17, 30:16-32:20.)[4]  But there was no

such "meeting."  There was only a public community event, attended by at least 20 people,

where the fate of the Center was discussed. Pointedly and contrary to Mayor Breed's testimony,

Mr. Shiferaw did not speak at this event, or present his proposal, and no one promoted it at this

event on his behalf. (Decl. Shiferaw, ¶ 25.) This was a far cry from the small private dinner

meeting Mayor Breed arranged between her, Dr. Bates, then Mayor Ed Lee, and City

Administrator Naomi Kelly, to promote Dr. Bates' interest in the Center, and from defendants'

sustained efforts which followed.

## H.    Defendants Settle for Gifting the Center to Mayor Breed's Ally Majeid Crawford of the NCLF in an Effective No Bid, Single Source, Sweetheart Deal

In the end, Dr. Bates bowed out, and the City leased the Center to Mayor Breed's friend

and perennial campaign supporter, Majeid Crawford, head of the NCLF, backed by the SFHDC.

---

[4] In these pages, Mayor Breed also claimed that she received and forwarded many
expressions of interest by people and entities in the Center, but she could not recall specific such
expressions of interest by anyone other than Mr. Shiferaw, Dr. Bates, and Majeid Crawford
(Breed Depo at 20:9-20:21). The Mayor testified that she did not keep any written records of
such expressions of interest (Depo at 21:11-13), and no documents produced by defendants
reveal any other expressions of interest conveyed to Mayor Breed, let alone any that she or her
fellow defendant officials encouraged and stoked, besides Bates' and Crawford's.

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

The City referred to this lease as a revocable permit, but it was tantamount to a lease. (Ex. 40.) Amazingly, the SFHDC, with NCLF signed on as a community partner, was one of the bidders who submitted, and lost, an RFP proposal. (Exhibits 38 – 4/24/17 MOU between the SFHDC and the NCLF; 21 – response assessments.) Consequently, the City's gift of the Center to the NCLF and SFHDC amounted to a no bid, single source, sweetheart deal which contradicted defendants' cancellation of the RFP. Defendants cannot reasonably claim to have cancelled the RFP if they turned around and crowned one of the bidders who competed in it.

> ### 1.    The NCLF's Main "Qualification" Was Its Head, Majeid Crawford's, Loyalty to London Breed

Although the City formally entered into an agreement for the reactivation of the Center with SFHDC as signatory, naming the NCLF as a community partner (Ex. 40 at B-1), the NCLF was the *de facto* recipient of this prize, as shown by Defendant Supervisor Vallie Brown's November 5, 2018 press release touting and taking credit for the reactivation, listing NCLF first among the partners, and extensively quoting Majeid Crawford. (Ex. 41 at 2-3.) The OCII, the ostensible owner of the Center, was not a signatory to the City's contract with NCLF. (Ex. 40.)

Majeid Crawford had an inside line to Mayor Breed and her fellow defendant officials concerning the fate of the Center, taking an unknown number of meetings with them to discuss it, including during the pendency of the RFP (Ex. 20 – 10/19/17 email from V. Brown to Torres, et al;  26 – 12/8/17 email from Crawford to Breed; 31 – 1/31/18 email from Crawford to Mayor's Office requesting input on an NCLF press release before issuing it), and on February 23, 2018, entering into a letter of intent with the City (Ex. 32) for the reactivation of the Center, vaunted by Mr. Crawford in a May 11, 2018 press release. (Ex. 36 at 3.)

Mayor Breed testified that she considers Mr. Crawford a friend. (Ex. 51 – Breed Depo at 75:1-10) At an NCLF rally on or about January 30, 2018, Mayor Breed addressed the crowd in front of City Hall, stating, *inter alia*, "Nothing is more important to me than making sure that this place is for the folks of the neighborhood who actually live there," and "People are gonna try to come into our community like they're doing now and divide us." (Ex. 30 – video of rally posted on Mr. Crawford's Facebook page; Decl. Ben Rosenfeld, ¶ 16.). The only outsider in the

equation was Shiferaw, who is from Ethiopia. (Ex. 52 – Shiferaw Depo at 42:18-25, 127:8-15; 150:12-19, 178:6 – 182:20.)

The NCLF had no experience operating or managing a large entertainment venue. Its only evident 'qualification' was that its head, Majeid Crawford's, political ties and loyalty to London Breed. Notably, not only did the SFHDC and NCLF not pay any rent to the City or OCII, *the City actually paid SFHDC and NCLF $50,000 to run the Center.* The NCLF 'ran' the Center by hosting sporadic, auditorium style events there. (Decl. Shiferaw, ¶¶ 36-40, 44; Exhibits 39 – NCLF's 9/11/18 reactivation plan; 40 at B-1; 42 at 4.) If plaintiff and the other RFP bidders could not "appropriately meet the expectations outlined in the RFP" (Ex. 22 – 11/2/17 email cancelling RFP), these organizations certainly could not either. And as stated, the City had already rejected their proposal, finding that SFHDC's "proposed financing is speculative," and they were an "inexperienced commercial developer." (Ex. 21.)

