108-043.13-002                              Meeting of September 17, 2013

## INFORMATIONAL MEMORANDUM

TO:          Community Investment and Infrastructure Commissioners

FROM:        Tiffany Bohee, Executive Director

SUBJECT:     To update the Commission on (1) the overall financial performance of the Fillmore Heritage Center at the corner of Fillmore and Eddy Streets, including the recent bankruptcy filing by Yoshi's San Francisco, and (2) the repayment history of tenant improvement loans associated with several businesses on Fillmore Street

## PURPOSE OF INFORMATION

The purpose of this Informational Memorandum is to update the Commission on (1) the overall financial performance of the Fillmore Heritage Center at the corner of Fillmore and Eddy Streets, including the recent bankruptcy filing by Yoshi's San Francisco, and (2) the repayment history of tenant improvement loans associated with several businesses on Fillmore Street.

The Fillmore Heritage Center is an $80.5 million public-private partnership that includes 80 condominiums, about 50,000 square feet of commercial space, and a 112-space public parking garage. Of that $80.5 million, about 35% ($28.4 million) was financed using public funds from the City and County of San Francisco (the "City") and the former San Francisco Redevelopment Agency (the "SFRA"). The public investment of dollars built the public parking garage and the commercial space, which was intended to help revitalize the lower Fillmore Street commercial corridor. The SFRA also contributed the land, and allowed the developer to pay the purchase price for the land over time. Part of the public investment included two tenant improvement loans from the SFRA to the two tenants in the commercial space: (1) Yoshi's San Francisco, a 28,000-square-foot jazz club and restaurant, and (2) Food for Soul, which operates a 6,300-square-foot restaurant/music lounge known as "1300 on Fillmore." These two tenant improvement loans total about $10.4 million. The Fillmore Heritage Center is the focus of this memorandum.

In addition, the SFRA approved two other tenant improvement loans to two other businesses on Fillmore Street. One is with Agonafer Shiferaw, who owns a building at 1534-40 Fillmore Street that formerly housed Rasselas Jazz Club, and the other is with Sheba Lounge, which leases space across the street from the Fillmore Heritage Center to operate a restaurant/music lounge. These two tenant improvement loans total about $1.6 million. These loans are discussed in further detail at the end of this memorandum.

## DISCUSSION

As mentioned above, the Fillmore Heritage Center can be divided into three components: (1) the residential units, which were entirely privately financed, (2) the commercial space, which was

financed with both private and public funds, and (3) the public parking garage, which was entirely publicly financed. Each of these components is discussed in more detail below.

- **Residential Units.** The Fillmore Heritage Center includes 80 condominiums, including 12 affordable condominiums. The construction of these units was completely privately financed with about $35 million from a pension fund. No public dollars went into the residential component of the Fillmore Heritage Center. All the units have been sold to individual homeowners, and the proceeds were used to pay back the private construction lender and the SFRA for a portion ($3.5 million) of the $6.6 million land value. The condo owners operate a homeowners' association, which manages the residential space, a separate residential garage, and the common areas within the Fillmore Heritage Center (the "HOA"). All the condo owners pay common area maintenance fees to the HOA.

- **Commercial Space.** The Fillmore Heritage Center also includes about 50,000 square feet of commercial space on the ground floor of the building. The City financed the construction of the commercial space. To do this, the City, acting through the Mayor's Office of Housing ("MOH"), borrowed $5.5 million from the U.S. Department of Housing and Urban Development ("HUD") in the form of a securitized Section 108 loan, which is backed by the City's federal Community Development Block Grant ("CDBG") fund allocation (the "HUD Loan"). The City then gave these federal dollars to Fillmore Development Commercial ("FDC"), an affiliate of the developer, Fillmore Development Associates ("FDA"), in the form of a construction loan, so that FDC could build the commercial space (the "FDC Loan"). The SFRA also contributed about $10.4 million in loan funds for the tenant improvements.

  OCII owns the commercial space and master leases the entire 50,000 square feet under a ground lease to FDC. The ground lease structure was used as a financing mechanism to allow the developer to pay the $6.6 million purchase price for the land over time instead of in one lump sum upfront (explained in more detail later in this memorandum). FDC, as master tenant, subleases the commercial space to two tenants: (1) Yoshi's San Francisco, and (2) Food for Soul. These subtenants pay rent and common area maintenance fees to FDC, who is supposed to (a) pass the rent through to the City as a debt service payment on the FDC Loan, and (b) pass the common area maintenance payments through to the HOA. This process has not been happening on a regular basis. FDC is about $1.4 million in arrears on the FDC Loan with the City (which is explained more fully below) and about $120,000 behind on its common area maintenance payments to the HOA. A copy of the HOA's July 18, 2013 letter to District 5 Supervisor London Breed is attached as Attachment 1.

  FDC is required to pay the common area maintenance charges under its ground lease with OCII, however, OCII is ultimately liable for these charges, as owner of the commercial space, under a separate project document. OCII is paying the outstanding amount to the HOA with reserve balances authorized under OCII's Recognized Obligations Payment Schedule III and 13-14A, both approved by the Oversight Board and the State Department of Finance ("DOF"). Staff has asked for new property tax funds to cover some common area maintenance payments going forward (in the event the space currently occupied by Yoshi's San Francisco doesn't generate enough income to pay

them) on OCII's Recognized Obligations Payment Schedule 13-14B, which still needs approval from the Oversight Board and DOF.

- **Public Parking Garage.** The Fillmore Heritage Center also includes a 112-space public parking garage. The SFRA financed the construction of this garage using $5.6 million in tax exempt bond proceeds. The SFRA also used about $860,000 in federal grant funds for site preparation/environmental remediation. OCII still owns the garage and operates it through a garage management agreement with a private garage operator. The garage also pays common area maintenance fees to the HOA. The garage's performance is very dependent on the performance of the commercial tenants in the Fillmore Heritage Center. Currently, the garage is running a deficit of about $2,000 a month on average, which is a significant improvement from just three years ago, when the average deficit was about $8,000 a month. The improvement can be attributed to better management, lower personnel costs, and improved marketing. Staff has asked for new property tax funds to cover the expected deficit, along with replenishment of the garage's operating and capital reserve, on OCII's Recognized Obligations Payment Schedule 13-14B, which still needs approval from the Oversight Board and DOF.

In sum, the public investment went into the land, site preparation, the public parking garage, and the commercial space. The SFRA contributed the land, which was valued at about $6.6 million, and accepted a payback plan on the purchase price of the land over time ($3.5 million has been paid to date). The SFRA contributed an additional $5.6 million in grant funds for garage construction. And about $16 million in SFRA/City loan funds went into building the commercial space. These investments are explained in more detail below.

### Investment by the City and County of San Francisco (the "City")

As mentioned, in an effort to finance the construction of the commercial space, the City borrowed $5.5 million from HUD (the "HUD Loan") and then loaned that money to FDC to build the commercial space (the "FDC Loan"). The HUD Loan is fully amortized at an interest rate of 5.54% with semi-annual interest payments and annual principal payments due through August 2025. MOH has no ability to alter the terms of the HUD Loan. The FDC Loan is fully amortized at an interest rate of 6.54% with monthly payments due through August 2025. Under this structure, FDC makes its debt service payments to the City using rental income from the commercial space, and then the City uses that money to make its debt service payments to HUD. However, because FDC has missed about $1.4 million in payments to the City since 2005, the City has had to find other money (i.e., CDBG funds used to serve the City's low- and moderate-income residents) to make its debt service payments to HUD. The City's loan is secured by a deed of trust on FDC's leasehold interest in the commercial space, among other things.

Since 2005, City staff has been working with FDC to resolve the arrearage issue. In December 2010, FDC was eight months in arrears, owing the City about $360,000. At that time, instead of foreclosing on the FDC Loan, MOH agreed to amend the loan terms and extend FDC's repayment of the $360,000 under separate repayment terms. FDC agreed to pay an additional $5,500 per month to the City through August 2013, with the balance of the delinquent $360,000 due as a balloon payment in August 2013. FDC made no payments on this workout loan between January 2011 and April 2013. To date, FDC has made only nine additional $5,500 payments, for a total of $49,500. FDC did not make the balloon payment due August 2013.

Over the last two years, the amount FDC owes under the FDC Loan has skyrocketed because the City's tax collector has been taking the rental income from the commercial space (rental income that would normally have gone to service the FDC Loan) to pay approximately $570,000 in delinquent property taxes and penalties FDC owed on its leasehold interest in the commercial space. Because that rental income went to the City's tax collector instead of to MOH, MOH had to service the HUD Loan using other funds (i.e., CDBG program dollars). While the initial $570,000 due to the City's tax collector has been satisfied, FDC owes the City's tax collector at least an additional $190,000 in delinquent taxes and penalties for the period July 1, 2012 through June 30, 2014. The FDC Loan is currently about $1.4 million in arrears.

**Investment by the former San Francisco Redevelopment Agency ("SFRA")**

The SFRA invested about $6.6 million in land value and about $16 million in public funds in the Fillmore Heritage Center. The SFRA's total investment took the form of deferred land payments, grants and loans. These are briefly discussed below:

- **Deferred Land Payments ($6.6 million).** The SFRA owned the land on which the Fillmore Heritage Center sits. At the time the property was being developed, it was valued at $6.6 million. The developer did not have $6.6 million to pay the SFRA for the land. Instead, the SFRA agreed to "finance" the land acquisition through a ground lease structure on the commercial space. Under the ground lease, the developer agreed to pay the SFRA the $6.6 million using proceeds from the sale of the condominiums and rental income from the commercial space (after the FDC Loan with the City was paid off). The developer paid the SFRA $3.54 million of the $6.6 million acquisition price using proceeds from the sale of the condominiums. However, the developer still owes OCII $3.1 million under the ground lease, which is supposed to be paid from the rental income from the commercial space (after the FDC Loan with the City is paid off). If and when the developer pays OCII the balance of the $6.6 million acquisition price, the developer will own the commercial space.

- **Grants ($5.6 million).** This money (tax exempt bond proceeds) paid for construction of the public parking garage, which OCII still owns. The state's environmental protection agency also contributed an additional $860,000 in grant funds to complete environmental remediation at the project site.

- **Loans ($10.4 million).** This money paid to build-out the commercial space. The City's $5.5 million loan paid for the core and shell, but additional money was needed to finish the space for occupancy. The SFRA loaned Yoshi's jazz club and restaurant $7.2 million and Food for Soul (doing business as "1300 on Fillmore") $2.6 million. The SFRA also loaned Food for Soul an additional $624,000 in working capital. These loans are discussed further below.

  *Yoshi's Loan.* In 2004, Yoshi's tenant improvements were estimated to be $7.4 million. By the time Yoshi's opened, however, that cost had doubled to $15 million. Yoshi's financed that cost with $7.8 million in private equity and debt and $7.2 million in loan funds from the SFRA. Repayment of this loan comes from a percentage of the club's net operating income. No payments have been paid since the loan was first executed in

October 2004 (i.e., <u>no payments have been made in nine years</u>).  Further history of the Yoshi's loan is included in Attachment 2.  The recent bankruptcy filing of Yoshi's San Francisco is discussed later in this memorandum.

*Food for Soul Loans.*  As mentioned, Food for Soul has two loans with OCII:  (1) a $2.6 million tenant improvement loan, and (2) a $624,000 working capital loan.  Repayment of the $2.6 million tenant improvement loan comes from a percentage of the restaurant's net operating income, and repayment of the $624,000 working capital loan is an amortized quarterly payment.  Food for Soul has told OCII staff that the restaurant has not been generating net operating income, and therefore, Food for Soul has not been able to make any payments under the tenant improvement loan that was first executed in October 2004 (i.e., <u>no payments have been made in nine years</u>).  OCII staff intends to request audited financial statements, as authorized under the loan agreement, to verify the restaurant's net operating income and compliance with the existing loan terms.

Food for Soul has been making small payments ($500 a month) on its $624,000 working capital loan since December 2011, which is a small fraction of the amortized quarterly payment due.  This loan is currently out of compliance with the existing loan terms and will require some kind of amendment in the future, which will be brought before the Commission and Oversight Board for consideration as soon as possible.

## Bankruptcy Filing of Yoshi's San Francisco

In November 2012, Yoshi's San Francisco filed a petition for Chapter 11 bankruptcy in U.S. Bankruptcy Court, Northern District of California.  At the time of filing, the only creditors listed on the petition were Yoshi's Oakland (owed $1.3 million), a restaurant supply company (owed $2,700), and a refrigeration services company (owed $500).  Since that time, representatives of Yoshi's San Francisco have been in mediation talks (under the supervision of the bankruptcy court) with FDC's investor group to devise a path forward.  All workout agreements proposed to date involve replacing Yoshi's San Francisco with a new club/restaurant.  This transition involves an investment of $1.0 million in new working capital by FDC's investors at a 12% return.  In exchange, FDC's investor group is asking the City and OCII for a number of changes to existing agreements.

