UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AGONAFER SHIFERAW,

Plaintiff,

vs. No. 4:18-cv-06830-SBA (JSC)

CITY AND COUNTY OF SAN FRANCISCO, et al.,

Defendants.
_____________________________/

**DEPOSITION BY REMOTE VIDEOCONFERENCE OF**

**TIM SHELTON**

Wednesday, March 17, 2021

TINA MARIE VELASQUEZ, CSR
COURT REPORTING SERVICES
P.O. BOX 21535
EL SOBRANTE, CALIFORNIA 94820
velasquezmtina@gmail.com
(510) 301-2918

Reported remotely by:
Tina Marie Velasquez, CSR No. 10072

I N D E X

DEPOSITION OF: TIM SHELTON

Wednesday, March 17, 2021

| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Rosenfeld | 8 |
| Mr. Lakritz | 89 |
| Mr. Holl | 94 |
| Mr. Rosenfeld | 95 |

E X H I B I T S

| PLAINTIFF'S | | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena; Proof of Service; Stipulation, Order, and Joint Response to Magistrate Judge Corley's 1/20/21 Order (Doc. No. 100) By Plaintiff Shiferaw and Non-Party Tim Shelton; Plaintiff's Notice of Deposition of Tim Shelton Duces Tecum; 11 pgs. | 16 |
| Exhibit 2 | Letter to Tim Shelton from Gavin Newsom, dated July 6, 2017, with attachments; 3 pgs. [Shelton0001-Shelton0003] | 23 |
| Exhibit 3 | Audio file [Shelton 4] | 36 |
| Exhibit 4 | Memorandum of Understanding; 4 pgs. | 53 |

E X H I B I T S

| PLAINTIFF'S | | PAGE |
|---|---|---|
| Exhibit 5 | Third Baptist Church of San Francisco celebration documents, attached letter dated September 8, 2017; 4 pgs. | 49 |
| Exhibit 6 | Email to Hilde Myall from Raymond Lee, dated July 12, 2017; 1 pg. [OCII-SHIFERAW_000010] | 64 |
| Exhibit 7 | Fillmore Heritage Center RFP Response assessment; 2 pgs. [CCSF-SHIFERAW_000509-000510] | 69 |
| Exhibit 8 | Email chain. Top email to Darryl from Joaquin Torres, dated October 4, 2017; 1 pg. [CCSF-SHIFERAW_000389] | 73 |

(Exhibit 3 was retained by Mr. Rosenfeld)

---o0o---

And below that, the third document in this group is the Notice of Deposition to you, and this "term duces tecum" is some Latin term. I don't know the literal translation of, but it essentially means "documents."

**A.** Yes.

**Q.** All right. Have you seen any of these three different documents before?

**A.** I'm not sure. I think so.

**Q.** You're aware that you were subpoenaed to appear here, correct?

**A.** That is correct.

**Q.** And you produced through your attorneys some documents to us yesterday in response to this subpoena and deposition notice duces tecum, correct?

**A.** I think so.

**Q.** Did you personally search for some documents that were responsive?

**A.** Yes.

**Q.** And to your understanding, were all of the documents that you were able to find that were responsive produced to us, the plaintiff?

**A.** I sent them to my attorney.

**Q.** What did you find and send to your attorney responsive to our subpoena and request?

**A.** It was basically two things -- three things. One

was a thank-you letter for a donation to the governor's fund. I think it was in the amount of $5,000. The other was my company, FHC2017, who was the proposer for the Fillmore Heritage Center. We bought a table —— I think it was eight people or maybe six —— at the Juneteenth celebration in San Francisco, and there was a copy of our logo of sponsorship on their program, and the other was a voicemail that I do not know why, but I had retained it from Joaquin Torres, indicating nobody's proposal was good enough for the City, so nobody wins the proposal. Those three things are the only things relevant to this deposition that I could find.

Q. Okay. Understood. I appreciate that.

Also, just for the sake of the record, since we didn't really say it before, we're here about -- this case revolves around a request for proposals —— I may refer to it sometimes as an RFP —— that was initiated by the City of San Francisco to the County of San Francisco on or about February 10th, 2017. Is that the same request for proposals you were talking about?

A. Yes.

Q. And it concerned property, which is sometimes known as, and which I'll refer to here as, "The Fillmore Heritage Center" or "The Center." Does that also mesh with your understanding?

A. Yes.

Q. And to my understanding anyways, and I'll say for the record, the City terminated that request for proposals without selecting a winning bid or proposal on or about November 2nd, 2017. Does that also mesh with your understanding?

