1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                     ---oOo---

4

5   AGONAFER SHIFERAW,          )
                                )
6               Plaintiff,      )
                                )
7          vs.                  ) NO.: 4:18-cv-06830-SBA (JSC)
                                )
8   CITY AND COUNTY OF          )
    SAN FRANCISCO, et al.,      )
9                               )
                Defendants.     )
10  _____)

11

12

13

14

15    VIDEOTAPED DEPOSITION VIA REMOTE VIDEOCONFERENCE OF

16                 MAYOR LONDON BREED

17              WEDNESDAY, APRIL 21, 2021

18

19

20  Reported By:  DANIELLE MISKE, CSR #9545

21

22

23

24            BONNIE L. WAGNER & ASSOCIATES
                  villagerun@msn.com
25                  (415)982-4849

```
 1                          INDEX

 2   EXAMINATION BY                                   PAGE

 3           MR. ROSENFELD                              4

 4                      ---oOo---

 5

 6        RECORD MARKED AT THE REQUEST OF COUNSEL

 7                   Page 56, Line 2

 8                      ---oOo---

 9

10           EXHIBITS MARKED FOR IDENTIFICATION

11   NO.                  DESCRIPTION               PAGE

12   Exhibit 1    Document entitled PLAINTIFF'S NOTICE   12
                  OF DEPOSITION DUCES TECUM OF MAYOR
13                LONDON BREED, 5 pages

14   Exhibit 2    Group document containing various      16
                  e-mail correspondence, oldest is
15                to London Breed from Dr. Ernest Bates
                  dated 11/10/17, 14 pages
16
     Exhibit 3    Group document containing various      42
17                e-mail correspondence, oldest is
                  to Lynn Khaw from Naomi Kelly dated
18                11/14/17, 9 pages

19   Exhibit 4    E-mail string, oldest is to Joaquin    49
                  Torres from Amy Cohen dated 5/30/17,
20                2 pages

21   Exhibit 5    E-mail to Andrea Baker from Denise     50
                  Bradley dated 7/24/17, 2 pages
22
     Exhibit 6    Group document containing various      57
23                e-mail correspondence, oldest is
                  to Dr. Ernest Bates and Vallie Brown
24                from pastor@thirdbaptist.org dated
                  4/9/18, 9 pages
25   //
```

DEPOSITION OF MAYOR LONDON BREED – APRIL 21, 2021

1          EXHIBITS MARKED FOR IDENTIFICATION (CONTINUED)

2    NO.                    DESCRIPTION                    PAGE

3    Exhibit 7    E-mail to Samantha Roxas from Majeid        116
                  Crawford dated 1/31/18, 1 page
4

5    NOTE:  The original Exhibit 2 is marked "Confidential –
     Attorneys' Eyes Only" and is bound separately.  A copy
6    with redacted text is attached to this transcript.

7                          ---oOo---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              3

1          BE IT REMEMBERED that, pursuant to Notice of

2     Taking Deposition and on Wednesday, April 21, 2021,

3     commencing at 12:30 p.m, before me, DANIELLE MISKE, CSR

4     License No. 9545, there remotely appeared

5                         MAYOR LONDON BREED,

6     called as a witness by the Plaintiff; who, being by me

7     remotely duly sworn, was thereupon examined and testified

8     as is hereinafter set forth.

9                         ---oOo---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        APPEARANCES

 2

 3   FOR THE PLAINTIFF (APPEARING REMOTELY):

 4           PIER 5 LAW OFFICES
             BY: BEN ROSENFELD, Attorney at Law
 5           3330 Geary Boulevard, 3rd Floor East
             San Francisco, California 94118
 6           (415) 285-8091
             ben.rosenfeld@comcast.net
 7

 8
     FOR THE DEFENDANTS CITY AND COUNTY OF SAN FRANCISCO,
 9   LONDON BREED, AMOS BROWN, JOAQUIN TORRES, NAOMI KELLY and
     VALLIE BROWN (APPEARING REMOTELY):
10
             OFFICE OF THE CITY ATTORNEY
11           CITY AND COUNTY OF SAN FRANCISCO
             BY: THOMAS S. LAKRITZ, Deputy City Attorney
12           1390 Market Street, 6th Floor
             San Francisco, California 94102
13

14
     ALSO PRESENT (APPEARING REMOTELY):
15
             MIKE TUNICK, Videographer
16
             AGONAFER SHIFERAW
17
                        ---oOo---
18

