```
                  UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA


AGONAFER SHIFERAW, dba FILLMORE      )
ENTERTAINMENT COMPLEX/REPUBLIC OF    )
FILLMORE, LLC,                       )
                                     )
        Plaintiff,                   )   Case No.
                                     )   4:18-cv-06830-SBA
vs.                                  )
                                     )
CITY AND COUNTY OF SAN FRANCISCO;    )
Mayor LONDON BREED, an individual,   )
in both her personal and official    )
capacities; Reverend AMOS BROWN,     )
an individual, in both his personal  )
and official capacities; Director    )
of the Mayor's Office of Economic    )
and Workforce Development; JOAQUIN   )
TORRES, an individual, in both his   )
personal and official capacities;    )
City Administrator NAOMI KELLY, an   )
individual, in both her personal     )
and official capacities; Former      )
District 5 Supervisor VALLIE BROWN,  )
an individual, in both her personal  )
and official capacities; and DOES    )
1-100,                               )
                                     )
        Defendants.                  )
_____)



           DEPOSITION BY REMOTE VIDEOCONFERENCE OF

                      AGONAFER SHIFERAW

                 Friday, February 12, 2021



                BONNIE L. WAGNER & ASSOCIATES
                    villagerun@msn.com
                      (415) 982-4849


Reported remotely by:  Dawn E. Howard, CSR No. 13201
```

1

```
 1  Breed nor the City responded."
 2          Do you believe that statement to be true and
 3  correct, as you sit here today?
 4      A.  Yes.
 5      Q.  "(4), Breed's disregard of the management plan
 6  proposal Plaintiff delivered to her after the City took
 7  possession of the Center."
 8          Do you believe that statement to be true and
 9  correct, as you sit here today?
10      A.  Yes.
11      Q.  "(5), Breed's assertion, on information and
12  belief, that Plaintiff was not the preferred candidate
13  to purchase the center because of his ethnicity and
14  origin, and that she would make the final decision."
15          Is that statement true and correct, as you sit
16  here today?
17      A.  Yes.
18      Q.  "(6), Breed's statement, 'I'm not going to give
19  it to that African,' that Plaintiff was trying to turn
20  the Center into an Ethiopian center, and that Black
21  people were born in the United States, referring to
22  Plaintiff and his efforts to purchase the Center."
23          Do you believe that statement to be true and
24  correct, as you sit here now?
25      A.  Yes.  Correct.
```

Deposition of Agonafer Shiferaw
February 12, 2021

42

1     So, yeah, you can say, "Did she tell you that?"
2  She didn't tell me that she's a crook and she's corrupt
3  and that she would do that, but the truth is this is
4  what has happened.  And there is a pattern and a
5  continuous pattern of underhandedness that manifests
6  itself continuously in this regard, and that's why the
7  place is still closed.
8     Q.  And when did Mayor Breed make that statement to
9  Fred Jordan?
10    A.  From what I understand, I'm not sure if it was
11 the same 2017 or 2016, but the African-American Chamber
12 of Commerce usually has an annual luncheon at the
13 Marriott Hotel celebrating the black history month or
14 doing things.  And right after that luncheon is when he
15 told me that that's what happened.
16    Q.  Was it before the RFP process or after?
17    A.  Yes.
18    Q.  I mean -- it was before?
19    A.  I think so.
20    Q.  Okay.  So other than that, do you have any
21 other direct evidence that Mayor Breed was involved in
22 the RFP process?
23        MR. ROSENFELD:  A continued objection.  The
24 line of questioning calls for legal opinion and
25 conclusion.

```
 1   objections.
 2           Go ahead.
 3           THE WITNESS:  Yeah.  The decision to favor FHC
 4   and, prior to that target, the Fillmore Heritage
 5   Partners Group -- I guess that's also part of the Puff
 6   Daddy group.  And I know later on the -- Dr. Bates is --
 7   basically, it originated earlier on by London Breed, by
 8   Amos Brown, and her associates.  So every decision,
 9   everything that they do, does not mean that today we're
10   going to make a racist decision or a xenophobic decision
11   to harm Agonafer.  It has been established.  One of the
12   ways that it was established is that London Breed, in a
13   City Hall rally, in a publicly recorded message, made it
14   clear to the public that she was not going to have
15   outsiders come into our community to take over the
16   heritage center.
17           Well, obviously the only outsider is someone
18   black, but Ethiopian, and, from their perspective, who
19   isn't considered black enough.  So that decision has
20   been made earlier on in this process.  So there's no
21   point that at every step the decision is that it's
22   related to their racist intention.  So it has been --
23   the whole process was denying me an opportunity.  The
24   whole process was discriminating against me.  The whole
25   process was based on that thinking, and she made it
```

