1

2

3

4

5                    UNITED STATES DISTRICT COURT

6              FOR THE NORTHERN DISTRICT OF CALIFORNIA

7                     SAN FRANCISCO DIVISION

8

9  AGONAFER SHIFERAW, dba FILLMORE        Case No: 18-cv-6830 RS
   ENTERTAINMENT COMPLEX/REPUBLIC
10 OF FILLMORE,                           **ORDER ON DEFENDANTS'**
                                          **MOTIONS FOR SUMMARY**
11              Plaintiff,                **JUDGMENT AND TO STRIKE**
                                          **PLAINTIFF'S DECLARATION**
12        vs.

13 CITY AND COUNTY OF SAN FRANCISCO;
   et al.,
14
                Defendants.
15

16        Plaintiff Agonafer Shiferaw ("Plaintiff") brings the instant action against the City and

17 County of San Francisco ("City"), as well as Mayor London Breed ("Mayor Breed"); Reverend

18 Amos Brown ("Rev. Brown"); former Director of the Mayor's Office of Workforce and

19 Economic Development, Joaquin Torres ("Dir. Torres"); and former San Francisco Supervisor

20 Vallie Brown ("Sup. Brown") (collectively "Individual Defendants," and together with the

21 City, "Defendants"), alleging he was unfairly denied the opportunity to own and operate the

22 Fillmore Heritage Center in San Francisco.  Plaintiff contends the City's bidding process for

23 the Center was a "sham" intended to steer the same to Mayor Breed's political allies and

24 supporters.  Pending are Defendants' Motion for Summary Judgment or Partial Summary

25 Judgment, Dkt. 123, and Motion to Strike Declaration of Agonafer Shiferaw and for Relief

26 Under Federal Rule of Civil Procedure 56(h), Dkt. 135.  The motion for summary judgment

27 shall be granted and the motion to strike shall be denied.  The matter is suitable for resolution

28 without oral argument.  See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

I.      **BACKGROUND**

    A.   **DEFENDANTS' EVIDENCE**

       1.      **The Fillmore Heritage Center**

The Fillmore Heritage Center ("Center") is located in the former Western Addition A-2 Redevelopment Project Area on land acquired with federal urban renewal funds by the former Redevelopment Agency of San Francisco ("Redevelopment Agency").  Morales Decl., ¶ 6, Dkt. 123-12.  It was developed as a mixed-use facility with the goal of both revitalizing the commercial corridor and honoring the cultural heritage of the neighborhood, which long had been considered the "Harlem of the West."  Torres Decl. ¶ 4, Dkt. 123-19.

In 2002, the Redevelopment Agency selected Filmore Development Association, LLC ("FDA") to construct the mixed-use facility.  Morales Decl. ¶ 6.  Development of the Center was partially financed with public funds.  Id.  The Center consists of three parcels: (1) an air rights parcel with residential condominiums; (2) an air rights parcel with retail/commercial space ("Commercial Parcel"); and (3) and a below grade parcel with a public parking garage ("Garage Parcel").  Id. ¶ 7.  At all times relevant herein, the Commercial and Garage Parcels (together "Agency Parcels") have been owned by the Redevelopment Agency, and later, its successor, the Office of Community Investment and Infrastructure ("OCII").  Id.[1]

       2.      **Commercial Parcel Loan and Ground Lease**

In August 2005, the Agency executed a long-term ground lease ("Ground Lease") with Fillmore Development Commercial, LLC ("FDC"), an affiliate of FDA, to develop the Commercial Parcel and, upon completion, master lease approximately 50,000 square feet of commercial space.  Id. ¶ 8 & Ex. A.  FDC, as master tenant, later leased the space to subtenants, including (1) Yoshi's San Francisco, which operated a 28,000 square foot jazz club and restaurant; and (2) Food for Soul, which operated a 6,000 square foot restaurant and music lounge known as "1300 on Fillmore."  Id. ¶ 9.

---

[1] In 2012, California passed a law dissolving all redevelopment agencies and providing for the designation of successor agencies.  Cal. Health & Safety Code § 34170 et seq.

FDC is controlled by Michael Johnson.  McCloskey Decl. ¶ 6, Dkt. 23-4.  To fund development of the Commercial Parcel, the Mayor's Office of Community Development ("MOCD") lent FDC $5.5 million in August 2005.  Id. ¶¶ 6-8 & Ex. A-B.  The loan was guaranteed by another of Johnson's businesses, EM Johnson Interest, Inc. ("EJI").  Id. ¶¶ 6, 9 & Ex. C.  Although the loan agreement was later amended, FDC, EJI and Johnson were unable to make all payments and perform all obligations thereunder.  Id. ¶¶ 12-13, Ex, D.

In or about January 2015, the primary commercial subtenant ceased all operations at the Center, leaving FDC with no verifiable path forward to satisfy its loan obligations.  Id. ¶¶ 14-15.  On or about February 20, 2015, the City sent FDC and Johnson a notice of default on the loan, demanding payment of all outstanding amounts, interest, and fees.  Id. ¶ 16 & Ex. E. That same day, OCII sent FDC a notice of default on the Ground Lease.  Morales Decl. ¶ 10 & Ex. B.  FDC requested and received additional time to find an investor group capable of recapitalizing the commercial space, reopening it as an entertainment venue, and taking over its day-to-day operations.  Id. ¶ 11.  However, FDC was unable cure its default.  Id.

On June 5, 2015, OCII terminated FDC's Ground Lease.  Id. ¶ 11 & Ex. C.  As the sole mortgagee, the City exercised its option to assume the lease.  Id. ¶ 12 & Ex. D.  At all times thereafter, the City has been the master tenant of the Commercial Parcel, while OCII retains title to the same.  Id.[2]  Since assuming the Ground Lease, the City has not entered into any lease or sublease for any portion of the Center.  Id. ¶ 15; McCloskey Decl. ¶ 20.  Nor has it entered into an agreement of any kind for use of the Center where rent was established by the Director of Property of the Real Estate Division.  Id.

[2] As part of the redevelopment agency dissolution law, OCII is required to dispose of the real property assets of the former redevelopment agency pursuant to a state-approved long-range property management plan ("PMP").  Cal. Health & Safety Code 34191.5(b).  On December 7, 2015, the state approved OCII's PMP, which requires transfer of the Agency Parcels to the City.  Morales Decl. ¶ 13 & Ex. E.  Pending the City's acceptance of title, the Agency Parcels remain in OCII's Community Redevelopment Property Trust Fund, as required by California Health & Safety Code section 34191.5(a).  Id. ¶ 15.

- 3 -

1

### 3.     Request for Proposal Process

2      In 2016, the City, through the Mayor's Office of Economic and Workforce

3   Development ("OEWD"), issued a Request for Interest ("RFI") for the purchase and

4   repurposing of the commercial portions of the Center.  Torres Decl. ¶ 7.  In determining the

5   best use of the Center, the City was committed to ensuring that it emerge as a vibrant and

6   financially viable commercial venue, such as an entertainment venue, that would also provide

7   substantial and sustained community benefits for the Fillmore corridor and the Western

8   Addition neighborhood.  Id. ¶ 5.

9      As part of the RFI process, OEWD solicited and received input from the Fillmore

10  corridor residents and businesses, the Western Addition neighborhood residents, and the

11  general public regarding the community benefits that should be required as part of the purchase

12  of the Center.  Id. ¶ 8.  It also received input from those same sources regarding who should

13  serve on the panel evaluating proposals to purchase the Center.  Id. ¶ 9.  OEWD received

14  feedback that representatives from large and small businesses, the faith community, and the

15  entertainment industry should be included.  Id.

16     On February 10, 2017, OEWD issued a formal Request for Proposals ("RFP") for the

17  purchase and repurposing of the commercial portions of the Center.  Id. ¶ 10 & Ex. A.  The

18  RFP expressly reserved the right to, among other things, reject all proposals and/or decline to

19  pursue the project.  Id.  The RFP set forth evaluation and selection criteria in various

20  categories.  Id.  It also set a minimum bid price for the Center of $6.5 million.  Id.