Collectively, the foregoing ties and coordination support Plaintiff Shiferaw's allegations that Mayor Breed and her fellow defendant officials were focused on steering the Center to their friends and allies, not on administering a fair and independent RFP. Everyone outside of this favored group, including Mr. Shiferaw, was essentially an extra, cast only as doomed foils to the real protagonists. One document which ties this together is a 12/8/17 personal email from London Breed to Dr. Bates, forwarding an email from Majeid Crawford to Breed, describing NCLF's accepted uses of the Center. (Ex. 26, Bates No. ASSF000034-35.) It evinces close coordination between Mayor Breed and her friends regarding the fate of the Center—a week and a half after Mayor Breed testified she dumped cold water on Dr. Bates' plans at the dinner meeting she herself brokered between Dr. Bates and then Mayor Ed Lee. Notably, defendants never produced these emails in discovery to plaintiff. Mayor Breed's farcical explanation that she deleted them from her gmail account to free up space, even if true, (a) violates her duty to conduct the public's business on the public record, and (b) fails to explain why Crawford's email to Breed at her official sfgov.org email address also apparently has gone missing.

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

### 2. The NCLF Exhortation to Supporters to Disrupt a Political Forum for Breed's Mayoral Campaign Rivals

Disturbingly, defendants gifted the Center to NCLF to operate despite the fact that in May 2018, the NCLF had exhorted its supporters to disrupt a political forum for Mayor Breed's then mayoral campaign rivals, Jane Kim and Mark Leno, which plaintiff hosted. Specifically: Oon May 12, 2018, Plaintiff Shiferaw hosted a "Meet the Progressives" forum to discuss the future of the Fillmore District, featuring Breed's opponents Kim and Leno. (Exhibit 35 – event flyer.) The day before, on May 11, 2018, Majeid Crawford and the NCLF issued a press release riling supporters up to protest this forum. (Exhibit 36 – NCLF Press Release, describing the time honored political forum as "an apparent attempt to undermine the candidacy of Board of Supervisors President, London Breed," and extolling the NCLF's own letter of intent with the City to reactivate the Center (see Ex. 32).) (Decl. Shiferaw, ¶¶ 41-42.)

A surly group of protesters heeded the NCLF's call. These protesters disrupted the forum by shouting "go home" at Mr. Shiferaw (Shiferaw is an immigrant of Ethiopian decent), ethnic slurs at candidate Jane Kim, and homophobic slurs at supporters of Mark Leno. Their physically intimidating disruption was covered, in part, on local news.[5]  Other racist, xenophobic, and homophobic comments lobbed were not captured on video. These included: "This skinny rice eating Chinese" (of Jane Kim); "This is London Breed's house;" "This is London Breed's playground;" And, "Fa _ _ ot" (in reference to a young Mark Leno supporters' perceived sexual orientation). (Decl. Shiferaw, ¶¶ 41-42.)

To be sure, Mr. Crawford's press release on behalf of the NCLF did not exhort supported to lob such offensive, ad hominem remarks at Mayor Breed's distinguished rivals or Mr. Shiferaw. Remarkably though, Mayor Breed, well aware of the incident (Ex. 51 – Breed Depo at 76:15-78:18), did not publicly condemned it, and went on to approve the transfer of the Center to NCLF, without any public or private censure, notwithstanding her calls to "unite the City" and "come together" around the Fillmore Heritage Center. (Decl. Shiferaw, ¶ 42; Exhibits

---

[5] See news ABC7 and KPIX (CBS) news coverage at https://abc7news.com/politics/racial-insult-yelled-at-sf-mayoral-candidate-during-election-event/3470631/ and https://youtu.be/Cry_ZhJkWpw (respectively).

30a – 1/30/18 rally video at :08. 51; Ex. 40 – City's lease with SFHDC/NCLF.)

### 3. Fatal Shooting During NCLF's Funeral for Drug Kingpin Re-Shutters the Center

The NCLF's operation of the Center was short-lived. On March 23, 2019, the group hosted a funeral for a reputed drug kingpin during which a gun fight erupted, resulting in five people shot, one fatally. (Exhibits 43 – SFPD press release and news articles.) At a town hall at the Center following this tragedy hosted by then Supervisor Vallie Brown, Defendant Brown had the temerity to stand in front of anxious members of the public, including residents of the condominium complex above the Center, and falsely tell them: "No one really wanted to buy this building and have the community benefits. Believe me, we tried. … There wasn't one person who stepped up for it."  Defendants Rev. Brown and Joaquin Torres, who also attended, did not correct her. (Ex. 44 – video at 2:47 and 4:26 on counter; Decl. Ben Rosenfeld, ¶ 21.) The Center has effectively been shuttered (again) since that time. (Decl. Shiferaw, ¶¶ 8, 44.)

## II. PLAINTIFF'S FIRST CAUSE FOR WASTE OF TAXPAYER RESOURCES UNDER CALIFORNIA CODE CIVIL PROC. § 526a IS VIABLE

### A. The City and County of San Francisco is the Beneficial Owner of the FHC

Ownership is question of fact. While written agreements are relevant to the issue of ownership, such agreements are not conclusive where it appears that the essential indicia of ownership are exercised by a party that is not the nominal title holder. *See General Dynamics Corp. v. County of L.A.*, 51 Cal.2d 59 (1958); *see also* this Court's 8/28/20 partial dismissal order, recognizing that the City's exercise of control, as exemplified by its decision to sell the Center, could establish the City's status as beneficial owner of the facility. (Dkt. #91 at 17.) Thus, for example, where a government entity obtains the exclusive right to occupy and use a facility under a lease agreement, and the right to automatic vesting of title upon the completion of obligations the parties are obligated to complete, the government entity may be deemed the true owner of the property, even though legal title resides with the lessor. *Shipyard Workers Educ. Asso. v. Lynch*, 250 Cal.App.2d 238, 246 (1967) (finding that union was the beneficial owner where evidence showed he management and control of the property had been exercised exclusively by the union); *Los Angeles Dodgers, Inc. v. County of Los Angeles, supra,* 256

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

1   Cal.App.2d 918 (baseball team found to be beneficial owner under agreement was executed

2   between the parties in which the county retained title to the property for 20 years to assure

3   compliance with the team's policies for providing recreation facilities).