In regards to the City's FDC Loan, FDC's investor group is asking the City to (1) invest an additional $216,000 (at a 6% return) into the club/restaurant, (2) give rent reductions to both commercial tenants for a period of about 12 months, (3) allow FDC to repay the $1.4 million in arrears between 2015 and 2027, and (4) waive interest and additional penalties.  The source of funds for these payments would be a portion of FDC's total rental income on the commercial space.  These repayments to the City would be after subordinate lenders are repaid.

In regards to OCII's $7.2 million tenant improvement loan, FDC's investor group is primarily asking OCII to (1) relinquish its $500,000 loan guarantee from Yoshi's Oakland, and (2) agree to a considerably longer repayment plan.  Under the latest proposal from FDC's investor group, OCII would not receive a payment until at least 2019, which would be six years after payments were supposed to start under the existing loan agreement and 15 years after the existing loan agreement was executed.

Unless a workout agreement can be reached between the City/OCII and FDC and its investors, the City will likely foreclose and take over as master tenant of the commercial space. Under this scenario, OCII (as owner and landlord) would work with the City (as master tenant) to stabilize and sell the property as soon as possible. If a workout agreement is reached between the City/OCII and FDC and its investors, OCII could possibly transfer this asset to the City for the governmental purposes mandated by the City's HUD Loan, assuming this transfer was approved by the Oversight Board and DOF. In addition, some kind of loan amendment would likely be required, and this would be brought before the Commission and Oversight Board for consideration as soon as possible.

OCII staff has been working closing with City staff on a response to the latest proposal from FDC's investor group. Copies of communications between OCII, the City, and FDC's investors since February 2013 are attached as Attachment 3.

**Other Tenant Improvement Loans on Fillmore Street**

In addition to the tenant improvement loans to Yoshi's San Francisco and Food for Soul, the SFRA approved two other tenant improvement loans to two other businesses on Fillmore Street. One is with Agonafer Shiferaw, who owns a building at 1534-40 Fillmore Street that formerly housed Rasselas Jazz Club, and the other is with Sheba Lounge, which leases space across the street from the Fillmore Heritage Center to operate a restaurant/music lounge. These two tenant improvement loans total about $1.6 million.

- **Agonafer Shiferaw Loan.** A detailed chronology of Mr. Shiferaw's $1.26 million tenant improvement loan with the SFRA, and now OCII, is attached as Attachment 4. In sum, Mr. Shiferaw has paid only $100,000 on this loan since it was first executed in December 1997 (i.e., <u>only $100,000 in payments have been made over the last 16 years</u>). In February 2011, Mr. Shiferaw filed a petition for Chapter 11 bankruptcy in U.S. Bankruptcy Court, Northern District of California. He emerged from the bankruptcy process in August 2012. Since then, Mr. Shiferaw has been making monthly payments to OCII of $2,235, pursuant to the bankruptcy plan agreed to in bankruptcy court, which represents a 50% discount to his regular monthly payments. He recently sold his business (Rasselas Jazz Club), but continues to own the building where Rasselas used to be located at 1534-40 Fillmore Street. He will now make his debt service payments to OCII using rental income from the building. OCII's tenant improvement loan is secured by a fee interest in the building, behind Mr. Shiferaw's primary lender.

- **Sheba Lounge Loans.** Sheba Lounge has two loans with OCII. One is a $290,000 tenant improvement loan, and the other is a $95,000 loan to cover prevailing wage expenses associated with the tenant improvements at Sheba Lounge's space at the Fillmore Center. The $95,000 prevailing wage loan is forgiven if Sheba Lounge makes 24 monthly payments of $1,475 each on its $290,000 tenant improvement loan before January 2014. To date, Sheba Lounge has made 20 payments of $740 each (50% of the full payment), and expects to make 24 payments of $740 each before January 2014. The owner of Sheba Lounge has advised OCII staff that her business is not generating enough net income to make the full $1,475 monthly payment. Similar to the Food for Soul tenant improvement loan, OCII staff intends to request audited financial statements, as authorized under the Sheba Lounge loan agreement, to verify the restaurant's financial

performance and compliance with the existing loan terms.  This loan is currently out of compliance with the existing loan terms and will require some kind of amendment in the future, which will be brought before the Commission and Oversight Board for consideration as soon as possible.

*(Originated by Tracie Reynolds, Manager, Real Estate and Development Services)*

Tiffany Bohee
Executive Director

Attachment 1:     July 18, 2013 Letter from HOA to District 5 Supervisor London Breed
Attachment 2:     Background on Yoshi's San Francisco Tenant Improvement Loan
Attachment 3:     Recent Communications between OCII/City and FDC's Investor Group
Attachment 4:     Background on Mr. Shiferaw's Tenant Improvement Loan

108-0262015-002                                    Meeting of July 7, 2015

## INFORMATIONAL MEMORANDUM

**TO:**          Community Investment and Infrastructure Commissioners

**FROM:**        Tiffany Bohee, Executive Director

**SUBJECT:**     To update the Commission on the status of the Fillmore Heritage Center at the corner of Fillmore and Eddy Streets in the former Western Addition Redevelopment Project Area A-2

## PURPOSE OF INFORMATION

The purpose of this Informational Memorandum is to update the Commission on the status of the Fillmore Heritage Center at the corner of Fillmore and Eddy Streets in the former Western Addition Redevelopment Project Area A-2.  The Fillmore Heritage Center is an $80.5 million public-private partnership that includes: (1) 80 condominiums, (2) about 50,000 square feet of commercial space, including a 28,000-square-foot entertainment venue/restaurant and a 6,000-square-foot restaurant/music lounge, and (3) a 112-space public parking garage.  Currently, the 28,000-square-foot entertainment venue/restaurant is vacant and the Office of Community Investment and Infrastructure ("OCII"), as the owner of the commercial space and the garage, and the City and County of San Francisco ("City"), as the master tenant of the commercial space, are working (1) to stabilize the commercial space as quickly as possible and (2) to ultimately sell both the commercial space and the garage as required by Redevelopment Dissolution Law.

## BACKGROUND

The Fillmore Heritage Center is an $80.5 million public-private partnership that was financed with $28.4 million of public funds from the City and the former San Francisco Redevelopment Agency (the "Former Agency").  The public investment of dollars built the public parking garage and the commercial space, which was intended to help revitalize the lower Fillmore Street commercial corridor.  The Former Agency also contributed the land, and allowed the developer to pay the $6.6 million purchase price for the land over time.  Part of the public investment also included two tenant improvement loans totaling about $10.4 million from the Former Agency to the two tenants in the commercial space.

The Fillmore Heritage Center can be divided into three components:  (1) the residential units, which were entirely privately financed, (2) the commercial space, which was financed with both private and public funds, and (3) the public parking garage, which was entirely publicly financed.  Each of these components is discussed in more detail below.

- **Residential Units.**  The Fillmore Heritage Center includes 80 condominiums, including 12 affordable condominiums.  The construction of these units was completely privately financed with about $35 million from a pension fund. No public dollars went into the residential component of the Fillmore Heritage Center.  All the units have been sold to individual homeowners, and the proceeds were used to pay back the private construction

lender and the Former Agency for a portion ($3.5 million) of the $6.6 million land value. The condominium owners operate a homeowners' association, which manages the residential space, a separate residential garage, and the common areas within the Fillmore Heritage Center (the "HOA"). All the condo owners pay common area maintenance ("CAM") fees to the HOA.

- **Commercial Space.** The Fillmore Heritage Center also includes about 50,000 square feet of commercial space on the ground floor of the building that is now owned by the Office of Community Investment and Infrastructure ("OCII") as the successor agency to the Former Agency. The City financed the construction of the commercial space. To do this, the City, acting through the Mayor's Office of Housing and Community Development ("MOHCD"), borrowed $5.5 million from the U.S. Department of Housing and Urban Development ("HUD") in the form of a securitized Section 108 loan, which is backed by the City's federal Community Development Block Grant ("CDBG") fund allocation. The City then loaned these federal dollars to Fillmore Development Commercial ("FDC"), an affiliate of the developer, Fillmore Development Associates, so that FDC could build the commercial space. The Former Agency also contributed about $10.4 million in loan funds for the tenant improvements, as detailed later in this memorandum.

  The Former Agency master leased the entire 50,000 square feet of commercial space to FDC. The ground lease structure was used as a financing mechanism to allow the developer to pay the $6.6 million purchase price for the land over time instead of in one lump sum upfront (explained in more detail later in this memorandum). FDC, as master tenant, subleased the commercial space to two tenants: (1) Yoshi's San Francisco, a 28,000-square-foot jazz club and restaurant and (2) Food for Soul, which operates a 6,000-square-foot restaurant/music lounge known as "1300 on Fillmore." These subtenants were supposed to pay rent and common area maintenance fees to FDC, who was supposed to (a) pass the rent through to the City as a debt service payment on the FDC Loan, and (b) pass the CAM payments through to the HOA. This process did not happen on a regular basis. FDC fell in in arrears on the FDC Loan with the City (which is explained more fully below) and its common area maintenance payments to the HOA. Under the ground lease, FDC was required to pay the CAM charges to the HOA, but OCII was ultimately liable for these charges, as owner of the commercial space, under a separate project document. OCII has been paying the outstanding amount to the HOA with reserve balances and new property tax funds authorized by the Oversight Board and the California Department of Finance ("DOF").

- **Public Parking Garage.** The Fillmore Heritage Center also includes a 112-space public parking garage. The Former Agency financed the construction of this garage using $5.6 million in tax exempt bond proceeds. The Former Agency also used about $860,000 in federal grant funds for site preparation/environmental remediation. OCII owns the garage and operates it through a garage management agreement with a private garage operator. The garage also pays common area maintenance fees to the HOA. The garage's performance is very dependent on the performance of the commercial tenants in the Fillmore Heritage Center.

In sum, the public investment went into the land, site preparation, the public parking garage, and the commercial space.  The Former Agency contributed the land, which was valued at about $6.6 million, and accepted a payback plan on the purchase price of the land over time ($3.5 million has been paid to date).  The Former Agency contributed an additional $5.6 million in grant funds for garage construction, and about $16 million in Former Agency/City loan funds went into building the commercial space.  These investments are explained in more detail below.

## Investment by the City

As mentioned, in an effort to finance the construction of the commercial space, the City borrowed $5.5 million from HUD (the "HUD Loan") and then loaned that money to FDC to build the commercial space (the "FDC Loan").  The HUD Loan is fully amortized at an interest rate of 5.54% with semi-annual interest payments and annual principal payments due through August 2025.  MOHCD has no ability to alter the terms of the HUD Loan.  The FDC Loan is fully amortized at an interest rate of 6.54% with monthly payments due through August 2025, and is secured by a deed of trust on FDC's leasehold interest in the commercial space, among other things.  Under this structure, FDC was required to make its debt service payments to the City using rental income from the commercial space, and then the City used that money to make its debt service payments to HUD.  However, since the term of the FDC Loan started, FDC has missed scheduled loan repayments at various points in time.  The City has had to find other money (i.e., CDBG funds used to serve the City's low- and moderate-income residents) to make its debt service payments to HUD.

In December 2010, FDC was eight months in arrears, owing the City about $360,000.  At that time, instead of foreclosing on the FDC Loan, MOHCD agreed to amend the loan terms and extend FDC's repayment of the $360,000 under separate repayment terms.  FDC agreed to pay an additional $5,500 per month to the City through August 2013, with the balance of the delinquent $360,000 due as a balloon payment in August 2013.  FDC made only nine of the thirty-six additional payments due under the work-out and did not make the balloon payment.

Additionally, during this time period, the amount FDC owed under the FDC Loan skyrocketed because the City's tax collector was taking the rental income from the commercial space (rental income that would normally have gone to service the FDC Loan) to pay approximately $570,000 in delinquent property taxes and penalties FDC owed on its leasehold interest in the commercial space.  Because that rental income went to the City's tax collector instead of to MOHCD, MOHCD had to service the HUD Loan using other funds (i.e., CDBG program dollars).

Over the last several years, MOHCD continued to engage with FDC and its investors related to its inability to make timely loan payments and ultimately agreed to a loan restructuring as part of the settlement of the Yoshi's San Francisco bankruptcy, as discussed later in this memorandum.