A. It sounds right. I'm not sure.

Q. Well, a moment ago, you referred to a voice message that you had preserved and that you caused to be sent to us in which Joaquin Torres alerted you anyway that -- well, let me not characterize it. He alerted you to what, if you recall? And I can play it, too, if that helps.

A. Yeah, he alerted that nobody won the proposal. There was five bidders originally, and I don't know what happened to them, but we didn't win is what the notification to me was. I don't remember the date of that voicemail.

Q. You anticipated my next question. I was wondering if you remembered even approximately when that voicemail was or if, in searching for it, you saw some context, clue, that might have told you --

A. No, I didn't notice, and I don't remember.

Q. Understood.

I'm going to stop this screen share now. Also,

said a prayer. And some other people got up and got and gave awards. That's all I remember.

**MR. ROSENFELD:** Q. And did you attend with sort of a group or delegation from your team?

**A.** A group.

**Q.** Is that why you guys had a table? So you got a table for your group?

**A.** Yes.

**Q.** Who else was present with you?

**A.** I remember my wife was, and then some other team members were, too.

**Q.** Your bidding entity in the RFP that we're talking about was called "FHC2017," correct?

**A.** Yes, it was.

**Q.** Is that an entity that preexisted the RFP or that you formed in order to make a proposal for the RFP?

**A.** Formed to make a proposal for the RFP, yes.

**Q.** And your wife, Vicky Shelton, she had a role to play in that entity as well, correct?

**A.** Yes. Co-owner.

**Q.** I'm sorry?

**A.** Co-owner.

**Q.** And you indicated that there were some other representatives present. Can you tell me who those were?

**A.** I really can't. I don't remember exactly who.
**Q.** How many people were part of your team at your table for the Juneteenth 2017 event?
**A.** I think it was six or eight people. I can't remember exact. We had a team of maybe ten people. And I don't know -- I don't remember who joined me at that event.
**Q.** And looking at page 2 of Exhibit 2, am I reading this right that this was hosted in some way by the African-American Chamber of Commerce?
**A.** Yes. That would be my guess, too.
**Q.** And you indicated a little while ago that the purpose in getting a table at this event was to -- I think your words were so Amos Brown would notice you; is that right?
**A.** That was one of it. The African-American Chamber of Commerce was another reason why.
**Q.** Did you know Amos Brown before this event?
**A.** No.
**Q.** Did you meet him at this event?
**A.** Yes. I think at the doorway, going out.
**Q.** And what did you mean when you said -- well, strike it. Let me back up.
Who suggested to you or your company that you make an appearance or get a table for this event?

**A.** I don't remember who did that, but the African-American Chamber of Commerce was -- at one time signed a letter of intent to be a tenant of the center, so we wanted to get them involved, too.

**Q.** And you had some -- did you have some prior communications with them or their representatives before this luncheon?

**A.** Yes.

**Q.** Who were those folks that you spoke to?

**A.** I do not remember names.

**Q.** How about the nature of those conversations in summary? What did you discuss?

**A.** Well, we discussed our proposal to buy the Heritage Center, and we wanted them to be part of it. We wanted them to have an office in it. And that's the extent of my knowledge, of my memory.

**Q.** And did you have some of those discussions yourself, in addition, maybe, through representatives or proxies?

**A.** There was one team member on my team that had a close association with the Chamber of Commerce. During the proposal process, she did leave our team, but I think she was the one -- and I don't remember her name. I think she was the one that introduced us to them.

**Q.** Did you ever end up with a working agreement with

email accounts for the team. I think I even registered it as an LLC. The email accounts were all dissolved when we did not receive the awarded project. There was no reason to continue paying for email and using that domain for a company we weren't going to ever use. So, unfortunately, I have no emails that were sent amongst the team members.

**Q.** Understood. Thank you.

What's Shelley's last name?

**A.** I don't remember.

**Q.** When you received that message from Mr. Torres, did you already know that you were not being selected as the winner?

**A.** I can't recollect that.

**Q.** What was your reaction or state of mind? I mean, in other words, were you shocked or surprised or ho-hum? How would you describe your reaction and state of mind in receiving that message from Mr. Torres?

**A.** When I received the message, whether it was that one or a different one, that we had lost the project, I was, of course, disappointed, surprised. We put a lot of money and time into the proposal. I'm guessing, the cost, upwards toward $30,000 for the proposal. And so, of course, I was very disappointed, and I think that was the biggest reaction I had when I heard we didn't win.

**Q.** And prior to receiving that news that you had not won, was there any point in the process where you felt like it was looking pretty good or you thought that you might be the ostensible winner?

**A.** We had a great proposal. It was packaged well. It, I thought, met all of the City's needs, so I thought we were amongst the top three out of five at least.