19

20

21

22

23

24

25
```

DEPOSITION OF MAYOR LONDON BREED - APRIL 21, 2021

1                          ---oOo---

2              (Mr. Shiferaw is not present.)

3              THE VIDEOGRAPHER:  All right.  We're going on

4     record at 12:30 p.m.

5              Today is April 21st, 2021.

6              And this marks the beginning of the deposition --

7     oh, the client is coming in here.

8              (Mr. Shiferaw is now present.)

9              THE VIDEOGRAPHER:  Okay.  I will continue.

10             Okay.  So this is April 21st, 2021.

11             And this marks the beginning of the deposition of

12    Mayor London Breed in the matter of Agonafer Shiferaw vs.

13    the City and County of San Francisco.  And this is for the

14    US District Court, Northern District of California.

15             Videographer is Mike Tunick and I have been

16    retained by counsel for Plaintiff.

17             And if we can have our attorneys present please

18    introduce yourselves.

19             MR. ROSENFELD:  Good afternoon, everyone.

20             Good afternoon, Mayor Breed.

21             My name is Ben Rosenfeld and I am the attorney

22    for the plaintiff, Agonafer Shiferaw.

23             MR. LAKRITZ:  Good afternoon.  I'm Deputy City

24    Attorney Tom Lakritz on behalf of the Mayor and all other

25    defendants.

1            THE VIDEOGRAPHER:  Okay.  Danielle, you are good

2    to go.

3            THE REPORTER:  Okay.  Very good.

4            Will counsel stipulate to my swearing in the

5    witness remotely?

6            MR. ROSENFELD:  Yes.

7            MR. LAKRITZ:  Yes.

8            THE REPORTER:  Thank you.

9            (Whereupon, the witness was first duly sworn by

10            the reporter.)

11                         ---oOo---

12            EXAMINATION BY MR. ROSENFELD

13            MR. ROSENFELD:  Q.  I will just reintroduce

14    myself.

15            My name is Ben Rosenfeld.  I'm counsel for

16    Plaintiff Agonafer Shiferaw.

17            Good afternoon, Mayor Breed.

18      A.  Good afternoon.

19      Q.  We are here regarding a civil matter in which you

20    are a named defendant, along with some other defendants,

21    represented by the City Attorney's Office and Deputy City

22    Attorney Tom Lakritz.

23            Just quickly, before we get started, I just want

24    to go over a couple what we call ground rules as follows.

25            Even though we are in this informal Zoom setting,

1    your testimony today is under oath, same as if you were

2    testifying in a more formal courtroom setting.  It carries

3    the same obligations, the same potential penalties of

4    perjury.

5            Is that clear?

6        A.  Yes.

7        Q.  And just as you and I are doing so far, it's

8    important that we not step over each other when we talk.

9    The court reporter can only take down one of us at a time.

10           It is also important that our questions and

11   answers be verbal, because the court reporter can't easily

12   take down gestures, like nods or shakes of the head.

13           Is that clear?

14       A.  Yes.

15       Q.  We are entitled today, as we sit here, to your

16   best recollection of events and circumstances concerning

17   this matter based on your own personal knowledge and

18   experience.

19           That could derive from other sources.  It could

20   be based on things you have read or heard.  But we are not

21   asking you, at any point, to guess or speculate.

22           Is that clear?

23       A.  Yes.

24       Q.  We are, however, entitled to reasonable

25   estimates, your best recollections, including things like

1    time, distance, dates, number of people, you know, even if

2    it is an approximation.

3            And I may, from time to time, sort of try to

4    narrow down the polls of those figures.  I may try to

5    refresh your recollection with documents.

6            This is the opportunity and it is your obligation

7    to provide your best testimony going forward.

8            Is that all clear?

9    A.  Yes.

10    Q.  The way lawyers like to distinguish between a

11    reasonable estimate and a pure guess is with the following

12    example.

13            If I were to ask you for the dimensions of

14    whatever desk or table you are sitting in front of right

15    now, even without taking out a tape measure, you could

16    provide a reasonable estimate.

17            But if I were to ask you for the dimensions of

18    the table or desk that I'm sitting at, not even being able

19    to see it, not having visited my office, you would be

20    hazarding a pure guess.

21            Is that clear?

22    A.  Yes.

23    Q.  At the conclusion of this -- or sometime after

24    the conclusion of this deposition, you will receive notice

25    that a transcript has been prepared.  And it will be your

1    opportunity but not your obligation to review it for any

2    corrections, modifications or additions you want to make.

3           Is that clear?

4    A.  Yes.

5    Q.  But just to let you know, your -- any changes you

6    make to the transcript will be kept track of in sort of

7    errata sheet at the back, meaning that all the parties,

8    including me, will be aware of any changes.  We will have

9    an opportunity, if we think they are material, for

10   example, if they are impeaching, to comment on those

11   changes in further proceedings.

12          Is that clear?

13   A.  Yes.

14   Q.  And that just becomes a further reason why it is

15   important to give your best testimony going forward.

16          And in concert with that, you should feel welcome

17   at any stage to interject, even if I have gone on to some

18   other topic, if you want to go back over some prior

19   testimony and modify something or add something.  Because

20   we understand that just the process of talking about

21   things sometimes reawakens dormant memories and

22   recollections.

23          Is that all clear?

24   A.  Yes.

25   Q.  Okay.  Great.

1          And, lastly for now, Mr. Lakritz may, from time

2    to time, object to my questions.  Even if he objects,

3    unless he specifically instructs you not to answer a

4    question, it is still your duty to answer the question,

5    presuming you understand it.

6          You can, of course, and you should ask me for a

7    clarification if something is unclear.  Because if you

8    answer the question, you will be presumed to have

9    understood it.

10          But the point I'm trying to get across is that

11    you don't have to wait after he objects to be said [sic];

12    you can go ahead and answer.

13          Even though I might say that -- the reason we do

14    it that way is because, obviously, we don't have a judge

15    here right now to referee disputes or things like

16    admissibility and objections.  So we simply preserve the

17    record of objections so that we can argue about them in

18    front of the court later.

19          Is that all clear?

20    A.  Yes.

21    Q.  All right.  Very good.

22          MR. ROSENFELD:  I have uploaded to the chat, Tom,

23    Exhibit Number 1.  But, also, I will e-mail the exhibits

24    we use to you and to the court reporter afterward.

25          But I'm going to share that exhibit now.

1                  And this will be marked as Exhibit 1.

2                  (Exhibit 1 was marked for identification.)

3             MR. LAKRITZ:  Give me just a moment here.

4        Q.   Mayor Breed, can you see a document on your

5   screen?

6        A.   Yes.

7        Q.   Okay.  So I will just represent this is the

8   notice of deposition for your deposition today.  "Duces

9   tecum" is Latin for something meaning "with documents" or

10  "produce documents."

11                 And that's why I'm marking this Exhibit 1.

12                 I just want to call your attention to the section

13  of this notice where we have asked for documents that

14  begins with the Number 1 now on the page here.

15                 Have you seen this document before?

16            MR. LAKRITZ:  I'm going to object to this depo

17  notice.  This notice was served on April 10th, 2021.

18                 We are here pursuant to a depo notice that you

19  served on my office on December 29th, 2020.  That was the

20  subject matter of a motion for protective order.  That

21  was litigated and the protective order was granted in

22  part.  Nothing in Judge Corley's order allows you to serve

23  a subsequent -- a notice of deposition.

24                 Nothing in Judge Armstrong's order of April 9th

25  allows you to serve a depo notice.

1          Our discovery cut-off was on -- was on

2     February 26, 2021.  And to the extent that this notice of

3     deposition requests the production of documents, it is in

4     violation of Federal Rule of Civil Procedure 30 and 34.

5          We were not given 30 days' notice.

6          Moreover, it is in violation of Judge Corley

7     order which the City agreed to produce any documents

8     through May -- through May 2nd, 2018.

9          MR. ROSENFELD:  Okay.  Your objections are noted,

10    for the record, Mr. Lakritz.  I'm not stipulating to them.

11        Q.  But be that as it may, Mayor Breed, have you

12    brought with you any documents to give to me today?

13        A.  No.

14         MR. LAKRITZ:  I can state for the record that all

15    defendants, including Mayor Breed, have previously

16    produced all documents requested through May 2nd, 2018.

17         MR. ROSENFELD:  Okay.  And we will certainly

18    except to that -- except, E-X-C-E-P-T -- take issue with

19    that representation.

20        Q.  Okay.  Moving on.

21         Mayor Breed, we are here, as I believe you know,

22    about a parcel on Fillmore -- from address 1300 to 1320 to

23    1330 on Fillmore Street which I will be referring to as

24    "the Fillmore Heritage Center" or "the Center" or "the

25    FHC."  I will use all those terms synonymously just so we

1    are on the same page.

2            Are you familiar with the property I'm referring

3    to?

4        A.  Yes.

5        Q.  Okay.  And we will also be talking, from time to

6    time, about a request for proposals that the City issued

7    soliciting bids for the purchase and use of the Fillmore

8    Heritage Center which I may abbreviate "RFP."

9            Is that clear?

10       A.  Yes.

11       Q.  Okay.  Very good.

12           So -- and the RFP, I will represent to you, was

13   initiated by the City and County of San Francisco on

14   February 10th, 2017.

15           On that date, what was your relationship with

16   Vallie Brown?

17       A.  I don't remember.

18       Q.  You were Supervisor -- County Supervisor at the

19   time, correct?

20       A.  Yes.

21       Q.  Okay.  And was there a time when Vallie Brown was

22   working for you?

23       A.  Yes.

24       Q.  In what capacity?

25       A.  She was one of my legislative aides.

1      Q.  Okay.  And do you recall the dates or approximate

2  dates when she served in that capacity?

3      A.  No.

4      Q.  To your knowledge, did she, at some point, go

5  over to the Mayor's Office?

6      A.  Yes.

7      Q.  Okay.  And you are familiar with a gentleman, a

8  distinguished doctor, by the name of Ernest Bates?

9      A.  Yes.

10     Q.  What is your relationship with Dr. Bates?

11     A.  I consider him a friend.

12     Q.  Okay.  And you, in fact, have each other's

13  personal contact information, like personal e-mail and

14  personal phone number, correct?

15     A.  I have his personal phone number.

16     Q.  Okay.  And you are aware that Dr. Bates made a

17  proposal to buy and operate a proton beam inhibitor --

18  proton beam machine, maybe, inside the Fillmore Heritage

19  Center, right?

20         MR. LAKRITZ:  Objection.  Vague as to time.

21         MR. ROSENFELD:  Q.  At some point.

22     A.  What type of proposal?

23     Q.  Well, are you aware that Dr. Bates expressed

24  interest, at one point in time, in locating this big

25  machine, this proton machine, used in cancer treatment,

DEPOSITION OF MAYOR LONDON BREED – APRIL 21, 2021

1   inside the Fillmore Heritage Center?

2        A.  Yes.

3        Q.  Okay.  When did you first become aware of

4   Dr. Bates's interest in doing that?

5        A.  I don't know.

6        Q.  There did come a time when you helped -- you sort

7   of worked with Dr. Bates to facilitate that process, the

8   process of his looking at the Center as a suitable space,

9   meaning with officials, about whether he would purchase it

10  and so forth, right?

11       A.  I need clarity on the question.

12       Q.  Sure.

13       A.  What specifically are you asking me?

14           You are asking me several things.

15       Q.  Okay.  Fair enough.

16           What role did you play, if any, in helping

17  Dr. Bates look into the prospect of locating his machine

18  in the Fillmore Heritage Center?

19       A.  I don't know.

20           I think the way that you are asking the question

21  is misleading.

22           MR. ROSENFELD:  Okay.  Let me pull up -- I will

23  pull up another exhibit here and maybe that will help.

24           And this will be marked as Exhibit 2.

25           (Exhibit 2 was marked for identification.)

DEPOSITION OF MAYOR LONDON BREED – APRIL 21, 2021

1          MR. ROSENFELD:  Q.  Exhibit 2 consists of

2   14 pages of e-mail communications.

3          And you see at the top here it is dated

4   November 10th and it says that it is from Dr. Bates and to

5   you?

6     A.  Yes.

7     Q.  And is that your -- or was that your personal

8   Gmail address at the time on there?

9     A.  (No response.)

10    Q.  Do you see that, Mayor?

11    A.  Yes.

12    Q.  Okay.  I'm sorry.  I just didn't hear the answer.

13    A.  I said yes.

14    Q.  Oh, okay.

15         MR. LAKRITZ:  Can we -- because this contains her

16   personal e-mail address, can we have this exhibit subject

17   to a protective order?

18         MR. ROSENFELD:  Well, we don't need it subject to

19   a protective order.  I will just redact out the personal

20   e-mail address for the copy of the exhibit we attached to

21   the deposition.

22         How about that?

23         MR. LAKRITZ:  Well, that's a different -- then

24   that's not the document that the witness is going to

25   testify to.  So if you are asking her to testify to a

1    document and it contains her personal e-mail account, then

2    it needs to be subject to a protective order.

3           MR. ROSENFELD:  Okay.  Well, we will figure out a

4    way of handling it afterwards.  I think I can probably do

5    that, Tom.  But, I mean, subject to a protective order, it

6    also provides for narrow and specific redaction when it is

7    attached to any record filings.

8           But yeah, we will figure something out to make

9    sure that --

10          MR. LAKRITZ:  Great.  Thanks.

11          MR. ROSENFELD:  Yep.

12     Q.  So Mayor, does this jog your recollection at all

13    with respect to any role you played in facilitating

14    Dr. Bates's interest in the Fillmore Heritage Center?

15     A.  No.

16     Q.  Do you recall that you helped arrange a dinner

17    meeting between Dr. Bates, yourself, and then-mayor Ed Lee

18    to discuss Dr. Bates's interest in the Fillmore Heritage

19    Center?

20     A.  Yes.

21     Q.  And that dinner took -- do you remember where

22    that dinner took place?

23     A.  No.

24     Q.  If I told you it was at a restaurant called -- I

25    don't know how to pronounce this -- Mourad --

1    M-O-U-R-A-D -- is that --

2         A.  Yes.

3         Q.  If I told you that it occurred on November 27th,

4    2017, does that mesh with your recollection, or do you

5    have any reason to disagree?

6         A.  I don't know.

7         Q.  Okay.  It sounds like that could be right?

8         A.  Can you repeat the date?

9         Q.  Yeah.

10             November 27th, 2017.

11        A.  I don't know the date.  I would have to go back

12   and look at a calendar.

13        Q.  Okay.  That's all right.

14             Why did you arrange that dinner meeting?

15        A.  Because Dr. Bates asked.

16        Q.  And what did you understand, at the time he

17   asked, to be his goal or interest?

18        A.  He wanted to talk about the Fillmore Heritage

19   Center, but he also wanted to talk about, specifically,

20   what he wanted to do with the Fillmore Heritage Center.

21        Q.  And what was that, in your understanding at the

22   time?

23        A.  This medical-related facility.

24        Q.  Okay.  And what was your -- what was your

25   response, if any, to his expression of interest in that?

 1      A.  Well, the community and I both wanted to keep it

 2  an entertainment facility, but out of respect for

 3  Dr. Bates, I supported his request.

 4      Q.  And you, in fact, took steps to arrange this

 5  dinner meeting involving the three of you, that is, you,

 6  then-mayor Ed Lee, and Dr. Bates, and some others,

 7  correct?

 8      A.  Yes.

 9      Q.  Did you -- did anybody else, other than

10  Dr. Bates, express any interest to you in purchasing or

11  reactivating the Fillmore Heritage Center at any time?

12      A.  Dr. Bates did not express any interest in

13  purchasing or reactivating the Fillmore Heritage Center.

14      Q.  Did anybody, other than Dr. Bates, express any

15  interest to you in utilizing the Fillmore Heritage Center?

16      A.  Yeah, a lot of people did.

17      Q.  Such as?

18      A.  Dang it.

19          I would need to go back to look at it.

20          I don't recall everyone.

21          I will say Agonafer definitely expressed

22  interest --

23      Q.  Okay.

24      A.  -- on numerous occasions.

25      Q.  And can you remember specifically anybody,

DEPOSITION OF MAYOR LONDON BREED – APRIL 21, 2021

1    besides Dr. Bates or Agonafer Shiferaw, that expressed

2    such interest at this dinner?

3         A.   Shoot.

4              Who else?

5              There were community members.  I can't recall

6    specifically who.

7              There was -- shoot.

8              I can't remember.

9              But there were a lot of people who, at the time,

10   did express interest, I'm sure.

11        Q.   Did you keep any records of those expressions of

12   interest, if they were in writing?

13        A.   I don't think so.

14        Q.   Okay.  Let me throw another name out to you.

15             Majeid Crawford of the New Community Leadership

16   Foundation.

17             Did he express interest to you in utilizing the

18   Fillmore Heritage Center?

19        A.   I don't remember if he expressed interest to me

20   directly, but I do know that he had interest in the

21   project -- in utilizing the space for community purpose.

22        Q.   And do you recall how you came to learn that?

23        A.   No.

24        Q.   And with respect to Dr. Bates, do you recall how

25   you first came to learn that he was interested in the

DEPOSITION OF MAYOR LONDON BREED – APRIL 21, 2021

1    Center?

2         In other words, directly from him or from some

3    third-party.

4         A.  It was directly from him.

5         Q.  Okay.  Just scrolling down a little bit through

6    this exhibit, do you actually recall -- looking -- or

7    focusing your attention on the e-mail in the middle of the

8    page there dated November 10, 2017, from Dr. Bates to you

9    where he says, "London, is it possible for me to view the

10   Fillmore Space this Wednesday after 1:00 p.m."

11        As you sit here, do you recall seeing that

12   e-mail?

13        A.  No.

14        Q.  You indicated --

15        A.  To be clear, I believe that there had been others

16   who asked for access to review the space as well.

17        Q.  Okay.  And -- but you don't -- other than

18   Mr. Shiferaw, you don't recall any other names as you sit

19   here right now.

20        Fair to say?

21        A.  Other than to ask to view the place?

22        Q.  Yeah.

23        A.  Mr. Shiferaw never asked -- I don't recall him

24   ever asking to review the place.

25        Q.  I understand the distinction.

1          So backing up.

2          Who else asked, besides Dr. Bates, to examine the

3     space?

4      A.  I don't recall.

5          But I do remember that there were people who were

6     reaching out to ask to view the space other than

7     Dr. Bates.  I just don't recall specifically who.

8      Q.  And were those people reaching out while the RFP

9     was pending or at some other time?

10     A.  I don't know.  Because I'm not -- I don't recall

11    the timing, so I don't know.

12     Q.  What, if any, actions did you take to facilitate

13    an inspection of the Fillmore Heritage Center by any of

14    those other people who were reaching out, other than

15    Dr. Bates?

16     A.  I believe, for the most part, we forwarded those

17    requests to Office of Economic and Workforce Development

18    to facilitate.

19     Q.  Other than on behalf of Dr. Bates, did you take

20    any affirmative or proactive steps, yourself, personally,

21    to arrange any meetings or facilitate any discussions by

22    any other third parties who expressed interest in the

23    Fillmore Heritage Center?

24     A.  Can you clarify that question?

25     Q.  Yeah.

1            Other than what we have been talking about with

2    respect to Dr. Bates, mainly the dinner meeting that you

3    helped arrange between yourself, him and Ed Lee, did you

4    take any affirmative steps to arrange any other meetings

5    or facilitate any inspections regarding the Fillmore

6    Heritage Center, any parties?

7         A.   Just for clarity, I didn't take an affirmative

8    step to coordinate a dinner.  I was asked by someone, who

9    I have a tremendous amount of respect for, to coordinate a

10   dinner.  And I honored that request the same way I honored

11   a request made by Agonafer Shiferaw and Reverend Brown for

12   me to meet at Third Baptist Church to talk about the

13   Fillmore Heritage Center and their desires for me to

14   support their collaboration to make something happen

15   there.

16            So, as a Supervisor, I was responsive to the

17   people of the community who made the request.  I didn't

18   make any proactive efforts to reach out to anyone.

19        Q.   In response to Dr. Bates's inquiry to you, you

20   personally took steps to arrange a dinner meeting between

21   yourself, Dr. Bates and Ed Lee, correct?

22        A.   I don't understand what you mean by "personally."

23   Help me to understand that.

24        Q.   Well, you reached out to staff -- or you reached

25   out through staff and/or to staff to facilitate

1    Dr. Bates's request and arrange a dinner meeting, right?

2        A.   Yeah.   Through proper channels, yes.

3             So what's the difference between that in regards

4    to my position in that?   Why do you keep putting the word

5    personal [sic] with that?

6        Q.   Oh, I'm just trying -- I'm just trying to clarify

7    that you took -- I'm just trying to understand the actions

8    you took.   That's all.   And, I mean, I want to get the

9    universe of it.

10       A.   Yeah.

11            And to be clear -- and I will reiterate --

12   Dr. Bates made a request.   I sent a request to the Mayor

13   to honor that request, and the Mayor complied.

14            Reverend Brown and Agonafer Shiferaw made a

15   request to me to meet, and I honored that request by

16   meeting with them and listening to them, what they wanted

17   to propose for the Fillmore Heritage Center.

18       Q.   Okay.   And still sticking with the Dr. Bates

19   inquiry.

20            Did you, in fact, attend that dinner meeting?

21       A.   Yes.

22       Q.   And what was discussed at that meeting?

23       A.   Just Dr. Bates talked about -- what I recall,

24   Dr. Bates talked about specifically what he wanted to do

25   there, details around this turning into what appeared to

1    be a medical facility.

2            And, you know, the conversation also -- what was

3    also brought up was that the community was more interested

4    in seeing the space continue as an entertainment venue, as

5    an art and culture facility, and that it would definitely

6    not be a use that the community would support.

7        Q.  Did you express that to Dr. Bates at that dinner

8    meeting?

9        A.  At that dinner meeting, yes, and on several

10   occasions.

11       Q.  And is there any written record of that?

12       A.  I don't know.

13       Q.  Have you seen any written record of it?

14       A.  I don't know.

15       Q.  Do you recall writing anything to Dr. Bates to

16   that effect?

17       A.  I don't think so.

18           I had the conversation with him.

19       Q.  Do you recall when or on what occasion or

20   occasions you conveyed that to him, mainly, that his

21   interest -- his use of the space might not be in accord

22   with what the opportunity wanted?

23       A.  Yes, it was, basically, on every occasion that we

24   ever talked about it.

25       Q.  And what was Dr. Bates's response, if any, to

1   that?

2       A.   That he believes that -- he talked about a

3   community component, arts-related function, that could be

4   incorporated into the use of the space that he thinks

5   could be something that the community might be open to.

6       Q.   Who else was present during that dinner meeting

7   on November 27th, 2017, at Mourad?  "Mourad."

8       A.   Who else was there?

9            May Naomi Kelly and Dennis Bradley Tyson.

10      Q.   And who is Denise Bradley Tyson?

11      A.   I don't know what -- she is just a friend.

12      Q.   I mean, what role or function did she play at the

13  time of that dinner meeting?

14      A.   It wasn't a role or function; it was just her

15  being a friend.  She doesn't work for anyplace.  So I

16  don't think it's -- yeah, I can't say because she is not

17  employed anywhere, so it --

18      Q.   Why was she there, to your understanding?

19      A.   Because we were basically -- because she wanted

20  to be there, I guess.

21           I don't know.

22           I can't remember.

23      Q.   What, if anything, did she say or contribute

24  during the meeting?

25      A.   A lot of the meeting -- I wouldn't say it was a

1    meeting; I would say it was more of a social gathering of

2    friends more than anything else.

3              So a lot of the discussion was around family

4    stuff or our own personal lives and things like that,

5    because we are friends.

6         Q.  And do you recall anybody else who was present

7    who you haven't already listed?

8         A.  No.

9         Q.  What else do you recall being said that you

10   haven't already recounted to me by anybody present?

11        A.  I don't know.

12             I -- as I said, there were a lot of personal

13   discussions not City-related.  So very -- much more

14   relaxing and casual than business-related.

15        Q.  Do you recall anything specific that you told

16   Dr. Bates regarding Fillmore Heritage Center at that time?

17             I understand you said you conveyed to him at some

18   other point -- other points -- plural -- that you didn't

19   think that his interest was in concert with the

20   community's interest.

21             But, I mean, at the dinner meeting, do you recall

22   anything specific that you said to him regarding the

23   Center?

24        A.  No, other than just to contribute to the

25   conversation, exactly what I said, and that was my

1    concern.

2         Q.   Were there any next steps planned with respect

3    to -- that you were part of with respect to Dr. Bates's

4    expressed interest in the Center?

5         A.   No.  I think -- I think things kind of ended at

6    that point.

7         Q.   What do you mean, "ended"?  Sorry.

8         A.   I think he somewhat got the message that it

9    probably wouldn't be a good idea.

10        Q.   Oh, as of the end of the dinner meeting, you

11   mean?

12        A.   At that point, I -- I don't believe we have -- we

13   had any other conversations about it.  It just seemed like

14   he just kind of quietly walked away.

15        Q.   And so -- I'm sorry -- just backing up.

16             So somebody did convey to him at the dinner

17   meeting that there was a disconnect between his interest

18   in the space for this medical use and the community's

19   interest?

20        A.   Yeah, I did.

21        Q.   Oh, okay.

22             Oh, okay.  I misunderstood.  I thought that came

23   at a different time.

24             So you expressed that to him at that meeting?

25        A.   Yes.

DEPOSITION OF MAYOR LONDON BREED – APRIL 21, 2021

1      Q.  I understand.

2          All right.  Do you recall any other discussions

3   that you were a part of after that November 27, 2017

4   dinner meeting with Dr. Bates, directly or indirectly,

5   regarding his potential use of the Center?

6      A.  No.

7      Q.  Did you delegate or task any staff to follow up

8   with him after that?

9      A.  I don't think so.

10     Q.  Did you receive any reports back from any staff,

11  after that meeting, regarding his further interest or

12  exploration of his potential use of the Center?

13     A.  I don't think so.

14     Q.  Do you know how long that dinner lasted?

15     A.  I don't know.

16     Q.  Now, you indicated a little while ago that you

17  also arranged or facilitated -- I mean, you can use your

18  own term if you don't like mine -- a meeting between

19  yourself and Mr. Shiferaw and Reverend Brown at Third

20  Baptist Church also regarding the Center; is that right?

21     A.  I didn't arrange any meetings or facilitate any

22  meetings.  I was invited to meet with them.

23     Q.  Okay.  Please just tell me how that came about.

24     A.  I don't recall.

25         But I know that I was invited to meet with them.

1    I can't remember who invited me.  I showed up.  And there

2    was a -- it was at Third Baptist Church in the conference

3    room.

4            Reverend Brown was there, Agonafer was there,

5    there were a number of other people in the room.  And they

6    all were supportive of Agonafer's, I guess, plans or

7    desires to take over the Fillmore Heritage Center.  And so

8    they were all on the same page.

9            And I made it clear to them that there would need

10   to be a process.  I didn't make any commitments.  And

11   that's where we were from that meeting, I vaguely

12   remember.

13       Q.  And when did that take place?

14       A.  I don't know.

15       Q.  Do you remember approximately or when in relation

16   to any other event?

17       A.  No.

18       Q.  How did you learn of the invitation?

19       A.  I don't know.

20       Q.  Would it have been calendared?

21       A.  Probably.

22       Q.  On official -- on official calendar software?

23       A.  Probably, yes.

24       Q.  And do you remember who first contacted you with

25   the invitation or request that you attend, for example,

31

```
1    whether it was Mr. Shiferaw directly or Reverend Brown or

2    somebody else?

3         A.  No.

4         Q.  But Reverend Brown was there?

5         A.  Yes.

6         Q.  And do you remember anything he said at that

7    meeting?

8         A.  I just vaguely remember him being very supportive

9    of Agonafer.

10        Q.  And had Agonafer already submitted a proposal

11   through the RFP process by that point?

12        A.  I don't know.

13        Q.  Maybe to refresh your recollection, was there any

14   discussion at that meeting at Third Baptist about

15   Agonafer's RFP proposal?

16        A.  I don't -- I don't know.

17        Q.  Okay.  Do you remember anything that Agonafer

18   said, himself, at that meeting?

19        A.  I just remember him talking about what he wanted

20   to do with the space, but not the specifics.

21        Q.  Did you know Agonafer before that meeting?

22        A.  Yes.

23        Q.  And how would you characterize your relationship

24   with him at the time of that meeting?