1      A.  I think in either late 2017 or something.
2      Q.  And --
3      A.  Oh, no.  No.  Sorry.  I thought you were asking
4  me about the comment she made "I'm not going to allow
5  outsiders to come into the community and take over."
6  "That African" was a similar time period when I heard
7  it, and I'm not sure if it was the last part of 2016 or
8  2017, but that's the message I heard.
9      Q.  And who told you that?
10     A.  If I don't -- it either came from -- I'm not
11 sure the exact person, if it was Fred Jordan or in a
12 conversation that I had with Dr. Bates.  I'm not sure.
13 I don't quite recall exactly who.
14     Q.  All right.  So now I'm understanding that there
15 were two conversations.  So one was in 2016, and
16 possibly Fred Jordan says at a chamber of commerce event
17 in June "London Breed said to him at his table 'I'm the
18 one that's going to make the decision about this,'" or
19 something like that?
20     A.  Yeah.  He told me that she's going to make the
21 final decision on this deal.  She is the one who's going
22 to make the final decision.
23     Q.  Okay.  And that was either --
24     A.  And not only that, he checked with Naomi Kelly,
25 you know, "Is this a good idea," whatever.  And Naomi

1  Kelly told him, "She is the one who's the supervisor,
2  and I don't want to get involved in that."
3      Q.  And then the second one was either Fred Jordan
4  or Dr. Bates told you that London Breed said "I'm not
5  going to give it to that African"?
6      A.  I think more likely in a discussion that we
7  had -- a three-way discussion or -- with Dr. Bates and
8  maybe someone else that came up.  I'm not sure at this
9  stage if it was Dr. Bates or somebody else, but the
10 comment was made.
11     Q.  And that was -- and so you learned of this in
12 late 2017; is that right?
13     A.  Not late 2017.  I think it's right around the
14 RFP interview or after, when there was discussion about
15 the FHC group amending their complaints.  Actually, they
16 were amending their complaints with Joaquin Torres, and
17 then -- Fred Jordan and the black chamber of commerce
18 actually wanted to join.  That's what happened,
19 actually.  Fred Jordan and the black chamber of commerce
20 wanted to join my team, including at that time, who had
21 shown interest, Dr. Bates, to submit a revised proposal
22 to the City.  And I think that was the discussion at
23 that time.
24         Because Fred Jordan and the black chamber of
25 commerce were part of the community benefit group with

1  FHC2017, the Shelton group.  They withdraw for whatever
2  reason, and that's why Shelton needed to revise their
3  proposal with an instruction from Joaquin Torres.  But
4  we tried to do the same thing, to send a revised -- I
5  sent a letter to Joaquin Torres, or to that group,
6  stating that this community group, the black chamber of
7  commerce, Fred Jordan, and the prominent
8  African-American individual, Dr. Bates, are interested
9  to join, and I want to see if I can revise the proposal
10 and submit the proposal.  And I was told later that they
11 will not accept any more revised proposals until they
12 make a final decision.  I think there's a letter to that
13 extent.
14      Q.  Okay.  So I want to go back to this allegation.
15 So in what context did London Breed state "I'm not going
16 to give it to that African"?
17      A.  I think in this discussion -- in an informal
18 discussion among the three of us-- in fact, there was
19 another lady.  I forget her name.  She was a consultant
20 for FHC, Claudia.  Yeah, a FHC2017 consultant who did
21 the proposal.  She also withdrew from the FHC proposal.
22 She's a prominent African-American woman.  So we had a
23 meeting, actually, in retrospect, the four of us.  They
24 invited me to attend this meeting with Fred Jordan and
25 Claudia, who wrote the proposal for the FHC and now who