21     As part of the RFP process, Dir. Torres—then Deputy Director of OEWD—selected the

22  members of the Review Panel.  Id. ¶¶ 3, 12.  He selected community members Rev. Amos

23  Brown, Rick Swig, Latonia Grice, Audrey Joseph, and Darryl Dieter.  Id.  He also selected

24  Malik Looper to represent MOCD, Jeff Suess to represent the Real Estate Department,

25  Raymond Lee to represent OCII, and Tonia Lediju to represent the Office of the Controller.  Id.

26  OEWD also retained a consultant, Wessington Ventures, LLC ("Wessington"), to perform an

27  initial review of the RFP applications.  Id. ¶ 11.

28

On April 24, 2017, Plaintiff submitted a proposal on behalf of Fillmore Entertainment Complex, LLC.  Id. ¶ 13 & Ex. B.  He did not provide documentation showing that he had either cash on hand or secured financing for the $6.5 million purchase price.  Id. ¶ 14.  Plaintiff conceded as much at his deposition.  Shiferaw Dep. at 88:9-14, 95:3-98:3, Dkt. 123-34.

Wessington reviewed the five RFP proposals that were submitted and assessed the strengths and weaknesses of each.  Torres Decl. ¶ 16 & Ex. C.  As is pertinent here, Wessington identified the following concerns with Plaintiff's proposal: (1) weak personal credit rating; (2) questionable financial projections and commitment of debt; and (3) [t]eam is diverse and representative … but its Mr. Shiferaw's concept and direction, with slim applicable development experience." Id.  Wessington noted that Plaintiff was "cash strong, at 1m+ in liquidity," but further noted that his "recent bankruptcy still carries with it outstanding debt obligations." Id.  Wessington concluded that Plaintiff's financing was "questionable," explaining that he had only a "[s]oft commitment/expression of interest from mortgage broker which requires LOI's [letters of intent] to ensure no vacancies in the building prior to a lending commitment." Id.  Finally, Wessington noted that Plaintiff had an outstanding tenant improvement loan of $1,256,000 "with a spotty payment history." Id.

Thereafter, the Review Panel interviewed each applicant.  Id. ¶ 17.  Each member of the Review Panel: reviewed each proposal and Wessington's assessment of each proposal; participated in the interview of each applicant; and analyzed the financial viability of the business and the community benefit offered by each proposal.  Rev. Brown Decl. ¶¶ 3-5, Dkt. 123-2; Dieter Decl. ¶¶ 3-5, Dkt. 123-11, Joseph Decl., ¶¶ 3-5, Dkt. 123-3; Lee Decl. ¶¶ 3-5, Dkt. 123-26; Lediju Decl. ¶¶ 3-5, Dkt. 123-36; Looper Decl. ¶¶ 3-5, Dkt. 123-25; Suess Decl. ¶¶ 3-5, Dkt. 123-18; Swig Decl. ¶¶ 3-5, Dkt. 123-27.  The Review Panel scored each of the proposals.  Torres Decl. ¶ 18 & Ex. D.  Plaintiff's proposal received the lowest score.  Id.

Ultimately, every member of the Review Panel determined that each proposal failed to establish either the "capacity to meet the minimum financial requirements of the RFP for a viable commercial enterprise" or the "ability to provide the significant community benefits required by the RFP." Rev. Brown Decl. ¶ 6; Dieter Decl. ¶ 6, Joseph Decl., ¶ 6; Lee Decl. ¶ 6;

1  Lediju Decl. ¶ 6; Looper Decl. ¶ 6; Suess Decl. ¶ 6; Swig Decl. ¶ 6.  Accordingly, the Review

2  Panel decided not to select any of the RFP proposals.  Rev. Brown Decl. ¶ 7; Dieter Decl. ¶ 7,

3  Joseph Decl., ¶ 7; Lee Decl. ¶ 7; Lediju Decl. ¶ 7; Looper Decl. ¶ 7; Suess Decl. ¶ 7; Swig

4  Decl. ¶ 7; see also Torres Decl. ¶ 19.  Based on the Review Panel's decision, the City exercised

5  its right not to select any proposal and to terminate the RFP.  Id. ¶ 20.  On November 2, 2017,

6  the City notified applicants of its decision by email.  Id. & Ex. E.

7      Since deciding not to proceed with the project, the City has received inquiries from

8  other individuals and entities about purchasing the Center.  Id. ¶ 21.  None of those inquiries

9  have resulted in an offer to purchase.  Id.  The City has tried to find ways to keep the space

10  occupied and used for the community and neighborhood.  Id. ¶ 22.  To that end, it has allowed

11  one-time and limited duration uses of the Center.  Id.

12      **B.  PLAINTIFF'S EVIDENCE**

13          **1.  Evidentiary Objections**

14      A declaration used to oppose a motion for summary judgment "must be made on

15  personal knowledge, set out facts that would be admissible in evidence, and show that the …

16  declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); see also N.D.

17  Cal. Civ. L.R. 7-5(b) (a declaration "may contain only facts, must conform as much as possible

18  to the requirements of Fed. R. Civ. P. 56[(c)(4)], and must avoid conclusions and arguments";

19  any statement made upon information or belief must specify the basis therefor).  Declarations

20  made on information and belief are entitled to no weight where the declarant does not have

21  personal knowledge.  Bank Melli Iran v. Pahlavi, 58 F.3d 1406, 1412 (9th Cir. 1995).  "The

22  matters must be known to the declarant personally, as distinguished from matters of opinion or

23  hearsay."  Boyd v. City of Oakland, 458 F. Supp. 2d 1015, 1023 (N.D. Cal. 2006).

24      Plaintiff's evidence consists largely of his own declaration, Dkt. 131-1, as well as the

25  declaration of his counsel, Ben Rosenfield, Dkt. 131-2.  As noted by Defendants, many of the

26  statements set forth therein are made on information and belief, without demonstrating personal

27  knowledge or providing any basis therefor.  Reply ISO MSJ at 14-15, Dkt. 134.  For example,

28  Plaintiff declares, on information and belief, "that the RFP was a charade and a pretext from

the start, designed as a smoke screen for defendants' plan to circumvent the bidding process, and to steer the Center into the hands of cronies and friends of then-Supervisor now Mayor London Breed." Shiferaw Decl. ¶ 17.  Defendants object to and move to strike such statements on the ground that they are inadmissible to oppose a motion for summary judgment.[3]  Plaintiff does not respond to the objection, which is meritorious.  The objection therefore is sustained, and those portions of the declarations made on information and belief are stricken.  See N.D. Cal. Civ. L.R. 7-5(b) ("An affidavit or declaration not in compliance with this rule may be stricken in whole or in part.").[4]

### 2.    Plaintiff's Background and Interest in the Center

Plaintiff is African American; he was born in Ethiopia in 1952 and immigrated to the United States in 1971.  Shiferaw Decl. ¶ 2.  Plaintiff has owned and operated mixed-use commercial and residential buildings and businesses in San Francisco and Oakland since 1981, including the two locations of the former Rasselas jazz club, one of which was on the Fillmore corridor.  Id. ¶¶ 3, 5-6.  Rasselas rose to fame as one of the most recognized jazz clubs in San Francisco until its closure in 2013.  Id. ¶ 3.

To develop the Rasselas location in the Fillmore, Plaintiff obtained a tenant improvement loan from the Redevelopment Agency in 1997.  Id. ¶¶ 5, 30.  Plaintiff declares that he has remained current on his loan payments.  Id.  However, other evidence offered by Plaintiff presents a more complex picture.  See Rosenfeld Decl., ¶ 2, Ex. 2 (stating that, as of September 2013, Plaintiff had paid only $100,000 on his $1.26 million loan; after emerging from bankruptcy in August 2012, he made monthly payments to OCII of $2,235, representing a 50% discount on his regular monthly payments).

---

[3] Defendants also file a separate motion to strike Plaintiff's declaration and for relief under Federal Rule of Civil Procedure 56(h) on the ground that it contains false statements. That motion is discussed separately, below.

[4] As necessary to provide context for Plaintiff's arguments and the corresponding analysis in this Order, certain of the stricken statements are recited herein.  Where such statements are recited, it is noted that they are made on information and belief.