4          Moreover, California law is settled that a buyer in possession under an executory contract

5   is the beneficial owner of property. *See Eisley v. Mohan*, 31 Cal.2d 637 (1948) ("'vendee …[in]

6   possession of the land under an executory contract, is for all purposes the owner and the vendor

7   retains mere legal title.'"), quoting *Elliott v. McCombs*, 17 Cal.2d 23, 31 (1941); *see also City of*

8   *Anaheim v. Cty. of San Diego*, 190 Cal.App.3d 695, 702 (1987) (a buyer in possession under an

9   executory contract is the beneficial owner of property, not the holder of security title. The

10  question is not whether the City received formal transfer of title to the Center, "the determinative

11  question is whether [the City's] rights have supplanted those of [the OCII] insofar as the use of

12  the property is concerned." *Timm Aircraft Corp. v. Byram*, 34 Cal.2d 632 (1950).

13         Here, the evidence overwhelmingly establishes that the City is the beneficial owner of the

14  Center, having entirely controlled and managed it for years. In December 2016, the California

15  Department of Finance ordered that the Center be deeded to San Francisco, subject only to the

16  City reaching a "compensation agreement with the affected taxing entities," but recommended

17  that this take the form only of "covenants and conditions restricting its use and any future

18  disposition to purposes consistent with [remaining] a catalyst to the revitalization of the lower

19  Fillmore Street commercial corridor and the creation of employment opportunities for the

20  community." (Ex. 6, 12/7/15 letter from Cal. DOF to OCII at 1, and attached LRPMP at 8.)

21  However, the state and municipal governments have simply failed, without explanation, to

22  effectuate the transfer.

23         In the meantime, belying the City's argument that it has no liability simply because the

24  OCII still technically owns the Center, defendants CCSF and City officials have fully and

25  exclusively operated the Center; devised, administered, and cancelled the RFP (Exhibits 8, 12,

26  16, 22); solicited and encouraged friends and political allies to purchase and/or temporarily

27  reactivate it (Exhibits 23, 24, 25, 26, 27, 28, 29, 30, 33, 34); and written, executed, and

28  terminated leases and permits, going so far as to *pay* the San Francisco Housing Development

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

Corporation and/or the New Community Leadership Foundation NCLF $50,000 in City funds to operate it (Exhibits 2, 37, 32, 40, 41, 42 at 4; Decl. Shiferaw at ¶ 37)—all without any involvement or limitations imposed by the OCII, and while actively rebuffing and thwarting qualified, multi-million dollar offers by experienced developers, including Plaintiff Shiferaw. (Ex. 3 – 5/22/15 Letter of Intent between Shiferaw and prior owner Michael Johnson; 4 – Shiferaw's 8/28/15 Interim Mgt Plan proposal to Mayor Breed; 21 – RFP response assessments; Decl. Shiferaw at ¶ 36 (re early 2018 reactivation plan).) Notably, the San Francisco City Attorney has an unfettered right to modify the use of the Center (Ex. 48 at 3 – 5/12/20 letter from DCA Thomas Lakritz to plaintiff's undersigned counsel), notwithstanding the SFRA's/OCII's vaunted heritage values embedded in it. (See Ex. 6 – LRPMP at 5-7.)

In addition, the City stands in the shoes of a purchaser-owner in an executory contract, notwithstanding the OCII's putative retention of title. Transfer of the Center to the City is mandated by California Health and Safety Code § 34191.5,[6] the approved LRPMP for the Center, and the California Department of Finance's December 7, 2015 approval of that plan. (Ex. 6.) The OCII cannot alter or opt out of Cal. Dept. of Finance and LRPMP transfer mandate provisions. See Cal. Health & Safety Code § 34191.5(a)(2)(A)(iii). Thus, the City is the owner of the FHC for the purposes of plaintiff's claims, based both on its exercise of possession and control over the management and sale of the Center, and based on the LRPMP.

**B.    The City Cannot Refuse to Collect Rents on City-Owned Property Merely Because It Obtained Right to Collect Rent With Acquisition of Ownership**

Defendants' remaining argument is not that it has not failed to collect rents due under leases owned and controlled by the City, but that it has inherited the leases, rather than entering into them. (Defs' MSJ at 20.) In other words, the City does not dispute that it is the master tenant, nor that the unpaid rent is due to be paid by the City, but merely that the unpaid rent is owed pursuant to leases the City took over when it became the master tenant. Defendants achieve this result via an unreasonable reading of San Francisco Admin. Code § 23.30. Defendants

---

[6] See Cal. Health & Safety Code § 34191.5 (a)(2)(A)(i) ("If the plan directs the use or liquidation of the property for a project identified in an approved redevelopment plan, the property shall transfer to the city, county, or city and county.")