## Investment by the Former Agency

The Former Agency invested about $6.6 million in land value and about $16 million in public funds in the Fillmore Heritage Center.  The Former Agency's total investment took the form of deferred land payments, grants and loans.  These are briefly discussed below:

- **Deferred Land Payments ($6.6 million).** The Former Agency owned the land on which the Fillmore Heritage Center sits. At the time the property was being developed, it was valued at $6.6 million. The developer did not have $6.6 million to pay the Former Agency for the land. Instead, the Former Agency agreed to "finance" the land acquisition through a ground lease structure on the commercial space. Under the ground lease, the developer agreed to pay the Former Agency the $6.6 million using proceeds from the sale of the condominiums and rental income from the commercial space (after the FDC Loan with the City was paid off). The developer paid the Former Agency $3.54 million of the $6.6 million acquisition price using proceeds from the sale of the condominiums. The remaining balance of $3.1 million was supposed to be paid from the rental income from the commercial space (after the FDC Loan with the City was paid off).

- **Grants ($5.6 million).** This money (tax exempt bond proceeds) paid for construction of the public parking garage, which OCII still owns. The state's environmental protection agency also contributed an additional $860,000 in grant funds to complete environmental remediation at the project site.

- **Loans ($10.4 million).** The City's $5.5 million FDC Loan paid for the core and shell of the commercial space, but additional money was needed to finish the space for occupancy. The Former Agency loaned Yoshi's jazz club and restaurant $7.2 million and Food for Soul (doing business as "1300 on Fillmore") $2.6 million. The Former Agency also loaned Food for Soul an additional $624,000 in working capital. These loans are discussed further below.

  *Yoshi's Loan.* In 2004, Yoshi's tenant improvements were estimated to be $7.4 million. By the time Yoshi's opened, however, that cost had doubled to $15 million. Yoshi's financed that cost with $7.8 million in private equity and debt and $7.2 million in loan funds from the Former Agency. The loan was secured with a deed of trust recorded against Yoshi's leasehold interest, and further secured by a $500,000 guaranty from the developer and a $500,000 from Yoshi's Oakland. Repayment of this loan was to come from a percentage of the club's net operating income. No payments were received. The bankruptcy filing of Yoshi's San Francisco is discussed later in this memorandum.

  *Food for Soul Loans.* As mentioned, Food for Soul has two loans with OCII: (1) a $2.6 million tenant improvement loan, and (2) a $624,000 working capital loan. Repayment of the $2.6 million tenant improvement loan comes from a percentage of the restaurant's net operating income, and repayment of the $624,000 working capital loan is an amortized quarterly payment. Food for Soul had been unable to make any payments under the tenant improvement loan that was first executed in 2004, due to a reported lack of net operating income. Food for Soul has been making small payments ($500 a month) on its $624,000 working capital loan since December 2011, which is a small fraction of the amortized quarterly payment due. Both loans are currently out of compliance with the existing loan terms and will require some kind of future amendment consistent with Redevelopment Dissolution Law, as discussed later in this memorandum.

**Bankruptcy Filing of Yoshi's San Francisco**

In November 2012, Yoshi's San Francisco filed a petition for Chapter 11 bankruptcy in U.S. Bankruptcy Court, Northern District of California. Subsequently, there were mediation talks (under the supervision of the bankruptcy court) with Yoshi's San Francisco, FDC and its investor group, and other creditors to devise a path forward. OCII and the City were involved in the mediation talks because Yoshi's San Francisco owed OCII the $7.2 million tenant improvement loan and FDC owed the City the FDC Loan. The mediations talks focused on workout agreements that included replacing Yoshi's San Francisco with a new club/restaurant.

On March 3, 2014, as part of the mediation talks, OCII and the City executed a non-binding term sheet with FDC and its investors, which presented the terms under which the City would agree to changes to the FDC Loan, and OCII would agree to changes to the ground lease and the tenant improvement loan (see Exhibit A). In regards to the City's FDC Loan, the City agreed to, among other things, forgo existing late charges (approximately $127,000 at that time) and reduce the interest rate for existing late payments from 10% to 6.25%. The City, in turn, required FDC to make the past due payments on a quarterly schedule, and pay all delinquent property taxes by June 1, 2014. In regards to OCII's tenant improvement loan, OCII agreed to forgo the portion of the loan (66.7% or $4.8 million) attributable to Yoshi's San Francisco as a result of the bankruptcy, and renegotiate the terms of the remaining portion of the loan (33.3% or $4.8 million) attributable to FDC and its investors. OCII also agreed to renegotiate the terms of the ground lease to extend the term of the land repayment. OCII, in turn, required FDC and its investors to make regular loan payments and repay any CAM charges OCII had paid on its behalf. The term sheet was intended to serve as the basis for negotiating and drafting final documents requiring approval from the Commission, the Oversight Board, and DOF.

On June 24, 2014, the federal bankruptcy court approved a global settlement agreement under which Yoshi's San Francisco and its creditors agreed to restructure their debts and sell the Yoshi's San Francisco business to FDC and its investor group. Under this bankruptcy court-approved settlement agreement, FDC and its investor group committed to the repayment terms in the term sheet with OCII and MOHCD, took over the Yoshi's San Francisco business, and on July 1, 2014, began operating a music venue/restaurant, subsequently renamed The Addition.

**DISCUSSION**

**Closure of The Addition**

OCII worked with FDC and its investors beginning in July 2014 to draft amendments to the tenant improvement loan and the ground lease that incorporated the terms of the term sheet. Items that still needed to be negotiated included the security that FDC was willing to provide for the tenant improvement loan, and a community benefits package. In addition, FDC had to be current on all payments agreed to under the term sheet. FDC made loan payments to OCII from July to October 2014, but stopped paying in November 2014. During this time frame, FDC did not make any CAM payments to the HOA or the City for the FDC Loan or delinquent property taxes. As a result, the draft amendments were never finalized. On January 14, 2015, FDC ceased operations of The Addition.

**OCII/City Actions Taken to Cure Default**

On February 20, 2015, OCII issued a Notice of Default to FDC and its investors under the terms of the ground lease, citing among other things, (1) the closure of The Addition, (2) security and life safety issues, including unauthorized and unmonitored use of the commercial parcel and failure to maintain the life safety system, and (3) failure to pay both property taxes (approximately $140,000) and CAM charges (approximately $250,000), and provided FDC with 30 days to cure these defaults (see Exhibit B).  On that same date, the City also issued a Notice of Default to FDC under the FDC Loan, citing $1.59 million in missed regular payments and $498,000 in interest and penalties (see Exhibit C).  An estimated summary of FDC's outstanding obligations to OCII and the City is attached as Exhibit D.

FDC and its investor group requested and received additional time from the City and OCII so that it could bring in a new investor group capable of recapitalizing the commercial space, reopening it as an entertainment venue, and taking over its day-to-day operations.  Unfortunately, FDC was unable to come to terms with the new investor group and unable to cure its defaults under the ground lease and the FDC Loan.  Accordingly, on June 5, 2015, OCII issued a Notice of Termination of Ground Lease to FDC and its investors, which terminated the ground lease (see Exhibit E) but did not waive any of OCII's and/or the City's rights to collect on amounts owed under the ground lease, the tenant improvement loan, or the FDC loan.  The City, as a "mortgagee" under the ground lease, immediately stepped in as the master tenant of the commercial space (see Exhibit F).

**Impact of Closure on Commercial Corridor**

The bankruptcy and closure of Yoshi's San Francisco and the subsequent closure of The Addition have negatively impacted the lower Fillmore Street commercial corridor overall and in particular the financial health of 1300 on Fillmore and the Fillmore Heritage Center garage, which have seen dramatic declines in their patronage.  Although 1300 on Fillmore has been trying to increase business through catering and on-line ordering and promotions, it has been forced to reduce its menu and inventory and lay-off staff and is unable to make its rent payments.  Before bankruptcy proceedings started, the garage was about breaking even.  Since the closure of The Addition, the monthly operating deficit of the garage has increased to approximately $10,000.  OCII has been backfilling this deficit with property tax funds authorized by the Oversight Board and DOF.

**Next Steps**

In order to stabilize the commercial property as quickly as possible, OCII (as owner and landlord) and the City (as master tenant) are currently exploring ways to activate the commercial space on a short term basis and restructure the obligations of 1300 on Fillmore so that it can remain open.  Ultimately, however, Redevelopment Dissolution Law, California Health and Safety Code Section 34191.5(c)(2), requires OCII to sell both the commercial parcel and the garage for fair market value.  OCII accordingly proposed selling the commercial parcel and the garage under its Long-Range Property Management Plan ("PMP"), which this Commission approved, by Resolution No. 53-2013 (November 19, 2013), and the Oversight Board approved by Resolution No. 12-2013 (November 25, 2013).  OCII submitted the PMP to DOF for approval

in November 2013; DOF is still reviewing the PMP.  OCII cannot sell the commercial parcel or the garage until DOF approves OCII's PMP.

There will be two community meetings hosted by Supervisor Breed over the next month to hear the community's concerns about the Fillmore Heritage Center and the lower Fillmore Street commercial corridor in general, and solicit feedback from the community on stabilizing and retenanting the space in the both the near and the long term.  The first meeting will be held on July 13, 2015 at 6:30 p.m. at West Bay Community Center.  The second meeting will be held on July 27, 2015 at 6:30 p.m., also at the West Bay Community Center.  The feedback received from the community will then be used to inform a request for proposals to be prepared by the City and OCII for the sale of the properties.

*(Originated by Christine Maher, Manager, Real Estate and Development Services)*

Tiffany Bohee
Executive Director

Exhibit A:    Non-Binding Term Sheet
Exhibit B:    Notice of Default under Ground Lease dated February 20, 2015
Exhibit C:    Notice of Default under the FDC Loan dated February 20, 2015
Exhibit D:    Summary Estimate of FDC's Outstanding Obligations
Exhibit E:    Notice of Termination of Ground Lease dated June 5, 2015
Exhibit F:    City Option to Assume Ground Lease dated June 5, 2015

**Exhibit A**

**Non-Binding Term Sheet**

**TERM SHEET**
**FOR THE RESTRUCTURING OF CERTAIN DEBTS AND OBLIGATIONS**
**RELATED TO THE COMMERCIAL PARCEL AT THE FILLMORE HERITAGE CENTER**
**AT 1310 FILLMORE STREET (ASSESSOR'S BLOCK 0732, LOT 033)**

This non-binding term sheet for the restructuring of certain debts and obligations related to the Fillmore Heritage Center at 1310 Fillmore Street (the "Term Sheet"), dated as of   March 3, 2014, is hereby agreed to by the following parties:  (1) the Office of Community Investment and Infrastructure, the successor agency to the Redevelopment Agency of the City and County of San Francisco, a public body, corporate and politic of the State of California ("OCII" or the "Successor Agency"), (2) the City and County of San Francisco, acting by and through the Mayor's Office of Housing and Community Development (the "City"), (3) Fillmore Development Commercial LLC, a California limited liability company ("FDC"), (4) SN Fillmore LLC, a California limited liability company ("SN Fillmore"), (5) Fillmore Jazz Club, LLC, a California limited liability company ("FJC"), and (6) Fillmore Entertainment Group LLC, a California limited liability company ("NewCo"), (together, the "Parties").  This Term Sheet summarizes certain basic terms related to the restructuring of OCII's ground lease with FDC (the "Ground Lease"), OCII's tenant improvement loan with FJC (the "TI Loan"), and the City's loan with FDC (the "Section 108 Loan").  This Term Sheet is non-binding on the Parties, but rather serves as the basis for negotiating and drafting final documents requiring approval from the Successor Agency Commission, OCII's Oversight Board, and the State Department of Finance ("DOF").  Accordingly, in light of the foregoing, the Parties wish to describe their understanding about final agreements that they are willing to negotiate in good faith regarding the potential restructuring of the Ground Lease, the TI Loan, and the Section 108 Loan.

**TERMS**

**Section 1:  Joint OCII/City Deal Points**

1. Initial FJC equity ($1.683 million) does not receive priority repayment, and is not included in workout deal.
2. No six-month grace period for forgiveness of City/OCII debts in exchange for deed-in-lieu (that is a one-time, now-or-never offer).
3. Revenue and expenditure budgets as prepared by FDC and agreed to by City/OCII (attached).
4. FDC will deposit into escrow a Release of Ground Lease Rights which will be exercised automatically if the any scheduled payments are missed and not cured within 60 days.  Scheduled payments include payments due to the City, OCII, property taxes, and CAM charges due to the HOA.
5. NewCo will assume the CBT and Key Bank tenant improvement loans.
6. Come to joint agreement on legal issues associated with Release of Ground Lease Rights, subleases, and additional liens.

**Section 2:  City Deal Points**

1. City will forgo the existing late charges due under the current Section 108 Loan, approximately $127,000.  City will also reduce the interest rate for existing missed payments under the current Section 108 Loan from 10% to 6.25%, approximately $63,000.  This results in an estimated past-due amount of approximately $1.304 million.
2. Interest rate will remain 6.25%.