**Q.** As you sit here right now, what's your best understanding of why the City did not select FHC2017 as the winner?

**A.** It sounded to me from Torres that the community benefits was limited in all of the proposals.

**Q.** Were you ever given an opportunity by the officials putting on the RFP to modify or augment your community benefits package?

**A.** I don't remember.

**Q.** Do you feel like you should have been given that opportunity before they concluded that the community benefits wasn't there?

**MR. RAMON:** Objection; relevance, but if you have a response, please answer.

**THE WITNESS:** Well, it would have been nice for the City to tell us what our shortcoming was and give us some idea how we could have won the bid. Of course.

**MR. ROSENFELD:** **Q.** Did you come to learn any other

related to the Fillmore Heritage Center?

**A.** Not in my company. I don't recollect that discussion.

**Q.** And then apart from what you've already testified to, namely kind of brief exchanges of greetings at the doorway of the Juneteenth luncheon, and Amos Brown having some questions of you and your RFP proposal, can you recollect any other communications between you and Dr. Brown, whether in person or over the phone or email, or anything else?

**A.** No.

**Q.** What about any -- same question, but with respect to anybody you understood to be a representative of Dr. Amos Brown's.

**A.** No.

**Q.** And there came a time where you made a contribution to the 40th anniversary event of the Third Baptist Church where Amos Brown is reverend, correct?

**A.** What contribution was that?

**Q.** Well, let me sort of pull it up. I'm going to go slightly out of order here, just because of the way I've done my own exhibits, but I'll show you what I'm talking about.

Let me upload it for everybody. Give me a second. And this will be Exhibit 5, Ms. Velasquez.

this event, did you delegate somebody to do that entirely, without checking in with you?

**A.** I don't think that would have been the common understanding.

**Q.** So is it fair -- sorry. Go ahead.

**A.** Might have happened. I don't know.

**Q.** Is it fair to say that in looking at this document, you just don't remember one way or another how it came about that you are listed as a patron?

**A.** Yes.

**Q.** But you're not disputing that you were a patron, are you?

**A.** No. I just don't remember it.

**Q.** Understood.

Do you have any recollection of attending such an event, that is, a 40-year celebration of service by Reverend and Mrs. Brown on behalf of the Third Baptist Church?

**A.** I did not attend that. I have never been in that church.

**Q.** And in looking at this or thinking about it, does it refresh your recollection in any way as to whether you received a communication from somebody asking if you would like to be a patron?

**A.** No, I can't remember that.

**Q.** Do you recall ever donating any money or anything in kind, in goods or services to Dr. Amos Brown or to the Third Baptist Church or foundation?

**A.** No.

**MR. RAMON:** Objection; compound.

**MR. ROSENFELD:** I'm going to unshare this.

**Q.** Now, I'm going to jump back to what is my Exhibit 4. Well, before I do that, let me just ask you, do you know Monetta White?

**A.** Yes.

**Q.** And how do you know Monetta White?

**A.** She was a tenant -- I'm sorry? She was a tenant inside of the Fillmore Heritage Center. She owned and operated a restaurant on the corner there called -- I think it's called "1300 On Fillmore."

**Q.** Have you ever patronized or had you ever patronized that restaurant?

**A.** Yes.

**Q.** And how did you come to know Monetta White?

**A.** Well, if we were successful, she would have been a tenant in our project, and so we brought her in as a team member to our proposal.

**Q.** And is it your understanding that that was actually in some sense a requirement of the RFP, that bidders work with 1300 On Fillmore or Monetta White?

**A.** Yes.

**Q.** And so in seeking to bring her in, is it fair to say you were endeavoring to meet the terms of the RFP bidding process?

**A.** Yes.

**Q.** And where did you first meet her, or when did you first meet her?

**A.** The first time I saw her name was on the RFP, and I don't remember the first time I met her. Might have been in a restaurant when we went to check it out.

**MR. ROSENFELD:** So let me just share this exhibit now, Exhibit 4.

(Plaintiff's Exhibit 4 was marked for identification.)

**MR. ROSENFELD: Q.** Can you see that on your screen?

**A.** Yes.

**Q.** Okay. Do you recognize this document? It's four pages. I'm scrolling slowly through it.

**A.** It looks like something we would have put together.

**Q.** You see a signature line for you at the bottom?

**A.** That is my signature.

**Q.** So for the record, it's titled "Memorandum of Understanding," and it appears to be between FHC2017, your entity, and Food for Soul, LLC, which is at 1300

Fillmore. You see that?