25        A.  It was good.
```

DEPOSITION OF MAYOR LONDON BREED – APRIL 21, 2021

1        Q.   And you knew his wife at the time, too, right?

2        A.   Yes.

3        Q.   And did you, from time to time, visit the

4   restaurant that she runs, the Ethiopian restaurant on

5   Fillmore?

6        A.   Yes, on a regular basis.

7        Q.   Would you characterize your relationship with

8   either of them, at that time, as friends?

9        A.   Yes.

10       Q.   Did -- did any of you have each other's personal

11  contact information, like a personal cell phone number or

12  personal e-mail address?

13       A.   Yes, both.

14       Q.   Did you --

15       A.   To be clear, I -- they have my -- they both have

16  my cell phone number and I have their cell phone number,

17  but I don't know about e-mail.

18       Q.   Understood.

19            How did you first come to know Agonafer?

20       A.   When I worked as a teller at Wells Fargo Bank on

21  Fillmore and California when I was in college.

22       Q.   And what opinion, if any, did you form of his

23  interest and candidacy as a purchaser of the Center?

24       A.   Oh, that was so long ago.  The Center wasn't even

25  built.

1      Q.  Oh, I'm sorry.  I meant -- I'm jumping ahead now.

2          I meant, as of the time of the meeting at Third

3      Baptist, what was your feeling about whether Agonafer was

4      a viable candidate or good prospect to operate the Center?

5      A.  To be clear, I wasn't looking at him or anyone

6      else, for that matter, as viable.  Because at the end of

7      the day, what was most important to me, I wanted this to

8      be a big win for the community.

9          So, for the most part, I know Agonafer.  He

10     operated a successful business with Rasselas both on

11     Divisadero and Fillmore.  I was a frequent visitor to his

12     locations, had events at his locations, a big, you know,

13     fan of his establishments and have supported them over the

14     years.

15         So, at the time, that's basically -- that was,

16     basically, my opinion of him in general.  But I never

17     equated an opinion to whether or not he or anyone else,

18     for that matter, would be, you know, the best fit or best

19     suited for managing the Fillmore Heritage Center, because

20     it was very important to me that the community made the

21     decision about what was to happen there.

22     Q.  Do you remember anything that you said at that

23     meeting at Third Baptist in which Agonafer and

24     Reverend Brown were present?

25     A.  The only thing would -- well, no.  I will just

1    say no.

2           Because I would guess that -- and I shouldn't

3    probably guess in this case.

4           But I know I have been consistent in everyone

5    that I talked to to say that there is a community process,

6    and if you want to participate, you can participate like

7    anyone else.  And that's what I said consistently

8    throughout that process, never giving anyone any

9    indication, one way or another, that I was a supporter of

10   their projects.

11       Q.  Was that a meeting in which people got up and

12   made presentations or gave speeches, or was it more

13   informal?

14       A.  It was more informal.  And Agonafer, I think, did

15   most of the talking.

16       Q.  Do you remember whether he gave any kind of

17   PowerPoint or had any graphs or charts or anything that he

18   displayed?

19       A.  I remember some paper.  There might have been

20   some information that was reviewed while we were there.

21       Q.  And do you remember anything else that anybody

22   else present said specifically with respect to this --

23   this -- whether -- well, with respect to Agonafer's

24   potential reactivation or purchase of the Center?

25       A.  I think that everyone there was there to support

1   him, and Reverend Brown, in particular, made a number of

2   positive comments.

3       Q.  And having talked about this a little bit, does

4   that jog your memory at all as to even what year this

5   occurred?

6       A.  No.

7       Q.  How about relative in time to when Dr. Bates and

8   you and Ed Lee met at the restaurant, was this meeting at

9   Third Baptist before or after that?

10      A.  It was before the dinner.

11      Q.  Do you recall even roughly whether it was months

12  before or years before?

13      A.  No.

14      Q.  Jumping back for a moment.

15          Did Reverend Brown ever convey to you his

16  feelings about the viability or suitability of Dr. Bates's

17  proposed use of the space?

18      A.  I don't recall.

19      Q.  As you sit here, do you have a sense of what

20  Reverend Brown's attitude about Dr. Bates's potential use

21  of the space was?

22      A.  No.

23      Q.  And, now, other than these two events, that is,

24  the meeting at Third Baptist Church we have just been

25  talking about and the dinner meeting at -- how do you

36

1   pronounce the restaurant, by the way?

2        A.  Sheba Lounge.

3        Q.  No.

4            Mourad.

5        A.  "Mourad."

6        Q.  "Mourad."

7            Okay.  Other than the meeting at Third Baptist

8   Church and the dinner meeting at Mourad, did you attend

9   any other in-person events or meetings with any people who

10  expressed interest in purchasing or reactivating or using

11  the Fillmore Heritage Center?

12       A.  Just -- can you clarify?

13           You mean private meetings or community meetings?

14           Because there were a lot of community meetings

15  that happened.

16       Q.  Okay.  Thanks for that clarification.

17           Yeah, let's set aside the community meetings and

18  talk just about -- about, essentially, private meetings,

19  however many people may have attended, but by-invitation

20  kind of private meetings.

21       A.  I don't recall, but I don't think so.

22       Q.  All right.  Did you -- was Agonafer's proposed

23  use of the Fillmore Heritage Center, as you came to

24  understand it, concurrent with that meeting at Third

25  Baptist Church, more in line with what you understood to

1  be the community benefits or uses of the space compared to

2  Dr. Bates's?

3      A.  I don't know because I don't remember his

4  proposal.

5      Q.  Fair to say that Mr. Shiferaw was proposing a use

6  that involved arts and entertainment?

7      A.  Then that would have been in line with what the

8  community would have wanted.

9      Q.  Right.

10         No, I was asking, is it fair to say that

11  Mr. Shiferaw's proposal for the reactivation or purchase

12  of the space was one that would involve arts and

13  entertainment, music, food, that kind of thing?

14     A.  I'm sorry.  What are you asking?

15     Q.  Is it fair to say, based on your understanding of

16  Mr. Shiferaw's proposed use of the Fillmore Heritage

17  Center as conveyed during that get-together at Third

18  Baptist Church, that it involved -- it involved arts,

19  entertainment, food, that sort of thing?

20     A.  Is it fair to say what?

21     Q.  That Mr. Shiferaw's proposed use of the Fillmore

22  Heritage Center was about using the space for arts and

23  entertainment and dining.

24     A.  If that's what his proposal said, which I don't

25  recall what his proposal said, the community -- and to be

38

DEPOSITION OF MAYOR LONDON BREED – APRIL 21, 2021

1  clear, folks in the community wanted to make sure that it
2  was an art and cultural entertainment venue.
3        And the other challenge with that is making sure
4  that financially it penciled out for the City because of
5  the financial challenges.
6        So I don't want to make any assumptions here, but
7  I made it clear what I said the community wanted and you
8  should, you know, not expect me to draw any conclusions
9  about any proposal related to that.
10     Q.  Sure.
11        I understand everything you are saying and I know
12  that there is, of course, a financial component.
13        I'm just asking, since you attended the meeting
14  at Third Baptist and you heard Agonafer talk about his use
15  of the space and you heard others extolling that use and
16  supporting it, in your understanding of his proposed use
17  of the space, the Center, was it more consonant with those
18  community uses, like arts, entertainment, dining?
19     A.  To be --
20        MR. LAKRITZ:  Objection.  Objection.  It has been
21  asked and answered twice.  She said that she didn't recall
22  what his proposal was.
23        MR. ROSENFELD:  That's not, actually, what the
24  Mayor said.
25        And please don't make speaking objections.

DEPOSITION OF MAYOR LONDON BREED – APRIL 21, 2021

 1     Q.   And, Mayor, you could answer the question.

 2          I'm just trying to clarify this.

 3     A.   Well, I will say, I don't recall the details of

 4     the conversation at Third Baptist Church other than

 5     Agonafer had a specific proposal that he wanted to

 6     implement in the Fillmore Heritage Center, and one other

 7     person -- Reverend Brown -- made comments to that

 8     proposal.

 9          But I don't recall the specifics of the proposal

10     or the specifics of the conversation other than there

11     seemed to be support from Reverend Brown and Agonafer in

12     their conversations.

13          So that's what I vaguely remember.

14     Q.   Yes.

15          But to clarify -- so to take, you know, one

16     extreme, is it fair to say Mr. Shiferaw was not proposing

17     using the Center or reopening the Center for some medical

18     treatment or research purpose?

19     A.   Yes.

20     Q.   Okay.  And as you reflect on, however

21     specifically or vaguely, the presentations or the tenor of

22     that meeting, was Mr. Shiferaw's proposed uses of the

23     space more in line with those expressed community

24     interests -- arts, entertainment, dining -- than

25     Dr. Bates's --

1        A.   You keep mentioning dining.  And, again, dining

2   is not something that came up as something that people

3   wanted to see.

4            So I just don't feel comfortable answering this

5   question because I feel like you are trying to put words

6   in my mouth.

7        Q.   Okay.  Let me ask it this way instead, then.

8            Did you ever express to Mr. Shiferaw -- to

9   Agonafer Shiferaw directly or through intermediaries that

10  you felt that his proposed use of the space was not

11  consonant or not consistent with what you understood to be

12  the community benefits, community-desired uses of the

13  Center?

14       A.   I don't think so.

15       Q.   And did you, yourself, form any opinion at any

16  time as to whether Dr. Bates's proposed use of the Center

17  or Mr. Shiferaw's proposed use of the Center was more

18  favorable to you?

19       A.   To be clear, those are two separate questions.

20           And I was not a supporter of what Dr. Bates

21  wanted to do with the Center, not just because of the

22  community but because of historically what we, as a

23  community, and me, as a community member, wanted to see

24  there.  And that was night life and entertainment and art

25  and culture.

DEPOSITION OF MAYOR LONDON BREED - APRIL 21, 2021

1          So I was definitely not a supporter of what
2    Dr. Bates wanted to do.  I didn't form an opinion one way
3    or another for anything else that anyone else proposed.
4          MR. ROSENFELD:  All right.  I'm going to put
5    another exhibit up here.  We have already had Exhibit 2.
6          I'm going to go to Exhibit 3 here.
7          Give me a moment.
8          (Exhibit 3 was marked for identification.)
9          MR. ROSENFELD:  Q.  All right.  Do you see the
10   document on your screen, Mayor?
11       A.  Yes.
12       Q.  Okay.  It is a nine-page document.  It is a
13   collection of e-mails but also a calendar item at the
14   bottom that had been produced by the City to us.
15          So -- well, first of all, calling your attention
16   to the document at the bottom of this stack, which is
17   Page 9 of his exhibit and Bates Number 15557.
18          You see what looks like a calendaring of that
19   dinner meeting with Dr. Bates on November 27, 2017?
20       A.  Yes.
21       Q.  And does the format of this look familiar to you
22   as calendaring software that you used or was used on your
23   behalf at that time?
24       A.  I don't know.  I have never seen my calendaring
25   software before.

1      Q.  Okay.  You see it says the organizer is Naomi

2  Kelly over here where I'm highlighting (indicating)?

3      A.  Okay.

4      Q.  Does that refresh your recollection one way or

5  another, tell you anything about whether Naomi Kelly, in

6  fact, organized that meeting or maybe she was just the

7  initiator of the calendaring memo?

8      A.  I just -- I don't remember.

9      Q.  Okay.  Fair enough.

10         Now, I've scrolled up a little bit to an e-mail

11 from a Lynn -- L-Y-N-N -- I don't know how to pronounce

12 the last name; I'm going to say Khaw, K-H-A-W -- do you

13 see that -- dated November 27th, 2017?

14     A.  Yes.

15     Q.  And it is from Lynn to Myisha?

16     A.  "Myisha."

17     Q.  I'm sorry?

18     A.  "Myisha."

19     Q.  Of course.  "Myisha."  I beg your pardon.

20         Myisha Hervey.

21         Can you tell me who those people are?

22     A.  Myisha was the Mayor's scheduler.  I don't

23 know -- I think that's her first and last name.

24     Q.  Okay.  How about Lynn Khaw?

25     A.  I don't know who that is.

1      Q.   Okay.  And can you shed light on why it was that

2  Naomi asked that the meeting be scheduled between you,

3  her, Dr. Bates and Mayor Ed Lee?

4      A.   No.  All I could think of is maybe I wasn't

5  asked.

6      Q.   You see now on your screen an e-mail dated

7  November 22, 2017?

8           It is from Kayleigh Lloyd to Myisha and Lynn.

9           You see that?

10     A.   Yes.

11     Q.   And you see where it says, "... Supervisor Breed

12 let me know" -- this is Kayleigh talking --

13 K-A-Y-L-E-I-G-H, last name Lloyd, L-L-O-Y-D.

14           It says, "... Supervisor Breed let me" -- that

15 is, Kayleigh -- "know she and Naomi are still discussing a

16 few options for restaurants."

17           Do you recall having discussions about where you

18 were all going to eat that night -- or the night the

19 meeting was going to take place?

20     A.   No.

21     Q.   But you have no reason, as you sit here, to

22 question that you played some role in helping to choose

23 the restaurant, right?

24     A.   No reason -- maybe rephrase the question.

25     Q.   I mean, this statement that you and Naomi were

1  discussing options for restaurants, that doesn't -- there

2  is no reason that you feel that's -- let me strike that

3  and try again.

4          The statement that you and Naomi were discussing

5  restaurant options for the 11/27/17 dinner meeting, is

6  that true, so far as you know?

7      A.  I don't know.

8      Q.  Do you have any reason to believe it is a false

9  statement, as you sit here?

10     A.  I don't think so.

11     Q.  Now, scrolling up to an e-mail dated the same

12 date as the dinner meeting took place, that is,

13 November 27th, 2017.  In the center of the page of

14 Exhibit 3 I'm displaying, there is an e-mail from Kayleigh

15 Lloyd to Lynn Khaw.

16         And in that e-mail Kayleigh says, "Supervisor

17 Breed asked me" -- Kayleigh -- "to let you" -- Lynn

18 Khaw -- "know that Denise Bradley Tyson will be joining

19 the group for dinner tonight."

20         Do you see that?

21     A.  Yes.

22     Q.  Does that refresh your recollection to the effect

23 that you were the one that invited Denise Bradley Tyson?

24     A.  I don't think that I was the one who invited her.

25 I think someone else told me that -- I think it might have

1   been Dr. Bates that said he invited her.

2       Q.  And looking at that, do you recall anything

3   further as to why she was in attendance?

4       A.  No.

5       Q.  And, then, calling your attention to an e-mail on

6   your screen now, dated November 14th, 2017, at 2:32 p.m,

7   the City's Bates Number 15536 in Exhibit 3.

8           The e-mail from Lynn Khaw -- K-H-A-W -- to Asha

9   Smith -- I'm sorry.

10          The e-mail from Asha Smith to Lynn Khaw says that

11  she -- Asha -- spoke with you and that the date

12  November 27th works.

13          Do you see that e-mail?

14      A.  Uh-huh.  Yeah.

15      Q.  Does that refresh your recollection regarding the

16  planning and organization of that dinner meeting?

17      A.  I just don't remember.

18          And to be clear, all of us are friends, so at any

19  given time, any of us could have talked to any of us

20  about, like, meeting up for dinner in general.

21          So I don't remember the specifics about this one

22  in particular.

23      Q.  And who is Asha Smith?

24      A.  I don't know.

25      Q.  So when you said "all of us are friends," you

1   weren't referring to Asha Smith?

2        A.   No, I was referring to Dr. Bates, Naomi Kelly and

3   Denise Bradley Tyson.

4        Q.   Okay.  I'm just going to un-share that.

5             So did you receive any information from any City

6   employees or department staff that Dr. Bates was

7   continuing to pursue an interest in the Fillmore Heritage

8   Center after that November 27th, 2017 dinner meeting?

9        A.   I don't know.

10       Q.   At that time in late 2017, in what capacity was

11  Naomi Kelly working?

12       A.   In what year, again?

13       Q.   Late 2017, when you were still supervisor.

14       A.   She was the City Administrator.

15       Q.   And how about Joaquin Torres?

16       A.   I don't recall, but he worked for the City.

17       Q.   And in late 2017, to your knowledge, had

18  Vallie Brown gone over to the Mayor's office?

19       A.   I don't recall.

20       Q.   Okay.  Do you know who Amy Cohen is, C-O-H-E-N?

21       A.   Who?

22       Q.   Amy Cohen, C-O-H-E-N.

23       A.   I know -- I know two Amy Cohens.

24       Q.   So this would be an Amy Cohen who in -- sometime

25  in 2017 worked for the -- I guess, was a director of the

1    Neighborhood Program Development for the Office of

2    Economic and Workforce Development.

3         A.  Yes.

4         Q.  And what was your relationship with Amy Cohen in

5    mid 2017?

6         A.  She works for the City.  We don't have a

7    relationship other than I was Supervisor and she worked

8    for the City.

9         Q.  Did you tell anyone, besides Dr. Bates and other

10   than, you know, those who were present at that dinner

11   meeting at Mourad, that you didn't think his use of the --

12   his proposed use of the Center was in line with the

13   community interest?

14        A.  I don't recall.

15        Q.  Did you, for example, convey that to -- well,

16   Naomi Kelly was present at that meeting, right?

17        A.  Yes.

18        Q.  Okay.  And did she indicate to you, one way or

19   another, whether she got that message, that it wasn't

20   likely to be a suitable proposal?

21        A.  I don't know.

22        Q.  Was Joaquin Torres present at that dinner

23   meeting?

24        A.  I don't think so.

25             MR. ROSENFELD:  All right.  I will just share

48

1    with you a set of documents marked as Exhibit 4.

2              (Exhibit 4 was marked for identification.)

3              MR. ROSENFELD:  Q.  So it is a small bunch of

4    e-mails -- well, two pages of e-mails produced by the City

5    to us.  And one of these is from Andrea Baker.

6              Do you know Andrea Baker?

7         A.   Yes.

8         Q.   Who is she?

9         A.   You need to be more specific.

10             I know her from the community.

11        Q.   I mean, what was her role in this -- looking at

12   this e-mail where she is writing to Amy Cohen, cc'ing

13   Dr. Bates and others?

14        A.   I don't know.

15        Q.   Scrolling up, do you see this e-mail is from

16   Andrea Baker dated May 30th, 2017?

17        A.   Where is that?

18        Q.   The e-mail starts right across the page.  I'm

19   just highlighting it there (indicating).

20             Do you see that?

21        A.   Yes.

22        Q.   And so this e-mail is conveying that Andrea did a

23   site tour of the Fillmore Heritage Center with Dr. Bates

24   and another person, Craig Fruin.

25             Do you know who Craig Fruin is?

1      A.  No.

2      Q.  Are you able to shed any light, based on your

3  knowledge at the time or any communications that you had,

4  why Dr. Bates was doing a site tour of the Fillmore

5  Heritage Center on May 30th, 2017?

6      A.  No.

7      Q.  Were you aware as of that time that he had begun

8  to express interest in the Center?

9      A.  I don't know.

10     Q.  But it's possible?

11     A.  I don't recall.

12     Q.  Did you ever visit Dr. Bates at his winery in

13  Sonoma County?

14     A.  Yes.

15     Q.  Did you ever discuss the Fillmore Heritage Center

16  with him there?

17     A.  No.  The visit was a long time ago, prior to this

18  space even being available.

19         MR. ROSENFELD:  Okay.  Fair enough.

20         Okay.  I'm moving on to display what I have

21  marked as Exhibit 5.  This is, again, two pages of e-mail

22  produced by the City.  Really it is just one page because

23  the last page is some weird graphic.

24         (Exhibit 5 was marked for identification.)

25         MR. ROSENFELD:  Q.  On July 23rd, 2017, where I'm

1    highlighting (indicating), there is an e-mail from Denise

2    Bradley, who was in attendance at your November 27th, 2017

3    dinner meeting subsequent to this e-mail, to the effect

4    that Dr. -- or about doing a walk-through of the Center

5    with Dr. Bates.

6              Do you see that?

7         A.   It's pretty small, so it is hard to read.

8         Q.   I'm blowing it up a little bit there

9    (indicating).

10             I just highlighted the part of this e-mail I want

11   to call your attention to where it says, "Is it possible

12   to do a walk-through sometime tomorrow, Monday, with

13   Dr. Ernest Bates ...."

14             Do you see that?

15        A.   Yes.

16        Q.   And that's Denise Bradley to Andrea and Yaris,

17   whoever Andrea and Yaris are.  We talked about an Andrea

18   Baker.  This is July 23rd, 2017.

19             Were you aware that Dr. Bates was wanting to do a

20   walk-through of the Center around that time?

21        A.   I don't recall.

22        Q.   Did you ever accompany Dr. Bates on any

23   inspection or walk-through of the Fillmore Heritage

24   Center?

25        A.   Not to my knowledge.

1       Q.   Okay.  And did you ever take any steps, yourself,

2  to facilitate or coordinate his doing a walk-through or

3  any inspection of the Center at any time?

4       A.   I don't recall.

5       Q.   But it is possible you did?

6       A.   It is possible that I might have gotten an e-mail

7  request from him and others making a request to do a

8  walk-through of the Fillmore Heritage Center which

9  traditionally we would forward to Office of Economic and

10  Workforce Development.

11       Q.   Okay.  Do you have any e-mail request that you

12  got from any interested third parties that you retained

13  expressing interest in the Center?

14       A.   I thought I turned over all that stuff already.

15       Q.   Apart from -- well, did you -- so calling your

16  attention to Exhibit 2 again which I will display in just

17  a moment.

18            So these are e-mails between you and Dr. Bates in

19  this exhibit starting November 10th, 2017, November 14th,

20  2017, and so on.

21            Did you retain these e-mails?

22       A.   Did I do what?

23       Q.   Did you retain these e-mails?

24            Do you still have these e-mails?

25       A.   I don't think so.  I was -- I think I was asked

1  and I did a search and they didn't pop up.

2       Q.  Okay.  Any reason why you don't still have them?

3       A.  You have them, so what's the point?

4       Q.  I'm just asking if you can shed light on why you

5  no longer have this e-mail -- this set of e-mail exchanges

6  in Exhibit 2 with Dr. Bates from your personal e-mail

7  address to and from -- both your City and your personal

8  e-mail address but at least including your personal e-mail

9  address.

10      A.  But does that really matter?

11          Why is it important as to retaining my personal

12  e-mails?

13          I'm confused by that.

14      Q.  Do you -- in your opinion, is it not necessary to

15  preserve -- to have preserved your e-mail communications

16  with Dr. Bates concerning his interest, in November 2017,

17  in the Fillmore Heritage Center which was the subject of

18  the City's request for proposals?

19          MR. LAKRITZ:  Objection.  Calls for a legal

20  conclusion and misstates the facts.

21          MR. ROSENFELD:  Q.  You could answer.

22      A.  I don't think I understand the question.

23          You have the e-mails, so I don't understand what

24  the concern is or why you are questioning me about what I

25  am to retain in my personal e-mails.