1  resigned from that group.  And that's the first time I
2  met Dr. Bates.  I'd never met him before.  And in that
3  discussion -- it was an open discussion of what's going
4  on and why there was a discussion between Dr. Bates and
5  London Breed.  And if I'm not mistaken, he is the one
6  who made a statement, well, you know -- because he made
7  a statement that in a phone conversation or a discussion
8  she made that statement that "I'm not going to give that
9  African the facility."
10      Now, one thing is, you know, there's been
11 frequent communication and visits to Dr. Bates' home up
12 in Napa Valley by London Breed, a frequent visit.  So
13 that, to me, looked like in some casual environment he
14 made that comment to her, but it is a comment that I
15 heard.  I didn't fabricate that.  That's a comment I
16 heard.  Now --
17      Q.  I apologize.
18      A.  No, don't apologize.  Go ahead.
19      Q.  No.  I don't want to cut you off.
20      A.  I think that's -- I'm done.
21      Q.  Okay.  Did Dr. Bates tell you who else was
22 involved in the conversation where London said "I'm not
23 going to give it to that African"?
24      A.  No, he didn't tell me that.  But he did make it
25 clear to me that it was in closed communication and best

Deposition of Agonafer Shiferaw
February 12, 2021

181

1   of friends, and she visits him on a regular basis on
2   weekends or something like that, and he didn't have any
3   problem calling her and asking for a visit of the
4   facility, even though it was -- a proposal was closed
5   and all that, arranging a special visit for him, which
6   happened.  And so in that context I just assumed, yeah,
7   they are -- you know, that statement came.  Now, as much
8   as I don't remember the exact details, he might say he
9   doesn't remember.  But, I mean, I know I heard it the
10  same way I heard what Fred Jordan said, because Fred
11  Jordan's was more like a report:  "This is what she
12  said.  This is what Naomi Kelly said."  So that was
13  clear.
14          The other one, we heard it at that meeting in a
15  casual format.  But it wasn't a surprise to me, because
16  I knew that she had issues with me.  And I don't know if
17  it's racially motivated, or I don't know whether it's
18  not racially motivated.  It is biased.  It is
19  discriminatory.  I heard it that day, and so I could,
20  obviously, remember it.
21      Q.  Okay.  So going back to your pattern of
22  discriminatory practices, you've given me three specific
23  examples or occasions, and we talked about the first
24  one.  And the second one was in the proposal -- it was a
25  revitalization proposal that you submitted?

```
 1                DEPOSITION OFFICER'S CERTIFICATE

 2    STATE OF CALIFORNIA    )
                             )SS.
 3    COUNTY OF SAN FRANCISCO )

 4

 5         I, DAWN E. HOWARD, CSR, hereby certify:

 6         I am a duly qualified Certified Shorthand Reporter
      in the State of California, holder of Certificate Number
 7    13201 issued by the Court Reporters Board of California
      and which is in full force and effect. (Fed. Rules of
 8    Civ. Proc. 28(a)).

 9    I am authorized to administer oaths or affirmations
      pursuant to California Code of Civil Procedure, Section
10    2093(b); and prior to being examined, the deponent was
      first duly sworn by me. (Fed. Rules of Civ. Proc.
11    28(a), 30(f)(1)).

12         I am not a relative, employee, attorney, or counsel
      of any of the parties, nor am I a relative or employee
13    of such attorney or counsel, nor am I financially
      interested in this action. (Fed. Rules of Civ. Proc.
14    28).

15         I am the deposition officer that stenographically
      recorded the testimony in the foregoing deposition, and
16    the foregoing transcript is a true record of the
      testimony given by the deponent. (Fed. Rules of Civ.
17    Proc. 30(f)(1)).

18         Before completion of the deposition, review of the
      transcript [ X ] was [ ] was not requested. If
19    requested, any changes made by the deponent (and
      provided to the reporter) during the period allowed are
20    appended hereto. (Fed. Rules of Civ. Proc. 30(e)).

21         Dated: February 23, 2021

22

                          _Dawn Howard_
23                        _____
                          DAWN HOWARD, CSR
24                        State of California
                          CSR License No. 13201
25
```