1    Plaintiff expressed interest in developing the Center even before issuance of the RFP

2  and has made four separate offers to purchase and/or reactivate the Center, including his RFP

3  proposal.  Id. ¶¶ 7-13, 36.  Plaintiff first offered to purchase the Center when Johnson solicited

4  new investors on behalf of FDC in early 2015.  Id. ¶ 7.  Plaintiff signed a letter of intent, which

5  he delivered to certain City officials.  Id.  He received no response.  Id.

6    As discussed above, Plaintiff also submitted a proposal in response to the RFP.  Id. ¶ 13.

7  Plaintiff opines that his proposal satisfied all RFP selection criteria.  Id. ¶¶ 13, 29.  Regarding

8  his financial ability to purchase and operate the Center, Plaintiff notes that he submitted with

9  his proposal a letter from Goldman Financial Group.  Id. ¶ 14.  As Plaintiff acknowledged at

10  his deposition, however, this was a letter of interest, not a letter of commitment.  Shiferaw Dep.

11  at 88:9-14, 95:3-98:3.  Plaintiff also asserts that Wessington's assessment of his proposal

12  contained "false and prejudicial information," id. ¶ 28, but presents no evidence to support that

13  assertion.  Indeed, other evidence, including Plaintiff's deposition testimony, establishes a

14  factual basis for the information set forth in Wessington's evaluation, e.g., that Plaintiff had

15  filed for bankruptcy in 2011 and had missed payments on his tenant improvement loan.  Id.

16  ¶ 31; Shiferaw Dep. at 30:16-31:20, 34:24-35:1, 202:17-203:12.

17    **3.    Criticisms of the RFP Process**

18    Plaintiff takes issue with the composition of the RFP Review Panel, asserting on

19  information and belief that the five community members were "simply installed" by Dir.

20  Torres at the behest of Mayor Breed, who was then a member of the San Francisco Board of

21  Supervisors.  Shiferaw Decl. ¶ 18.[5]  The evidence does not support this assertion.  Mayor Breed

22  merely testified that, after OEWD made recommendations for members of the Review Panel,

23

24    [5] London Breed did not serve as mayor during the pendency of the RFP.  She was first
    elected mayor in a special election in June 2018.  Defs.' RJN, Exs. G-H, Dkt. 124.  Before that,
25  she served on the San Francisco Board of Supervisors for District 5 and briefly served as
    Acting Mayor from December 12, 2017 to January 23, 2018.  Id., Exs. A-F.  Defendants'
26  request for judicial notice of the San Francisco Board of Supervisors' minutes, motions, and
    resolutions demonstrating Mayor Breeds' dates of service is granted.  See Fed. R. Evid. 201(b);
27  Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001) (a court may take judicial notice
    of undisputed matters of public record).  Defendants' request for judicial notice is otherwise
28  denied as moot because the materials are not pertinent to resolution of the instant motions.

she suggested they also consider Rev. Brown due to his community engagement and outspokenness regarding the Center.  Breed Dep. at 86:14-88:2, 91:9-92:2, Dkt. 131-51.

Plaintiff also takes issue with Mayor Breed's overall involvement in the RFP process. He acknowledges that Mayor Breed "had no official role to play in the RFP process once it was underway," but claims that she "acknowledged between the lines of her deposition testimony that she played an active role in the process from beginning to end, making sure the RFP reflected the Fillmore community's values and goals; recruiting Reverend Amos Brown to serve on the Review Panel; receiving briefing on the proposals; and receiving advanced notice of the City's cancellation of the RFP before the bidders and the public were notified."  Opp'n to MSJ at 2 (citing Breed Dep. at 79:24-84:7, 85:24-86:7, 86:18-21, 91:9-92:9, 92:22-94:25, 96:9-99:13), Dkt. 131.  However, that Mayor Breed was briefed about the inadequacy of the proposals and notified of the decision to terminate the RFP does not evidence control over or involvement in the evaluation of the proposals or the ultimate outcome of the RFP.

Plaintiff contends that, on or about August 11, 2017, Dir. Torres met with Tim and Vicky Shelton, principals of bidder FHC2017, which he believes was for the purpose of discussing their proposal.  Shiferaw Decl. ¶ 19.[6]  He also complains that the RFP response period was extended, which he believes was done to allow FHC2017 and another bidder to modify their proposals.  Id. ¶¶ 20-23.  In August 2017, Rev. Brown and his wife solicited contributions to celebrate their 40th anniversary with the Third Baptist Church.  Id. ¶ 24. Plaintiff declined to contribute.  Id.  However, Mr. Shelton made a financial contribution.  Id. & Ex. 18.  This, Plaintiff believes, gave FHC2017 an unfair advantage with Rev. Brown.  Id.

On October 6, 2017, Plaintiff, through counsel, "raised various of the foregoing irregularities and illegalities" in letters to the City Attorney's Office.  Id. ¶ 35 & Ex. 19.  The letters are from the Law Offices of Whitney Leigh and are copied to City Administrator Naomi Kelly ("Admin. Kelly") and Dir. Torres.  Id.  They do not mention Plaintiff or his LLC by

---

[6] Plaintiff also cites the deposition of Mr. Shelton in support of this assertion; however, the cited pages are not included in Plaintiff's exhibits.

1   name.  Id.  The evidence presented does not indicate whether any City official was ever

2   notified that the letters were sent on behalf of Plaintiff.

3                    **4.      Other Interest in the Center**

4            Dr. Ernest Bates is a friend of both Mayor Breed and Rev. Brown.  Bates Dep. at 24:17-

5   25:2, 37:20-39, Dkt. 131-49.  Dr. Bates did not submit a proposal in response to the RFP.  Id. at

6   31:23-33:9.[7]  At some point prior to May 30, 2017, Rev. Brown advised Dr. Bates of the

7   availability of the Center.  Id. at 23:10-15.  Dr. Bates considered making an offer on the Center

8   to use as a medical office for cancer radiation therapy.  Id. at 18:3-19.  In May and July 2017,

9   after the RFP response period had closed and while the RFP was pending, Sup. Brown—then a

10  Project Manager for OEWD, see Sup. Brown Decl. ¶ 4, Dkt. 123-37—and other OEWD staff

11  arranged to provide Dr. Bates tours of the facility.  Rosenfeld Decl. ¶¶ 9-11 & Ex. 23-25.

12           On November 7, 2017, Mayor Breed participated in arranging a dinner for herself,

13  Dr. Bates, then Mayor Ed Lee, Admin. Kelly, and others.  Id. ¶¶ 12-13 & Ex 26-27; Breed Dep.

14  at 16:16-25:17.  At the dinner, Dr. Bates spoke of his interest in purchasing the Center.  Id. at

15  25:22-26:6.  For a few months thereafter, Dr. Bates continued to express interest in the Center

16  and certain City officials appeared to foster that interest by providing schematics and arranging

17  further site visits.  Rosenfeld Decl. ¶¶ 14, 19-20 & Ex. 28, 33-34.  Ultimately, however,

18  Dr. Bates determined that the Center was not suitable for his medical offices.  Bates Dep. at

19  32:25-33:9.  He never submitted an offer to purchase the Center.  Id.

20           In early 2018, after the RFP had been terminated, Plaintiff worked with the San

21  Francisco African American Chamber of Commerce to develop a temporary reactivation plan

22  for the Center.  Shiferaw Decl. ¶ 36.  They approached Andrea Baker, a City consultant, with

23  their proposal.  Id.  Plaintiff claims that, although Ms. Baker was initially enthusiastic about the

24  proposal, she abruptly ceased communicating with him about the same.  Id.

25

26

27  ─────────────────

28        [7] Plaintiff cites to portions of Dr. Bates' deposition that are not included in his exhibits.
     However, Defendants provide the entirety of Dr. Bates' deposition.  See Dkt. 123-35.