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

misconstrue its provisions to apply only to leases prospectively entered into by the City. In other words, defendants argue that the phrase "the Director of Property shall have the charge of the Lease of Real Property owned by the City" (§ 23.30(1)) only refers to new leases entered into by the City, not leases inherited by the City when it assumes ownership or the right (as a master tenant) to receive rent. This does not make sense. The "charge" assigned to the Director of Property is to any leased property owned by the City, not solely property the City leases after it obtains ownership.[7]

Defendants' interpretation would allow the City Director of Property to choose not to collect rents owed to the City (and its taxpayers) by a tenant in property purchased or otherwise acquired by the City, so long as the tenant held a lease, even though the City acquired the right to receive rent from the tenant as a part of its acquisition of ownership of the property. This is an absurd result contrary to basic rules of statutory interpretation. *See Fireside Bank Cases*, 187 Cal.App.4th 1120, 1129 (2010) ("One of the fundamental rules of statutory construction is that a law should not be applied in a manner producing absurd results, because the Legislature is presumed not to intend such results.")

Here, defendants have failed to seek and collect rent on the Center from at least four separate tenant partnerships: First: In 2014, the City simply erased a $4.8 million loan to Kaz Kajimura, the former proprietor of Yoshi's SF, then anchor tenant of the Center. (Decl. Shiferaw at ¶ 34; Exhibit 1 – 3/4/14 restructuring deal, at 2.)

Second: In June 2015, after failing for months to collect rent, the City walked away from $5.5 million in loan debt from Michael Johnson, then owner of Yoshi's. The City is at pains to describe Mr. Johnson as an owner, rather than a tenant, since it has taken the position that he did not build equity in Center, but rather, that the City could default on him and retake possession after he remained in arrears. (Exhibits 2, 45, 46.) Compounding this waste, and as detailed above, the City refused to accept Mr. Johnson's letter of intent with Plaintiff Shiferaw to

---

[7] Moreover, San Francisco Admin. Code § 23.35 contemplates the City's acquisition of property subject to an ongoing lease, and authorizes the Director of Property to negotiate a new lease upon the ongoing lease's expiration.

purchase the Center, which would have erased this debt and turned the Center into a performing asset for taxpayers. (Decl. Shiferaw, ¶ 7, Ex. 3.)

Third: In May 2018, the City likewise walked away from roughly $3.25 million in tenant improvement loan debt owed by Monetta White and David Lawrence, owners of the restaurant 1300 on Fillmore ("1300") then anchor tenant of the Center.  (Decl. Shiferaw at ¶ 32; Exhibits 2 – OCII memoranda re Center's financial performance (*9/17/13 Memo at 4); 37 – CCSF's 5/18/18 acknowledgment of 1300's vacation of the premises, making no mention of any loan repayment requirement.) Of the two loans to 1300 (Food For Soul), 1300 had, as of 2013, made no payments on the first loan (for $2.6 million) for nine preceding years (Ex. 2, id., at 5), and there is no evidence that any payments have been made on that loan since.

The City also failed to collect rent from 1300 over the same period, which it continues not to seek. The City was to receive rent from 1300 (in passthrough from master tenant Michael Johnson) as debt service. (Id. at 2.) In 2015, the City foreclosed on Johnson (Ex. 2, 7/7/15 memo), thereby exercising its right to collect rent from 1300 in his stead. (Ex. 6 - LRPMP at 2-3 (describing right of master tenant (formerly Michael Johnson but as of June 2015, the City) to receive rent paid by 1300 to master tenant), and at 6 (noting 1300 status of arrears on $10,000 monthly rent). See also Ex. 50 – Shelton Depo. at 52:6-56:18 (1300 on Fillmore owed $300,000 in back rent at time of RFP.)

Four:  In October 2018, the City leased the Center to the SFHDC and NCLF and not only failed to collect rent, but actually paid these groups $50,000 in taxpayer money to be there. The City would like to characterize this lease as something other (they title it a "revocable permit"), but this is pure semantics. Their agreement was functionally a lease. (Exhibits 32, 40-42; Decl. Shiferaw, ¶¶ 37, 44.)

## III.   PLAINTIFF'S SECOND CAUSE FOR FRAUD, MISREPRESENTATION, AND DECEIT IN THE RFP PROCESS IS VIABLE

### A.   The Individual Defendant are Not Immune From Actual Fraud, Corruption, or Malice

The immunity afforded by California Gov. Code § 822.2, to a public employee acting in the scope of his employment, from liability for injury caused by his negligent or intentional

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

misrepresentation, does not apply where the employee "is guilty of actual fraud, corruption or actual malice"—that is, if the employee is motivated by corruption or actual malice, i.e., a conscious intent to deceive, vex, annoy or harm the injured party in his business. *See Curcini v. Cnty. of Alameda*, 164 Cal.App.4th 629, 649 (2008); *see also*, *Taus v. Loftus*, 40 Cal.4th 683, 721 (2007) ("actual malice" which is established by a motivation of hatred or ill will towards the plaintiff or by a showing that the defendant lacked reasonable grounds for belief in the truth of the representation and therefore acted in reckless disregard of the plaintiff's rights."" (citations).