3. Payments to the City on the past-due amount will follow the quarterly payment schedule prepared by FDC (attached). As part of this schedule, FDC agrees to the full repayment of the Section 108 Loan delinquency by December 2017.
4. All property taxes due for FDC and its subtenants will be paid no later than June 1, 2014.
5. FDC will make a good faith effort to refinance the HUD Section 108 Loan by the end of 2017.

## Section 3:  OCII Deal Points

1. **TI Loan**
   - Terms have changed. Oversight Board and DOF approval required.
   - Loan is converted from a % of NOI loan to a fixed payment loan
   - Interest rate stays the same at 3.25% (simple interest)
   - Security is given – new UCC-1 filing on tenant improvements
   - The % of the loan attributable to Kaz is lost in the bankruptcy (66.7%, or $4.8 million)
   - The % of the loan attributable to FJC will be repaid (33.3%, or $2.4 million)
     - NewCo portion of loan ($1.74 million, which represents FJC's % interest in NewCo)
       - NewCo will make fixed, above-the-line, payments of $5,000 a month ($60,000) a year for five years, then 100% of NOI until loan plus interest is paid in full
       - NewCo will pay interest of 3.25% (simple interest)
       - Full payment estimated to be in eight years (by 2021)
     - FDC portion of loan ($660,000)
       - FDC will pay 100% of NOI after City second mortgage is paid in full
       - FDC will pay interest of 3.25% (simple interest)
       - Full payment estimated to be in 14 years (by 2027)
   - Any missed loan payment triggers the reverter
   - FDC will also pay back any CAM charges paid by OCII (As of February 2014, that amount is $175,108) with 100% of FDC NOI (see waterfall below)

2. **Ground Lease**
   - Terms have changed. Oversight Board and DOF approval required.
   - OCII gets paid 100% of FDC cash flow after City second mortgage is paid off (estimated to be in Year 4 (2017))
   - OCII will use the cash flow:
     - FIRST, to pay off CAM charges paid by OCII (as of Feb 2014 = $175,108), and
     - SECOND to pay off FDC's portion of TI loan ($660,000, plus interest), and
     - THIRD to pay off $3,006,328 balance on ground lease.
   - Once $3,006,328 is paid in 18 years, FDC will own the commercial parcel (by 2031)

Exhibit A:     FDC and NewCo Cash Flows Reflecting Term Sheet

Acknowledged and Accepted:

**THE SUCCESSOR AGENCY:**

Date: 3 -3-14

Tiffany Bohee, Executive Director
Office of Community Investment,
Successor Agency to the Redevelopment Agency
of the City and County of San Francisco, a public body,
corporate and politic of the State of California

**THE CITY:**

Date: 3/3/14

Olson Lee, Director
Mayor's Office of Housing and Community Development,
City and County of San Francisco, California

Acknowledged and Accepted:

FDC:

Date: 3/4/14

Fillmore Development Commercial LLC, a California limited liability company

By _MICHAEL E. JOHNSON_

Its _MANAGING MEMBER_


SN FILLMORE:

_Sten mayer DIRECTOR_   Date: 3-4-14

SN Fillmore LLC, a California limited liability company

By _STEVEN MAYER_

Its _DIRECTOR_


FJC:

Date: 3/4/14

Fillmore Jazz Club, LLC, a California limited liability company

By _MICHAEL E. JOHNSON_

Its _MANAGING MEMBER_


NEWCO:

Date: 3/4/14

Fillmore Entertainment Group LLC, a California limited liability company

By _Bradford Flewellon_

Its _CO-MANAGING MEMBER_

# FILLMORE DEVELOPMENT COMMERCIAL, LLC - CASHFLOW PROJECTION

3/3/2014

| Year: | | 1 May - Dec 2014 | 2 Jan - Dec 2015 | 3 Jan - Dec 2016 | 4 Jan - Dec 2017 | 5 Jan - Dec 2018 | 6 Jan - Dec 2019 | 7 Jan - Dec 2020 | 8 Jan - Dec 2021 | 9 Jan - Dec 2022 | 10 Jan - Dec 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New Co Base Rent | 44,000 | $ 352,000 | $ 528,000 | $ 528,000 | $ 528,000 | $ 528,000 | $ 543,840 | $ 543,840 | $ 543,840 | $ 543,840 | $ 543,840 |
| 1300 Rent Base Rent | 10,000 | $ 80,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 123,600 | $ 123,600 | $ 123,600 | $ 123,600 | $ 123,600 |
| Gallery Rent (New Tenant) | 1,000 | $ 8,000 | $ 18,000 | $ 18,000 | $ 18,000 | $ 18,000 | $ 18,540 | $ 19,096 | $ 19,669 | $ 20,259 | $ 20,867 |
| Total Rent | | $ 440,000 | $ 666,000 | $ 666,000 | $ 666,000 | $ 666,000 | $ 685,980 | $ 686,536 | $ 687,109 | $ 687,699 | $ 688,307 |
| | | | 1.03 | | | | | | | | |
| New Co CAM Charges | 76% | 78,750 | 108,150 | 111,395 | 114,736 | 118,178 | 121,724 | 125,375 | 129,137 | 133,011 | 137,001 |
| 1300 CAM Charges | 16% | 16,579 | 22,768 | 23,451 | 24,155 | 24,879 | 25,626 | 26,395 | 27,186 | 28,002 | 28,842 |
| Gallery CAM Charges | 8% | 8,289 | 11,385 | 11,726 | 12,078 | 12,440 | 12,813 | 13,198 | 13,594 | 14,002 | 14,422 |
| Total CAM | 100% | 103,618 | 142,303 | 146,572 | 150,969 | 155,498 | 160,163 | 164,968 | 169,917 | 175,014 | 180,265 |
| New Co Property Tax Share | 76% | 66,120 | 68,104 | 70,147 | 72,251 | 74,419 | 76,651 | 78,951 | 81,319 | 83,759 | 86,272 |
| 1300 Property Tax Share | 16% | 13,920 | 14,338 | 14,768 | 15,211 | 15,667 | 16,137 | 16,621 | 17,120 | 17,633 | 18,162 |
| Gallery Tax Share | 8% | 6,960 | 7,169 | 7,384 | 7,605 | 7,834 | 8,069 | 8,311 | 8,560 | 8,817 | 9,081 |
| Total Property Tax Collected | 100% | 87,000 | 89,610 | 92,298 | 95,067 | 97,919 | 100,857 | 103,883 | 106,999 | 110,209 | 113,515 |
| **TOTAL REVENUE:** | | 630,618 | 897,913 | 904,870 | 912,036 | 919,417 | 947,000 | 955,387 | 964,025 | 972,923 | 982,087 |
| Total Operating Expenses (Taxes, CAM) | 2.7% | (190,618) | (231,913) | (238,870) | (246,036) | (253,417) | (261,020) | (268,850) | (276,916) | (285,223) | (293,780) |
| FDC Management Expenses | | (12,000) | (18,000) | (18,000) | (18,000) | (18,000) | (18,720) | (18,720) | (18,720) | (18,720) | (18,720) |
| Net Operating Income: | | $ 428,000 | $ 648,000 | $ 648,000 | $ 648,000 | $ 648,000 | $ 667,260 | $ 667,816 | $ 668,389 | $ 668,979 | $ 669,587 |
| Mortgage Amount (First Mortgage) | | $ (360,151) | $ (540,227) | $ (540,227) | $ (540,227) | $ (540,227) | $ (540,227) | $ (540,227) | $ (540,227) | $ (540,227) | $ (540,227) |
| Cummulative First Mortgage Payments: | | $ (360,151) | $ (540,227) | $ (1,080,454) | $ (1,620,681) | $ (2,160,908) | $ (2,701,135) | $ (3,241,362) | $ (3,781,589) | $ (4,321,816) | $ (4,862,043) |
| Mortgage Amount (Second Mortgage) | | $ (44,000) | $ (66,000) | $ (66,000) | $ (66,000) | | | | | | |
| Cummulative Second Mortgage Payments: | | $ (44,000) | $ (110,000) | $ (176,000) | $ (242,000) | | | | | | |
| Total Debt: | | $ (404,151) | $ (606,227) | $ (606,227) | $ (606,227) | $ (540,227) | $ (540,227) | $ (540,227) | $ (540,227) | $ (540,227) | $ (540,227) |
| **AVAILABLE CASHFLOW:** | | $ 23,849 | $ 41,773 | $ 41,773 | $ 41,773 | $ 107,773 | $ 127,033 | $ 127,589 | $ 128,162 | $ 128,752 | $ 129,360 |
| Mos. | | 8 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| Share to City/Mayor's Office (100[%] Until Paid in Full | 100% | $ 23,849 | $ 41,773 | $ 41,773 | $ 41,773 | $ 107,773 | $ 127,033 | $ 127,589 | $ 128,162 | $ 128,752 | $ 129,360 |
| Share to FDC (0%) Until City is Paid in Full | 0% | $ - | $ - | $ - | $ - | $ 107,773 | $ 127,033 | $ 127,589 | $ 128,162 | $ 128,752 | $ 129,360 |
| CUMMULATIVE PAYMENTS TO CITY: | | | | | $ 149,168 $ 177,058 | | | | | | |
| FDC Balloon Payment: | | | | | | $ 7,200,000 | | | | | |
| Valuation at Year 1 & S: | Cap Rate: 9% | $ 4,755,556 | | | | $ 7,200,000 | | | | | |
| Cashflow To OCII to Acquire Leasehold Interest Fee: | 100% | 4,013,036 [1] | | | | $ 107,773 | $ 127,033 | $ 127,589 | $ 128,162 | $ 128,752 | $ 129,360 |
| Cummulative Payments to OCII: | | | | | | $ 107,773 | $ 234,806 | $ 362,395 | $ 490,557 | $ 619,309 | $ 748,669 |
| Cashflow to FDC: | 0% | | | | | $ - | $ - | $ - | $ - | $ - | $ - |

Cummulative Payments to FDC:

| | | 11 Jan-Dec 2024 | 12 Jan-Dec 2025 | 13 Jan-Dec 2026 | 14 Jan-Dec 2027 | 15 Jan-Dec 2028 | 16 Jan-Dec 2029 | 17 Jan-Dec 2030 | 18 Jan-Dec 2031 | 19 Jan-Dec 2032 | 20 Jan-Dec 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Year:** | | | | | | | | | | | |
| New Co Base Rent | 76% | 560,155 | 560,155 | 560,155 | 560,155 | 560,155 | 576,960 | 576,960 | 576,960 | 576,960 | 576,960 |
| 1300 Rent Base Rent | 16% | 127,308 | 127,308 | 127,308 | 127,308 | 127,308 | 131,127 | 131,127 | 131,127 | 131,127 | 131,127 |
| Gallery Rent (New Tenant) | 8% | 21,493 | 21,493 | 21,493 | 21,493 | 21,493 | 22,138 | 22,138 | 22,138 | 22,138 | 22,138 |
| **Total Rent** | | 708,956 | 708,956 | 708,956 | 708,956 | 708,956 | 730,225 | 730,225 | 730,225 | 730,225 | 730,225 |
| New Co CAM Charges | 76% | 141,111 | 145,345 | 149,705 | 154,196 | 158,822 | 163,587 | 168,494 | 173,549 | 178,755 | 184,118 |
| 1300 CAM Charges | 16% | 29,707 | 30,598 | 31,516 | 32,462 | 33,436 | 34,439 | 35,472 | 36,536 | 37,632 | 38,761 |
| Gallery CAM Charges | 8% | 14,854 | 15,300 | 15,759 | 16,232 | 16,719 | 17,220 | 17,737 | 18,269 | 18,817 | 19,382 |
| **Total CAM** | 100% | 185,673 | 191,243 | 196,980 | 202,890 | 208,976 | 215,246 | 221,703 | 228,354 | 235,205 | 242,261 |
| New Co Property Tax Share | 76% | 88,860 | 91,526 | 94,271 | 97,099 | 100,012 | 103,013 | 106,103 | 109,286 | 112,565 | 115,942 |
| 1300 Property Tax Share | 16% | 18,707 | 19,269 | 19,847 | 20,442 | 21,055 | 21,687 | 22,338 | 23,008 | 23,698 | 24,409 |
| Gallery Property Tax Share | 8% | 9,354 | 9,634 | 9,923 | 10,221 | 10,528 | 10,843 | 11,169 | 11,504 | 11,849 | 12,204 |
| **Total Property Tax Collected** | 100% | 116,921 | 120,428 | 124,041 | 127,762 | 131,595 | 135,543 | 139,609 | 143,798 | 148,112 | 152,555 |
| **TOTAL REVENUE:** | | 1,011,550 | 1,020,627 | 1,029,978 | 1,039,608 | 1,049,528 | 1,081,014 | 1,091,537 | 1,102,377 | 1,113,541 | 1,125,041 |
| Total Operating Expenses (Taxes, CAM) | | (302,594) | (311,671) | (321,021) | (330,652) | (340,572) | (350,789) | (361,312) | (372,152) | (383,316) | (394,816) |
| FDC Management Expenses | | (19,469) | (19,469) | (19,469) | (19,469) | (19,469) | (20,248) | (20,248) | (20,248) | (20,248) | (20,248) |
| **Net Operating Income:** | | 689,487 | 689,487 | 689,487 | 689,487 | 689,487 | 709,977 | 709,977 | 709,977 | 709,977 | 709,977 |
| Mortgage Amount (First Mortgage) | | (540,227) | (540,227) | (540,227) | (540,227) | - | - | - | - | - | - |
| Cummulative First Mortgage Payments: | | (5,402,270) | (5,942,497) | (6,482,724) | | | | | | | |
| Mortgage Amount (Second Mortgage): | | - | - | - | - | - | - | - | - | - | - |
| **Total Debt:** | | (540,227) | (540,227) | (540,227) | (540,227) | - | - | - | - | - | - |
| **AVAILABLE CASHFLOW:** | | 149,260 | 149,260 | 149,260 | 689,487 | 689,487 | 709,977 | 709,977 | 709,977 | 709,977 | 709,977 |
| Mos. | | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| Valuation at Year 14 & 20: | 9% (Cap Rate:) | | | | 7,660,970 | | | | | | 7,888,636 |
| Cashflow To OCII to Acquire Leasehold Interest Fee: | 100% | 149,260 | 149,260 | 149,260 | 689,487 | 689,487 | 709,977 | 709,977 | 17,657 | - | - |
| Cummulative Payments to OCII: | | 897,929 | 1,047,190 | 1,196,450 | 1,885,937 | 2,575,425 | 3,285,402 | 3,995,379 | 4,013,036 | - | - |
| Cashflow to FDC: | 0% | - | - | - | - | - | - | - | 692,321 | 709,977 | 709,977 |
| Cummulative Payments to FDC: | | - | - | - | - | - | - | - | 692,321 | 1,402,298 | 2,112,275 |