**A.** Yes.

**Q.** And then you see Monetta White signed at the bottom on behalf of Food For Soul?

**A.** Yes.

**Q.** So does this document sort of comport with what you were telling me a moment ago, namely that you were endeavoring to bring them in as part of your proposal?

**A.** Yes.

**Q.** And there's some terms here that are listed in the obligation section. They include, for example, 1.50 per square foot per month. Is that what she would have charged them as a tenant?

**A.** That's what it looks like, yes.

**Q.** In your understanding, looking back, was that the prevailing market rate for commercial square footage in that area at that time, or was that a discounted rate?

**A.** It's a discounted --

**MR. RAMON:** Objection; calls for expert opinion.

**MR. ROSENFELD:** **Q.** You said it was a discounted rate, sir?

**A.** I'm not an expert, though.

**Q.** I understand.

Why did you offer them discounted terms, I guess, is my question?

**A.** I don't want to make up something that wasn't true. I can't remember exactly, but I think they might have been having financial problems, and they needed time to build up. We needed them as part of our agreement. I don't remember exactly why I offered them a discounted rate.

**Q.** Were you surprised in any way to see that the City and County's RFP required that you make provisions for including this business?

**A.** No, it didn't surprise me.

**Q.** Have you seen other things like that in other RFPs?

**A.** Well, they're a current tenant the City wanted to keep there is my assumption, and they wanted the new landlord to help them do that.

**Q.** Tell me about this term that involved payment to them of $300,000. Was that something that was required under the RFP?

**A.** I don't remember. I think -- and I'm guessing right now. If you want me to guess, I will. I think they had -- they owed back-rent to the City, and that was to help them get out of that position.

**Q.** And as you sit here today, does that seem normal or reasonable to you in a City-administered request for proposals on a City-owned parcel?

**A.** I don't think it was a requirement by the City, so

I can't answer that question. I think it was just a need for Food For Soul.

Q. Okay. Give me just a moment.

What conversations did you have with Ms. White that you can recall discussing any of these terms?

**A.** It was a long time ago. I don't remember the terms. This reminds me what the terms are, but I don't remember the necessary terms. The next one was to help modernize her restaurant.

**Q.** In any event, none of these things came to pass, because you weren't selected, correct?

**A.** That is correct.

**Q.** Did you ever make any payments, either in money or goods or services or promises to -- strike it. Not promises.

Did you ever make any payments to Monetta White or 1300 on Fillmore or Food For Soul in the form of money or goods or services?

**MR. RAMON:** Objection; vague and ambiguous as to time or purpose.

**MR. ROSENFELD:** **Q.** Related to the RFP process.

**A.** No.

**Q.** Give me a moment. I'm just looking for something here.

How did you come to understand that in order to

**A.** My guesstimate, yes.
**Q.** And if you had this to do over, looking back, would you still have -- based on the way the process unfolded, would you do it again? Would you submit another -- submit that proposal knowing what you know now?
**A.** Knowing that I would lose, eventually lose, I would not spend the money, nor make the time.
**Q.** How common is it in your experience that a municipal entity cancels an RFP process without selecting any winner or bidder?
**A.** I don't have a lot of experience in that.
**Q.** Have you been involved in any other RFP submissions, either private or government, where no winner was selected, where it was canceled without selection of a winner?
**A.** I can't remember that ever happening.
**Q.** Other than this one, you mean?
**A.** Correct.
**MR. ROSENFELD:** I have no further questions at this time.
**MR. LAKRITZ:** Okay. I just have a few questions.

**EXAMINATION BY MR. LAKRITZ**

**MR. LAKRITZ:** **Q.** Mr. Shelton, as I said earlier, I'm Tom Lakritz with the City Attorney's Office. I represent the City, Mayor Breed, Vallie Brown, I mean

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA )
)ss.
COUNTY OF SAN FRANCISCO )

I, TINA MARIE VELASQUEZ, CSR, hereby certify:

I am a duly qualified Certified Shorthand Reporter in the State of California, holder of Certificate Number 10072 issued by the Court Reporters Board of California and which is in full force and effect. (Fed. Rules of Civ. Proc. 28(a)).

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b); and prior to being examined, the deponent was first duly sworn by me. (Fed. Rules of Civ. Proc. 28(a), 30(f)(1)).

I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in this action. (Fed. Rules of Civ. Proc. 28).

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition, and the foregoing transcript is a true record of the testimony given by the deponent. (Fed. Rules of Civ. Proc. 30(f)(1)).

Before completion of the deposition, review of the transcript [ X ] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto. (Fed. Rules of Civ. Proc. 30(e)).

Dated: March 31, 2021

TINA MARIE VELASQUEZ, CSR
State of California
CSR License No. 10072