```
 1        Q.  Did you retain the e-mail that we are looking at
 2   from November 10th, 2017?
 3        A.  I don't think so.
 4        Q.  Did you retain any of your e-mail exchange from
 5   November 2017 about the Fillmore Heritage Center with
 6   Dr. Bates?
 7        A.  I don't think so.
 8        Q.  Do you recall deleting those e-mails?
 9        A.  I have a Gmail account and I don't pay for extra
10   space.  And so in order to retain my e-mail, everything
11   that's old gets deleted on a regular basis.
12        Q.  Okay.  What is "old" in the settings of your
13   Gmail account?
14        A.  Well, when I get a notice that I'm running out of
15   space in my Gmail, I just, basically, go in and clear
16   everything that's old in order to make room for future
17   e-mails that come into my e-mail address.
18        Q.  And in your understanding of Sunshine Law and
19   open records requirements, government records
20   requirements, were you supposed to have retained e-mails
21   in which you were discussing the -- Dr. Bates's potential
22   use of the Fillmore Heritage Center?
23             MR. LAKRITZ:  Objection.  It calls for a legal
24   conclusion.
25             MR. ROSENFELD:  Q.  Mayor?
```

DEPOSITION OF MAYOR LONDON BREED – APRIL 21, 2021

1      A.   I still don't understand the question.

2      Q.   Do you -- apart from this set of communications

3  with Dr. Bates --

4      A.   Let me back up.

5      Q.   Yeah?

6      A.   I told you what I did.

7           So, you know, if someone sends me an e-mail on my

8  personal e-mail address, typically it gets sent to or

9  addressed from my City e-mail address or with my team in

10 some capacity.

11     Q.   Did you take any steps to make sure that e-mail

12 correspondence with Dr. Bates concerning the Fillmore

13 Heritage Center was preserved in any way, whether it be by

14 retaining it in your Gmail account or making sure that it

15 was also copied to your City government e-mail address?

16     A.   I don't recall.

17     Q.   And have you -- apart from this, have you

18 conducted other e-mail communications with anybody through

19 your personal e-mail address regarding Fillmore Heritage

20 Center?

21     A.   I don't recall.

22     Q.   Have you turned over everything to the City

23 involving your e-mail communications about the Fillmore

24 Heritage Center with interested third parties?

25     A.   Everything that -- when a request is made and I'm

1   asked, yes.

2       Q.  When did you first look to see what you had in

3   that regard still in your e-mail accounts?

4           MR. LAKRITZ:  Objection.  It calls for

5   attorney-client communication.

6           MR. ROSENFELD:  It doesn't.

7       Q.  But, anyway, you can answer.

8           MR. LAKRITZ:  Objection.  It calls for

9   attorney-client communication and I'm instructing the

10  witness not to answer.

11          MR. ROSENFELD:  I'm not asking anything about

12  communications.  I'm just asking when in time Mayor Breed

13  made an effort to examine her personal e-mails for records

14  of communications with Dr. Bates or other private parties

15  interested in utilizing the Fillmore Heritage Center.

16          Can the Mayor answer that question, Tom?

17          MR. LAKRITZ:  She can answer the question to the

18  extent that it doesn't call for attorney-client

19  communication.

20          But I believe that answer would disclose

21  attorney-client communication.

22          MR. ROSENFELD:  You are either instructing her

23  not to answer or you are not.

24          I disagree with you that it calls for that.  I'm

25  asking for a date and time.  I don't see how that's

1    attorney-client privilege.  And we can certify the

2    transcript if you want.

3              MR. LAKRITZ:  My objection -- I have given my

4    instruction.

5              MR. ROSENFELD:  I'm not clear.  I don't know if

6    the witness is clear what your instruction is.

7              Are you instructing her to answer my question?

8              MR. LAKRITZ:  Okay.  Let me be clear.

9              THE WITNESS:  I could just speak for me.  I heard

10   Tom and I know what he said.

11             He is instructing me not to answer the question

12   and I will not be answering the question.

13             MR. ROSENFELD:  Madam Court Reporter, can we just

14   mark the transcript.  We will have to go back to a judge

15   about this one.

16             THE REPORTER:  Yes.

17             MR. ROSENFELD:  Okay.  Thanks.

18             What exhibit number did I leave off with?

19             (Discussion off the record.)

20             MR. ROSENFELD:  I'm going to display what I will

21   mark as Exhibit 6.

22             (Exhibit 6 was marked for identification.)

23             MR. ROSENFELD:  Q.  Mayor Breed, do you see

24   another set of e-mails that appears on your screen?

25             It is nine pages beginning with the City's Bates

1    Number 15585 at the bottom.

2         A.  I see some stuff on the screen.

3         Q.  Okay.  I'm going to scroll down to the -- toward

4    the middle, anyway, of this exhibit to a calendar item.

5              This is Page 3 of the exhibit and Bates

6    Number 15562 where the subject is "Meeting to Discuss

7    Fillmore Project."

8              Do you see that?

9         A.  Uh-huh.  Yes.

10        Q.  And you see the date for this item given as

11   April 17th, 2018?

12        A.  Yes.

13        Q.  And that is to involve Dr. Bates in addition to

14   some officials and others including Joaquin Torres?

15        A.  Yes.

16        Q.  And now I just want to share with you a set of

17   e-mails.  These have been produced to us by the City.

18             I'm scrolling up where Vallie Brown, in an e-mail

19   on April 6, 2018, is addressing Dr. Brown and Dr. Bates

20   reaching out to schedule a meeting to discuss Dr. Bates's

21   proposal to purchase the Fillmore Heritage Center.

22             Do you see that?

23        A.  Yes.

24        Q.  Can you shed any light for me on -- well,

25   actually, before I ask that question, let me just sort of

1    scroll up further.

2         You see that Vallie Brown is proposing several

3    dates -- where I have highlighted -- for such a meeting?

4    A.  Yes.

5    Q.  And it is to include Joaquin Torres and

6    Vallie Brown.

7         Do you see that?

8    A.  Yes.

9    Q.  I'm scrolling up a little bit, which means later

10   in time in this e-mail exchange.

11        Dr. Bates, through his executive assistant

12   Asha Smith -- that tells us who Asha Smith is, by the

13   way -- is writing to Vallie that they -- Dr. Bates -- can

14   confirm the meeting for Tuesday, April 17th of 2018.

15        Do you see that?

16   A.  Yes.

17   Q.  Okay.  So can you -- oh, and Reverend Brown also

18   is party to this chain.  And you see that he says that

19   he's available -- on April 9, 2018, he confirms that he's

20   also available for a meeting on that chosen date of

21   April 17th, 2018.

22        Do you see that?

23   A.  No.

24   Q.  So here -- I will highlight it for you.

25        Here is an e-mail from Amos Brown on April 9th

1    2018.  It is signed by Amos Brown.

2           Do you see that?

3       A.  Yes.

4       Q.  And it says, "Greetings.  I'm available for this

5    meeting," exclamation point.

6       A.  Okay.  Yes.

7       Q.  And above that, Vallie Brown confirms that

8    meeting date among those participants.

9       A.  Okay.

10      Q.  So my question for you is, can you shed any light

11   on why, in April 2018, which would be almost five

12   months -- roughly five months after your dinner meeting at

13   Mourad with Dr. Bates and Mayor Lee and others, Dr. Bates,

14   and these folks, including these officials, would still be

15   pursuing Dr. Bates's potential use of the Fillmore

16   Heritage Center after you clearly conveyed to him that

17   there -- that his proposal wasn't in line with the

18   community-interested uses of the space?

19      A.  No.

20      Q.  Did anybody discuss Dr. Bates's continuing

21   interest in the space or others' continuing interest in

22   his using the space with you as of -- or around

23   April 2018?

24      A.  I don't recall.

25      Q.  Did you, yourself, express any interest to

1    Dr. Bates directly or through intermediaries in or around

2    April 2018 in his continuing to pursue potential use of

3    the Fillmore Heritage Center?

4         A.   I don't recall.

5         Q.   I will stop that screen-share.

6              Give me a moment, please.

7              Were you aware on -- in April -- I'm sorry.

8              Were you aware in 2017, when you met with

9    Dr. Bates and Mayor Lee at the restaurant, that the

10   Fillmore Heritage Center parcel itself was owned by the

11   OCII, that is, the Office of Community Infrastructure

12   Investment -- or the Office of Community Investment and

13   Infrastructure?

14        A.   I'm not sure if that's entirely accurate, so I

15   don't know how to answer that question.

16        Q.   What was your understanding of that as to what

17   the ownership structure of the parcel was?

18        A.   I think it is more complicated than that and I

19   don't completely recall.

20        Q.   How could it be, if the Fillmore Heritage Center

21   was owned by OCII, that officials of San Francisco -- OCII

22   being a State -- or quasi State agency, how could it be,

23   if the parcel is owned by OCII, that officials such as

24   yourself and others of San Francisco were in a position to

25   discuss or facilitate sale and purchase of the Center to

1    people like Dr. Bates or Agonafer Shiferaw or anybody

2    else?

3              MR. LAKRITZ:  Objection.  It calls for a legal

4    conclusion.

5              She can answer.

6              THE WITNESS:  And I think part of it is, you are

7    making the answer more simple than it is.

8              The Fillmore Heritage Center -- I can't -- I

9    can't entirely recall when it changed hands and

10   specifically who retained ownership.  I think there might

11   be some confusion there.  And I just would need to go back

12   and ask to get some level of specificity to really answer

13   a question like this.

14             Because the role that I had as a Supervisor,

15   regardless of who owned the property, had everything to do

16   with making sure that there was a community process, that

17   people had a say in what happens there.  And there was no

18   plans to do any negotiation, or anything of that nature,

19   without making sure that people who were a part of this

20   community, who actually lived in this community, wanted to

21   go in that direction.

22             So you are implying that something was going to

23   happen that was never going to happen and at the end of

24   the day, you know, I'm responsive, as an elected official,

25   to the request that people make of me as it relates to

1    having meetings and having discussions and hearing

2    feedback and listening to the things that they might

3    propose.  Whether I support them or not is an entirely

4    other issue.

5          MR. ROSENFELD:  Q.  And -- I'm sorry -- just to

6    be clear, when you say I was suggesting something that

7    would happen -- that wasn't going to happen, what did you

8    mean?

9          A.  You were suggesting that there was some

10   negotiations going on to make something happen in terms of

11   the lease or purchase of the Fillmore Heritage Center, and

12   that wasn't going to happen without a clear public

13   process.

14         Q.  Oh, I see.

15         A.  And to also be clear, you know, these are people

16   who are asking to meet -- people who are part of the

17   community who asked to meet about a number of things,

18   so -- Agonafer and Dr. Bates.  So, you know, it just --

19   it -- you know, it is how things work.

20         Q.  That reminds me, you had alluded earlier to some

21   interest by community groups or nonprofits in the

22   Center --

23         A.  Members.  I never said community groups or

24   nonprofits.

25         Q.  Oh, community members.

1              You mean other than -- I'm just unclear

2    whether -- I thought you were making a distinction between

3    Dr. Bates and Agonafer Shiferaw, as private individuals,

4    and then community groups that were also expressing

5    interest.

6        A.  But to be clear, they are not just private

7    individuals.

8              Agonafer is a part of the community, Dr. Bates is

9    a part of the community, and so they, basically, wanted,

10   along with other people who have expressed interest, to

11   have, you know, either control to either purchase or

12   manage, or what have you, this particular facility.

13             So there were a number of people who did express

14   interest in addition to these two.

15             So I think that's the point I want to make.

16             And they are all doing it, I guess, in that case,

17   as -- in the capacity as private individual because -- you

18   know, I don't see the difference between them and being a

19   part of the community.

20       Q.  Okay.  I may have just misunderstood.

21             I mean, there was sort of a fork earlier where I

22   said let's talk about these folks and we will come back to

23   the others.

24             So I just want to make sure we've talked about

25   everything that you could recall with respect to any other

1    parties, whether they be individuals or groups,

2    organizations or community members, who conveyed to you an

3    interest in reactivating or purchasing or utilizing the

4    Center, other than what we've already talked about.

5        A.   There have been a lot of people -- a lot -- in

6    the neighborhood.  And I just can't necessarily pinpoint

7    specifically to a person --

8        Q.   Okay.

9        A.   -- you know.

10       Q.   So as you sit here right now, is it fair to say

11   that you are not recalling any other actual specific names

12   of people or groups?

13       A.   That what?

14       Q.   I just want to talk about anything that you can

15   actually remember as you sit here.

16            So if you could remember any other among that

17   universe of people or groups that expressed an interest

18   that you received directly or indirectly, can you recount

19   for me who those people or groups were.

20       A.   I just -- I was told I didn't have to go back and

21   read any notes to prepare for this.  And I just really

22   don't remember.  This was a long time ago and I don't have

23   a memory of exactly the specifics.  So I don't know what

24   you are expecting me to say here.

25            When you said Asha was Dr. Bates's assistant, I'm

DEPOSITION OF MAYOR LONDON BREED – APRIL 21, 2021

1    like, oh, yeah, now I remember who Asha is.

2            So I don't know.

3    Q.  Okay.  Fair enough.

4            And I would ask -- or I would point out to

5    you the name Majeid Crawford and his community group, the

6    New Community Leadership --

7    A.  Yes.

8    Q.  -- Foundation.

9    A.  And I know Majeid.  And I don't remember having a

10   conversation directly with Majeid, but I probably did,

11   because I talked to him -- if I see him in the community,

12   we have a discussion about anything.

13   Q.  Are you aware there came a time when the City did

14   enter into a lease of the Center with the San Francisco

15   Housing Development Corporation -- SFHDC -- and New Leaf

16   Community Foundation as a partner?

17           MR. LAKRITZ:  Objection.  Misstates the facts.

18           MR. ROSENFELD:  Q.  You were going to say, Mayor?

19   A.  I was going to say that I don't recall the City

20   entering into an agreement with those specific

21   organizations.

22   Q.  Do you recall that the City leased the Center to

23   one or more community groups after the termination of the

24   RFP?

25           MR. LAKRITZ:  Objection.  It misstates the facts.

1             THE WITNESS:  Yeah, I don't -- basically, the

2    City, I know, entered into an agreement with a nonprofit

3    to help manage the facility.  I don't know what the

4    specifics were of that particular agreement.

5             MR. ROSENFELD:  Q.  And what was that nonprofit?

6        A.  I don't remember.

7        Q.  And did you participate in any way in those

8    negotiations or terms or discussions?

9        A.  I don't think so.  The proposal to do this, to

10   make the space available to the community, was brought to

11   my attention, I vaguely remember, by OEWD, to make the

12   place available to the community.

13       Q.  Okay.  Do you recall any discussions or

14   conversations you had with Majeid Crawford -- and, for the

15   reporter, that's M-A-J-E-I-D -- regarding the use of the

16   Center?

17       A.  I don't recall.

18       Q.  And apart from what you recounted for me

19   regarding the meetings that you attended with Dr. Bates,

20   on the one hand, and with Agonafer Shiferaw, on the other,

21   do you recall attending any meetings with any interested

22   parties regarding the use of the Fillmore Heritage Center?

23       A.  I don't recall.

24       Q.  Do you recall receiving any invitations to attend

25   any meetings by any parties expressing interest in the use

DEPOSITION OF MAYOR LONDON BREED - APRIL 21, 2021

1    of the Fillmore Heritage Center which you declined to

2    attend?

3         A.  I don't recall.

4         Q.  Do you recall speaking at any rallies or events

5    about the Fillmore Heritage Center?

6         A.  Would you consider a community meeting an event?

7         Q.  Yes.

8         A.  Then yes.

9         Q.  And what was that?

10        A.  There were a number of meetings that we helped to

11   do outreach for with OEWD at my direction to get community

12   feedback about the Fillmore Heritage Center and what folks

13   wanted to see.  So there were a number of meetings.

14            And I'm sure I -- I don't know if I attended all

15   of those meetings, but I definitely attended several of

16   those meetings.

17        Q.  Not necessarily taking them in chronological

18   order, but can you just recall for me briefly whatever

19   details you do recall regarding each of those?

20        A.  Shoot.

21            It is hard to say.

22            I will say there might have been one at the

23   West Bay Conference Center.  There were a lot of people

24   that came out.  And there was some tension, in some

25   respects, because I think the community felt that they

1    wanted a say, they wanted to be involved, and a lot of

2    people had a lot of different opinions about what they

3    wanted to see happen.

4          And so I think -- what was it -- I can't

5    remember, but I just -- I just know there were several

6    meetings, and there was a lot of community feedback, and

7    I'm sure I spoke at those meetings, as well, whenever I

8    attended.

9          Q.  Do you recall any others specifically, as you sit

10   here?

11         A.  Any other what?

12         Q.  Any other community meetings that you attended to

13   talk about the Center.

14         A.  I don't know.  I don't think there -- there was

15   any other meetings.  It would have been either at the

16   West Bay Conference Center or the Fillmore Heritage Center

17   and they had a little auditorium room.  I think there

18   might have been something there, I think.  But other than

19   that, I'm not certain.

20         Q.  And -- I'm sorry -- just so I'm clear, you are

21   saying that you think that was the only one or you just

22   don't recall the others?

23         A.  No, I'm saying that there were -- I think there

24   were several meetings, and they were basically in that

25   same location, in that area, I believe.

1        Q.   Okay.  I think I understand.

2             And in those meetings did they -- did they

3    involve, in any respects, a proposal by any interested

4    individual or group for the purchase or reactivation of

5    the Center?

6        A.   I don't know.

7        Q.   I mean, as opposed to being, you know, forums or

8    fora where there was, more or less, just a discussion, an

9    airing, of what the community's felt needs and interests

10   were about the fate of the Center?

11       A.   Yeah, I don't know.