1    In September 2018, the nonprofits San Francisco Housing Development Corporation

2    ("SFHDC") and New Community Leadership Foundation ("NCLF") submitted a temporary

3    reactivation plan for the Center.  Shiferaw Decl. ¶ 38, Ex. 39.  SFHDC, in partnership with

4    NCLF, had submitted a proposal to purchase the Center in response to the RFP.  Id., Ex. 38.

5    On October 26, 2018, the City issued SFHDC a revocable permit, granting it temporary use of

6    the Center through March 31, 2019.  Id., Ex. 40.  Plaintiff asserts, on information and belief,

7    that Majeid Crawford controls NCLF.  Id. ¶ 40.  Mayor Breed testified that she knows

8    Mr. Crawford from the neighborhood and considers him a friend.  Breed Dep. at 75:1-12.  The

9    two "socialize when [they] see each other in the neighborhood," but do not "make plans to

10   hang out."  Id.  According to Plaintiff, NCLF's only "qualification" to operate the Center is

11   Mr. Crawford's connection to Mayor Breed.  Opp'n to MSJ at 10.

12   Plaintiff asserts, on information and belief, that Crawford "demonstrated his loyalty to

13   Mayor Breed by rallying his supporters to protest a political forum [Plaintiff] hosted for

14   [Mayor] Breed's 2018 mayoral campaign rivals."  Shiferaw Decl. ¶ 40.  On May 12, 2018,

15   Plaintiff hosted a forum on the future of the Fillmore corridor, which featured mayoral

16   candidates Jane Kim and Mark Leno.  Id. ¶ 41 & Ex. 35.  A day prior to the event, NCLF

17   issued a press release inviting community stakeholders to "gather peacefully outside the venue"

18   to voice their concerns regarding efforts to discredit Mayor Breed's track record as then

19   District Supervisor.  Id., Ex. 36.  Plaintiff asserts that protestors disrupted the forum, shouting

20   "go home" at him, as well as other offensive remarks, including ethnic slurs directed at Jane

21   Kim and homophobic slurs directed at Mark Leno's supporters.  Id.  Plaintiff asserts that, to his

22   knowledge, neither Mayor Breed nor any other Defendant publicly criticized or disavowed the

23   protestors.  Id. ¶ 42.

24   At a rally concerning the Center, purportedly hosted by NCLF on or about January

25   20, 2018, Mayor Breed addressed a crowd in front of City Hall.  Rosenfeld Decl. ¶ 17 &

26   Ex. 30a.  In a video purportedly posted on Mr. Crawford's Facebook page, depicting

27   footage of the rally, Mayor Breed states: "nothing is more important to me than making

28

1    sure that this place is for the folks of the neighborhood who actually live there" and "people

2    are gonna try to come into our community like they're doing now and divide us."  Id.

3         Plaintiff declares that he remains interested, willing and able to purchase and reactive

4    the Center.  Id. ¶ 44.  He asserts, on information and belief, that the City is renegotiating with

5    SFHDC and NCFL to reopen the Center, which was closed in March 2019.  Id.

6         **C.**    **PROCEDURAL HISTORY**

7         Plaintiff commenced the instant action on November 9, 2018, Dkt. 1, and thereafter

8    filed a First Amended Complaint ("FAC"), Dkt. 29.  After Defendants prevailed on a motion to

9    dismiss the FAC, see Dkt. 64 ("First Dismissal Order"), Plaintiff filed a Second Amended

10   Complaint ("SAC"), Dkt. 73.

11        The SAC alleged claims for: (1) Waste of Taxpayer Resources, Cal. Civ. P. Code

12   § 526a; (2) Fraud, Misrepresentation, and Deceit, Cal. Civ. Code §§ 1572, 1709, 1710;

13   (3) Conspiracy to Commit Fraud, Misrepresentation, and Deceit, id. §§ 1572, 1709, 1710;

14   (4) Denial of Equal Protection Based on Race, Ethnicity and National Origin, 42 U.S.C.

15   § 1983; (5) Retaliation for Exercise of Free Expression and Petition, id.; (6) Conspiracy to

16   Violate Civil Rights, id. §§ 1983, 1985; (7) Unlawful Business Practices, Cal. Bus. & Prof.

17   Code § 17200, et seq.; (8) Intentional Interference with Prospective Economic Advantage;

18   (9) Violation of the California Political Reform Act, Cal. Gov. Code § 81000 et seq.; and

19   (10) Violation of San Francisco Ethics Ordinance, id. § 87300.

20        Defendants thereafter prevailed on a motion to dismiss the SAC.  See Dkt. 91 ("Second

21   Dismissal Order").  As is pertinent here, the first claim for relief was dismissed "with limited

22   leave to amend to allege a duty to collect unpaid rent that is independent of California Code of

23   Civil Procedure § 526a."  Id. at 21.  The second and third claims for relief were dismissed

24   without leave to amend to the extent they seek the recovery of monetary damages.  Id.  The

25   seventh, eighth, ninth, and tenth claims for relief were dismissed without leave to amend.  Id.

26        On September 4, 2020, Plaintiff filed the operative Third Amended Complaint

27   ("TAC"), realleging all ten claims for relief set forth in the SAC.  Dkt. 92.  Because the seventh

28   through tenth claims for relief previously were dismissed without leave to amend, they are no

longer at issue.  Plaintiff acknowledges this in the TAC.  See TAC at ii* (recognizing that the TAC makes substantive changes only to the first claim for relief but acknowledging that the Second Dismissal Order "controls other portions of plaintiff's pleading").

## II.    LEGAL STANDARD

"Summary judgment is appropriate only where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Salazar-Limon v. City of Houston, 137 S. Ct. 1277, 1280 (2017) (quoting Fed. R. Civ. P. 56(a)).  The moving party bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that establish the absence of a genuine dispute of material fact.  Cline v. Indus. Maint. Eng'g & Contracting Co., 200 F.3d 1223, 1229 (9th Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986)).  If this burden is satisfied, the non-moving party must go beyond the pleadings to set forth evidence demonstrating the existence of a genuine dispute for trial.  Id. (citing Celotex, 477 U.S. at 323-24; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence."  In re Oracle Corp. Secs. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Anderson, 477 U.S. at 252).

In evaluating a motion for summary judgment, "the court must 'view the facts and draw reasonable inferences "in the light most favorable to the [non-moving party]."'"  Salazar-Limon, 137 S. Ct. at 1281 (quoting Scott v. Harris, 550 U.S. 372, 378 (2007) (citation omitted)).  Facts must be viewed in this manner, however, only if there is a genuine dispute as to a material fact.  Scott, 550 U.S. at 380.  A fact is material if it may affect the outcome of the suit under governing law, and a dispute of fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson, 447 U.S. at 248.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (internal citations omitted).

It is not the task of the court "to scour the record in search of a genuine issue of triable fact."  Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (quotation marks and citations omitted).  The non-moving party must "identify with reasonable particularity the evidence that

precludes summary judgment." <u>Id.</u>  This must take the form of "non-speculative evidence of specific facts, not sweeping conclusory allegations." <u>Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.</u>, 637 F.3d 1047, 1061 (9th Cir. 2011) (citations omitted).  "A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." <u>F.T.C. v. Publ'g Clearing House, Inc.</u>, 104 F.3d 1168, 1171 (9th Cir. 1997), <u>as amended</u> (Apr. 11, 1997).  Additionally, although deposition testimony may be elaborated upon, explained, or clarified by a later affidavit, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." <u>Nelson v. City of Davis</u>, 571 F.3d 924, 927-28 (9th Cir. 2009) (quotation marks and citation omitted).

## III.  DISCUSSION

### A.  FEDERAL CLAIMS

#### 1.  Equal Protection

In his fourth claim for relief, Plaintiff brings a claim for denial of equal protection based on race, ethnicity, and/or national origin.  TAC ¶¶ 176-183.  He alleges that Defendants denied him equal protection of the law when they "gave preferential treatment to [his] competitors and denied [his] RFP proposal." <u>Id.</u> ¶ 178.  This allegedly had the "discriminatory effect of causing [P]laintiff to be denied selection as the winning bidder." <u>Id.</u> ¶ 179.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." <u>City of Cleburne Living Center</u>, 473 U.S. 432, 439 (1985) (citation omitted).  To state a claim for denial of equal protection, a plaintiff must show that the defendant "'acted with an intent or purpose to discriminate against [him] based upon membership in a protected class,'" such as a certain race or religion.  <u>Furnace v. Sullivan</u>, 705 F.3d 1021, 1030 (9th Cir. 2013) (quoting <u>Barren v. Harrington</u>, 152 F.3d 1193, 1194 (9th Cir. 1998)).  "Intentional discrimination means that a defendant acted at least in part *because* of a plaintiff's protected status." <u>Serrano v. Francis</u>, 345 F.3d 1071, 1082 (9th Cir. 2003) (quotation marks and citation omitted; emphasis in original).  Thus, to avoid summary judgment, Plaintiff must produce evidence sufficient to

1  permit a reasonable trier of fact to find by a preponderance of the evidence that the denial of

2  his bid was motivated by his race, ethnicity, and/or national origin.  Id.