"Actual intent" is a question of fact for the jury. *Nat'l Union Fire Ins. Co. v. Garber*, 45 F.App'x 564, 565-66 (9th Cir. 2002), citing *Slater v. Bielsky*, 183 Cal.App.2d 523, 527 (1960); *See also*, *Sloan v. GM LLC,* 2020 U.S. Dist. LEXIS 71982, \*55 (N.D. Cal. 2020) (whether the defendant acts with the requisite scienter for fraud is generally a question of fact for the jury). Summary judgment on Defendants' actual intent claim would be appropriate only if "'the evidence, viewed in a light most favorable to [Mr. Shiferaw], presents [no] genuine issues of material fact.'" *Id.*, citing *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

Based on the foregoing, a reasonable jury could conclude that defendants' purported motivation for rejecting Shiferaw's bid was pretextual, because Shiferaw (1) met and exceeded all of the RFP's financial and other requirements; and (2) defendants at no time indicated to Shiferaw any deficiencies in his bid.[8] These facts, and defendants' effort to secure the purchase of the Center by Dr. Bates—who defendants must admit did not come close to the qualifications presented by Shiferaw—demonstrate internal inconsistency based upon which a jury could reasonably conclude that  defendants' proffered justification is unworthy of credence. *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1127 (9th Cir. 2000). Consequently, the individual defendants cannot avail themselves of § 822.2 immunity.

### B.    Defendants Committed Fraud, Misrepresentation, and Deceit

Plaintiff's foregoing evidence shows that defendants (1) staged a sham RFP and sham

---

[8] A bidder "is entitled to notice of that fact and is entitled to submit materials … concerning the issue of responsiveness." *Taylor Bus Service, Inc. v. San Diego Bd. of Education*, 195 Cal.App.3d 1331, 1342 (1987).

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

RFP selection process, (2) stacked the RFP Panel with cronies masquerading as community representatives, (3) recruited Dr. Bates' purchase of the Center during, and outside of, the RFP process, (4) deemed Shiferaw's qualified proposal insufficient while surreptitiously promoting Bates' admittedly unqualified purchase of the Center for a medical business, and (5) gifted the Center to NCLF's Majeid Crawford, sans any experience in running a major entertainment venue—for wrongful purposes of misleading Shiferaw and the public into believing defendants were conducting a fair and genuine RFP process, thereby also inducing Shiferaw to incur significant, wasted expense. (Ex. 15.)[9]

Defendants' self-serving declarations at best present a factual dispute regarding their assertion that Shiferaw's RFP proposal was insufficient. Plaintiff's evidence, on the other hand, shows that he was financially pre-qualified and his RFP proposal met and exceeded all of the criteria (Decl. Shiferaw, ¶¶ 14, 29-30; Exhibits 8, 11.)  Defendants' declarations are also undermined by the fact defendants actively promoted Dr. Bates' takeover of the Center, notwithstanding Breed's admission that his interest did not satisfy the RFP criteria. (Ex. 51 – Breed Depo at 18:16-20:3, 25:22-26:24, 28:16-29:20, 41:20-42:2, 48:9-123:9-11.) Moreover, defendants' purported justifications for rejecting Shiferaw's RFP proposal do not refute his claim that the whole of defendants' RFP process was a sham from the start, and malfeasantly administered, in violation of law and the RFP rules themselves.[10]

---

[9] Plaintiff's TAC alleged actual fraud, corruption, and actual malice. Federal Rule of Civil Procedure 9(b) allows a party to allege malice generally. *Auluck v. Cty. of* Alameda, 2014 U.S. Dist. LEXIS 20018, *23 (N.D. Cal. 2014), citing *Yagman v. Gali*po, 2013 U.S. Dist. LEXIS 6978, *28 (C.D. Cal. 2013) (plaintiff may allege malice generally in context of § 822.2).

[10] A County's discretion to reject all public works bids is not unbridled, but is cabined by due process. *See*, e.g., *Fisher Sand & Gravel Co. v. Clark County*, 2010 U.S. Dist. LEXIS 4888 (D. Nev. 2010) (County's unfair RFP process and pretextual cancellation in order to award bid to plaintiff's competitor were actionable, notwithstanding County's ordinary discretion to cancel the RFP. See also, *Gurtler, Herbert & Co. v. Orleans Parish Sch. Bd.,* 251 So.2d 51, 62 (La. Ct. App. 1971) (a school board could not reject all bids when under an injunctive order preventing it from awarding a contract to other than the lowest bidder, and that rejection of the plaintiff's bid had been arbitrary); *Donahue v. Board of Levee Comm'rs,* 413 So.2d. 488, 492 (La. 1982), quoting 10 McQuillian, Municipal Corporations § 29.77, at 438-39 ("Even where the right to reject any and all bids is properly reserved, the bidding law may not be evaded under color of rejection.")

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

### C.      Plaintiff's Related Third Cause of Action for Civil Conspiracy is Viable

Proof of civil conspiracy does not require evidence of an express agreement, but may be shown by circumstantial evidence. *Wagner v. O'Bannon*, 274 Cal.App.2d 121, 132. (1969). Here, plaintiff's conspiracy claim is supported not just by circumstantial evidence, but also by direct evidence, including Joaquin Torres' ratification of London Breed's cherry picking and stacking of the RFP Review Panel with friends and political allies, sans any application or selection process; and Rev. Brown's, Vallie Brown's, and Joaquin's complicity and participation with London Breed in working, outside of the RFP process and hidden from public view, to usher Dr. Bates into the Center.