[1] Amount equals:
- $175,108 CAM
- $660,000 @ 3.25% over 8 Years
- $3,006,328 Towards Ground Lease Purchase

# NEW CO. FINANCIAL OPERATING PROJECTION

3/7/2014

| | 1<br>2014<br>(8 Months) | 2<br>2015<br>(12 Months) | 3<br>2016<br>(12 Months) | 4<br>2017<br>(12 Months) | 5<br>2018<br>(12 Months) | 6<br>2019<br>(12 Months) | 7<br>2020<br>(12 Months) | 8<br>2021<br>(12 Months) | 9<br>2022<br>(12 Months) | 10<br>2023<br>(12 Months) | 11<br>2024<br>(12 Months) | 12<br>2025<br>(12 Months) | 13<br>2026<br>(12 Months) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **New Co - San Francisco, LLC** | | | | | | | | | | | | | |
| Gross Revenue (Base Annual Budget - $10 million) | $ 6,666,666.67 | $ 10,300,000.00 | $ 10,609,000.00 | $ 10,927,270.00 | $ 11,255,088.10 | $ 11,592,740.74 | $ 11,940,522.97 | $ 12,298,738.65 | $ 12,667,700.81 | $ 13,047,731.84 | $ 13,439,163.79 | $ 13,842,338.71 | $ 14,257,608.87 |
| % of Gross | 85.4% | 85.4% | 85.4% | 85.3% | 85.3% | 85.3% | 85.3% | 85.3% | 85.3% | 85.3% | 85.3% | 85.3% | 85.3% |
| Minus Operating Expenses (Base Annual Expenses - $8.9 million) -5% Savings in Expenses | $ 5,692,666.67 | $ 8,792,550.00 | $ 9,053,909.50 | $ 9,325,526.79 | $ 9,605,292.59 | $ 9,893,451.37 | $ 10,190,254.91 | $ 10,495,962.55 | $ 10,810,841.43 | $ 11,135,166.67 | $ 11,469,221.67 | $ 11,813,298.32 | $ 12,167,697.27 |
| Base Rent: | $ 352,000.00 | $ 528,000.00 | $ 528,000.00 | $ 528,000.00 | $ 528,000.00 | $ 543,840.00 | $ 543,840.00 | $ 543,840.00 | $ 543,840.00 | $ 543,840.00 | $ 560,155.20 | $ 560,155.20 | $ 560,155.20 |
| -CAM: (NO INITIAL REDUCTION)   Monthly Rent: 44,000 | $ 70,400.00 | $ 108,768.00 | $ 112,031.04 | $ 115,391.97 | $ 118,853.73 | $ 122,419.34 | $ 126,091.92 | $ 129,874.68 | $ 133,770.92 | $ 137,784.05 | $ 143,917.57 | $ 146,175.10 | $ 150,560.35 |
| -Property Taxes: (NO INITIAL REDUCTION) | $ 44,080.00 | $ 66,120.00 | $ 66,120.00 | $ 66,120.00 | $ 66,120.00 | $ 66,120.00 | $ 66,120.00 | $ 66,120.00 | $ 66,120.00 | $ 66,120.00 | $ 66,120.00 | $ 66,120.00 | $ 66,120.00 |
| **SBA Loan:** | | | | | | | | | | | | | |
| CBT Portion: | | | | | | | | | | | | | |
| - Balance: $518,000 -5T | | | | | | | | | | | | | |
| - Extended Term to 8.5 Yrs | $ 56,000.00 | $ 84,000.00 | $ 84,000.00 | $ 84,000.00 | $ 84,000.00 | $ 108,000.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Key Bank Participation Portion: | | | | | | | | | | | | | |
| - Balance: $410,000 | | | | | | | | | | | | | |
| - Interest Only for 12 Months @ 5.0% | $ 13,666.67 | $ 58,800.00 | $ 58,800.00 | $ 58,800.00 | $ 58,800.00 | $ 176,400.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| - Agency TI Loan: | $ 40,000.00 | $ 60,000.00 | $ 60,000.00 | $ 60,000.00 | $ 60,000.00 | | | | | | | | |
| **NET INCOME: (NOI Avail for Debt)** | $ 397,353.33 | $ 601,662.00 | $ 646,139.46 | $ 689,431.24 | $ 734,021.78 | $ 682,510.03 | $ 1,014,216.14 | $ 1,062,941.42 | $ 1,113,128.46 | $ 1,164,821.12 | $ 1,201,749.35 | $ 1,256,590.09 | $ 1,313,076.04 |
| **New Notes:** | | | | | | | | | | | | | |
| City/Mayor's Office New Note   27.00% | $ 107,420.40 | $ 162,448.74 | $ 174,457.65 | $ 186,146.44 | | | | | | | | | |
| - Preferred Return @ 3%   630,473 | $ 107,420.40 | $ 269,869.14 | $ 444,326.79 | $ 630,473.23 | | | | | | | | | |
| New PDC Note   36.50%   -$500,000 | $ 145,216.47 | $ 219,606.63 | $ 235,840.90 | $ 43,124.63 | | | | | | | | | |
| - Preferred Return @ 12% | | | | | | | | | | | | | |
| SN Fillmore Equity Note   36.50%   680,000 | $ 145,216.47 | $ 219,606.63 | $ 235,840.90 | $ 43,124.63 | | | | | | | | | |
| - Preferred Return @ 12%   -$680,000 | | | | | | | | | | | | | |
| Minus MOHCD Delinquency Note (Balloon)   680,000 | $ - | $ - | $ - | $ 410,026.25 | $ 734,021.78 | $ 682,510.03 | $ 1,014,216.14 | $ 1,062,941.42 | $ 1,113,128.46 | $ 1,164,821.12 | $ 1,201,749.35 | $ 1,256,590.09 | $ 1,313,076.04 |
| **AVAILABLE CASHFLOW:** | $ - | $ - | $ - | $ 6,109.29 | $ 734,021.78 | $ 682,510.03 | $ 1,014,216.14 | $ 1,062,941.42 | $ 1,113,128.46 | $ 1,164,821.12 | $ 1,201,749.35 | $ 1,256,590.09 | $ 1,313,076.04 |
| Minus SN Fillmore Note   $1,250,000 @ 3% | | | | $ 6,109 | $ 734,021.78 | $ 361,368.92 | | | | | | | |
| - Preferred Return @ 3% | | | | $ 342,109 | $ 1,076,131.08 | $ 1,437,500.00 | | | | | | | |
| SN Fillmore Note Cumulative Amount   1,437,500 | | | | | | | | | | | | | |
| **AVAILABLE CASHFLOW:** | | | | | | | | | | | | | |
| Distribution to OCII for TI Loan: | $ - | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 321,141 | $ 1,014,216 | $ 1,062,941 | $ 1,113,128 | $ 1,164,821 | $ 1,201,749 | $ 1,256,590 | $ 1,313,076 |
| Cumulative Distribution to OCII:   1,742,000 | $ 40,000 | $ 60,000 | $ 60,000 | $ 220,000 | $ 280,000 | $ 321,141 | $ 1,014,216 | $ 459,707 | | | | | |
| Distribution to New Co for TI Loan: | $ 40,000 | $ 100,000 | $ 160,000 | | $ - | $ 601,141 | $ 1,615,357 | $ 2,075,065 | $ 2,075,065 | $ 2,075,065 | $ 2,075,065 | $ 2,075,065 | $ 2,075,065 |
| Cumulative Distribution to New Co: | $ 40,000 | | | | $ - | $ - | $ - | $ 603,234 | $ 1,113,128 | $ 1,164,821 | $ 1,201,749 | $ 1,256,590 | $ 1,313,076 |
| | | | | | $ - | $ - | $ - | $ 603,234 | $ 1,716,362 | $ 2,881,184 | $ 4,082,933 | $ 5,339,523 | $ 6,652,599 |
| **Year:** | 1<br>2014 | 2<br>2015 | 3<br>2016 | 4<br>2017 | 5<br>2018 | 6<br>2019 | 7<br>2020 | 8<br>2021 | 9<br>2022 | 10<br>2023 | 11<br>2024 | 12<br>2025 | 13<br>2026 |

3/3/2014

| | 14 2027 (12 Months) 1.03 | 15 2028 (12 Months) 1.03 | 16 2029 (12 Months) 1.03 | 17 2030 (12 Months) 1.03 | 18 2031 (12 Months) 1.03 | 19 2032 (12 Months) 1.03 | 20 2033 (12 Months) 1.03 |
|---|---|---|---|---|---|---|---|
| | $ 14,685,337.13 | $ 15,125,897.25 | $ 15,579,674.17 | $ 16,047,064.39 | $ 16,528,476.32 | $ 17,024,330.61 | $ 17,535,060.53 |
| | 85.3% | 85.3% | 85.3% | 85.3% | 85.3% | 85.3% | 85.3% |
| | 12,532,728.19 | 12,908,710.04 | 13,255,971.34 | 13,694,850.48 | 14,105,695.59 | 14,528,866.37 | 14,964,732.88 |
| | $ 560,155.20 | 560,155.20 | 576,959.86 | 576,959.86 | 576,959.86 | 576,959.86 | 576,959.86 |
| | 155,077.16 | 159,729.47 | 164,521.36 | 169,457.00 | 174,540.71 | 179,776.93 | 185,170.24 |
| | 66,120.00 | 66,120.00 | 66,120.00 | 66,120.00 | 66,120.00 | 66,120.00 | 66,120.00 |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ 1,371,256.58 | $ 1,431,182.54 | $ 1,476,101.61 | $ 1,539,677.06 | $ 1,605,159.76 | $ 1,672,606.95 | $ 1,742,077.56 |
| | $ 1,371,256.58 | $ 1,431,182.54 | $ 1,476,101.61 | $ 1,539,677.06 | $ 1,605,159.76 | $ 1,672,606.95 | $ 1,742,077.56 |
| | $ 1,371,257 | 1,431,183 | 1,476,102 | 1,539,677 | 1,695,160 | 1,672,607 | 1,742,078 |
| | $ 2,075,065 | 2,075,065 | 2,075,065 | 2,075,065 | 2,075,065 | 2,075,065 | 2,075,065 |
| | $ 1,371,257 | 1,431,183 | 1,476,102 | 1,539,677 | 1,605,160 | 1,672,607 | 1,742,078 |
| | $ 8,023,856 | 9,455,038 | 10,931,140 | 12,470,817 | 14,075,977 | 15,745,584 | 17,490,661 |
| | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |

**Exhibit B**

**Notice of Default under Ground Lease dated February 20, 2015**

**Office of Community
Investment and Infrastructure**
(Successor to the San Francisco
Redevelopment Agency)

One South Van Ness Avenue
San Francisco, CA 94103
415.749.2400



EDWIN M. LEE, Mayor

Mara Rosales, Chair
Marily Mondejar
Darshan Singh
Miguel Bustos

Tiffany Bohee, Executive Director

Certified Mail Return Receipt and Electronic Mail

**NOTICE OF EVENT OF DEFAULT
FILLMORE HERITAGE CENTER**

February 20, 2015                                             108-0062015-004

Fillmore Development Commercial, LLC
c/o UrbanCore Development, LLC
4096 Piedmont Avenue, Box 313
Oakland, CA 94611

mjohnson@urbancorellc.com

Attn:   Michael Johnson
        Members

Re:     Ground Lease Agreement entered into as of August 23, 2005, by and between the
        Office of Community Investment and Infrastructure, as the Successor Agency to
        the Redevelopment Agency of the City and County of San Francisco ("OCII")
        and Fillmore Development Commercial, LLC ("Tenant") (the "Ground Lease")

Dear Mr. Johnson and Members of Tenant:

**NOTICE IS HEREBY GIVEN** that you are in default of your obligations under the following
sections of the Ground Lease:

- Section 21.1(i), Abandonment of Premises Under Certain Conditions, which provides
  that the Premises must not be abandoned or cease to be used for the uses permitted under
  the Ground Lease.

  o   Section 18.1 of the Ground Lease requires that the Tenant "continuously use the
      Premises for permitted uses and for no other purposes." As of January 14, 2015,
      Tenant closed the nightclub and ceased commercial activity in the nightclub
      portion of the Premises. Previously, the sublease by and between the Tenant and
      Yoshi's San Francisco, LLC (the "Sublessee"), dated as of May 6, 2005, was
      terminated when the Sublessee ceased operations at the Premises on July 1, 2014
      and the sublease was not assigned to a new operator.