12       Q.   As you sit here right now, do you recall any

13   other specific individual person or entity that expressed

14   an interest in reactivating, purchasing or operating the

15   Center, other than Bates and Shiferaw?

16       A.   So Majeid's group -- I didn't think that they --

17   when they tried to express interest in trying to operate

18   the facility, I think it -- I believe it came kind of

19   after the RFP process, when they submitted a proposal, but

20   I just don't remember exactly when.

21       Q.   Okay.  And, then, other than those three, now

22   adding Majeid and/or his group to that list, are there any

23   other individuals or entity that -- yeah?

24       A.   I think that -- I don't remember all the

25   groups -- oh, there was some marijuana group, I remember,

1    that wanted to do something there I heard about.

2           There was Patrick Seto, who owns property in the

3    area.  I think he had expressed interest.

4           But other than that, I can't -- I can't think

5    of -- yeah, I just -- I just don't remember everybody.

6       Q.  And with respect to the marijuana group, did you

7    have any direct communications with a principal or

8    representative of that group about the Center?

9       A.  I don't recall, but I don't think so.

10      Q.  Did you -- with respect to Patrick Seto, did you

11   have any direct communications with him about the Center?

12      A.  Yes.  He -- I saw him at -- out in the

13   neighborhood and he mentioned it to me.

14      Q.  Just kind of in passing?

15      A.  Yes.  And I think later he decided not to submit

16   a proposal.

17      Q.  And so when you say "decided not to submit a

18   proposal," is it your recollection, then, that that

19   interest was when you met him outside somewhere or ran

20   into him outside somewhere that the RFP process was

21   already underway?

22      A.  I don't remember.

23      Q.  And what about with respect to the marijuana

24   group, do you know if you came to learn their interests

25   during the pendency of the RFP process?

1        A.   I don't remember.  I don't remember the timeline.

2        Q.   And with respect to those two others, the

3    marijuana group or Patrick Seto, did you, yourself, take

4    any steps to help arrange or facilitate any kind of

5    meeting or put any people together and talk about it --

6    talk about the interests?

7        A.   The only thing, I believe, I might have done is

8    told them to reach out.  And maybe it was Joaquin at

9    Office of Economic and Workforce Development.  I don't

10   recall who the specific person was.  I think Joaquin

11   helped facilitate the meetings.

12            But I would refer anyone that expressed interest

13   to me to the office so that they could be kept aware of

14   the process, kept aware of, you know, how things -- you

15   know, once the whole community process occurred and RFP

16   went out, that they could be held -- kept aware of

17   everything that we was [sic] doing.

18            So whenever people would ask me about it or say

19   anything to me, I always told them to reach out to my

20   team, and they will refer them to the Office of Economic

21   and Workforce Development, and that's usually what

22   happened.

23       Q.   And did there come a time when you were invited

24   or asked to attend or participate in any meeting or

25   discussion with representatives of the marijuana group

1    expressing interest in the Center?

2         A.  I don't recall.

3         Q.  And same question with respect to Patrick Seto,

4    did there come a time when you were asked to or did, in

5    fact, attend or participate in any meetings or discussions

6    subsequent to your running into him when he expressed

7    potential interest?

8         A.  I don't recall.

9             MR. ROSENFELD:  I want to try to -- by the way,

10   how is everybody doing for -- you know, we have a limited

11   time, obviously, but that doesn't mean we can't take a

12   break and go over a little bit.

13            Does anybody need a break?

14            Mayor, do you need a break?

15            THE WITNESS:  I don't need a break.

16            MR. LAKRITZ:  Does anybody else need a break?

17            THE REPORTER:  I'd like to take a bathroom break,

18   if that's okay, just a minute.

19            MR. ROSENFELD:  Do you want to take five?

20            THE REPORTER:  Yes.

21            MR. ROSENFELD:  Be back at 2:17.

22            Okay.  That's good.  Thanks.

23            THE VIDEOGRAPHER:  Okay.  Off the record at 2:12.

24            (Short recess.)

25            THE VIDEOGRAPHER:  We are back on record at

1    2:18 p.m.

2              MR. ROSENFELD:  Q.  Jumping back for a moment,

3    Mayor Breed.

4              In your understanding, was it an obstacle to the

5    City's sale of the Fillmore Heritage Center that the OCII

6    still owned the parcel at the time of the RFP?

7         A.  What do you mean?

8         Q.  Would the fact that the OCII owned the Fillmore

9    Heritage Center during the RFP have scuddled or prevented

10   the City from selecting a winner and selling it to the

11   winner?

12             MR. LAKRITZ:  Objection.  The RFP speaks for

13   itself.

14             And the question calls for a legal conclusion.

15             THE WITNESS:  Yeah, I don't know.

16             MR. ROSENFELD:  Q.  Well, was that in your mind

17   at all when you were meeting with Dr. Bates, on the one

18   hand, or Mr. Shiferaw and Reverend Brown, on the other?

19        A.  The only thing I knew is that I was working with

20   the City Attorney's Office.  I was working with Office of

21   Economic and Workforce Development to go through whatever

22   the proper channels were to issue an RFP to the public.

23             In terms of all the details of who owned and all

24   of that, that was for that department and the City

25   Attorney to sort out.

1        Q.   All right.  Going back to Majeid Crawford.

2             What's your history with him?

3        A.   I know Majeid from the neighborhood.

4        Q.   How would you characterize your relationship with

5   him?

6        A.   I don't know.

7        Q.   I mean, do you consider yourself friends?

8             I mean, do you socialize?

9        A.   Yeah, I mean, I consider him a friend.  We

10  socialize when we see each other in the neighborhood.

11       Q.   But you don't, like, make plans to hang out?

12       A.   No.

13       Q.   Okay.  And do you know anything about the New

14  Community Leadership Foundation that he's a part of?

15       A.   I think so, yes.  I know something about it.

16       Q.   What do you know about them?

17       A.   I know that they consist of people who were, for

18  the most part, born and raised in the neighborhood, mostly

19  African-American men who are very good people, very

20  active, wanting to empower and support and uplift the

21  community.  They have very good intentions to make real

22  change and to address a lot of the systemic racism and

23  other challenges that have existed that made it difficult

24  for people like them to access resources with the City.

25       Q.   Did -- to your knowledge, did Dr. Bates

1    contribute -- make any donations or financial

2    contributions to any of your political campaigns?

3         A.  I'm pretty sure he probably made a contribution

4    to all my campaigns.

5         Q.  And what about Majeid Crawford?

6         A.  The $500 maximum to each campaign.

7         Q.  And same question with respect to Majeid

8    Crawford.

9         A.  I don't know.

10             But he supported me.

11        Q.  In which campaign or campaigns?

12        A.  I want to say he probably supported me -- I don't

13   know.

14             But just, in general, he has been a supporter.

15        Q.  Were you aware of a candidate forum called Meet

16   the Progressives which --

17        A.  Oh, by the way, Agonafer also contributed to my

18   campaign, just for the record.

19        Q.  Okay.  And were you aware of an event or forum

20   that Agonafer Shiferaw hosted called Meet the Progressives

21   in which Jane Kim and Mark Leno spoke?

22        A.  I'm aware of -- can you be more specific, please?

23        Q.  Are you aware that Agonafer hosted such a forum

24   in support of both candidates in which they attended and

25   spoke?

1      A.  Candidates for -- I mean, you have to be more

2   specific.

3      Q.  Well, it's Jane Kim for mayor and it would have

4   been -- I believe it would have been Mark Leno

5   for assembly or state senator -- state senator.

6      A.  So just for clarity, it was at Agonafer's

7   building that he owns.  I was not aware that he was the

8   actual host.  And they were both running for mayor.

9      Q.  Oh, that's right.  That's right.

10          Thank you.  It was -- Mark Leno was running for

11   mayor.

12          And they were your opponents in your own mayoral

13   campaign, correct?

14      A.  Yes.

15      Q.  You didn't attend, did you?

16      A.  No, I wasn't invited.

17      Q.  Were you aware that there were disruptions of

18   that event by people who had been alerted to the event by

19   the New Community Leadership Foundation?

20      A.  Could you clarify the question?  I'm sorry.

21      Q.  Were you aware, whether from news or some other

22   source, that the -- that that event at Agonafer's -- in

23   Agonafer's building, on behalf of those mayoral

24   candidates, was disrupted by people who shouted epithets,

25   for example, at the candidates?

1      A.  I heard about it, yes.

2      Q.  Did you have any conversations subsequent to that

3  with Majeid Crawford about that disruption?

4      A.  No.

5      Q.  Did you make any statement about that after it

6  happened?

7      A.  I believe I might have made a statement or made

8  some comments because of some of the racial epithets that

9  were levied at, at the time, Supervisor Kim.

10     Q.  Do you recall specifically, as you sit here,

11  whether you made a comment and, if so, if it was in

12  writing or spoken?

13     A.  I don't recall.

14     Q.  Oh, I --

15     A.  I know when I heard about it, I was very

16  disappointed, and I believe I might have said something or

17  made some sort of comment or statement to condemn the

18  behavior.

19     Q.  And I meant to ask you, too, separate from

20  financial contributions to any of your campaigns, did

21  Majeid Crawford volunteer in any of your campaigns?

22     A.  I think he did.

23     Q.  And same question with respect to any other

24  members or folks who associated themselves with the NCLF,

25  did they -- any of them come over and volunteer in any of

DEPOSITION OF MAYOR LONDON BREED - APRIL 21, 2021

1    your campaigns?

2         A.  I'm not certain who the members specifically are

3    other than a number of community members that I recall.

4              So you would have to be specific about names.

5         Q.  What do you remember of Majeid Crawford's

6    volunteer work in your campaign or campaigns?

7         A.  I don't.  I know one time I saw him out at a bus

8    stop when he had a "London Breed for Supervisor" T-shirt

9    on and I expressed my appreciation to him for his support.

10        Q.  Was he ever paid staff on any of your campaigns?

11        A.  I don't think so, but I don't recall.

12        Q.  Did he ever furnish any -- that you know of,

13   furnish any volunteers or recommend any paid staff who

14   then came to be hired by your campaign?

15        A.  I don't know.

16        Q.  Okay.  Did you participate in a decision to put

17   out a request for proposal, that is, an RFP, for the

18   Fillmore Heritage Center?

19        A.  What do you mean?

20        Q.  Did you -- were you part of the kind of

21   decision-making process that -- to do that -- to undertake

22   that step?

23        A.  I don't think I really understand the question.

24        Q.  Well, you are aware that there -- you are aware

25   that, on February 10th, 2017, the City and County of

1    San Francisco, in fact, issued an RFP for the Fillmore

2    Heritage Center, right?

3         A.   Yes.

4         Q.   What was your role, if any, in that happening?

5         A.   So my role was the push to have a number of

6    community forums or meetings to solicit feedback and to

7    incorporate that feedback into the actual RFP.

8         Q.   Prior to the issuance of the RFP?

9         A.   Yes.

10        Q.   And did you -- and how did you -- how, if at all,

11   did you convey that feedback or make sure that that --

12   that that found expression in the RFP?

13        A.   I don't recall who was the director at the time

14   or who I talked to at the time, but probably through my

15   staff or with a meeting, maybe, that I might have had in

16   regards to it.

17        Q.   And do you recall specifically what it was you

18   were trying to convey or get across to be included?

19        A.   Yes.  I wanted to make sure that whatever the

20   community wanted -- because that was important -- I wanted

21   it to be, you know, a win for the community.  So it was

22   important to solicit feedback.

23             And many folks, I recall, expressed strong

24   interest in seeing it continue to be a kind of

25   performance/entertainment/art and culture type of

1   facility.

2         So that was important.

3     Q.   And what role, if any, in your sort of expressed

4   values or those, you know, relayed from the community, did

5   economic -- the economic viability of the Fillmore

6   District play, or job creation, that sort of thing?

7     A.   I -- I think -- I think we were very concerned

8   about, you know, trying to balance the two.

9         So it was definitely important to make sure

10  that -- that it didn't cost the City any additional money

11  but that it was able to sustain itself financially, and

12  that we, of course, created, you know, job opportunities

13  for the community.  I mean, that was the whole goal of it

14  from its creation in the first place.

15        So it wasn't -- it didn't deviate from what it

16  was anticipated that it would do as it moved over to a,

17  possibly, new person who would either own it or who would

18  receive it as a lease or an agreement from the City.

19    Q.   And how important was it to you, if at all, that

20  the City get a top purchase price for it relative to any

21  other values?

22    A.   It was more important for me that the City got

23  enough money to cover whatever City-related expenses could

24  potentially be.  That was important because what I didn't

25  want to do is use other financial City resources to cover

1    or to subsidize this facility.

2        Q.  And did you attend some meetings with anybody

3    about putting the RFP together?

4        A.  I -- I was -- I mean, wouldn't you count giving

5    my recommendation as providing that information to the

6    OEWD?  I already said that I had done that.

7        Q.  Yeah, certainly.  I just wasn't clear -- sorry --

8    whether that was done in meetings or in writing or on the

9    phone.

10       A.  Yeah, I don't know.  I don't recall.

11           But I know that I made it clear to that office

12   what was important to the community.

13           And I would also say -- I'm just realizing or

14   recalling -- I think we -- actually, as a part of this

15   process, we even offered -- we might have even offered the

16   facility below market rate because we knew that it would

17   be difficult -- I think I remember from the RFP process

18   that it would be difficult to incorporate all of the

19   various things that the community wanted to see and --

20   and -- and -- and expect someone to adjust to that.

21           I remember vaguely there were some conversations

22   around that.  So there was some adjustments in the price

23   of the facility.

24       Q.  And who were you liaising with at -- I'm sorry.

25   I'm forgetting the acronym.  I mean, I know it, but --

1       A.   OEWD?

2       Q.   Yeah.

3       A.   It may have been Joaquin.  I don't remember who

4  the director was at the time or who else we had talked to,

5  but a lot of the conversations might have been with my

6  team even.

7       Q.   When you say your team, you just mean your staff

8  and supervisor?

9       A.   Yeah, it could have been with my staff and

10 supervisor.  I would have to recall who was working in my

11 office at the time to know specifics.

12      Q.   I just want to make sure I wasn't -- I wasn't

13 misunderstanding something and you weren't referring to

14 some, like, different or special team you put together.

15      A.   No.  My office was the Board of Supervisors.  It

16 would have been one of my legislative aides.

17      Q.   And how is it at all that you were able to make

18 sure that -- that -- that these expressions of, you know,

19 the community values and interests found their way into

20 the RFP itself?

21           I mean, in other words, you had -- did you -- did

22 you then trust that those people you were talking to would

23 execute it, or did you take some steps to make sure --

24      A.   No, I trusted that they would -- they would

25 execute it, because it was in the best interest of the

1    community.  This is an office that also cared about seeing

2    it happen as well.

3        Q.  And is it fair to say that you generally -- those

4    of you who were meeting to discuss and work that out

5    generally saw eye-to-eye that there wasn't any major

6    discord or disagreement about those things?

7        A.  You know, I don't think so.

8        Q.  Okay.  Did you -- were you presented with or did

9    you review any drafts of the RFP?

10       A.  I don't recall.

11       Q.  Or did you ever have any hand in -- either

12   directly or through staff, in penning any specific terms

13   of it that you wanted to see included?

14       A.  I don't think so.

15       Q.  Do you have any sense of how many face-to-face

16   meetings you had with Joaquin's office about the RFP

17   contents before it was issued?

18       A.  I don't think it was Joaquin's office, but I

19   think he worked in the office.  And no, I don't recall.

20       Q.  Okay.  Or do you remember -- are you able to say,

21   as you sit here, what portion of those discussions were in

22   meetings in person compared to on the phone compared to in

23   written exchanges?

24       A.  I would say that they were, more than likely,

25   probably in person, and I don't think that there were a

1   lot of meetings.

2        Q.  Roughly how many, if you can give a ballpark?

3        A.  I don't know.  I don't know.

4            I don't think it's fair to ask me to do that

5   because there -- I have a lot of meetings all the time

6   with a lot of people.

7        Q.  I totally understand.  And I have to ask.  And I

8   apologize.  This is one of those sort of attempts to

9   narrow the pulse on the feel of things.

10           But was it more than five?

11           Could it have been more than five?

12       A.  But with who specifically?

13       Q.  Just with any other parties to discuss what the

14  RFP should look like and what --

15       A.  Oh, definitely I don't know.  I don't know that.

16       Q.  Okay.  Do you remember how much time that -- over

17  what interval of time that process began?

18           Well, the RFP issued on February 10th, 2017, do

19  you recall how long before that you were having

20  intermittent discussions with folks about what it should

21  incorporate, what it should look like?

22       A.  I don't think we had a lot of discussion about

23  that at all.

24       Q.  Did you ever read the final RFP or skim it or

25  anything?

1        A.   I don't recall.

2        Q.   Do you have a sense, as you sit here, of whether,

3   when it issued, it did, in fact, reflect those community

4   values that we have been talking about that you were

5   conveying from the community to the drafters?

6        A.   I believe that my staff might have reviewed that

7   and told me that it did.

8        Q.   And what did you -- what was your role, if any,

9   going forward from that point after the RFP issued on

10  February 10th of 2017?

11       A.   I don't know.