3      In moving for summary judgment, Defendants show that Plaintiff cannot prevail on his

4  equal protection claim.  Plaintiff's claim is predicated on the allegation that other RFP bidders

5  and/or interested parties were given preferential treatment.  As a threshold matter, the City

6  denied all bids in the RFP process and opted not to sell the Center to any interested party.

7  Thus, although Plaintiff makes allegations of purported preferential treatment in the selection

8  process (e.g., that others were given a private audience with City officials), there is no evidence

9  such treatment conferred any advantage or substantive benefit on another bidder or prospective

10  buyer.  To the extent Plaintiff insinuates that his proposal would have fared better had he

11  received the same treatment as other bidders, the suggestion is belied by the evidence.

12      As demonstrated by Defendants, Plaintiff's bid was denied for legitimate, non-

13  discriminatory reasons.  Plaintiff's RFP proposal failed to establish that he had secured

14  financing for the $6.5 million minimum purchase price.  Plaintiff conceded as much at his

15  deposition.  Additionally, of the five RFP proposals, Plaintiff's received the lowest score.

16  Although Plaintiff claims the adverse assessment of his proposal was based on "false and

17  prejudicial information" regarding his financial history, the only evidence he provides in

18  support of this claim is his conclusory averment that the information was "demonstrably false."

19  Shiferaw Decl. ¶ 28.  This is plainly insufficient.  See Thornton v. City of St. Helens, 425 F.3d

20  1158, 1167 n.4 (9th Cir. 2005) (courts accept the plaintiff's factual averments as true but

21  disregard averments that are not based on personal knowledge or that are purely conclusory in

22  nature).  Indeed, during his deposition, Plaintiff conceded that there is a factual basis for the

23  information set forth in Wessington's evaluation.

24      Lastly, the initial evaluation of Plaintiff's proposal was made by an outside consultant,

25  while the final evaluation was made by the Review Panel.  The Review Panel consisted of nine

26  individuals, only one of whom—Rev. Brown—is a named defendant.  Each member of the

27  Review Panel determined that Plaintiff's proposal failed to satisfy the requisite RFP criteria.

28  Thus, the evidence of a legitimate basis for the denial of Plaintiff's proposal is significantly

bolstered by the fact that Rev. Brown did not act alone in rejecting the same.  As to the other Individual Defendants, aside from Mayor Breed and Dir. Torres' respective roles in recommending and selecting Rev. Brown to serve on the Review Panel, there is no evidence they had any involvement in the decision to deny Plaintiff's bid.

In opposing summary judgment, Plaintiff fails to produce *any* evidence that Defendants acted with a discriminatory intent in denying his RFP bid.  Plaintiff asserts on information and belief that he was "the sole [B]lack principal among the five teams who submitted RFP proposals."  Shiferaw Decl. ¶ 15.  He further asserts on information and belief that Bates and Crawford, who are both Black, are "North American born."  Id. ¶ 16.  By itself, the fact that Plaintiff is Black and Ethiopian born, while other interested parties may not be, fails to demonstrate that Defendants discriminated against him on the basis of his race, ethnicity, and/or national origin.  Thornton, 425 F.3d at 1167.  Nor do "conclusory statements of bias" carry Plaintiff's burden in opposing the motion for summary judgment.  Id.

In the absence of any evidence Defendants acted with discriminatory animus in denying his RFP proposal, Plaintiff attempts to rely on purported xenophobic comments that Mayor Breed purportedly made or failed to condemn in the months following the RFP.  Opp'n to MSJ at 22.  This evidence fails to create a triable issue of material fact.  Regarding the comment Mayor Breed allegedly made at a rally in January 2018 (i.e., "people are gonna try to come into our community like they're doing now and divide us"), there is no indication from the statement itself or the context in which it was made that the "people" referred to therein are immigrants.  In short, there is no evidence this statement expresses xenophobic bias.  As for the comment allegedly made by protestors at an event in May 2018, those comments are "of little" or no value "in determining the motivations of" Mayor Breed or the other Individual Defendants.  Int'l Franchise Ass'n, Inc. v. City of Seattle, 803 F.3d 389, 407 (9th Cir. 2015) (holding statements of community members serving on the City's advisory committee were not probative of the intent of the City Council or Mayor)  Indeed, the comments were made by unidentified members of the public who had no known involvement in the RFP process.

Seemingly cognizant of the lack of any evidence that Defendants acted with an intent to discriminate against him based on his race, ethnicity, and/or Ethiopian origin, Plaintiff—in his opposition brief—shifts his equal protection claim from one based on his membership in a protected class to one based on a "class of one." Opp'n to MSJ at 19-21. "A successful equal protection claim may be brought by a 'class of one,' when the plaintiff alleges that it has been intentionally treated different from others similarly situated and that there is no rational basis for the difference in treatment." SeaRiver Mar. Fin. Holdings v. Mineta, 309 F.3d 662, 679 (9th Cir. 2002) (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)). Plaintiff claims he was similarly situated to other parties vying for purchase and control of the Center but was treated less favorably. Opp'n to MSJ at 20.

The "class of one" theory of liability is not alleged in the TAC (or any earlier pleading). Thus, the theory may not be advanced for the first time on summary judgement. Navajo Nation v. U.S. Forest Serv., 535 F.3d 1058, 1080 (9th Cir. 2008) (en banc); but see Desertrain v. Cty. of Los Angeles, 754 F.3d 1147, 1154 (9th Cir. 2014) (holding district court should construe matter raised for the first time on summary judgement as a request to amend the pleadings out of time). Construing Plaintiff's opposition as a request to amend the complaint, the request is denied. See Coleman v. Quaker Oats Co., 232 F.3d 1271, 1292, 1294-95 (9th Cir. 2000) (denying request to amend pleadings to add a new theory of liability raised for the first time in motion for summary judgment where the plaintiffs failed to demonstrate diligence and amendment would have prejudiced the defendant). Plaintiff gave no indication of his intent to plead a class of one claim prior to filing his opposition brief and has not demonstrated diligence in pursuing this claim. Additionally, because a class of one claim does not depend on discriminatory animus, adding this unpled theory after the close of discovery would prejudice Defendants by requiring them to develop a different defense.

Moreover, even if raising a class of one claim was not procedurally improper, Plaintiff fails to show that this new theory creates a genuine dispute of material fact as to the denial of equal protection. A class-of-one theory of equal protection has been recognized where regulations or other governmental constraints are applied in a singular way to particular

citizens.  Engquist v. Oregon Dep't of Agr., 553 U.S 591, 602-03 (2008) (explaining that, in Olech, the zoning board typically required only a 15-foot easement to connect property to the municipal water supply but required a 33-foot easement from the plaintiff).  What animates these cases is "the existence of a clear standard against which departures, even for a single plaintiff, c[an] be readily assessed."  Id.  As the Supreme Court has recognized, this theory of equal protection does not apply to forms of state action, such as public employment decisions, that "by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments."  Id. at 603.  The determinations at issue in this action are inherently discretionary, and Plaintiff fails to identify a clear standard against which departures can be readily assessed.  Thus, a claim that Defendants acted in a seemingly arbitrary or irrational manner (i.e., by treating one bidder "differently from others for a bad reason, or for no reason at all"), does not implicate the Equal Protection Clause.  Id. at 605-06.

Finally, Plaintiff fails to present any evidence demonstrating that he was treated differently from other bidders without rational basis.  See Opp'n to MSJ at 19-20.  The only evidence cited is two statements made on information and belief, which is insufficient to survive summary judgment.  The remainder of Plaintiff's opposition brief consists of wholly unsupported argument.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's fourth claim for relief.