### IV.     PLAINTIFF'S FOURTH CAUSE OF ACTION FOR DENIAL OF EQUAL PROTECTION BASED ON RACE, ETHNICITY, AND NATIONAL ORIGIN UNDER THE FOURTEENTH AMENDMENT / 42 U.S.C. § 1983 IS VIABLE[11]

"A successful equal protection claim may be brought by a 'class of one,' when the plaintiff alleges that it has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Seariver Mar. Fin. Holdings v. Mineta*, 309 F.3d 662, 679 (9th Cir. 2002), citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) and *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995) ("Classifications should be scrutinized more carefully the smaller and more vulnerable the class is. A class of one is likely to be the most vulnerable of all."). In *Olech*, the Court found that plaintiff homeowners stated an equal protection claim against the municipality based on its arbitrary and irrational demand for a 33-foot easement as a condition of connecting plaintiffs' property to the municipal water line, while requiring only a 15-foot easement of other property owners in the subdivision. *Olech*, 528 U.S. at 565.

"To state a 'class of one' claim, [plaintiff] must show that [defendants] "(1) intentionally (2) treated [plaintiff] differently than other similarly situated [[] applicants], (3) without rational basis." *Nev. Partners, Inc. v. Workforce Connections*, 2019 U.S. Dist. LEXIS 142597, *11 (D. Nev. 2019), quoting *Gerhart v. Lake County, Montana*, 637 F.3d 1013, 1022 (9th Cir. 2011)

---

[11] Plaintiff sues the defendant officials in their individual, personal capacities, and CCSF on a *Monell*/municipal liability theory, for denial of equal protection. (TAC at 39.)

(citing *Olech*, 528 U.S. at 564). "Intentional" means volitionally, not that plaintiff must show that defendants "were motivated by subjective ill will." *Gerhart*, 637 F.3d at 1022, citing *Olech*, 528 U.S. at 565. Courts have allowed 'class of one' claims under a variety of factual scenarios. See, e.g., *Olech*, 528 U.S. at 562 (unfavorable zoning decisions); *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (2012) (baseless parking tickets); *Gerhart*, 637 F.3d at 1023 (withholding permits); *Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 849 (10th Cir. 2005) (selective regulatory enforcement); *cf. Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602-03, 604 (2008), disapproving 'class of one' claim in employment context, but recognizing: "What seems to have been significant in *Olech* [a zoning case] was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed.

Here, plaintiff was similarly situated with respect to the other parties vying for purchase and control of the Center, a clearly defined objective (like in *Olech*) against which defendants' disparate treatment of these parties can be measured. Absent any rational basis, defendants gave lesser consideration to plaintiff's RFP proposal compared to that of his competitors, Tim and Vicky Shelton's (principals of FHC2017), as detailed above, including by holding at least one private meeting with the Sheltons to discuss their proposal and allowing the Sheltons to amend and bolster their proposal after the deadline had lapsed, both in violation of the RFP rules— opportunities which plaintiff did not receive. (Decl. Shiferaw, ¶¶ 19, 23.)

Even more significantly, absent any rational basis, defendants showed extreme solicitude and favoritism toward Mayor Breeds friends and allies, Dr. Ernest Bates and Majeid Crawford, head of the NCLF, compared to plaintiff, in the myriad ways detailed above. To summarize:  Dr. Bates and Mr. Crawford did not even submit RFP proposals (though NCLF served as a community partner alongside respondent SFHDC), comply with its cumbersome bureaucracy, or incur the hefty expenses associated with applying—but Mayor Breed and her fellow defendant officials nevertheless rushed Bates and Crawford to the front of the line, and rolled out the red carpet for them, maneuvering to install them in the Center despite their total lack of qualifications or ability to satisfy the RFP criteria. Put another way, even if the RFP Review Panel had legitimate misgivings about plaintiff's proposal (which plaintiff genuinely disputes

based on record evidence), *the Panel had no chance to have any givings* about Bates and Crawford, because they didn't even have to apply or compete. The preferential treatment defendants showed Bates was so irrational (under any measure of legitimate government action) that (a) Rev. Brown and Mayor Breed nurtured Dr. Bates' interest in private, outside of the RFP process and shielded from public scrutiny (Breed using her personal gmail account and destroying those emails); (b) Breed made up a story at her deposition that she discouraged Bates' interest at the private dinner meeting she arranged with then-Mayor Ed Lee *to promote Bates' interest*; and (c) Breed was forced to concede that plaintiff's RFP proposal was actually consonant with the RFP criteria and community's interests in how the Center should be used, whereas Dr. Bates' was not. (Ex. 51 – Breed Depo at 37:22-42:3.)

Defendants' focus on the supposed rational basis for their action (declining to name plaintiff the winner under the RFP) is misplaced. "[T]he rational basis prong of a 'class of one' claim turns on whether there is a rational basis for the *distinction*, rather than the underlying government action." *Gerhart*, 637 F.3d at 1023 (citation omitted). Irrespective of the outcome of defendants' processes in deciding whom to award the Center to, there was no rational basis (sounding in any legitimate government conduct) for them to give such preferential treatment to Dr. Bates and Mr. Crawford compared to plaintiff.