Mr. Michael Johnson                                            February 20, 2015
Members of Lessee                                                      Page 2 of 3

        o   Section 18.2 prohibits certain uses on the Premises in the absence of the
            Landlord's consent.  Information received from the property manager of the
            Fillmore Heritage Center indicates that the Tenant has been allowing the
            unauthorized and unmonitored use of the Commercial Parcel.  OCII has not had
            the opportunity to review and/or consent to any of these activities, as required by
            the Ground Lease.

- Section 21.1 (k), Failure to Comply with Lease Terms Under Certain Conditions (Waste).

        o   Section 8.1 of the Ground Lease requires the Tenant to covenant not to do or
            suffer any waste or damage, disfigurement or injury to the Premises.  On January
            23, 2015, OCII was notified that the utilities serving the nightclub portion of the
            Premises had been turned off and the life safety system was operating on back-up
            battery.  This action caused life safety, security, and liability concerns for both
            the Commercial Parcel and the Housing Parcel.  At Landlord's request, the City
            and County of San Francisco has since restored the utilities under its emergency
            authority.

- Section 21.1 (k), Failure to Comply with Lease Terms Under Certain Conditions (Failure
to pay Impositions).

        o   Section 4.1 of the Ground Lease requires the Tenant to pay all Impositions,
            which include, among other things, "any and all taxes on the assessed value of
            the Commercial Parcel" as well as "all assessment levied under the provisions of
            the Reciprocal Easement Agreement ("REA").  The Ground Lease further
            provides that the Tenant covenants to pay the Impositions before delinquency
            and before any fine, penalty, interest or cost is added thereto for nonpayment. As
            of this date, Tenant owes approximately $145,000 in delinquent property taxes to
            the City and County of San Francisco, which amount includes the principal tax
            amount due and penalties, and approximately $37,400 in delinquent Common
            Area Maintenance Charges ("CAM" Charges) to the Fillmore Heritage
            Homeowners Association pursuant to the terms of the REA.  The current amount
            of delinquent CAM Charges is in addition to the approximately $210,000 of
            delinquent CAM Charges that the OCII,   as the legal owner of the Commercial
            Parcel, has already paid on behalf of the Tenant after numerous failed attempts to
            collect CAM Charges from the Tenant itself.

- Section 21.1(a), Failure to Pay Ground Rent Within Certain Time Period, which provides
that Tenant must pay any Ground Rent, in the manner prescribed in Section 2.2 of the
Lease, when due to Landlord within five (5) days after notice thereof from Landlord.

        o   Section 2.2 of the Ground Lease provides that "Ground Rent will commence on
            the sixth (6th) year of the Commercial Term."  The Commercial Term
            commenced in November 2007; accordingly, Ground Rent became due starting
            in November 2012.  Tenant has paid no Ground Rent to date.

**BE ADVISED THAT THE FAILURE TO COMPLY WITH THE COVENANTS OF THE
GROUND LEASE CONSTITUTES AN EVENT OF DEFAULT UNDER THE GROUND
LEASE. YOU ARE HEREBY NOTIFIED THAT YOU HAVE FIVE (5) DAYS FROM**

Mr. Michael Johnson                                    February 20, 2015
Members of Lessee                                           Page 2 of 3

**THE DATE OF THIS NOTICE IN WHICH TO CURE THE DEFAULT UNDER
SECTION 21.1(A) ABOVE AND THIRTY (30) DAYS FROM THE DATE OF THIS
NOTICE IN WHICH TO CURE THE DEFAULTS LISTED UNDER SECTIONS  21.1(i)
AND 21. 1(k) ABOVE.  UPON FAILURE TO CURE THE DEFAULTS, OCII INTENDS
TO EXERCISE AVAILABLE REMEDIES UNDER THE GROUND LEASE,
INCLUDING, BUT NOT LIMITED TO, TERMINATION OF THE GROUND LEASE.**

As a result of the above-described cessation of a Permitted Use, the unauthorized use of a portion
of the Commercial Parcel, and the compromise to the life safety system, on February 12, 2015,
OCII notified the Tenant that it intended to take immediate action under Section 7.1 of the
Ground Lease to secure the Commercial Space; subsequently, OCII had the Commercial Space
rekeyed.

We write this letter without waiving any rights.


Successor Agency to the Redevelopment Agency of the City and County of San Francisco,
a public body, organized and existing under the laws of the State of California

Tiffany Bohee
Executive Director


cc:     Olson Lee, Director, Mayor's Office of Housing and Community Development
        Heidi Gewertz, City Attorney's Office
        California Bank and Trust, 2399 Gateway Oaks Drive, Suite 110, Sacramento, CA,
          95833
        U.S. Small Business Administration, c/o 1050 Iron Point Road, Folsom, CA, 95630

**Attachment C**

**Notice of Default under the FDC Loan dated February 20, 2015**

# MAYOR'S OFFICE OF HOUSING
## AND COMMUNITY DEVELOPMENT
### CITY AND COUNTY OF SAN FRANCISCO



**EDWIN M. LEE**
MAYOR

**OLSON LEE**
DIRECTOR

February 20, 2015

Michael Johnson
Fillmore Development Commercial, LLC
c/o UrbanCore Development, LLC
4096 Piedmont Ave, Box 313
Oakland, CA 94611

mjohnson@urbancorellc.com

Sent via Certified Mail Return Receipt and Electronic Mail

Re:     Notice of Default under the Loan Agreement entered into as of August 29, 2005, by and between the City and County of San Francisco ("City") and Fillmore Development Commercial, LLC ("FDC" or "Borrower"), as amended by the First Amendment to Loan Agreement and Promissory Note dated as of December 8, 2010 (the "Loan Agreement"), for a loan in the original principal amount of Five Million Five Hundred Thousand Dollars (the "Loan")

Dear Mr. Johnson:

     The City, acting through the Mayor's Office of Housing and Community Development ("MOHCD"), provided a $5.5 million construction loan to FDC for the construction of tenant improvements at the Fillmore Heritage Center Project (the "Project"). The Loan is secured by the leasehold estate pursuant to the Borrower's ground lease with the Successor Agency to the Redevelopment Agency of the City and County of San Francisco. The Loan is fully amortized at an interest rate of 6.54 percent with monthly payments due through August 2025. To fund this loan, MOHCD borrowed $5.5 million from the U.S. Department of Housing and Urban Development ("HUD") in the form of a securitized Section 108 loan. Section 108 loans are backed by the City's federal Community Development Block Grant ("CDBG") fund allocation.

     Since the Loan began, the Borrower has missed scheduled loan repayments at various points in time. In August 2010, Borrower was 8 months in arrears on its original Loan, owing $360,150 in missed payments. At the time, MOHCD agreed to a work-out plan, rather than foreclose on the ground lease, whereby MOHCD amended the original loan and agreed to a longer repayment schedule. In separating the delinquent amount in a first amendment to the loan, MOHCD agreed to no longer consider the loan delinquent and forgo collecting any late fees or penalties unless Borrower missed subsequent payments.

The repayment of the delinquent amount was structured with payments of $5,500 per month through August 2013, with the balance of the delinquent amount due as a balloon payment in August 2013. To date, Borrower has only made nine of thirty-six payments due under this first amendment and has not made the balloon payment. MOHCD agreed to this work-out plan in good faith in recognition of a challenging economic climate and was led to believe that the Project's tenants had gotten behind on their rent payments. Subsequent information has shown that the tenants were making timely rent payments but that Borrower got behind in passing along those revenues to service the debt. Furthermore, SN Fillmore, as a subordinate lender, was repaid from Yoshi's rental income, ahead of MOHCD in violation of MOHCD's agreement with the Borrower.

Over the last three years, MOHCD has engaged in negotiations with Borrower related to the Borrower's inability to make timely loan payments due to obligations owed the City Tax Collector and due to Yoshi's San Francisco's bankruptcy proceedings. Throughout these negotiations, the Borrower was not able to successfully implement a timely repayment plan for the loan amount past due nor for unpaid Unsecured Personal Property taxes owed the City.

On June 24, 2014, the federal bankruptcy court approved a global settlement agreement under which Yoshi's San Francisco and its creditors agreed to restructure their debts and sell the Yoshi's San Francisco business to FDC and its investor group. Under the global settlement agreement, FDC and its investor group took over the Yoshi's San Francisco business and the Yoshi's San Francisco sublease of 28,000 square feet in the Fillmore Heritage Center and began operating a music venue/restaurant, The Addition, in the space on July 1, 2014.

Subsequent to July 1, 2014, FDC remains in default under the Loan. Borrower is currently 27 months behind in making payments on the Loan. Amounts past due at this time include $1.59 million in regular payments and $498,000.00 in interest and penalties. The current principal balance on the Loan, without applying any late charges, is $5 million dollars.

Borrower's failure to pay amounts due under the Loan results in a direct loss of CDBG funds that the City's nonprofit community relies on to serve low-income communities. The City has an obligation to protect and garner its CDBG funds for this critical work. At a time when the City is facing significant demands for its CDBG program, this office is faced with setting aside additional CDBG funds to repay HUD while the Loan default remains uncured. Accordingly, if Borrower is not able to cure the payment default plus subsequent missed payments, accrued interest and loan fees totaling **$2,087,022.79** before **March 2, 2015**, we intend to exercise available remedies, including foreclosure on the leasehold deed of trust. We write this letter without waiving any rights.

Sincerely,

Olson Lee
Director


cc:    Tiffany Bohee, Executive Director, Office of Community Investment and Infrastructure
       Heidi Gewertz, City Attorney's Office
       California Bank and Trust, 2399 Gateway Oaks Drive, Suite 110, Sacramento, CA, 95833
       U.S. Small Business Administration, c/o 1050 Iron Point Road, Folsom, CA, 95630

**Exhibit D**

**Summary Estimate of FDC's Outstanding Obligations**

| Obligation | Amount | Payable To |
|---|---|---|
| FDC Loan - Arrearage | $2,300,000 | City |
| FDC Loan – Principal Balance | $5,000,000 | City |
| Property Taxes | $143,000 | City |
| Utility Costs | $16,000 | City |
| Deferred Land Payment for Commercial Parcel | $3,100,000 | OCII |
| Yoshi's Tenant Improvement Loan | $7,200,000 | OCII |
| Common Area Maintenance Charges | $295,000 | OCII |
| **Total** | $18,054,000 | |

**Exhibit E**

**Notice of Termination of Ground Lease dated June 5, 2015**

**Office of Community Investment**
**and Infrastructure**

(Successor to the San Francisco
Redevelopment Agency)

One South Van Ness Avenue
San Francisco, CA 94103
415.749.2400



EDWIN M. LEE, Mayor

Mara Rosales, Chair
Marily Mondejar
Darshan Singh
Miguel Bustos

Tiffany Bohee, Executive Director

<u>Sent via Certified Mail Return Receipt</u>

## NOTICE OF TERMINATION OF GROUND LEASE AND
## THE RIGHT OF POSSESSION OF THE PREMISES
## FILLMORE HERITAGE CENTER

June 5, 2015                                                                          108-0202015-004

Michael Johnson
Fillmore Development Commercial, LLC
c/o UrbanCore Development, LLC
4096 Piedmont Ave., Box 313
Oakland, CA 94611

Attn:    Michael Johnson
            Members

Re:    Notice of Termination of Ground Lease Agreement entered into as of August 23, 2005,
          by and between the Office of Community Investment and Infrastructure, as the Successor
          Agency to the Redevelopment Agency of the City and County of San Francisco ("OCII"
          or "Landlord") and Fillmore Development Commercial, LLC ("Tenant") (the "Ground
          Lease") and Termination of Right of Possession

Dear Mr. Johnson and Members of Tenant:

**NOTICE IS HEREBY GIVEN** that, as of the date of this notice, the Ground Lease is terminated and all
Tenant's rights of possession are terminated (the "Termination") pursuant to Ground Lease Section
23.1(e), following the Event of Default occurring under the Ground Lease.