12       Q.   I mean, did you play any role in it?

13       A.   What kind of role would I have played?

14       Q.   I mean, did you -- well, for example, did you

15  participate in recommending or selecting members of the

16  review panel or the selection committee who was to review

17  the proposals?

18       A.   I believe that the office might have made the

19  suggestions of the people that they were going to include.

20  And I also suggested that they consider Reverend Amos

21  Brown.

22       Q.   For the chair?

23       A.   No, just to participate on the panel.

24       Q.   I see.

25            Okay.  Did you come to learn that he did, in

1   fact, become the chair?

2       A.  I didn't -- I was not aware that he was the

3   chair.

4       Q.  Okay.  Did you -- did you or your office

5   recommend -- so here are the people who did end up

6   comprising the review panel or the selection -- also known

7   as the selection committee of the RFP.  I will just read

8   them to you and ask you if any of these were folks that

9   you recommended.

10          LaTonia Grice, or "Grice"?

11      A.  I don't know.

12          The only person of whomever was on the committee,

13  I know that I, for certain, recommended Reverend Brown.  I

14  can't remember whether or not I recommended anyone else,

15  but I don't think I did.

16      Q.  Okay.  But your office might have?

17      A.  I don't know.  And I don't think so.

18          To be clear, Office of Economic and Workforce

19  Development was actively engaged in the community on this

20  project.  And I think that the recommendations had a lot

21  to do with not just their office and their work on the

22  ground with the community but also OCII and their work

23  with that department to come up with what made the most

24  sense for who would be objective and who would be fair in

25  the process of reviewing these proposals so that there

1    weren't, you know, people who had a vested interest other

2    than seeing things happen in this space.

3        Q.  Okay.  Do you know LaTonia Grice?

4        A.  Yes.

5            MR. ROSENFELD:  And for the court reporter,

6    that's capital L-A, capital T-O-N-I-A, one word, first

7    name.  Grice or "Grice" is spelled --

8            THE WITNESS:  "Grice."

9            MR. ROSENFELD:  Q.  I'm sorry?

10       A.  It's "Grice."

11           MR. ROSENFELD:  Grice is spelled G-R-I-C-E.

12       Q.  And how do you know Ms. Grice?

13       A.  From the neighborhood.

14       Q.  And did the two of you ever work together?

15       A.  No.

16       Q.  How would you characterize your relationship or

17   acquaintanceship with her?

18       A.  Friendly, similar to probably Majeid.

19       Q.  Okay.  How about Darryl Dieter, D-I-E-T-E-R?

20       A.  I don't know who that is.

21       Q.  Okay.  Rick Swig?

22           Last name, S-W-I-G.

23       A.  I know Rick.

24       Q.  How do you know him?

25       A.  Rick and I served on the San Francisco

1    Redevelopment Agency Commission together.

2         Q.  And have you worked together in any other

3    capacities?

4         A.  Just the Commission, but we are friends.

5         Q.  Friends, like, social friends sometimes?

6         A.  Yes.

7         Q.  Okay.  Today still?

8         A.  Who?

9         Q.  Still today?

10        A.  Oh, yes.

11        Q.  And you were friends -- you were friends -- when

12   did you work together on that committee?

13        A.  I don't remember.

14            But I served on the Redevelopment Agency

15   Commission for five years.  I don't remember Rick's

16   tenure.  And he wasn't on there the entire time I was on

17   there, but we served together and worked in that capacity.

18        Q.  But that was before the RFP issued, right?

19        A.  Yeah.  Yes.

20        Q.  And, then, Audrey -- A-U-D-R-E-Y -- Joseph?

21            Do you know Audrey Joseph?

22        A.  I think I know Audrey.  I think so.

23        Q.  And how do you know her?

24        A.  I -- I don't -- I think she is, like, a nightlife

25   person or involved in entertainment-related stuff.

1      Q.   Okay.  But you don't know her -- it sounds like

2   you don't know her like --

3      A.   I know who she is, but I don't know her, know her

4   like that.

5      Q.   Okay.  Did you ever, yourself, review any

6   applications by any review panel members for the RFP?

7      A.   I don't think so.

8           Why would I do that?

9      Q.   I don't know.  I'm just asking.

10          Or have any discussions with your staff about the

11   review of any applications by prospective review panel

12   members?

13     A.   No.

14     Q.   Did you ever even see an application by any

15   review panel -- prospective review panel member who came

16   to serve on it?

17     A.   Wait.

18          See an application?

19          So the review-panel submitted applications?

20     Q.   That's my understanding, yeah.

21     A.   Oh, definitely not.

22     Q.   Okay.  Just to be clear -- because we had two

23   different questions there, I just want to make sure that

24   I'm distinguishing them.

25     A.   You are saying that the people you mentioned, the

1    review panel, they have to submit an application to be on

2    the review panel?

3         Q.   That's my understanding, yes.

4         A.   Okay.  Well, no, definitely not.

5         Q.   And when you say "definitely not," you are

6    answering the question, did you ever even see such an

7    application?

8         A.   I have never even seen such an application.

9         Q.   And, then, what -- what did your recommendation

10   of Amos Brown to serve on it consist of?

11        A.   When -- I think I was -- I might have been told

12   who was going to be on the review panel.

13             And because Reverend Brown was, honestly, driving

14   me nuts about this project and wanting to see it go to the

15   community and very actively engaged in various capacities,

16   I basically said to them that they should seriously

17   consider working with Reverend Brown, because what I don't

18   want to see happen is him not be a part of the process and

19   then be upset, you know, that he wasn't asked to

20   participate.

21             And this is a common thing with him.  He is very

22   engaged and active in the community, but he always has to

23   have a part in something that's going on.

24             So I strongly made that recommendation.  And they

25   said they would talk with him and meet with him to see if

1  it works, and, eventually, I guess, they decided that it

2  could.

3        Q.  Okay.  Understood.

4            But you made a recommendation to who?  To Joaquin

5  Torres?

6        A.  I don't remember, but whoever was in charge of

7  this process.

8        Q.  Okay.  Could it have been Joaquin Torres?

9        A.  It could have been.

10       Q.  Did you -- do you know the name Tim or Timothy

11  Shelton?

12       A.  Who?

13       Q.  Tim Shelton, S-H-E-L-T-O-N.

14       A.  No.

15       Q.  I take it, therefore, you don't know his wife

16  Vicky?

17       A.  No.

18       Q.  And would it jog your memory or ring a bell if I

19  told you that they, through a group, made one of the

20  proposals to the RFP?

21       A.  No.

22       Q.  Did you, at any time, review the actual RFP

23  proposals?

24       A.  I don't think so.

25       Q.  Or did anybody brief you on it, like, your staff,

1    for example?

2         A.   I'm pretty sure I was briefed on them.

3         Q.   Did you come to any feeling as the process

4    unfolded about whether you thought any of the proposals

5    were worthy proposals?

6         A.   My briefing came once the committee made a

7    decision that none of the proposals were good enough.

8         Q.   Why would they brief you after the fact?

9              Why did they brief you after the fact?

10        A.   Because, I guess, the proposals -- they were

11   concerned -- they didn't like any of the proposals and

12   were considering rejecting the proposals and starting the

13   process over again.

14        Q.   And who briefed you?

15        A.   I don't remember.

16        Q.   I mean, was it your own staff, or was it, like,

17   people who were administering the RFP?

18        A.   I don't remember.

19             It would have either been my staff or OEWD.

20        Q.   Why did they -- wait.

21             So what exactly did they tell you about -- or did

22   they tell you anything specific about why they didn't

23   think anybody was -- anybody submitted a suitable

24   proposal?

25        A.   I'm sure they did, but I just don't recall the

1   details.

2       Q.  And did you have any opinion or feedback on that

3   subject?

4       A.  I just asked if there was any way that they could

5   go back to the respondents and try and get some

6   clarification or more information or help address some of

7   the deficiencies.

8       Q.  And did that come to pass, to your knowledge?

9       A.  I don't remember.

10      Q.  Or do you remember what whoever was -- you were

11  having those conversations with told you in response to

12  your proposing that idea?

13      A.  I don't remember.  As I said, it could have been

14  my staff.  It could have been OEWD.  But those were

15  probably the only people that I talked to about this.

16      Q.  And were they asking you for some -- in briefing

17  you about these proposals and the -- and, in their minds,

18  the inadequacy of them, were they asking something of you?

19      A.  No, they weren't asking something of me, but I

20  definitely offered.

21      Q.  Okay.  And other than that, did you offer or

22  suggest anything else, other than what you just testified

23  to, which is that they had to go back and solicit more

24  information if there was some hope there?

25      A.  Yeah, that's the only option we had.

1     Q.  Okay.  Are you aware that there did come a time
2  or two when the folks administering the RFP extended the
3  deadline to applicants?
4     A.  I don't recall, but it probably did happen.
5     Q.  And as you sit here, are you able to say, one way
6  or another, whether those two things were linked, the fact
7  that you had suggested that they try to get some more
8  information out of the bidders and the fact that they
9  extended the deadline to suggest that maybe they took you
10  up on that suggestion?
11     A.  Wait.
12        Can you clarify the question?
13     Q.  Yeah.  Sorry.  It was garbled.
14        I'm just trying see if you got any feedback that
15  would allow -- enable you to say whether -- whether they
16  actually acted on your idea that they try to get some more
17  information out of the bidders.
18        Because I can represent to you that they did, in
19  fact, extend the deadline.
20     A.  I don't remember.
21     Q.  Okay.  So at the time -- did the briefing of --
22  to you on the proposals come on one occasion or more than
23  one occasion.
24        Was it an ongoing process or was there just like
25  a --

DEPOSITION OF MAYOR LONDON BREED – APRIL 21, 2021

1        A.  I really don't remember.

2        Q.  In your understanding -- I think you may have

3   said but I didn't totally understand or I have to go back

4   and look.

5            Were you being briefed on those proposals when

6   the committee had come to a determination that they were

7   going to cancel the RFP without -- sorry.  I'm messing up

8   this question.  Let me try to straighten it out.

9            At the time that you were briefed on the

10  proposals, as you have been talking about, had the folks

11  administering the RFP already told the bidders that it was

12  done, that they were canceling it, or do you know?

13       A.  I don't know.

14           But I do believe the committee had already made

15  their decision.

16       Q.  Okay.  So it might have been that they privately

17  made their decision, and this was just sort of a can we do

18  anything else before we call this?

19       A.  I don't know if it was privately or publicly.  I

20  can't remember.

21       Q.  Okay.  Did you -- did you otherwise participate

22  in any way in the decision to cancel the RFP without

23  selecting any winning proposal?

24       A.  I think I was asked to support the decision, I

25  guess, of the committee.

1          But is that what they did?  They canceled it?

2          I don't know.

3      Q.  They canceled it, yeah.  Yeah, I can represent to

4  you that they canceled it on November 2nd, 2017, without

5  selecting any -- a winning bid.

6      A.  Okay.  I'm sure I was told.

7      Q.  And, to your knowledge, were you informed -- just

8  informed or were you asked whether they could or should go

9  ahead and do that?

10      A.  I think that I was more -- I was informed.  And

11  the concerns around the proposals were probably

12  communicated to me and -- but I don't recall a real

13  solution from that point.

14      Q.  I mean, what was your feeling at the time, if you

15  can recall, given the -- the interest that you took in

16  seeing -- seeing something of benefit to the community

17  that this process, you know, had run its course and there

18  was going to be no selection?

19      A.  Well, I was pretty disappointed.

20          But this is a -- it was a big decision, the

21  decision to trust someone to take over this facility and,

22  in fact, purchase it, now that I remember, and initially

23  maybe do what the community wanted them to do but maybe

24  turn it into some other use.  Who knows.

25          But at the end of the day, the proposals, from

1  what I recall, didn't completely represent, you know, what

2  the RFP called for as it related to the expectations of

3  the space for the community.

4          That's what I remember.

5          And I want to say that even with cutting the

6  price down significantly, the financials, also, I vaguely

7  remember, didn't pencil out as well.

8      Q.  But you kind of anticipated my next question, but

9  I will just ask it more specifically.

10          I was going to ask, was it that -- was it that

11  folks were reciting to you why they didn't think the

12  proposals met the -- well, strike that.

13          Let me try that again.

14          Did you -- were you asked for or did you express

15  an opinion of your own as to whether the proposals were

16  good enough, or were you just receiving the information

17  that they weren't?

18      A.  I received the information.

19      Q.  But at some point you suggested they -- they try

20  to get some more information -- you didn't want to see the

21  process fail, obviously?

22      A.  Yeah, definitely.

23      Q.  And was that why you, at some point, suggested

24  that they dig in a little more, if they could, and try to

25  get something to augment the proposals, if it would help?

1      A.   Yes.

2      Q.   And do you remember whether that occurred on the

3  occasion when you were being told that the committee had

4  basically reached the decision that they were going to

5  terminate it?

6      A.   No.

7      Q.   So is it possible those were two different

8  events; that there was one event where they were --

9  somebody was briefing you on the proposals and another

10  event where they said we are going to terminate it, you

11  said can't you get some more information out of people,

12  maybe?

13      A.   I think they were two different times.

14      Q.   Okay.  Do you remember how far apart in time they

15  were?

16      A.   No.

17      Q.   Okay.  In hearing -- well, strike it.

18          Do you remember anything specific that was

19  relayed to you about why the committee felt any one or

20  more of the proposals were inadequate?

21      A.   No.

22      Q.   And do you recall, yourself, forming any opinion

23  in concert when you received that briefing?

24      A.   No.

25      Q.   Or the opposite?

1          Do you recall, for example, thinking something

2     along the lines of some of those sound more adequate or

3     viable to me than the committee seems to regard them?

4          A.  No.

5          Q.  So do you -- did you just not form an opinion one

6     way or the other or you're just not recalling what your

7     questions might have been now?

8          A.  I didn't form -- I didn't form an opinion one way

9     or another.

10         Q.  But you did think that, potentially, one or more

11     of them might have been salvageable with some further

12     information addressing shortcomings?

13         A.  I don't know the specifics about the proposals to

14     say that they -- the proposals specifically were

15     salvageable.

16          My recommendation was as a result of, well, do

17     you think -- like, I was asking for the team to -- or the

18     team, I would say, OEWD and my staff, whoever I talked

19     to -- I'm pretty sure I was asking them to maybe look at

20     whether or not we could ask for additional information

21     from the people who were submitting proposals that could

22     help augment or support or make their case in some

23     capacity.

24          So I didn't know what the proposals specifically

25     said; I just know that I was concerned that the committee

1    was not supportive of any of the proposals.  And I just

2    thought that that could have been a recommendation because

3    those were the only proposals we had to work with.  And I

4    would have preferred not to delay the process in moving

5    forward any further, but I also didn't want to get it

6    wrong.

7         Q.  And do you recall what anybody among your staff

8    or OEWD personnel said or did in response to your raising

9    that question whether --

10        A.  I can't remember if they did it or not.  I just

11   don't recall.

12        Q.  Or do you recall -- relatably do you recall any

13   occasion where those folks who were briefing you came back

14   to you and said anything along the lines of, we tried and

15   we still didn't get what we needed, or anything like that?

16        A.  Yeah, I don't remember that.

17        Q.  Okay.

18        A.  I don't remember if that happened or not.

19        Q.  Okay.  I would just like to ask you, was the

20   Fillmore Heritage Center ever a site -- was it ever the

21   site of any campaign-related event for any of your

22   campaigns?

23        A.  I don't know.

24        Q.  Did you, yourself, negotiate directly or

25   indirectly on behalf of any of the people who made

1   proposals to the RFP?

2        A.   No.

3        Q.   Do you know any of the other -- as you sit here,

4   do you know who any of the other bidders or proposers were

5   besides Agonafer?

6        A.   I don't recall.

7        Q.   But you are aware that Agonafer was one of them,

8   correct?

9        A.   Now I am.

10       Q.   Oh, okay.

11            You may have been aware -- is it fair to say that

12   you may have been aware as of the time of that --

13       A.   Yes.

14       Q.   -- meeting at Third Baptist?

15       A.   Yes.

16       Q.   Okay.

17       A.   Wait.

18       Q.   Yeah?

19       A.   You said I may have been aware at the meeting at

20   Third Baptist?

21       Q.   Yeah.

22            What I'm asking is, just -- I think you

23   testified, but correct me if I'm wrong, that you are not

24   sure whether -- as of that meeting at Third Baptist that

25   involved Agonafer and Reverend Brown and others,

1   whether -- you are not sure when that occurred or whether

2   Agonafer had submitted an RFP at that time or whether you

3   were aware that he submitted an RFP at that time?

4        A.  Yes, but --

5        Q.  I mean -- I don't mean RFP.  RFP proposal.

6   Sorry.

7        A.  Yeah.

8            But the question was different than that.

9        Q.  Yeah.

10           I guess I'm just asking whether -- let me ask it

11   this way.

12           When did you -- when did you first become aware

13   that Agonafer had submitted an RFP proposal?

14        A.  I don't recall.

15        Q.  Okay.  Did you ever come to form any opinion,

16   yourself, of Agonafer's proposed use of the space or his

17   RFP proposal itself?

18        A.  I don't think so.

19        Q.  Or did you ever express any opinion of Agonafer's

20   proposed use of the space or the prospect that he would