### 2.   Retaliation

Plaintiff's fifth claim for relief is for retaliation for exercise of free expression and petition.  TAC ¶¶ 184-189.  Plaintiff alleges that, "[i]n giving preferential treatment to [his] competitors and rejecting [his] RFP bid," Defendants were substantially motivated by the exercise of his protected rights to free expression and to petition the government for redress of grievances.  Id. ¶ 186.  He further alleges that persons who "challenge and buck" the City and Mayor Breed's "'pay to play' schemes" are "treated as *persona non grata* and denied City contracts and access to City officials and resources."  Id. ¶ 187.

"The First Amendment's guarantee of freedom of speech protects government employees from termination [or other adverse employment action] *because of* their speech on

matters of public concern." <u>Bd. of Cty. Comm'rs Wabaunsee Cty., Kan. v. Umbehr</u>, 518 U.S. 668, 675 (1996) (citation omitted; emphasis in original). This same protection has been extended to contractors who have a "pre-existing commercial relationship with the government." <u>Id.</u> at 685 (declining to reach the question of whether "bidders or applicants for new government contracts" enjoy this protection). Thus, when government contractors bring First Amendment retaliation claims, courts analyze such claims using the same basic approach as would be applied to claims raised by government employees. <u>Alpha Energy Savers, Inc. v. Hansen</u>, 381 F.3d 917, 923 (9th Cir. 2004) (citing <u>Umbehr</u>, 548 U.S. at 684-85).

To prevail on a retaliation claim, a contractor must show that: (1) he engaged in expressive conduct that addressed a matter of public concern; (2) government officials took an adverse action against him; and (3) his expressive conduct was a substantial or motivating factor for the adverse action. <u>Id.</u> (citation omitted). If the contractor discharges that burden, the government can escape liability by demonstrating either that: (a) under the mixed motives analysis established by <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S., 274, 287 (1977), it would have taken the same action in the absence of the contractor's expressive conduct; or (b) under the balancing test established by <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568 (1968), legitimate countervailing government interests outweigh the contractor's free speech interests. <u>Alpha Energy Savers</u>, 381 F.3d at 923 (citing <u>Umbehr</u>, 518 U.S. at 675-76).

Defendants move for summary judgement on the grounds that: (1) Plaintiff cannot show they retaliated against him for exercising his First Amendment rights; and (2) they are entitled to qualified immunity because the right being asserted is not clearly established. As to the question of whether a constitutional violation occurred, Defendants marshal the same evidence set forth above with respect to Plaintiff's equal protection claim to demonstrate a legitimate, non-retaliatory motive for the denial of Plaintiff's RFP proposal. As discussed above, this evidence is compelling. In response, Plaintiff makes a two-sentence argument, relying solely on the close temporal proximity between his "whistleblowing letters" and cancellation of the

RFP.  Opp'n to MSJ at 22-23.[8]  The letters were sent on October 6, 2017, and the RFP was terminated on or about November 2, 2017.  Citing <u>Reynaga v. Rosenburg Forest Prod.</u>, 847 F.3d 678, 694 (9th Cir. 2017), Plaintiff notes that temporal proximity alone can constitute sufficient circumstantial evidence of retaliation in some cases.  This is not such a case.

The Ninth Circuit has explained that the appropriateness of summary judgment depends on various factors, including the strength of the plaintiff's prima facie case and the probative value of any evidence showing that the defendants' proffered explanation for the challenged conduct is false.  <u>Id.</u>  Here, Plaintiff's prima facie showing is rather weak.  <u>Cf. id.</u> (concluding that the plaintiff's prima facie case was strong where he had worked for the defendant for five years and was fired barely a month after making a formal written complaint).  Plaintiff did not have an existing relationship with the City; he was merely one of several bidders interested in purchasing the Center.[9]  Additionally, Defendants did not deny only Plaintiff's proposal. Rather, they denied all proposals and terminated the RFP.  The City thereafter declined to sell the Center to any buyer.  Consequently, circumstantial evidence that Defendants' actions were motivated by a desire to retaliate against Plaintiff and chill his speech is rather attenuated.

Moreover, even if temporal proximity is sufficient to establish a prima facie case of retaliation, "it does nothing to refute [Defendants'] proffered legitimated reasons for [rejecting Plaintiff's RFP proposal]."  <u>Hashimoto v. Dalton</u>, 188 F.3d 671, 680 (9th Cir. 1997).  As stated above, Plaintiff presents *no* other evidence of retaliatory motive.  In light of the substantial evidence showing Defendants rejected Plaintiff's proposal (and all other proposals) based on their failure to satisfy the RFP selection criteria, temporal proximity alone is insufficient

---

[8] Plaintiff also makes passing reference to retaliation for hosting a political event for Mayor Breed's rival mayoral candidates.  Opp'n to MSJ at 22-23.  However, that event occurred in May 2018, nearly six months after the RFP was terminated.

[9] In connection with the issue of qualified immunity, Plaintiff makes a one-sentence argument that he had a "preexisting commercial relationship" with the City based on his tenant improvement loan.  Opp'n to MSJ at 24.  Defendants respond that the loan was from the former Redevelopment Agency, not the City.  Reply ISO MSJ at 9.  Regardless, a *lender/lendee* relationship has no bearing on the instant analysis.  Plaintiff had no relationship with the City *as a government contractor*.

evidence of pretext.  See id. (holding evidence of temporal proximity alone failed to carry the plaintiff's burden of establishing a triable issue of fact on the ultimate question of whether the defendant retaliated against her); e.g., Kelly v. Boeing Co., 848 F. App'x 692, 694 (9th Cir. 2021) (holding temporal proximity, standing alone, insufficient evidence of pretext in light of substantial evidence showing the defendant had a legitimate reason for the challenged action). Because Plaintiff has not demonstrated retaliation in violation of his constitutional rights, the question of whether Defendants are entitled to qualified immunity need not be reached.  See Austin v. Univ. of Oregon, 925 F.3d 1133, 1139 (9th Cir. 2019) (declining to reach issue of qualified immunity after concluding that no constitutional violation occurred).  In view of the foregoing, Defendants are entitled to summary judgment on Plaintiffs' fifth claim for relief.[10]

### 3.    Conspiracy to Violate Civil Rights

In his sixth claim for relief, Plaintiff brings a claim for conspiracy to violate civil rights under 42 U.S.C. §§ 1983 and 1985.  TAC ¶¶ 190-193.  He alleges Defendants conspired to violate his rights to equal protection and free expression, id. ¶ 191, thereby depriving him of "fair and unbiased consideration of his RFP proposal," id. ¶ 192.

To establish liability for conspiracy under section 1983, a plaintiff must demonstrate the existence of an agreement to violate constitutional rights.  Crowe v. Cty. of San Diego, 608 F.3dd 406, 440 (9th Cir. 2010).  Of course, a conspiracy, even if established, does not give rise to liability under section 1983 unless it resulted in an "'actual deprivation of [the plaintiff's]

---

[10] In his fourth and fifth claims for relief, Plaintiff also alleges liability against the City under Monell v. Dep't of Soc. Servs. of City of New York, 523 U.S. 658 (1978).  Specifically, he alleges: (a) Mayor Breed and Sup. Brown ratified the unconstitutional conduct of others; and/or (b) the City has a custom and practice of discriminating against immigrant and non-U.S. born African Americans.  TAC ¶¶ 180-82, 187-88.  By failing to respond to arguments raised in Defendants' summary judgment motion, Plaintiff has abandoned his theories that the City has a custom and practice of discrimination and that Sup. Brown was a final decisionmaker. See Shakur v. Schriro, 514 F.3d 878, 892 (9th Cir. 2008) (a plaintiff abandons claims by not raising them in opposition to a defendant's motion for summary judgment).  In any event, because Plaintiff fails to establish an underlying constitutional violation, his Monell claims fail. See Lockett v. Cty. of Los Angeles, 977 F.3d 737, 741 (9th Cir. 2020) (holding municipal defendants cannot be held liable under Monell where no constitutional violation has occurred).

1   constitutional rights.'"  Hart v. Parks, 450 F.3d 1059, 1071 (9th Cir. 2006) (quoting Woodrum

2   v. Woodward Cnty., 866 F.2d 1121, 1126 (9th Cir. 1989) (citations omitted)).