Of course, plaintiff also challenges defendants' decision-making in cancelling the RFP without selecting his proposal as the winner. Contrary to defendants' conclusory assertions that plaintiff "did not meet the minimum threshold requirements of the RFP," including the "capacity to meet the minimum financial requirements" and "provide the significant community benefits required by the RFP" (MSJ at 11), plaintiff has presented extensive record evidence that he met and exceeded all such requirements, including the financial ones, and that he financially pre-qualified to compete in the RFP process. (Decl. Shiferaw at ¶¶ 14, 29-30; Exhibits 8, 11, 13) At the same time, plaintiff has also presented evidence that defendants did not furnish him with any notice or opportunity to clarify or correct any alleged shortcomings, as other respondents were. (Decl. Shiferaw, ¶ 19.) And as stated, Dr. Bates' and Mr. Crawford's 'proposals' *ipso facto* fell shorter, because they did not have to present their qualifications to the Review Panel at all.

21

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

Although, contrary to defendants' contention, "membership in a protected class is not a prerequisite to the entitlement to equal protection, [but] merely factors into the level of scrutiny courts will use in reviewing certain governmental classifications" (*Bari v. Held*, 1992 U.S. Dist. LEXIS 13634, *53 (N.D. Cal. 2013)), plaintiff also alleges invidious discrimination based on his race, ethnicity, and national origin, i.e. as an African American man from Ethiopia who speaks English with an accent, compared to the North American born Black men (Dr. Bates and Mr. Crawford) preferred by London Breed and Rev. Brown to operate the Center. (Decl. Shiferaw at ¶ 2, 16.) Here, evidence that defendants considered and treated plaintiff as an outsider and second class citizen includes (1) defendants' refusal even to respond to plaintiff's several proposals to purchase and/or reactivate the Center (Shiferaw Decl., ¶¶ 7-10, 36; Exhibits 3, 4, 13), while maintaining direct lines of communication regarding the same with Dr. Bates and Mr. Crawford (Exhibits 26-27, 30-31, 33-34, ); (2) Breed's 1/30/18 statement at the NCLF's rally, "People are gonna try to come into our community like they're doing now and divide us" (Ex. 30; Decl. Rosenfeld, ¶ 17); and (3) Breed's and Rev. Brown's failure to publicly condemn the NCLF-fielded protesters who disrupted plaintiff's political forum for Breed's rival mayoral candidates and jeered at plaintiff to "go home," where Rev. Brown actually attended the event. (Decl. Shiferaw, ¶ 42; Ex. 51 – Breed Depo at 76:15-78:18.) *See Healthcare Emples. Union, Local 399 v. NLRB,* 463 F.3d 909, 919 (9th Cir. 2006) (because non-self-serving evidence of actual motive is seldom available, circumstantial evidence is sufficient to establish discriminatory motive).

## V.     PLAINTIFF'S FIFTH CAUSE OF ACTION FOR RETALIATION FOR EXERCISE OF FREE SPEECH AND PETITION UNDER THE FIRST AMENDMENT / 42 U.S.C. § 1983 IS VIABLE

### A.     Defendants Cancelled the RFP Rather Than Selecting a Winning Bid Because Plaintiff Blew the Whistle on Defendants' Fraudulent RFP

Plaintiff's evidence shows that defendants abruptly and arbitrarily canceled the RFP, and thereby also denied his proposal and caused him to squander $25,000 on a sham and dead end process—and then turned a deaf ear on plaintiff's reactivation proposal—in retaliation against him for blowing the whistle on defendants' malfeasance, and hosting a political event for Def.

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Breed's rival mayoral candidates. (Exhibits 19, 30, 35, and 36; Decl. Shiferaw at ¶¶ 41-42.) The close temporal proximity between Shiferaw's whistleblowing letters, and the City's cancellation of the RFP, alone can constitute sufficient circumstantial evidence of retaliation. *See Reynaga v. Roseburg Forest Prods*., 847 F.3d 678, 694 (9th Cir. 2017).

**B.      Defendants Are Not Entitled to Qualified Immunity**

Where qualified immunity is raised by a defendant late in the case, and in a perfunctory manner, unaccompanied by developed argument—as is the case here—it should be deemed waived. *Guillemard-Ginorio v. Contreras-Gomez*, 490 F.3d 31, 37 (1st Cir. 2007) (waived, where raised in response to First Amendment retaliation claim in a perfunctory manner, for first time on summary judgment); *see also*, *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir. 1997) (waived "either by failure to raise it in a timely fashion or by failure to raise it with sufficient particularity.") Here, defendants did not assert qualified immunity in either of their first two motions to dismiss (Dkt. #s 32 and 78), but instead raise it in a perfunctory manner for the first time on summary judgment (and only in response to plaintiff's First Amendment retaliation claim), two and a half years into the case. Their qualified immunity argument should be denied for this reason alone.