Tenant received a Notice of Default from OCII, dated February 20, 2015, as attached hereto (the
"Notice"), which Notice included, among other defaults, a default under Ground Lease Section 21.1(a),
Failure to Pay Ground Rent Within Certain Time Period, which provides that Tenant must pay Ground
Rent, in the manner prescribed in Section 2.2 of the Ground Lease, when due to Landlord within five (5)
days after notice thereof from Landlord. Tenant failed to cure such default under Section 21.1(a) within
five (5) from the date of receipt of the Notice and therefore an Event of Default has occurred under the
Ground Lease. In addition, no cures have been made for any of the other defaults included in the Notice,
and as such Notice is attached hereto, and accordingly all other defaults listed in the Notice remain
outstanding as of the date of this Notice of Termination even though over three (3) months have passed
since the Notice was sent, which time period extended far beyond the maximum five (5) day cure period

Mr. Michael Johnson                                                                June 5, 2015
Members of Lessee                                                                    Page 2 of 2

for a default under Section 21.1(a) and the maximum thirty (30) day cure period for the other defaults listed in the Notice.

Please be advised that Ground Lease Section 23.1(g) provides that in the event Landlord terminates Tenant's right to possession of the Premises pursuant to Section 23.1, Tenant waives all rights to recover possession under any rights of redemption, including, without limitation, those rights under Ca. Code of Civil Procedure Sections 1174 and 1179.

Please also be advised that Ground Lease Section 23.2, Continuation of Subleases and Other Agreements, provides that following such Termination the Landlord has the right to take over all subleases as well as licenses and agreements, which rights include transfer of the existing liquor license from Tenant to Landlord. Accordingly, the Tenant is required to take steps to transfer the liquor license and all other licenses and agreements as requested by OCII. Accordingly, Tenant will be required to cooperate with OCII and respond in a timely manner to any requests from OCII to take steps necessary for Landlord's assumption of such licenses and agreements.

Additionally, Article 24 of the Ground Lease provides that Tenant's liabilities and obligations arising under the Ground Lease prior to termination survive such expiration (the "Tenant Obligations"). Such Tenant Obligations include any outstanding Common Area Maintenance Charges or outstanding property tax owed to the City and County of San Francisco, in addition to any other outstanding Tenant Obligations. As of this date, Tenant owes approximately $143,000 in delinquent property taxes to the City and County of San Francisco, which amount includes the principal tax amount due and penalties, and approximately $45,000 in delinquent Common Area Maintenance Charges ("CAM Charges") to the Fillmore Heritage Homeowners Association pursuant to the terms of the REA. The current amount of delinquent CAM Charges is in addition to the approximately $250,000 of delinquent CAM Charges that OCII, as the legal owner of the Commercial Parcel, has already paid on behalf of the Tenant after numerous failed attempts to collect CAM Charges from the Tenant itself.

We write this letter without waiving any rights.

Office of Community Investment and Infrastructure, the Successor Agency to the Redevelopment Agency of the City and County of San Francisco, a public body, organized and existing under the laws of the State of California

Tiffany Bohee
Executive Director

cc:     Olson Lee, Director, Mayor's Office of Housing and Community Development
        Heidi Gewertz, San Francisco City Attorney's Office
        California Bank and Trust, 2399 Gateway Oaks Drive, Suite 110, Sacramento, CA, 95833

Attachment: Notice of Default dated February 20, 2015

**Office of Community
Investment and Infrastructure**
(Successor to the San Francisco
Redevelopment Agency)

One South Van Ness Avenue
San Francisco, CA 94103
415.749.2400



EDWIN M. LEE, Mayor

Mara Rosales, Chair
Marily Mondejar
Darshan Singh
Miguel Bustos

Tiffany Bohee, Executive Director

Certified Mail Return Receipt and Electronic Mail

## NOTICE OF EVENT OF DEFAULT
## FILLMORE HERITAGE CENTER

February 20, 2015                                                    108-0062015-004

Fillmore Development Commercial, LLC
c/o UrbanCore Development, LLC
4096 Piedmont Avenue, Box 313
Oakland, CA 94611

mjohnson@urbancorellc.com

Attn:    Michael Johnson
         Members

         Re:    Ground Lease Agreement entered into as of August 23, 2005, by and between the
                Office of Community Investment and Infrastructure, as the Successor Agency to
                the Redevelopment Agency of the City and County of San Francisco ("OCII")
                and Fillmore Development Commercial, LLC ("Tenant") (the "Ground Lease")

Dear Mr. Johnson and Members of Tenant:

**NOTICE IS HEREBY GIVEN** that you are in default of your obligations under the following
sections of the Ground Lease:

- Section 21.1(i), Abandonment of Premises Under Certain Conditions, which provides
  that the Premises must not be abandoned or cease to be used for the uses permitted under
  the Ground Lease.

    o   Section 18.1 of the Ground Lease requires that the Tenant "continuously use the
        Premises for permitted uses and for no other purposes." As of January 14, 2015,
        Tenant closed the nightclub and ceased commercial activity in the nightclub
        portion of the Premises. Previously, the sublease by and between the Tenant and
        Yoshi's San Francisco, LLC (the "Sublessee"), dated as of May 6, 2005, was
        terminated when the Sublessee ceased operations at the Premises on July 1, 2014
        and the sublease was not assigned to a new operator.

Mr. Michael Johnson
Members of Lessee

February 20, 2015
Page 2 of 3

    o  Section 18.2 prohibits certain uses on the Premises in the absence of the Landlord's consent. Information received from the property manager of the Fillmore Heritage Center indicates that the Tenant has been allowing the unauthorized and unmonitored use of the Commercial Parcel. OCII has not had the opportunity to review and/or consent to any of these activities, as required by the Ground Lease.

- Section 21.1 (k), Failure to Comply with Lease Terms Under Certain Conditions (Waste).

    o  Section 8.1 of the Ground Lease requires the Tenant to covenant not to do or suffer any waste or damage, disfigurement or injury to the Premises. On January 23, 2015, OCII was notified that the utilities serving the nightclub portion of the Premises had been turned off and the life safety system was operating on back-up battery. This action caused life safety, security, and liability concerns for both the Commercial Parcel and the Housing Parcel. At Landlord's request, the City and County of San Francisco has since restored the utilities under its emergency authority.

- Section 21.1 (k), Failure to Comply with Lease Terms Under Certain Conditions (Failure to pay Impositions).

    o  Section 4.1 of the Ground Lease requires the Tenant to pay all Impositions, which include, among other things, "any and all taxes on the assessed value of the Commercial Parcel" as well as "all assessment levied under the provisions of the Reciprocal Easement Agreement ("REA"). The Ground Lease further provides that the Tenant covenants to pay the Impositions before delinquency and before any fine, penalty, interest or cost is added thereto for nonpayment. As of this date, Tenant owes approximately $145,000 in delinquent property taxes to the City and County of San Francisco, which amount includes the principal tax amount due and penalties, and approximately $37,400 in delinquent Common Area Maintenance Charges ("CAM" Charges) to the Fillmore Heritage Homeowners Association pursuant to the terms of the REA. The current amount of delinquent CAM Charges is in addition to the approximately $210,000 of delinquent CAM Charges that the OCII, as the legal owner of the Commercial Parcel, has already paid on behalf of the Tenant after numerous failed attempts to collect CAM Charges from the Tenant itself.

- Section 21.1(a), Failure to Pay Ground Rent Within Certain Time Period, which provides that Tenant must pay any Ground Rent, in the manner prescribed in Section 2.2 of the Lease, when due to Landlord within five (5) days after notice thereof from Landlord.

    o  Section 2.2 of the Ground Lease provides that "Ground Rent will commence on the sixth (6th) year of the Commercial Term." The Commercial Term commenced in November 2007; accordingly, Ground Rent became due starting in November 2012. Tenant has paid no Ground Rent to date.

**BE ADVISED THAT THE FAILURE TO COMPLY WITH THE COVENANTS OF THE GROUND LEASE CONSTITUTES AN EVENT OF DEFAULT UNDER THE GROUND LEASE. YOU ARE HEREBY NOTIFIED THAT YOU HAVE FIVE (5) DAYS FROM**

Mr. Michael Johnson                                          February 20, 2015
Members of Lessee                                                   Page 2 of 3

**THE DATE OF THIS NOTICE IN WHICH TO CURE THE DEFAULT UNDER
SECTION 21.1(A) ABOVE AND THIRTY (30) DAYS FROM THE DATE OF THIS
NOTICE IN WHICH TO CURE THE DEFAULTS LISTED UNDER SECTIONS 21.1(i)
AND 21.1(k) ABOVE.  UPON FAILURE TO CURE THE DEFAULTS, OCII INTENDS
TO EXERCISE AVAILABLE REMEDIES UNDER THE GROUND LEASE,
INCLUDING, BUT NOT LIMITED TO, TERMINATION OF THE GROUND LEASE.**

As a result of the above-described cessation of a Permitted Use, the unauthorized use of a portion
of the Commercial Parcel, and the compromise to the life safety system, on February 12, 2015,
OCII notified the Tenant that it intended to take immediate action under Section 7.1 of the
Ground Lease to secure the Commercial Space; subsequently, OCII had the Commercial Space
rekeyed.

We write this letter without waiving any rights.

Successor Agency to the Redevelopment Agency of the City and County of San Francisco,
a public body, organized and existing under the laws of the State of California

Tiffany Bohee
Executive Director

cc:     Olson Lee, Director, Mayor's Office of Housing and Community Development
        Heidi Gewertz, City Attorney's Office
        California Bank and Trust, 2399 Gateway Oaks Drive, Suite 110, Sacramento, CA,
            95833
        U.S. Small Business Administration, c/o 1050 Iron Point Road, Folsom, CA, 95630

**Exhibit F**

**City Option to Assume Ground Lease dated June 5, 2015**

**Office of Community Investment and Infrastructure**

(Successor to the San Francisco Redevelopment Agency)

One South Van Ness Avenue
San Francisco, CA 94103
415.749.2400



EDWIN M. LEE, Mayor

Mara Rosales, Chair
Marily Mondejar
Darshan Singh
Miguel Bustos

Tiffany Bohee, Executive Director

June 5, 2015

108-0212015-120

Mr. Olson Lee
Director
Mayor's Office of Housing and Community Development
1 South Van Ness Avenue, 5th Floor
San Francisco, CA 94103

> Re:   Termination of Tenant's Ground Lease and Right of Possession for the Fillmore
>       Heritage Center Project and City Option to Assume Ground Lease

Dear Olson:

As you are aware, the Office of Community Investment and Infrastructure ("OCII" or "Landlord"), as the Successor Agency to the Redevelopment Agency of the City and County of San Francisco, issued a Notice of Event of Default on February 20, 2015 (the "Notice") to Fillmore Development Commercial, LLC (the "Tenant") under the Ground Lease Agreement entered into as of August 23, 2005, by and between the OCII and the Tenant, and as attached hereto (the "Ground Lease"). The Notice included a list of defaults and required that the Tenant cure such defaults within the applicable cure periods. As the defaults were not cured within the time period required, OCII issued a Notice of Termination of Ground Lease and Right of Possession of the Premises, dated June 5, 2015, pursuant to Ground Lease Section 23.1, and as attached hereto (the "Termination Notice").

Section 42.11(d) of the Ground Lease, provides that in the event of termination of the Ground Lease prior to expiration of the Commercial Term (as defined in the Ground Lease), the Landlord shall serve notice to the Mortgagee of the termination, including all amounts then due under the ground lease (as included in the Notice and Termination attached hereto), and the Mortgagee shall then have the option to assume the lease in accordance with the terms and conditions provided therein, as long as the Mortgagee exercises such option within thirty (30) days after receiving Mortgagee's request to assume the lease.

As the City and County of San Francisco, acting through the Mayor's Office of Housing and Community Development (the "City" or "Mortgagee") is the only mortgagee of the leasehold through its Section 108 Loan Agreement with the Tenant, entered into as of August 29, 2005, and as amended by that certain First Amendment dated as of December 8, 2010, OCII is now, through this letter, providing notice to the City of the termination and requesting the City to indicate its interest, if any, in assuming the Ground Lease.

Please be advised that Ground Lease Section 42.11(f) allows the Landlord to also assign and transfer to the Mortgagee all subleases in effect at time of the execution of the assigned Ground Lease with the Mortgagee. In addition, Ground Lease Section 23.2 provides that following such termination the Landlord has the right to take over all licenses and agreements, which rights include transfer of the existing liquor license from Tenant to Landlord. Accordingly, OCII will require the Tenant to take steps to transfer the liquor license and all other licenses and agreements as requested by OCII or the City.

Please indicate the City's interest in exercising its rights to assume the Ground Lease under Section 42.11(d) of the Ground Lease by signing below and returning a signed copy to me.

OCII looks forward to working with the City on preserving this valuable asset. Please contact me with any questions.

OCII, Successor Agency to the Redevelopment Agency of the City and County of San Francisco, a public body, organized and existing under the laws of the State of California

Tiffany Bohee
Executive Director

The City and County of San Francisco, acting through the Mayor's Office of Housing and Community Development, as Mortgagee of the Leasehold Interest of the Fillmore Heritage Center under the Ground Lease between OCII and Fillmore Development Corporation, LLC , entered into as of August 23, 2005, does hereby agree to assume the Ground Lease pursuant to the terms and conditions of the Ground Lease.

Date: _____

Olson Lee
Director
Mayor's Office of Housing and Community Development

Attachment A: Notice of Termination of Ground Lease and Right of Possession of the Premises

**Office of Community Investment**
**and Infrastructure**
(Successor to the San Francisco
Redevelopment Agency)

One South Van Ness Avenue
San Francisco, CA 94103
415.749.2400



EDWIN M. LEE, Mayor

Mara Rosales, Chair
Marily Mondejar
Darshan Singh
Miguel Bustos

Tiffany Bohee, Executive Director

<u>Sent via Certified Mail Return Receipt</u>

### NOTICE OF TERMINATION OF GROUND LEASE AND
### THE RIGHT OF POSSESSION OF THE PREMISES
### FILLMORE HERITAGE CENTER

June 5, 2015                                                                108-0202015-004

Michael Johnson
Fillmore Development Commercial, LLC
c/o UrbanCore Development, LLC
4096 Piedmont Ave., Box 313
Oakland, CA 94611

Attn:   Michael Johnson
        Members

Re:   Notice of Termination of Ground Lease Agreement entered into as of August 23, 2005,
      by and between the Office of Community Investment and Infrastructure, as the Successor
      Agency to the Redevelopment Agency of the City and County of San Francisco ("OCII"
      or "Landlord") and Fillmore Development Commercial, LLC ("Tenant") (the "Ground
      Lease") and Termination of Right of Possession

Dear Mr. Johnson and Members of Tenant:

**NOTICE IS HEREBY GIVEN** that, as of the date of this notice, the Ground Lease is terminated and all
Tenant's rights of possession are terminated (the "Termination") pursuant to Ground Lease Section
23.1(e), following the Event of Default occurring under the Ground Lease.

Tenant received a Notice of Default from OCII, dated February 20, 2015, as attached hereto (the
"Notice"), which Notice included, among other defaults, a default under Ground Lease Section 21.1(a),
Failure to Pay Ground Rent Within Certain Time Period, which provides that Tenant must pay Ground
Rent, in the manner prescribed in Section 2.2 of the Ground Lease, when due to Landlord within five (5)
days after notice thereof from Landlord. Tenant failed to cure such default under Section 21.1(a) within
five (5) from the date of receipt of the Notice and therefore an Event of Default has occurred under the
Ground Lease. In addition, no cures have been made for any of the other defaults included in the Notice,
and as such Notice is attached hereto, and accordingly all other defaults listed in the Notice remain
outstanding as of the date of this Notice of Termination even though over three (3) months have passed
since the Notice was sent, which time period extended far beyond the maximum five (5) day cure period

Mr. Michael Johnson                                                        June 5, 2015
Members of Lessee                                                         Page 2 of 2

for a default under Section 21.1(a) and the maximum thirty (30) day cure period for the other defaults listed in the Notice.

Please be advised that Ground Lease Section 23.1(g) provides that in the event Landlord terminates Tenant's right to possession of the Premises pursuant to Section 23.1, Tenant waives all rights to recover possession under any rights of redemption, including, without limitation, those rights under Ca. Code of Civil Procedure Sections 1174 and 1179.

Please also be advised that Ground Lease Section 23.2, Continuation of Subleases and Other Agreements, provides that following such Termination the Landlord has the right to take over all subleases as well as licenses and agreements, which rights include transfer of the existing liquor license from Tenant to Landlord. Accordingly, the Tenant is required to take steps to transfer the liquor license and all other licenses and agreements as requested by OCII. Accordingly, Tenant will be required to cooperate with OCII and respond in a timely manner to any requests from OCII to take steps necessary for Landlord's assumption of such licenses and agreements.

Additionally, Article 24 of the Ground Lease provides that Tenant's liabilities and obligations arising under the Ground Lease prior to termination survive such expiration (the "Tenant Obligations"). Such Tenant Obligations include any outstanding Common Area Maintenance Charges or outstanding property tax owed to the City and County of San Francisco, in addition to any other outstanding Tenant Obligations. As of this date, Tenant owes approximately $143,000 in delinquent property taxes to the City and County of San Francisco, which amount includes the principal tax amount due and penalties, and approximately $45,000 in delinquent Common Area Maintenance Charges ("CAM Charges") to the Fillmore Heritage Homeowners Association pursuant to the terms of the REA. The current amount of delinquent CAM Charges is in addition to the approximately $250,000 of delinquent CAM Charges that OCII, as the legal owner of the Commercial Parcel, has already paid on behalf of the Tenant after numerous failed attempts to collect CAM Charges from the Tenant itself.

We write this letter without waiving any rights.

Office of Community Investment and Infrastructure, the Successor Agency to the Redevelopment Agency of the City and County of San Francisco, a public body, organized and existing under the laws of the State of California

Tiffany Bohee
Executive Director

cc:   Olson Lee, Director, Mayor's Office of Housing and Community Development
      Heidi Gewertz, San Francisco City Attorney's Office
      California Bank and Trust, 2399 Gateway Oaks Drive, Suite 110, Sacramento, CA, 95833

Attachment: Notice of Default dated February 20, 2015

**Office of Community**
**Investment and Infrastructure**
(Successor to the San Francisco
Redevelopment Agency)

One South Van Ness Avenue
San Francisco, CA 94103
415.749.2400



EDWIN M. LEE, Mayor

Mara Rosales, Chair
Marily Mondejar
Darshan Singh
Miguel Bustos

Tiffany Bohee, Executive Director

Certified Mail Return Receipt and Electronic Mail

### NOTICE OF EVENT OF DEFAULT
### FILLMORE HERITAGE CENTER

February 20, 2015                                                   108-0062015-004

Fillmore Development Commercial, LLC
c/o UrbanCore Development, LLC
4096 Piedmont Avenue, Box 313
Oakland, CA 94611

mjohnson@urbancorellc.com

Attn:   Michael Johnson
         Members

         Re:   Ground Lease Agreement entered into as of August 23, 2005, by and between the
               Office of Community Investment and Infrastructure, as the Successor Agency to
               the Redevelopment Agency of the City and County of San Francisco ("OCII")
               and Fillmore Development Commercial, LLC ("Tenant") (the "Ground Lease")

Dear Mr. Johnson and Members of Tenant:

**NOTICE IS HEREBY GIVEN** that you are in default of your obligations under the following
sections of the Ground Lease:

- Section 21.1(i), Abandonment of Premises Under Certain Conditions, which provides
  that the Premises must not be abandoned or cease to be used for the uses permitted under
  the Ground Lease.

  o   Section 18.1 of the Ground Lease requires that the Tenant "continuously use the
      Premises for permitted uses and for no other purposes." As of January 14, 2015,
      Tenant closed the nightclub and ceased commercial activity in the nightclub
      portion of the Premises. Previously, the sublease by and between the Tenant and
      Yoshi's San Francisco, LLC (the "Sublessee"), dated as of May 6, 2005, was
      terminated when the Sublessee ceased operations at the Premises on July 1, 2014
      and the sublease was not assigned to a new operator.

Mr. Michael Johnson                                     February 20, 2015
Members of Lessee                                              Page 2 of 3

- o   Section 18.2 prohibits certain uses on the Premises in the absence of the
      Landlord's consent. Information received from the property manager of the
      Fillmore Heritage Center indicates that the Tenant has been allowing the
      unauthorized and unmonitored use of the Commercial Parcel. OCII has not had
      the opportunity to review and/or consent to any of these activities, as required by
      the Ground Lease.

- Section 21.1 (k), Failure to Comply with Lease Terms Under Certain Conditions (Waste).

  - o   Section 8.1 of the Ground Lease requires the Tenant to covenant not to do or
        suffer any waste or damage, disfigurement or injury to the Premises. On January
        23, 2015, OCII was notified that the utilities serving the nightclub portion of the
        Premises had been turned off and the life safety system was operating on back-up
        battery. This action caused life safety, security, and liability concerns for both
        the Commercial Parcel and the Housing Parcel. At Landlord's request, the City
        and County of San Francisco has since restored the utilities under its emergency
        authority.

- Section 21.1 (k), Failure to Comply with Lease Terms Under Certain Conditions (Failure
  to pay Impositions).

  - o   Section 4.1 of the Ground Lease requires the Tenant to pay all Impositions,
        which include, among other things, "any and all taxes on the assessed value of
        the Commercial Parcel" as well as "all assessment levied under the provisions of
        the Reciprocal Easement Agreement ("REA"). The Ground Lease further
        provides that the Tenant covenants to pay the Impositions before delinquency
        and before any fine, penalty, interest or cost is added thereto for nonpayment. As
        of this date, Tenant owes approximately $145,000 in delinquent property taxes to
        the City and County of San Francisco, which amount includes the principal tax
        amount due and penalties, and approximately $37,400 in delinquent Common
        Area Maintenance Charges ("CAM" Charges) to the Fillmore Heritage
        Homeowners Association pursuant to the terms of the REA. The current amount
        of delinquent CAM Charges is in addition to the approximately $210,000 of
        delinquent CAM Charges that the OCII,  as the legal owner of the Commercial
        Parcel, has already paid on behalf of the Tenant after numerous failed attempts to
        collect CAM Charges from the Tenant itself.

- Section 21.1(a), Failure to Pay Ground Rent Within Certain Time Period, which provides
  that Tenant must pay any Ground Rent, in the manner prescribed in Section 2.2 of the
  Lease, when due to Landlord within five (5) days after notice thereof from Landlord.

  - o   Section 2.2 of the Ground Lease provides that "Ground Rent will commence on
        the sixth (6th) year of the Commercial Term." The Commercial Term
        commenced in November 2007; accordingly, Ground Rent became due starting
        in November 2012. Tenant has paid no Ground Rent to date.

**BE ADVISED THAT THE FAILURE TO COMPLY WITH THE COVENANTS OF THE
GROUND LEASE CONSTITUTES AN EVENT OF DEFAULT UNDER THE GROUND
LEASE. YOU ARE HEREBY NOTIFIED THAT YOU HAVE FIVE (5) DAYS FROM**

Mr. Michael Johnson                                    February 20, 2015
Members of Lessee                                               Page 2 of 3

**THE DATE OF THIS NOTICE IN WHICH TO CURE THE DEFAULT UNDER
SECTION 21.1(A) ABOVE AND THIRTY (30) DAYS FROM THE DATE OF THIS
NOTICE IN WHICH TO CURE THE DEFAULTS LISTED UNDER SECTIONS 21.1(i)
AND 21.1(k) ABOVE.  UPON FAILURE TO CURE THE DEFAULTS, OCII INTENDS
TO EXERCISE AVAILABLE REMEDIES UNDER THE GROUND LEASE,
INCLUDING, BUT NOT LIMITED TO, TERMINATION OF THE GROUND LEASE.**

As a result of the above-described cessation of a Permitted Use, the unauthorized use of a portion
of the Commercial Parcel, and the compromise to the life safety system, on February 12, 2015,
OCII notified the Tenant that it intended to take immediate action under Section 7.1 of the
Ground Lease to secure the Commercial Space; subsequently, OCII had the Commercial Space
rekeyed.

We write this letter without waiving any rights.


Successor Agency to the Redevelopment Agency of the City and County of San Francisco,
a public body, organized and existing under the laws of the State of California


Tiffany Bohee
Executive Director


cc:     Olson Lee, Director, Mayor's Office of Housing and Community Development
        Heidi Gewertz, City Attorney's Office
        California Bank and Trust, 2399 Gateway Oaks Drive, Suite 110, Sacramento, CA,
          95833
        U.S. Small Business Administration, c/o 1050 Iron Point Road, Folsom, CA, 95630