21   become the purchaser and owner of the space of the Center,

22   that is, to anybody else?

23        A.  No.

24        Q.  As you sit here right now, do you have any

25   opinion as to whether Agonafer -- Agonafer's proposal met

1   the criteria that you, yourself, consider to be the

2   criteria that needed to be satisfied for the RFP?

3       A.  I don't know, because I don't remember his

4   proposal.

5       Q.  Based on anything that you know about Agonafer,

6   do you have an opinion as to whether he would be a worthy

7   or viable candidate for the purchase of reactivation,

8   developer or user, of the Fillmore Heritage Center?

9       A.  Well, he has operated successful businesses in

10  the community, including -- I mean, he had Rasselas on

11  Divisadero that was a very popular location for many

12  years.  And he had Rasselas on Fillmore Street that became

13  a neighborhood go-to spot for many years.

14          So that's the extent of what I would say.

15          I mean, he has definitely proven that he's

16  capable of managing a space.

17      Q.  And I think you also testified that you somewhat

18  frequently attended or -- not attended -- patronized his

19  and his wife's restaurant -- Sheba -- on Fillmore, right?

20      A.  I didn't realize that was his restaurant, too,

21  but okay.

22      Q.  I understand it to be her restaurant.  I don't

23  honestly know what the business, you know, relationship

24  there is in terms of the property, but --

25      A.  Yeah.

1          And I -- I -- I am a big fan of that restaurant.

2     I was a big fan of Rasselas.  Love the food.  Love the

3     entertainment.

4          So I definitely -- it hasn't been open, but as

5     soon as it opens, I will be back.

6     Q.  And, conversely, is there anything in Agonafer's

7     profile, as a person or as a businessman or developer,

8     that you would consider disqualifying or even just

9     negative in terms of his ability or viability in operating

10    the Fillmore Heritage Center or transforming it into

11    something?

12    A.  I didn't realize he was a developer, so I'm not

13    familiar with his work in that regard.

14    Q.  By "developer," I mean in the sense that -- I

15    will represent to you that his proposal called for, you

16    know, bringing in others and -- I mean, a wide array of

17    other folks, you know, to operate out of the Center

18    consonant with the community values of the space.

19         So "developer" in that sense, that would

20    certainly involve, you know, some remodeling, rebuilding

21    and that kind of thing.  I don't mean "developer" in the

22    sense of, like, erecting skyscrapers from the ground up.

23         But it was kind of a tangled question, so let me

24    try to reask it.

25         Is there anything that -- in your personal

1    feelings about Agonafer or your awareness of his

2    experience or his profile as a businessman or him as a

3    person, that you feel would be disqualifying when it comes

4    to his ability -- ability or suitability to purchase or

5    operate the Fillmore Heritage Center within the community

6    interests that you have expressed?

7         A.  I don't know.

8         Q.  You don't know one way or another?

9         A.  Yes.

10        Q.  I'm sorry.

11             Just to clarify, does that mean you are saying

12    you are not aware of anything that would -- that you would

13    regard as negative or disqualifying, or there might be

14    something negative or disqualifying but you just don't

15    want to say?

16        A.  I'm not necessarily comfortable answering that

17    question.  I'm trying to stay positive here.

18        Q.  And I'm trying to figure out a way to ask it

19    without -- I guess, minimizing the discomfort.  But it is

20    a question that I am sort of duty-bound to ask under the

21    circumstances of this case.

22             I mean, certainly you can qualify it any way you

23    want -- it's your testimony -- but I do need to ask it and

24    ask for an answer.

25        A.  Well, I would just say that I thought Agonafer

1    was a friend.  He has known me since I was in college.  We

2    worked together even when we've had different

3    disagreements.  I see him on a regular basis because I go

4    to Sheba Lounge, like, two, three times a week when it was

5    open before the pandemic.

6              And so the fact that I'm here right now answering

7    these kinds of questions in a number of accusations is

8    hurtful and disappointing from somebody who I have had a

9    tremendous amount of respect for over the years.

10        Q.  Okay.  Are you aware -- do you know the name

11   Michael Johnson?

12        A.  Yes.

13        Q.  Do you know him personally?

14        A.  Yes.

15        Q.  And are you aware that there came a time when

16   Michael Johnson became unable to operate Yoshi's in the

17   Fillmore Heritage Center as the then owner?

18        A.  Yes.

19        Q.  Were you involved in any way in negotiating his

20   exit from Yoshi's and from the Center?

21        A.  No.

22        Q.  Do you have any knowledge or understanding of

23   what -- what the terms of that exit were?

24        A.  I don't recall.

25        Q.  Were you aware that Agonafer and Michael Johnson

1    submitted a letter of intent to the officials -- to City

2    officials for Agonafer to purchase the Center from Michael

3    Johnson while Michael Johnson was still the ostensible

4    owner?

5         A.  I don't recall.

6         Q.  Were you privy to any discussions among fellow

7    City officials regarding this effort by Michael Johnson

8    and Agonafer to -- for Michael to sell the Center to

9    Agonafer?

10        A.  I don't recall.

11        Q.  Did you ever have any discussions with anybody

12   about whether Michael Johnson should have to repay the

13   City for a loan when he turned over the keys and vacated

14   the Center?

15        A.  I -- I might have had conversations with the City

16   Attorney's Office about the legality of what's happening

17   with the project and how the City needs to move forward.

18        Q.  As you sit here right now -- I'm sorry if I asked

19   you this.  I don't remember that I did.

20            What's your recollection were the earliest

21   communications by date that you had with Dr. Bates about

22   his interest or others' interest on his behalf for

23   utilizing the Center for his medical facility?

24        A.  Ben, I don't know.  It has been so long.  I'm

25   sorry.  I just don't have the answer to that.

1      Q.   Okay.   To your understanding, was -- the OCII's

2  ownership of the Center on paper, would it have been an

3  obstacle to transferring the Center to a new purchaser if

4  it would have been selected in the RFP project?

5           MR. LAKRITZ:   Objection.   It is asked and

6  answered and calls for a legal conclusion.

7           MR. ROSENFELD:   Q.   You could answer.

8      A.   Oh, I don't know.

9      Q.   Have you communicated about the Fillmore Heritage

10  Center or the RFP via personal e-mail with any of the

11  following people.

12          Vallie Brown?

13     A.   I don't know but probably.

14     Q.   Naomi Kelly?

15     A.   And to be clear, with Vallie Brown, if she was my

16  aide and I was forwarding something to her, that happened

17  on a regular basis.

18     Q.   Okay.   Naomi Kelly?

19     A.   I don't know.

20     Q.   Harlan Kelly?

21     A.   I don't think so.

22     Q.   Amos Brown?   Reverend Brown?

23     A.   I don't know.

24     Q.   Joaquin Torres?

25     A.   I don't know.

1                You said from my personal e-mail?

2        Q.  Yeah.

3        A.  Yeah, I don't know, but I don't think so.

4        Q.  Denise Bradley?

5        A.  I don't know.

6        Q.  And, conversely, do you recall at any time

7    affirmatively deleting any e-mails among or between you

8    and any of those people regarding the Fillmore Heritage

9    Center or the RFP?

10       A.  I don't think so.

11       Q.  When you go to delete -- when your Gmail

12   program -- not program.

13            But when your Gmail account associated with the

14   personal e-mail address reflected in Exhibit 2 and your

15   communications with Dr. Bates went to delete e-mails

16   because of space limitations, as you testified, how did

17   that come about?

18            Did it prompt you?

19            How did that work?

20       A.  Oh, I get an e-mail that tells me that I'm going

21   to -- I'm, basically, at a point where I'm almost at

22   maximum space.  And sometimes what will happen -- because

23   this happens regularly.  Sometimes what will happen is I

24   will stop getting e-mails.  And other times, if I'm able

25   to remember or have the time, I will just go in and delete

1   all the old e-mails, empty out the spam, empty out the

2   trash and just get rid of anything that's the oldest thing

3   in my Gmail to make room.

4       Q.  You mean, like, just sort of pick a date and

5   everything before that date kind of thing?

6       A.  No, I don't pick a date; I just go to the very

7   end of the e-mails and get rid of the last stuff in the

8   e-mail.

9       Q.  How do you decide how much to get rid of, I

10  guess, is what I'm asking.

11          Or is it trial and error until you are within the

12  space again?

13      A.  Kind of, yeah.

14          It is more so -- I try to -- most of the time, it

15  is probably every e-mail, because I have thousands of

16  e-mails.  So, for the most part, I probably dump almost

17  everything and get rid of everything.  Because if I

18  haven't read it by now, then I'm probably not going to

19  read it anyway.

20      Q.  Okay.  In the little bit of time we have

21  remaining, let me just show you a video quickly.  And I

22  just want to ask your -- ask you just to comment on a

23  couple of things.

24          Let me see if I can share this.

25          All right.  So do you see an image on your screen

1    of a flag on a building?

2         A.   Yes.

3         Q.   Okay.  Now, some tiles with videos?

4         A.   Yes.

5              MR. ROSENFELD:  Okay.  So I'm going to play the

6    one that depicts you there for a moment.  I'm just going

7    to play just a few seconds of it initially just to make

8    sure you can see it.

9              (Video playing.)

10             MR. ROSENFELD:  Q.  I'm just pausing.

11             Are you able to see that video and hear

12   people saying --

13        A.   Yep.

14        Q.   -- "Unite the City"?

15        A.   Uh-huh.

16        Q.   Okay.  There is just a couple little excerpts I

17   want to play for this -- of this and just ask you a

18   question or two on it.

19             MR. LAKRITZ:  I'm going to make an objection for

20   the record.

21             This was not turned over by the plaintiff

22   during discovery.

23             MR. ROSENFELD:  Well, for the record, we know

24   about it through a document that you turned over, Tom,

25   although I don't remember what that is.

1              But, also, for the record, I don't think any

2      discovery request went to it.

3              And, also, for the record, it is publicly

4      available on Facebook.

5              So you are looking at Majeid Crawford's Facebook

6      page available to defendants and anybody else in the

7      public.

8              MR. LAKRITZ:  Well, that's fine.

9              It was not disclosed and -- it was not disclosed

10     in written responses to interrogatories and requests for

11     production of documents.

12             Even though it's a publicly available document or

13     video, it should have been identified in interrogatories

14     or the written responses.

15             MR. ROSENFELD:  Okay.  Well, I disagree with you.

16             MR. LAKRITZ:  Our objection is on record.

17             MR. ROSENFELD:  Yes.

18             Okay.  I'm just going play -- I'm going to play

19     about a minute of this.

20             (Video playing.)

21             MR. ROSENFELD:  Q.  Okay.  Pausing there.

22        Q.  Do you recall this event?

23        A.  I do.

24        Q.  And what was it?

25        A.  Well, I don't know what it was, but I was asked

1    to come outside and speak.

2          Q.   Who asked you?

3          A.   I don't recall.

4          Q.   What made you decide to agree?

5          A.   Because these are my community members.  I grew

6    up with all these people.

7          Q.   Right, that's what I was asking you, who asked --

8    if you knew who was asking you.

9          A.   I don't remember who asked me.

10         Q.   Okay.  I have something that might shed light on

11   that in a moment.

12              But let me just ask you a couple questions about

13   it.

14              So when you said --

15         A.   Well, if you know, then why are you asking me?

16         Q.   Well, because it's still -- it's a requirement.

17   I have to try to lay a foundation.  It is not that I'm

18   trying to trick you or hide the ball.

19         A.   Yeah, I don't remember what -- who asked me to do

20   that.  But a lot of these folks are people that I grew up

21   with.

22         Q.   Okay.

23         A.   And, of course, I would want to support them.

24   And I represent them as their supervisor on top of that.

25         Q.   Okay.

1           So do you hear yourself say a moment ago, "People

2    are going to try to come into our community like they are

3    doing now and divide us"?

4         A.  Uh-huh.

5         Q.  What did you mean by that?

6         A.  I don't recall.

7         Q.  Any idea at all, as you sit here?

8         A.  No.

9         Q.  Okay.  And, then, do you recall hearing yourself

10   say in the same video, "Nothing is more important to me

11   than making sure that this place is for the folks of the

12   neighborhood who actually live there"?

13        A.  Yes.

14        Q.  And what did you mean by that?

15        A.  Well, I wanted to make sure that the people who

16   lived there have access to the Fillmore Heritage Center.

17        Q.  Okay.

18        A.  Because that didn't always happen before.

19        Q.  Tell me more.

20        A.  So when it was Yoshi's, you know, there was an

21   expectation, and it was just kind of expensive to go to

22   shows, to buy drinks.

23           And it was just important to make sure that it

24   was also available, affordable, and that people from the

25   neighborhood could actually get employment opportunities

DEPOSITION OF MAYOR LONDON BREED – APRIL 21, 2021

1    there.

2         Q.   Okay.  Understood.

3              All right.  I'm stopping that screen-share.

4              And the document that I'm -- first of all, do you

5    recall -- again, this is one of those foundation

6    questions.  It is not supposed to be a memory test.

7              But do you recall when you gave those remarks

8    outside City Hall?

9         A.   No, I don't.

10             MR. ROSENFELD:  So the document I'm going to

11   share with you might shed light on that.

12             Give me a second.

13             So this will be Exhibit 7.

14             (Exhibit 7 was marked for identification.)

15             MR. ROSENFELD:  This is an e-mail -- it is a

16   one-page exhibit.  It's marked as the City's Bates

17   Number 9913.  And it's dated January 31st, 2018.

18        Q.   Do you see that, Mayor?

19        A.   Uh-huh.

20        Q.   And I will just read this real quickly.

21             It says,

22             "The NCLF is in the process of issuing a

23             press release regarding the outcomes of our

24             rally.  Since it is regarding the wonderful

25             work of your office, I wanted to send you a

1          copy of it for your review and any input.

2          We want to make sure we got our information

3          correct."

4          And then there is a link.

5          And then it says,

6          "We are also going to attach a video with

7          the press release.  To see the video click

8          the link below.  The final video we send to

9          press will have captions and music.  The

10         one below is just a draft."

11         Do you recall that e-mail, by any chance?

12    A.   No.

13    Q.   Okay.  And it is signed by Majeid.

14         Do you see that?

15    A.   Yes.

16    Q.   You were cc'd up here.

17         Do you see that?

18    A.   Okay.

19         MR. ROSENFELD:  Okay.  So I am just representing,

20    for the record, that this is how we came to learn of this

21    video.

22         And, Tom, that's why it is not produced back to

23    you, because we got it from you.  I mean, it is one of the

24    reasons.

25    Q.  But, Mayor, would it -- you would have no reason

1    to disagree that the timing of this video was the day

2    before, referring back to it, on January 30th, 2018, would

3    you?

4         A.  Well, if the -- I'm confused.  Because if the

5    video is of the rally, then this came after the fact.

6         Q.  Right.  That's what I mean.

7              So in other words -- you know what?  Actually,

8    the -- hold on.

9              Let me just ask you to look at -- you see the

10   date here?

11             January 31st, 2018, is the date of the e-mail,

12   right?

13        A.  Okay.

14        Q.  And it is from Majeid to others including you.

15        A.  Okay.

16        Q.  So I'm going to stop the --

17        A.  There is only one other person on this e-mail,

18   Samantha Roxas, who was my legislative aide.

19        Q.  Okay.  I'm sorry.  One other person, yes.

20             Okay.  So I'm going to stop that screen-share.

21             So that e-mail is dated January 31, 2018.  That's

22   referring to the rally.

23             Okay.  I'm stopping that share.

24             I'm just going back real quick to the video.

25   Don't worry, I'm not going to play it again.

1          And I should have thought of this before.

2          But you see now, up here to the right of the

3     screen, that there is a post date of January 30th, 2018?

4          A.   Okay.

5          Q.   Okay.  So I don't think either of us knows for

6     sure whether it was posted on the exact day of the --

7     whether Majeid Crawford or others for him posted the video

8     of your remarks at that rally on the exact day that it was

9     shot or that e-mail was exactly one day after.

10          But do you have any reason to think otherwise,

11    then, that you delivered those remarks, at least, very

12    close in time to January 31st, 2018?

13         A.   I don't remember when I delivered those remarks.

14         Q.   Okay.  Could it have been January 30th, 2018?

15         A.   It could have been any date because I don't know

16    what the date is.

17         Q.   Right.

18          Okay.  Stopping that share.

19          Have you had communications about -- about the

20    fate or disposition of the Fillmore Heritage Center with

21    any of the following people.

22          Benjamin McCloskey?

23         A.   I don't even know who that is.

24         Q.   Fred Jordan?

25         A.   I don't recall.

1      Q.   Okay.  Kaj -- K-A-J -- Kajimura, K-A-J-I-M-U-R-A?

2           That is the person who was the principal owner of

3      Yoshi's before Michael Johnson.

4      A.   No.

5      Q.   Okay.  Did you have any role or participation in

6      the decision to cancel Mr. Kajimura's debt to the City

7      related to Yoshi's?

8           MR. LAKRITZ:  Objection.  It misstates the facts.

9           MR. ROSENFELD:  Q.  Let me ask you more

10     generally.

11          Did you -- were you involved in any discussions

12     or decision-making about the terms of any loans or

13     cancellation of any loans or debts which Mr. Kajimura

14     obtained related to his -- to Yoshi's?

15     A.   I don't recall, but I don't think so.

16     Q.   Okay.  And -- I'm sorry -- who is Kayleigh Lloyd,

17     again?

18          K-A-Y-L-E-I-G-H.  Last name, L-L-O-Y-D.

19     A.   Kayleigh worked for me.  She was one of my

20     legislative aides.

21     Q.   Did you discuss the Fillmore Heritage Center or

22     the RFP with her?

23     A.   Possible.

24     Q.   Do you recall any specific discussions you had

25     with her about it?

```
1      A.  No.

2      Q.  Have you had any discussions about the Center or

3  the RFP with Jim Morales?

4      A.  I don't recall, but I don't think so.

5      Q.  All right.  And, then, do you know Juliet Ellis,

6  E-L-L-I-S?

7      A.  Yes.

8      Q.  And who is she?

9      A.  She worked at the Public Utilities Commission.

10     Q.  And did you discuss the Center or the RFP with

11  her?

12     A.  I doubt it.  I don't think so.

13     Q.  Same question with respect to Teresa -- that's

14  T-E-R-E-S-A -- Roiz, R-O-I-Z.

15         Do you know her?

16     A.  No, I don't think so.

17     Q.  I'm sorry.

18         You don't know her or you didn't have any

19  discussions with her?

20     A.  I don't know.  I don't think I know her.

21     Q.  It is a common name, but in connection with the

22  subject matter, David Grey, G-R-E-Y?

23     A.  No.

24     Q.  Do you even know a David Grey?

25     A.  No.
```

1     Q.   Okay.  And I think we talked a little bit about

2  Myisha Hervey.

3          Who is she, again?

4     A.   I believe Myisha was Ed Lee's scheduler.

5     Q.   Did you have direct communications with Ed Lee

6  outside of that November 27th, 2017, dinner get-together

7  about the Fillmore Heritage Center or the RFP?

8     A.   I don't recall.

9     Q.   Or with Myisha Hervey?

10    A.   Definitely not.

11    Q.   Okay.  And Lynn Khaw, who we talked a little bit

12  about -- I may be mispronouncing the last name, but it is

13  L-Y-N-N, K-H-A-W -- I believe she was the executive

14  assistant to the City Administrator who would have been

15  Naomi Kelly.

16          Did you know her?

17    A.   I don't think so.

18    Q.   Okay.  Give me just one moment.

19          How would you characterize your relationship with

20  Vallie Brown in 2017?

21    A.   2017, I don't -- I don't know if she was still

22  working in my office or not, but we have a very good

23  relationship.

24    Q.   Do you consider her a personal friend?

25    A.   Yes.

1     Q.  And did you in 2017?

2     A.  Yes.

3     Q.  And what about Joaquin Torres, do you consider

4  him a personal friend?

5     A.  Probably not, but I am friends -- like, we work

6  together.

7     Q.  Okay.

8     A.  And I have a lot of respect for him.

9     Q.  Okay.  Did you want to see Dr. Bates end up with

10  the Fillmore Heritage Center?

11    A.  No.

12        Don't tell him I said that.  He is going to be

13  mad at me.

14    Q.  He has very -- he has very -- he has nothing but,

15  you know, warm things to say about you.  And it seems

16  reciprocal.  It doesn't sound like you guys are in any

17  trouble.

18    A.  Yeah.

19        But -- he is a good guy, but that just wasn't the

20  right use for the space, and he knows it.

21    Q.  All right.  Do you remember anything around his

22  decision to withdraw his interest?

23        I mean, did he ever communicate that to you?

24    A.  No.  We have -- no.  We haven't talked about it

25  after my last conversation.

1      Q.  Or do you know why he ended up withdrawing his

2   interest?

3      A.  No.

4          MR. ROSENFELD:  Okay.  We are right on schedule,

5   more or less.

6          That's all I have.

7          I appreciate your time.  I know it was

8   conscriptive.

9          And, Tom, you, of course, have the opportunity to

10  ask any questions if you want.

11         MR. LAKRITZ:  I have no questions.

12         MR. ROSENFELD:  Okay.  Thank you, Mayor Breed.

13         THE WITNESS:  Thank you.

14         Thanks, everyone.  Take care.

15         MR. ROSENFELD:  Thank you.

16         THE VIDEOGRAPHER:  Okay.  This concludes the

17  deposition of Mayor London Breed.  We are off the record

18  at 3:29.

19         (The deposition recessed at 3:29 p.m.)

20                        ---oOo---

21

22

23

24

25

```
 1                  REPORTER'S CERTIFICATE

 2

 3          I, DANIELLE MISKE, CSR No. 9545, hereby certify:

 4   That I am a Certified Shorthand Reporter in the State of

 5   California.

 6          That prior to being examined, MAYOR LONDON

 7   BREED, the witness named in the foregoing deposition, was

 8   by me remotely duly sworn to testify the truth, the whole

 9   truth, and nothing but the truth.

10          That said deposition was taken pursuant to

11   Notice at the time and place therein set forth and was

12   taken down by me in stenotype and thereafter transcribed

13   into typewriting by me and that the deposition is a true

14   record of the testimony given by the witness.

15          I further certify that I am neither counsel for,

16   nor related in any way to any party to said action, nor

17   otherwise interested in the result or outcome thereof.

18

19                         _____

20                         DANIELLE MISKE, CSR No. 9545

21

22                         DATE:  APRIL 26, 2021

23

24

25
```

```
 1              REPORTER'S CERTIFICATE

 2

 3         I, DANIELLE MISKE, CSR No. 9545, hereby certify:

 4    That I am a Certified Shorthand Reporter in the State of

 5    California.

 6         That prior to being examined, MAYOR LONDON

 7    BREED, the witness named in the foregoing deposition, was

 8    by me remotely duly sworn to testify the truth, the whole

 9    truth, and nothing but the truth.

10         That said deposition was taken pursuant to

11    Notice at the time and place therein set forth and was

12    taken down by me in stenotype and thereafter transcribed

13    into typewriting by me and that the deposition is a true

14    record of the testimony given by the witness.

15         I further certify that I am neither counsel for,

16    nor related in any way to any party to said action, nor

17    otherwise interested in the result or outcome thereof.

18

19              Danielle Miske CSR

20              DANIELLE MISKE, CSR No. 9545

21

22              DATE:  APRIL 26, 2021

23

24

25
```

1                    BONNIE WAGNER & ASSOCIATES
                      COURT REPORTING SERVICES
2                     1819 Polk Street, Suite 446
                     San Francisco, California 94109
3                          (415) 982-4849

4    April 26, 2021

5    MAYOR LONDON BREED
     c/o THOMAS S. LAKRITZ, Deputy City Attorney
6    1390 Market Street, 6th Floor
     San Francisco, California 94102

7
     RE:  AGONAFER SHIFERAW vs. CCSF, et al.
8         DEPOSITION OF MAYOR LONDON BREED - 4/21/21

9    Dear Ms. Breed:

10   The original transcript of your deposition in the
     above-entitled action is now available for your signature
11   at this office for 30 days from the above date.  Please
     contact our office if you plan to review the deposition
12   transcript so we may arrange a mutually convenient
     appointment.
13
     You may instead read your attorney's copy if more
14   convenient to you.  After reading the transcript, sign
     your name on the signature line to indicate approval of
15   the transcript.  However, if you wish to change the form
     or substance of your answer to any question, please use
16   the "Errata Sheet" and indicate any changes by way of page
     and line number.
17
     Your rights regarding signature of this deposition are
18   contained in the Federal Rules of Civil Procedure.

19   Your cooperation is appreciated.  Thank you.

20   Very truly yours,

21

22   Danielle Miske, CSR No. 9545

23   cc:  Thomas S. Lakritz, Deputy City Attorney
          Ben Rosenfeld, Attorney at Law
24

25

                                                              126

```
1                CERTIFICATE OF WITNESS

2

3        I, MAYOR LONDON BREED, do hereby declare under

4   penalty of perjury that I have read the foregoing

5   transcript of my deposition; that I have made such

6   corrections as noted herein, initialed by me, or attached

7   hereto; that my testimony as contained herein, as

8   corrected, is true and correct.

9            Executed this _____ day of _____, 2021, at

10  _____, California.

11

12

13

14                                  _____

15                                  MAYOR LONDON BREED

16

17

18

19

20

21

22

23

24

25
```

```
1                    DEPONENT'S CORRECTION SHEET

2   To add testimony, indicate "Add" and print the exact words
    you wish to add.  To delete testimony, indicate "Delete"
3   and print the exact words you wish to delete.

4   Deposition of:   MAYOR LONDON BREED
    Deposition date:  APRIL 21, 2021
5
    I, MAYOR LONDON BREED, have the following changes to my
6   deposition transcript:

7

8   PAGE     LINE      CHANGE (Add/Delete)

9   _____/_____/_____

10  _____/_____/_____

11  _____/_____/_____

12  _____/_____/_____

13  _____/_____/_____

14  _____/_____/_____

15  _____/_____/_____

16  _____/_____/_____

17  _____/_____/_____

18  _____/_____/_____

19  _____/_____/_____

20  _____/_____/_____

21                          EXECUTED this _____day

22  of_____, 2021, at _____,_____.

23

24                          _____

25                          MAYOR LONDON BREED
```