3        Section 1985 also proscribes conspiracies to interfere with certain civil rights.  Kush v.

4   Rutledge, 460 U.S. 719, 724-25 (1983).  As is pertinent here, section 1985(3) "prohibits two or

5   more persons from conspiring to deprive any person or class of persons of the equal protection

6   of the law."  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1141 (9th Cir. 2000).  "'[T]he absence

7   of a section 1983 deprivation of rights precludes a section 1985 conspiracy claim predicated on

8   the same allegations.'"  Thornton, 425 F.3d at 1168 ((quoting Caldeira v. Cnty. of Kauai, 866

9   F.2d 1175, 1182 (9th Cir. 1989)).

10        As discussed in Sections III.A.1 and 2, *supra*, Plaintiff fails to demonstrate a

11  deprivation of his constitutional rights under section 1983.  Accordingly, he cannot sustain his

12  claim for conspiracy to violate civil rights under that section or section 1985(3).  Hart, 450 F.3d

13  at 1071 (affirming grant of summary judgment on conspiracy claim under section 1983 where

14  no underlying deprivation of a constitutional right had been shown); Thornton, 425 F.3d at

15  1168 (affirming grant of summary judgment on conspiracy claim under section 1985(3) where

16  it was predicated on the same allegations as an unsuccessful 1983 claim).  Defendants therefore

17  are entitled to summary judgment on the sixth claim for relief.

18        B.   STATE LAW CLAIMS

19             1.   Waste of Taxpayer Resources

20        In his first claim for relief, Plaintiff seeks injunctive relief to prevent the waste of

21  taxpayer resources pursuant to California Code of Civil Procedure § 526a.  TAC ¶¶146-160.

22  Section 526a allows a taxpayer to bring "[a]n action to obtain a judgement, restraining and

23  preventing any illegal expenditure of, waste or, or injury to, the estate, funds, or other property

24  of a local agency," such as a city and county.  Cal. Code Civ. Proc. § 526a(a), (d)(1).  An

25  action lies under section 526a, not only to enjoin wasteful expenditures, but also to compel a

26  municipality to collect funds due where it has a duty to do so.  Vasquez v. State of California,

27  105 Cal. App. 4th 849, 854 (2003).  Here, Plaintiff alleges Defendants have failed to collect

28

millions of dollars in outstanding rents and loan payments owed to the City by current and former operators of the Center.  TAC ¶ 152.

As noted in the Second Dismissal Order, "[t]axpayer suits are authorized only if the government body has a duty to act and has refused to do so."  Daily Journal Corp. v. County of Los Angeles, 172 Cal. App. 4th 1550, 1557 (2009); Harman v. City and County of San Francisco, 8 Cal. 3d 150, 160 (1972) ("A taxpayer may sue a governmental body in a representative capacity in cases involving … failure on the part of the governmental body to perform a duty specifically enjoined.") (quotation marks and citation omitted).  In other words, a court may hear only those suits that seek to measure governmental performance against a set legal standard.  Harman, 7 Cal. 3d at 160-61.  This well-established rule ensures that section 526a is not used to trespass into the domain of governmental discretion or to seek relief that courts cannot effectively render.  Id.

In the SAC, Plaintiff failed to allege any duty to collect rent on the part of the City or those acting on its behalf.  In opposing dismissal of the SAC, Plaintiff argued for the first time that San Francisco Administrative Code ("SFAC") § 23.30 imposes such a duty.  Although Defendants argued that SFAC § 23.30 does not apply because the City does not legally own the Center, there remained a question as to whether the City is the beneficial owner.  Because resolution of the City's ownership interest in the Center and the import of SFAC § 23.30 were better suited for resolution on summary judgment, Plaintiff was granted leave to amend his first claim for relief to "allege a duty to collect unpaid rent" independent of section 526a.  Second Dismissal Order at 21.  Plaintiff now alleges that the City has a duty to collect rent due on the Center pursuant to SFAC § 23.30.  TAC ¶¶ 150-152.

SFAC § 23.30 provides that, with exceptions not relevant here, "the Director of Property shall have the charge of the Lease of Real Property owned by the City."  "When the head of any department in charge of Real Property reports to the Director of Property that certain land is not required for the purposes of the department, the Board of Supervisors, by resolution, may authorize the Lease of such Real Property."  Id.  The Director of Property shall determine the Market Rent of such Lease based on a review of available and relevant data[,]"

and shall obtain an Appraisal and an Appraisal Review where certain circumstances dictate that one or both are required.  Id.  "The Director of Property shall arrange for such Lease to the highest responsible bidder in accordance with Competitive Bidding Procedures" and for no less than market rent, unless the Board of Supervisors, by resolution, has made findings permitting an alternative process or below market rent.  Id.  "*The Director of Property shall collect rents due under such Lease*."  Id. (emphasis added).

Defendants argue that Plaintiff's claim under section 526a fails as a matter of law because the City has not entered into any lease or sublease for any portion of the Center or any agreement of any kind for use of the Center where rent was established by the Director of Property of the Real Estate Division.  Because no such lease, sublease, or agreement exists, Defendants argue, there can be no duty to collect rent under SFAC § 23.30.  This argument is compelling.  As set forth above, in the absence of an independent duty to collect rent, a claim under section 526a fails.  Although SFAC § 23.30 imposes a duty to collect rent, Defendants present evidence that no lease giving rise to such a duty exists.[11]

Plaintiff fails to rebut Defendants' showing.  Plaintiff identifies five sources of funds that the City has allegedly failed to collect from the Center's developer and former subtenants (i.e., Yoshi's and 1300 on Fillmore).  Opp'n to MSJ at 15-16.  As a threshold matter, three of those sources are not unpaid rent, but rather, loans that the City allegedly "walked away from" or "erased."  Id.  SFAC § 23.30 imposes no duty on the City to obtain repayment of loans, and Plaintiff has identified no other code section or statutory basis for such a duty.  Consequently, he cannot prevail on this claim as to unpaid loan obligations.

---

[11] In a footnote, Defendants again argue that, by its terms, SFAC § 23.30 only applies to "Real Property owned by the City."  Mot. for Summ. J at 20 n.16.  They note the Center is not owned by the City, but rather, is held in trust by OCII.  Plaintiff responds that the City is the beneficial owner of the Center, Opp'n to MSJ at 12-14, and Defendants fail to respond to this argument in their reply.  Contentions raised in a footnote of an opening brief, without citation to relevant authorities, are waived.  Acosta-Huerta v. Estelle, 7 F.3d 139, 144 (9th Cir. 1992); City of Emeryville, v. Robinson, 621 F.3d 1251, 1261 n.10 (9th Cir. 2010).  In any event, for the reasons discussed above, Plaintiff does not prevail on the first claim for relief.  Questions regarding the City's ownership of and control over the Center thus need not be resolved.

The fourth source of funds is rent from 1300 on Fillmore, whose lease was terminated in or about May 2018.  Shiferaw Decl., Ex. 37.  In appears rent was not paid on the lease from approximately May 2016 onward.  Id.  As Plaintiff acknowledges, however, the lease was not authorized by the Board of Supervisors or arranged by the Director of Property in the manner dictated by SFAC § 23.30.  Opp'n to MSJ at 16.  Instead, the sublease agreement was executed between master tenant FDC and 1300 on Fillmore.  See Rosenfeld Decl., Ex. 2 at 5 ("[The] subtenants were supposed to pay rent … to FDC, who was then supposed to … pass the rent through to the City as a debt service payment on the FDC Loan….").  The City's right to receive rent from 1300 on Fillmore derives solely from its status as the new master tenant of the Center after assuming the Ground Lease.  Plaintiff's own evidence thus demonstrates that rent due under the sublease agreement does not fall under the directive of SFAC § 23.30.

Lastly, Plaintiff takes issue with the City's exercise of its discretion to enter into an agreement with SFHDC/NCLF in October 2018 for their temporary use of the Center.  Plaintiff asserts that the City "not only failed to collect rent" for this use of the space, "but actually paid these groups $50,000 in taxpayer money to be there."  Opp'n to MSJ at 16.  This allegation does not support a claim under section 526a.  The City's agreement with SFJDC/NCLF was not a lease subject to the directive of SFAC § 23.30; it was a revocable permit.  Shiferaw Decl., Ex. 40.  No rent was due under the agreement.  Id.  Although Plaintiff argues that the City could make better use of the Center as an asset, such claim is not actionable in a taxpayer suit.  Harman, 7 Cal. 3d at 160-61; California Assn. for Safety Educ. v. Brown, 30 Cal. App. 4th 1264, 1281 (1994) ("A taxpayer suit is authorized only if the governing body has a duty to act and has refused to do so. If the governing body has discretion and decided not to act, then the court is prohibited from substituting its discretion for the discretion of the governing body.").  Accordingly, Defendants are entitled to summary judgment on Plaintiff's first claim for relief.

### 2.    Fraud, Misrepresentation and Deceit

Plaintiff's second claim for relief alleges fraud, misrepresentation, and deceit pursuant to California Civil Code §§ 1572, 1709, and 1710.  TAC ¶¶ 161-170.  The claim is predicated on allegations that Defendants falsely represented the RFP as a "legitimate bidding process,"

while in actuality it a "sham" designed to "steer the Center into the hands of their cronies."  Id. ¶¶ 162, 164.  Plaintiff alleges Defendants made these representations knowing them to be false and misleading.  Id. ¶ 163.

California Civil Code §§ 1572, 1709, and 1710 merely define fraud and deceit.  "The elements of fraud, which give rise to the tort action for deceit, are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) justifiable reliance, and (5) resulting damages."  Conroy v. Regents of the Univ. of Cal., 45 Cal. 4th 1244, 1255 (2009) (citation omitted).

Defendants move for summary judgment on the grounds that: (1) the City is immune from liability under California Government Code § 815(a); and (2) Plaintiff fails to present evidence showing that the RFP was a sham.  Plaintiff does not respond to the argument that the City is immune from liability.  See Opp'n to MSJ at 16-18.  Consequently, he has abandoned his claim against the City.  See Shakur, 514 F.3d at 892.

As for the Individual Defendants, the evidence presented persuasively shows that the RFP represented a sincere effort to find a suitable buyer for the Center.  To reiterate, the City engaged in a considered process that included obtaining feedback from the community, retaining an outside consultant to perform an initial review of proposals, and selecting a review panel of nine members to interview respondents and make final recommendations.  Ultimately, it was determined that none of the proposals satisfied the selection criteria.  Thus, Plaintiff's proposal, which received the lowest score, was rejected along with four others.

Plaintiff discounts the foregoing evidence, arguing that, "at best," it presents a factual dispute as to whether his RFP proposal was insufficient.  Opp'n to MSJ at 18.  He contends other evidence demonstrates "he was financially pre-qualified and his RFP proposal met and exceeded all of the criteria."  Id.  However, the only evidence presented is Plaintiff's own declaration, wherein he opines that his proposal satisfied all selection criteria.  This is plainly insufficient to rebut the evidence put forward by Defendants.  Plaintiff's declaration also makes the case that he was in a strong position to secure financing for the purchase of the Center.  Yet Plaintiff concedes that he had obtained only a letter of interest, not a letter of commitment.

Plaintiff further contends that Defendants' purported justifications for rejecting his proposal "do not refute his *claim* that the whole of [the] RFP process was a sham from the start, and malfeasantly [*sic*] administered, in violation of law and the RFP rules themselves." Id. (emphasis added).  However, this claim is unsupported by any evidence.  Plaintiff offers bare conclusory assertions or embellishes facts that are benign on their face (e.g., Mayor Breed recommended Rev. Brown for the Review Panel based on his demonstrated interest in the Center) to buoy otherwise unsupported conclusions (e.g., Defendants "stacked the RFP Panel with cronies masquerading as community representatives").  Speculation and conclusory assertions do not carry Plaintiff's burden at this stage of the proceedings.  Accordingly, Defendants are entitled to summary judgment on the second claim for relief.

### 3.    Civil Conspiracy

In his third claim for relief, Plaintiff alleges a civil conspiracy to commit the fraud, misrepresentation and deceit set forth in the second claim for relief.  TAC ¶¶ 171-175. "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 510-11 (1994).  "Standing alone, a conspiracy does no harm and engenders no tort liability.  It must be activated by the commission of an actual tort." Id.  As discussed in Section III.B.2., *supra*, Plaintiff has not shown that Defendants (or any subset of them) committed fraud, misrepresentation, or deceit.  Accordingly, Defendants are entitled to summary judgment on the third claim for relief.

### C.    RELIEF UNDER RULE 56(h)

As stated above, Defendants separately move to strike Plaintiff's declaration and for relief under Rule 56(h).  Rule 56(h) provides: "If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court--after notice and a reasonable time to respond--may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions."

The motion to strike is predicated on the claim that Plaintiff's declaration contains "blatantly false statements." Mot. to Strike at 2. Specifically, Plaintiff declares that, with respect to his tenant improvement loan, he "always made timely loan payments in accordance with his [*sic*] agreement with *the City*." Shiferaw Decl. ¶ 30 (emphasis added). Defendants assert, however, that Plaintiff's tenant improvement loan was not from the City, but rather, from the former Redevelopment Agency, which was a quasi-state entity separate from the City. According to Defendants, Plaintiff "expanded on [this] falsehood" in his opposition brief by arguing that he had a preexisting commercial relationship *with the City* based on his tenant improvement loan. Mot. to Strike at 3 (citing Opp'n to MSJ at 24). Defendants claim Plaintiff clearly understands that the former Redevelopment Agency and the City are distinct entities because he alleged as much in his TAC. Id. (citing TAC ¶ 4).[12] Defendants argue that Plaintiff's contrary statements were intended to mislead the court.

As a threshold matter, the only argument offered by Defendants to demonstrate the falsity of Plaintiff's statement is as follows: "After the dissolution of redevelopment agencies in California … the California Legislature amended state law to make clear that successor agencies are **separate public entities from the local cities or cities and counties** that provides [*sic*] for its governance and 'the two entities shall not merge.'" Mot. to Strike at 3-4 (citing Cal. Health & Saf. Code § 34173(g) (emphasis in original)). This speaks to the status of OCII, not the former Redevelopment Agency. But see Pac. States Enterprises, Inc. v. Cty. of Coachella, 13 Cal. App. 4th 1414, 1424 (1993) (stating former redevelopment agencies were governmental entities that existed by virtue of state law and were separate and distinct from the communities in which they existed). Additionally, Defendants focus on the legal distinction between the City and Redevelopment Agency, without consideration of their functional relationship. Plaintiff contends the City is and has been involved in the affairs of the

---

[12] Notably, the TAC does not so allege. Rather, it alleges that OCII, the successor agency to the former Redevelopment Agency, is "a quasi-state agency" that has failed to transfer ownership of the Center to the City. TAC ¶ 4.

Redevelopment Agency (and OCII) such that there exists a functional relationship between the same, and thus, a relationship between himself and the City.  Opp'n to Mot. to Strike, Dkt. 141.

In any event, even assuming the falsity of Plaintiff's statement, sanctions are not warranted.  "[C]ourts have found 'bad faith' only where affidavits contained perjurious or blatantly false allegations or omitted facts concerning issues central to the resolution of the case. Awarding sanctions … is 'rare' and the conduct involved generally must be 'egregious.' Additionally, courts have not awarded sanctions under Rule 56[h] where a litigant's actions, even though wrongful, did not affect the disposition of the summary judgment motion." Raher v. Fed. Bureau of Prisons, No. 03:09-CV-00526-ST, 2011 WL 4832574, at *7-8 (D. Or. Oct. 12, 2011) (quoting Abdelkhaleq v. Precision Door of Akron, 653 F. Supp. 2d 773, 787 (N.D. Ohio 2009) (quotations and citations omitted)).  Here, the statement in Plaintiff's declaration is intended to show that he made all loan payments, not that his loan was from the City.  That this statement was then used to bolster a one-sentence, alternative argument in Plaintiff's opposition brief does not justify sanctions.  The argument is inconsequential and goes to the issue of qualified immunity, which ultimately has no bearing on resolution of the motion for summary judgment.  Accordingly, Defendants are not entitled to relief under Rule 56(h).

## IV.   **CONCLUSION**

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1.    Defendants' motion for summary judgment is granted.

2.    Defendants' motion to strike and for relief under Rule 56(h) is denied.

3.    This order terminates Docket Nos. 123 and 135.

IT IS SO ORDERED.

Dated:  3/30/2022

Richard Seeborg
Chief United States District Judge