 "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Bracken v.Okura*, 869 F.3d 771, 776 (9th Cir. 2017), quoting *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). "Qualified immunity, on the other hand ... *acts to safeguard government, and thereby to protect the public at large, not to benefit its agents*." *Bracken*, *id*., quoting *Wyatt*, *id*. at 167-68 (emphasis added in *Bracken*). Government actors are entitled to qualified immunity only if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity does not protect the 'plainly incompetent' or 'those who knowingly violate the law.' *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Defendants argue incorrectly, and overly narrowly, that plaintiff's right to be free from retaliation by defendant officials was not clearly established for purposes of the qualified

immunity analysis. As this Court observed, other Circuits have recognized a government contract bidder's First Amendment retaliation claim both where the bidder did and did not have a preexisting commercial relationship with the government. (2/6/20 Order, Dkt. #64, at 14, comparing *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 670 (1996) (recognizing right in context of preexisting commercial relationship) and *Lucas v. Monroe County*, 203 F.3d 964, 973 (6th Cir. 2000) and *Oscar Renda Contracting, Inc. v. Lubbock,* 463 F.3d 378, 385 (5th Cir. 2006) (recognizing right absent preexisting commercial relationship).)

A right "may be clearly established even if there is no case directly on point . …. It is enough if 'in the light of pre-existing law the unlawfulness is apparent.'" *Inouye v. Kemna*, 504 F.3d 705, 715 (9th Cir. 2007), quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999). "There is no requirement that the very action in question has previously been held unlawful," *Vaughn v. Ruoff*, 253 F.3d 1124, 1129 (8th Cir. 2001) (citation and quotes omitted), nor that there be "a case decided on all fours with the present factual circumstances." *Wilson v. Lawrence County*, 260 F.3d 946, 951 (8th Cir. 2001). "Rather, [the court] need conclude only that, in light of preexisting law, the unlawfulness of the conduct at issue was apparent." *Mathers v. Wright,* 636 F.3d 396, 401, 402 (8th Cir. 2011). Even if the specific action in question has not previously been held unlawful, qualified immunity may still be denied if, in the light of preexisting caselaw, the unlawfulness is apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Contrary to defendants' simplistic argument, a split in authority does not *ipso facto* usher in qualified immunity. *Foster v. Runnels*, 554 F.3d 807, 816 (9th Cir. 2009), citing *Morgan v. Morgensen*, 465 F.3d 1041, 1046 (9th Cir. 2006) (finding an inmate's Eighth Amendment right to be clearly established despite a split in authority among the circuits). Importantly here, as this Court observed, the Supreme Court in *Umbehr* did not foreclose, but rather left open, the question whether bidders for future government contracts are similarly protected. (Order, *id.*, citing *Umbehr*, 518 U.S. at 685.) Finally, although it may not have been made clear to the Court at the time of defendants' 12(b)(6) motion, plaintiff did have a preexisting commercial relationship with Defendant CCSF, based on his participation in the Fillmore Jazz District tenant improvement loan program. (Decl. Shiferaw,¶ 30.) For each of the foregoing reasons, plaintiff's

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

right to be free from retaliation by defendant officials was clearly established at the time, under *Umbehr*, *Lucas*, and *Oscar Renda Contracting, Inc.*, *supra*.

## VI. DEFENDANTS CONSPIRED TO VIOLATE PLAINTIFF'S CIVIL RIGHTS PURSUANT TO 42 U.S.C. § 1983 (SIXTH CAUSE OF ACTION)

Civil conspiracy under Section 1983 is not a claim, per se, but "merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible … for any overt act or acts." *Rutkin v. Reinfeld*, 229 F.2d 248, 252 (2d Cir. 1956); *accord*, *Putman v. Gerloff*, 701 F.2d 63, 65 n. 4 (8th Cir. 1983). Here, plaintiff's evidence demonstrates, at least circumstantially, that defendants conspired by reaching at least a tacit agreement or "meeting of the minds," and taking some concerted action to deprive plaintiff of equal protection and retaliation against him for blowing the whistle on their malfeasance. *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301-1302 (9th Cir. 1999), citing *Kunik v. Racine County*, 946 F.2d 1574, 1580 (7th Cir. 1991) (conspiracy may be inferred based on acts that were "unlikely to have been undertaken without an agreement") (other citations omitted).

## VII. PLAINTIFF HAS STATED VIABLE *MONELL* CLAIMS AGAINST CCSF

A final policymaker's failure to take remedial action can demonstrate ratification of an unconstitutional practice or custom under *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978). *Larez v. City of Los Angeles* 946 F.2d 630, 647 (9th Cir. 1991). Ratification is a question for the jury. *Fuller v. City of Oakland,* 47 F.3d 1522, 1534 (9th Cir.1995). Here, plaintiff's evidence, as detailed above, shows that Supervisor and President of the Board turned Mayor London Breed personally and directly interfered in the RFP process, including terminating it to try to steer control of the Center to her friends Dr. Bates and Majeid Crawford, thereby ratifying Defendant CCSF's unconstitutional deprivations of plaintiff's Fourteenth Amendment right to equal protection and First Amendment right against retaliation for exercise of free speech.

## CONCLUSION

WHEREFORE, Plaintiff Agonafer Shiferaw respectfully requests that the Court deny defendants' motion for summary judgment/partial summary judgment in its entirety, and grant such further relief as the Court deems just and proper.

Respectfully Submitted,

BEN ROSENFELD
TESFAYE W. TSADIK

Dated:  April 28, 2021          By:     */s/ Ben Rosenfeld*
                                        Ben Rosenfeld
                                        Attorneys for Plaintiff Shiferaw

LAW OFFICE OF BEN ROSENFELD
San Francisco, CA

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT